UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of<br>PIRAEUS BANK<br>for an Order Directing Discovery from The Bank of New York Mellon, Citibank N.A., HSBC Bank (USA) N.A., and JP Morgan Chase Bank N.A. Pursuant to 28 U.S.C. § 1782 | Case No. 20 Misc. ___ |

*EX PARTE* **PETITION OF PIRAEUS BANK FOR JUDICIAL ASSISTANCE IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

Pursuant to 28 U.S.C. § 1782, Piraeus Bank ("Piraeus" or "Petitioner") respectfully submits this Petition seeking an Order permitting it to issue subpoenas for the production of documents to The Bank of New York Mellon ("BNYM"), Citibank N.A. ("Citibank"), HSBC Bank (USA) N.A. ("HSBC"), and JP Morgan Chase Bank N.A. ("JP Morgan") (collectively, "Respondents") that will assist in foreign legal proceedings pending in the courts of England. The proposed forms of the subpoenas *duces tecum* are attached hereto as **Exhibits A-D**.

**I.    PETITIONER'S PURPOSE FOR SEEKING SECTION 1782 DISCOVERY**

1. Petitioner is an interested party in a pending foreign proceeding and respectfully requests that this Court permit it to issue subpoenas for the production of documents to Respondents, all of which are entities that are found in this district. (Hewetson Decl. ¶ 4.)

2. Petitioner requires the requested discovery in connection with a foreign legal proceeding that is currently pending before the Queen's Bench Division of the High Court of Justice, within the Commercial Court (the "English Court") styled as *Piraeus Bank v. Grand Anemi Limited, Grandunion Inc., and Michail (Michael) Zolotas*, Case No. CL-2019-000129 (the "English Proceeding"). (*Id.* ¶ 1.)

   **A.    THE PARTIES IN THE ENGLISH PROCEEDING**

3. Petitioner is the Claimant in the English Proceeding. (*Id.* ¶ 8.) Petitioner is, and was at all relevant times, a banking institution duly incorporated and existing under the laws of

Greece, with its registered office at 4 Amerikis Street, 10564, Athens, Greece.  (*Id*.)

4.     The Defendants in the English Proceeding are Grand Anemi Limited ("Grand Anemi"), Grandunion, Inc. ("Grandunion"), and Michail (Michael) Zolotas ("Zolotas") (collectively, the "English Defendants").  (*Id*. ¶ 9.)

5.     Grandunion is, and was at all relevant times, a company duly organized and existing under the laws of the Republic of the Marshall Islands, with its last known registered office at Trust Company Complex, Ajeltake Islands, Ajeltake Road, Majuro MH9660, the Republic of the Marshall Islands.  (*Id*. ¶ 10.)  Zolotas formed Grandunion in 2007 and the company was in the business of owning and managing shipping vessels.  (*Id*.)  Grandunion was dissolved on August 11, 2016; however, by the operation of Section 105(a) of the Marshall Island's Business Corporations Act, Grandunion continued to exist for, among other things, the purpose of defending any action, suit, or proceeding brought against it within three years of the dissolution.  (*Id*. & Ex. 8)

6.     Grand Anemi is, and was at all relevant times, a company duly organized and existing under the laws of the Republic of Malta, with its last known registered office at 198 Old Baker Street, Valletta, VLT 1455, Malta.  (*Id*. ¶ 11.)  Grand Anemi is a subsidiary of Grandunion and was in the business of owning and managing shipping vessels.  (*Id*.)  Upon information and belief, Grand Anemi has ceased its business and either is insolvent or has been dissolved.  (*Id*.)

7.     Zolotas is a Greek national with a last known address at Chateau Perigord, 6 B (Flat 128) Lacets Saint Leon 98000 Monaco.  (*Id*. ¶ 12.)  Zolotas was in the business of, among other things, operating and managing a fleet of shipping vessels.  (*Id*.)  As of 2006, Zolotas operated and managed a fleet of shipping vessels through an entity that he controlled named Stamford Navigation Inc., which was incorporated in Liberia but operated from Greece.

(*Id.*)  Thereafter, his business was transferred to and run through a vertically integrated shipping enterprise named Newlead Holdings Limited, which was incorporated in Bermuda and listed on the NASDAQ stock exchange between December 2009 and July 2014.  (*Id.*)

### B. SUMMARY OF RELEVANT FACTS

8. On or around August 28, 2009, Marfin Egnatia Bank Societe Anonyme ("Marfin Egnatia" or "Lender") and certain of the English Defendants entered into three loan agreements: (i) a Financial Agreement between Marfin Egnatia, as Lender, and Grand Anemi and another company named Grand Rodosi Inc. ("Rodosi"), as Borrowers ("Loan Agreement"); (ii) a Guarantee and Indemnity between Marfin Egnatia, as Lender, and Grandunion, as Guarantor ( "Grandunion Guarantee"); and (iii) a Personal Guarantee between Marfin Egnatia, as Lender, and Zolotas, as Guarantor ("Zolotas Guarantee").  (*Id.* ¶ 13 & Exs. 5-7.)

9. Pursuant to the Loan Agreement, Marfin Egnatia agreed to make available to Grand Anemi and Rodosi a revolving credit facility in an amount up to USD 112 million for certain specified purposes, namely: (i) up to USD 89.5 million for the refinancing of certain outstanding debt under the company's existing financial agreements; and (ii) certain additional amounts for working and investment capital.  (*Id.* ¶ 14 & Ex. 5 at §§ 1(A), 3.1.)

10. In connection with the Loan Agreement, Grand Anemi and Rodosi agreed to various undertakings, including, as relevant here, that they would: (i) use the loan proceeds in accordance with and for the purposes specified in the Loan Agreement (*id.* at §§ 3.2, 19.23); (ii) not make any loans or advances to, or any investments in, any person, firm, corporation or joint venture (*id.* at § 19.6); (iii) not borrow any money or permit any such borrowing to continue or incur any indebtedness whatsoever (*id.* at § 19.7); and (iv) not, and would ensure that Grandunion and Zolotas would not, without Lender's prior written consent, dispose of or otherwise transfer the Ships (being two bulk carriers owned by Grand Anemi and Rodosi)

or other property, assets or rights owned by them, Grandunion, or Zolotas. (*Id*. at § 19.17.) Grand Anemi and Rodosi also agreed that they would promptly notify the Lender of any Event of Default or matter that might lead thereto (*id*. at § 19.13), which would include, among other things, a transfer or disposal by them, Grandunion, or Zolotas of all or a substantial part of their assets whether by one or a series of transactions, related or not. (*Id*. at § 24.1.8.)

11.     Pursuant to the Grandunion Guarantee and Zolotas Guarantee, Grandunion and Zolotas agreed that they would: (i) irrevocably and unconditionally guarantee the due and punctual payment by Grand Anemi and Rodosi of their obligations under the Loan Agreement; and (ii) discharge the indebtedness of Grand Anemi and Rodosi under the Loan Agreement from time to time when demanded by the Lender together with interest, costs, fees and other expenses. (*Id*. ¶ 16 & Ex. 6 at § 4.1; Ex. 7 at § 4.)

12.     Additionally, in connection with the Grandunion Guarantee and Zolotas Guarantee, Grandunion and Zolotas each agreed to various undertakings, including, as relevant here, that: (i) they would comply, and ensure that each of Grand Anemi, Rodosi, and Zolotas/Grandunion (as applicable) would comply, with all covenants and undertakings set out in the Loan Agreement (*id.* ¶ 17 Ex. 6 at § 8.1.3; Ex. 7 at § 8.3), which included the covenants and undertakings not to transfer, dispose of, or otherwise deal with other property, assets or rights owned by them (*id.* Ex. 5 at §§ 19.17, 24.1.8); (ii) they would promptly notify the Lender of any Event of Default or matter that might lead thereto, and of any occurrence of which it becomes aware which might adversely affect their ability or the ability of Grand Anemi, Rodosi, and Zolotas/Grandunion (as applicable) to perform and discharge their duties and obligations to Lender (*id.* Ex. 6 at § 8.2.3); (iii) they had not taken, and would not take without the prior written consent of the Lender, any security from Grand Anemi, Rodosi, or Zolotas/Grandunion (as applicable) (*id.* Ex. 6 at § 8.3); and (iv) until all amounts due under the Loan Agreement were

paid in full, they would not demand or accept repayment in whole or in part of any loans or advances due from Grand Anemi or Rodosi. (*Id.* Ex. 6 at § 15.2.1; Ex. 7 at § 15.2.1)

13. Following the execution of the Loan Agreement, the Grandunion Guarantee, and the Zolotas Guarantee, Marfin Egnatia performed its obligations under the Loan Agreement by making available the revolving credit facility, and Grand Anemi drew on the facility in the cumulative amount of € 120,424,892.70, including € 109,195,785.14 on August 28, 2009 and € 11,299,107.56 on August 26, 2010. (*Id.* ¶ 18.)

14. On or around March 31, 2010, Marfin Egnatia, Grand Anemi, and Rodosi executed a side letter pursuant to which Marfin Egnatia agreed to release Rodosi from its obligations under the Loan Agreement and other finance documents to which it was a party. (*Id.* ¶ 19.)  This side letter in favor of Rodosi did not effect a release of Grand Anemi from its obligations under the Loan Agreement, nor did it release Zolotas and Grandunion from their respective guarantees.

15. Between September 2, 2009 and July 30, 2012, Grand Anemi made € 71,425,512.53 in repayments pursuant to the Loan Agreement, including in respect of capital, fees, expenses, and interest (often at a penalty rate). (*Id.* ¶ 20 & Ex. 10.)  Significantly, part of the capital was repaid prior to the second drawdown on August 26, 2010 (which is why the cumulative drawdown amount exceeds the USD 112 million that was made available under the Loan Agreement). (*Id.*)

16. In or around March 2011, Marfin Egnatia was acquired by Marfin Popular Bank Public Co. Ltd. ("Marfin Popular"). (*Id.* ¶ 21.)  Approximately one year later, on or around April 5, 2012, Marfin Popular changed its name to Cyprus Popular Bank Public Co. Ltd. ("Cyprus Popular"). (*Id.*)

17. After July 30, 2012, Grand Anemi ceased paying interest due pursuant to Clause

7.1 of the Loan Agreement, and also failed to pay a renewal fee due pursuant to Clause 26.1 of the Loan Agreement. (*Id*. ¶ 22.)

18. By email dated February 26, 2013, Cyprus Popular demanded payment of the overdue interest and the renewal fee by close of business Athens time on February 28, 2013, but no payment was made. (*Id*. ¶ 23.)

19. By letter dated March 1, 2013 (sent by hand and by fax), Cyprus Popular notified Grand Anemi and Grandunion that: (i) they were in breach of the Loan Agreement; (ii) such breaches constituted an Event of Default; and (iii) the facility therefore was cancelled and/or had expired, and the "[i]ndebtedness [in the total amount of USD 59,846,742.53] is immediately due and payable." (*Id*. ¶ 24 & Ex. 11.)

20. In or around early 2013, during the Cypriot financial crisis, Cyprus Popular was restructured in a process that was overseen by the governments of Greece and Cyprus. (*Id*. ¶ 25.) As part of that process, specific assets of Cyprus Popular relating to its Greek business were sold to Petitioner, including the rights under the Loan Agreement, the Grandunion Guarantee, and the Zolotas Guarantee. (*Id*.) The sale took effect by the following instruments: (i) a Sale and Transfer Agreement dated March 26, 2013 between Cyprus Popular and Piraeus; (ii) Decree No. 97/26-3-2013 of the Central Bank of Cyprus; and (iii) Decision No. 66/26-3-2013 of the Bank of Greece. (*Id*. ¶ 25 & Exs. 12-14.)

21. Thus, on March 26, 2013, Petitioner became a special successor to Cyprus Popular and succeeded to all of the rights and obligations of Marfin Egnatia and Cyprus Popular set out in the Loan Agreement, the Grandunion Guarantee, and the Zolotas Guarantee. (*Id*. ¶ 26.)

22. In or around 2014, Zolotas met with representatives of Petitioner to discuss the restructuring of the liabilities owed to it by Zolotas and his related entities, including the amounts due under the Loan Agreement, the Grandunion Guarantee, and the Zolotas Guarantee.

(*Id.* ¶ 27.)  Following that meeting, Zolotas pledged a number of further securities as collateral securing his indebtedness to Petitioner.  (*Id.*)

23. In or around January 2016, Zolotas submitted a further proposal for restructuring his and his entities' debt obligations to Petitioner; however, the parties ultimately did not reach a resolution and the liabilities under the Loan Agreement, the Grandunion Guarantee, and the Zolotas Guarantee remain outstanding.  (*Id.* ¶ 28.)

      C.      **THE ENGLISH PROCEEDING**

24. The English Proceeding was commenced on February 27, 2019, after the English Court issued and sealed Petitioner's Claim Form CL-2019-000129 against the English Defendants.  (*Id.* ¶ 29 & Ex. 15.)

25. On June 6, 2019, Petitioner filed a Claim Form and Particulars of Claim against Grand Anemi, Grandunion, and Zolotas with the English Court.  (*Id.* ¶ 30 & Ex. 16.)

26. As set out in the Claim Form and Particulars of Claim, Petitioner has asserted claims against the English Defendants for their numerous breaches of the Loan Agreement, the Grandunion Guarantee, and the Zolotas Guarantee. (*Id.* ¶ 31 & Exs. 15-16.)  In particular, Petitioner has alleged that the English Defendants breached the relevant agreements by failing to make payments of all overdue loan principal and interest.

27. Petitioner also has alleged, among other things, that the English Defendants breached the relevant agreements by dissipating assets and failing to provide notice of the Event of Default that occurred by virtue of their dissipation of assets.  (*Id.* ¶ 31 & Ex. 16 at ¶¶ 22.2-22.4, 26.)

28. Consistent with English law, Petitioner also expressly has reserved the right to amend and/or amplify its case upon disclosure in the English Proceeding and/or upon the discovery of any new material relating to the breach of the Loan Agreement, the Grandunion

Guarantee, and the Zolotas Guarantee.  (*Id*. ¶ 31 & Ex. 16 at ¶ 15.)

29. Petitioner is seeking to recover damages in the amount of at least USD 85,557,894.70, consisting of USD 53,718,984.79 in principal and USD 31,838,909.91 in accrued interest as of June 3, 2019.  (*Id*. ¶ 32 & Ex. 16 at ¶ 27.)

30. On June 7, 2019, Petitioner served the Claim Form, Particulars of Claim and all other necessary documents (the "Initiating Documents") on Grand Anemi's and Grandunion's irrevocably appointed London service agent, HFW Nominees Limited ("HFW").  (*Id*. ¶ 33.)

31. On June 11, 2019, HFW purported to resign from its appointment as Grand Anemi's and Grandunion's designated London service agent.  (*Id*. ¶ 34.)

32. On June 26, 2019, Petitioner lodged an application to the English Court seeking, among other things, a declaration from the English Court that it properly had served the English Defendants with all documents required to be served to institute the English Proceeding (the "Service Application").  (*Id*. ¶ 35.)

33. On July 18, 2019, counsel for Petitioner appeared before Mr. Justice Jacobs of the English Court to argue the Service Application.  (*Id*. ¶ 36)  On July 18, 2019, Justice Jacobs granted the Service Application, finding, among other things, that: (i) Petitioner successfully served the Initiating Documents on Grand Anemi and Grandunion via HFW; (ii) Petitioner is permitted to serve the Initiating Documents on Zolotas in Greece via Zolotas' designated service agent, Mr. George Livanos; and (iii) Zolotas is a necessary and proper party to the English Proceeding.  (*Id*. ¶ 36 & Ex. 17.)

34. On September 13, 2019, the Foreign Process Section of the English Court approved Initiating Documents against Zolotas. (*Id*. ¶ 37.)  Consistent with the English Court's direction, on September 19, 2019, Petitioner posted the Initiating Documents to Zolotas' designated service agent, Mr. Livanos. (*Id*.)

35. Between September 26, 2019 and October 7, 2019, Petitioner attempted service on Mr. Livanos six separate times, but Mr. Livanos refused to accept service of the Initiating Documents on behalf of Zolotas. (*Id.* ¶ 38.) Petitioner lodged an application with the English Court seeking a declaration that: (i) steps already taken to serve the Initiating Documents on Zolotas amounts to valid service under English Law or, in the alternative (ii) service on Zolotas can be dispensed with altogether. (*Id.*)

36. A hearing on the merits in the English Proceeding took place on March 13, 2020. By Order dated March 13, 2020 (which was amended on 30 March 2020 under the "slip rule" to include wording required under English Civil Procedure Rule 6.15) the Court declared that service upon Zolotas had been validly effected. (*Id.* ¶ 39.) In addition, Jacobs J granted Piraeus permission to serve Zolotas via alternative means pursuant to CPR 6.15, if so advised. (*Id.*)

37. A Case Management Conference (the "CMC") in the English Proceeding is fixed for 26 June 2020. The CMC will determine the dates for completing the various preparatory stages leading up to trial. These include, in particular, dates for disclosure of documents, the filing of witness statements, and the date of the trial. (*Id.* ¶ 40.) Importantly, the parties are allowed to submit evidence in support of their claims until several months prior to the hearing on the merits. (*Id.*)

## D. DOCUMENTS IN THE POSSESSION, CUSTODY, AND CONTROL OF RESPONDENTS

38. As set forth below, upon information and belief, Respondents are in possession, custody, and control of discrete categories of documents relating to the claims advanced by Petitioner in the English Proceedings, specifically with respect to the English Defendants' breaches of their undertakings regarding the use of loan proceeds and the dissipation of assets by Grand Anemi, Grandunion, and Zolotas as they specifically agreed they would not do. (*Id.* ¶ 41.)

39. For example:

      a.      BNYM acted as an intermediary bank for wire transfers that were originated by Zolotas from an account at Marfin Egnatia on September 14, 2009; November 17, 2009; July 6, 2010; July 9, 2010; July 15, 2010; July 18, 2010; July 23, 2010; July 30, 2010; April 29, 2011; May 18, 2011; and May 20, 2011.  It also acted as the beneficiary bank for one of the wire transfers on November 17, 2009.

      b.      Citibank acted as the beneficiary bank for a wire transfer that was originated by Zolotas from an account at Marfin Egnatia on July 30, 2010.

      c.      HSBC acted as an intermediary bank for a wire transfer that was originated by Zolotas from an account at Marfin Egnatia on May 20, 2011.

      d.      JP Morgan acted as the beneficiary bank for wire transfers that were originated by Zolotas from an account at Marfin Egnatia on September 14, 2009; November 17, 2009; July 6, 2010; July 16, 2010; July 18, 2010; April 29, 2011; May 18, 2011; and May 20, 2011.

(*Id.* ¶¶ 42-45 & Exs. 18-21.)

40.    Moreover, documents submitted in a New York state court action styled *TransAsia Commodities Investment Ltd. v. Zolotas, et al.* (Index No. 150312/2018) (the "New York Action") amplify Zolotas' relevant connections to Citibank.  (*Id.* ¶ 46.)  In the New York Action, plaintiff TransAsia Commodities Investment Ltd. ("TransAsia") seeks to enforce a USD 22 million judgment obtained by TransAsia against, *inter alia*, Zolotas in December 2017 (the "Judgment").  Zolotas and two entities controlled by Zolotas—Aurora Properties (USA) LLC ("Aurora USA") and Aurora Properties, Inc. ("Aurora Marshall")—are named as defendants in the New York Action.  (*Id.*)

41.    In the New York Action, TransAsia seeks information relating to a turnover of a

condominium unit owned by Aurora USA to satisfy a portion of the Judgment. (*Id*. ¶ 47.)

42. In support of its application, TransAsia submitted evidence, in the form of bank account statements and transfer forms, demonstrating Zolotas' frequent use of Citibank accounts for purposes of moving and transferring his assets. For example, Aurora USA's bank account record show that Zolotas: (i) transferred approximately USD 871,686.64 from Aurora USA's Citibank account to a joint Citibank account held by Zolotas and his wife; (ii) made over USD 119,906 in withdrawals from Aurora USA's Citibank account between 2010 and 2015; and (iii) credited approximately USD 2.6 million in Aurora USA's bank account. (*Id*. ¶ 46 & Exs. 22-24.)

43. These transfers directly correspond to allegations made by Petitioner in the English Proceeding. There, Petitioner alleges that each of the English Defendants breached their respective loan agreement and guarantees by dissipating assets and failing to provide notice of the Event of Default that occurred by virtue of their dissipation of assets. (*Id*. ¶ 49 & Ex. 16 at ¶¶ 22.2-22.4, 26.) Specifically, the English Defendants breached the relevant agreements by failing to obtain Petitioner's prior written consent for a May 28, 2010 transfer of Zolotas' ownership in 500 shares in Aurora Marshall to Zolotas' wife. (*Id.* & Ex. 16 at ¶ 26.)

44. In light of their roles as intermediary banks and/or beneficiary banks for the foregoing transactions, Respondents likely are to have possession, custody, and control of documents concerning the use of the loan proceeds and dissipation of assets, which will aid the English Court in resolving Petitioner's claims that the English Defendants breached the Loan Agreement, the Grandunion Guarantee, and the Zolotas Guarantee. (*Id*. at ¶ 50.)

II. **THE REQUIREMENTS OF SECTION 1782 ARE SATISFIED**

45. "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals."

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004); *see also Application of Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993) ("The primary intent of the amendments [to § 1782] was to 'clarif[y] and liberalize . . . existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and documentary evidence in the United States'") (quoting S. Rep. No. 88-1580, at 7, *reprinted in* 1964 U.S.C.C.A.N. 3782).

46. Section 1782 provides, in relevant part, that:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person . . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).

47. Accordingly, a district court is authorized to grant a Section 1782 petition and order discovery if three requirements are met: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012); *see also In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017); *In re Esses*, 101 F.3d 873, 875 (2d Cir. 1996). Moreover, courts in this district have held that "it is neither uncommon nor improper for district courts to grant applications made pursuant to [Section 1782] *ex parte*." *Gushlak v. Gushlak*, 486 Fed. Appx. 215, 217 (2d Cir. 2012); *accord In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2016) ("We also reject Adelson's suggestion that it was impermissible or improper for O'Keeffe to bring her application *ex parte*.") Here, all three of the statutory requirements are satisfied.

48. ***First***, each of the Respondents is a New York entity and/or has its principal place of business in New York, New York. (Hewetson Decl. ¶ 4 & Exs. 1-4.) More specifically:

    a. BNYM is a New York corporation, with its principal place of business located at 240 Greenwich Street, New York, NY 10286. (*Id.* ¶ 4(a) & Ex. 1.)[1]

    b. Citibank is a New York corporation, with its principal place of business located at 388 Greenwich Street, New York, NY 10013. (*Id.* ¶ 4(b) & Ex. 2.)[2]

    c. HSBC is a Delaware corporation, with its principal place of business located at 452 Fifth Avenue, New York, NY (*Id.* ¶ 4(c) & Ex. 3.).[3]

    d. JP Morgan is a Texas corporation, with its principal place of business located at 4 New York Plaza, New York, NY 10004. (*Id.* ¶ 4(d) & Ex. 4.)[4]

49. Accordingly, each of the Respondents is found in this district for purposes of Section 1782. *See In re Iraq Telecom Ltd.*, No. 18-MC-458 (LGS) (OTW), 2019 WL 3798059, at *3 (S.D.N.Y. Aug. 13, 2019) (granting application for Section 1782 seeking production of documents from*, inter alia*, Citibank, BNYM, and HSBC, and finding such corporations "conduct business in this District"). Moreover, Petitioner is seeking the production of documents that are located within this district.

50. ***Second***, the discovery sought is "for use" in the English Proceeding, which is a "proceeding before a foreign or international tribunal." (Hewetson Decl. ¶ 1) Proceedings

---

[1] *See* Ex. 1, *Contact*, BNY MELLON, https://www.bnymellon.com/us/en/contact.jsp (last visited May 6, 2020).
[2] *See* Ex. 2, *Citibank, N.A.* SEC, https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0000036684&owner=exclude&count=40&hidefilings=0 (last visited May 6, 2020).
[3] *See* Ex. 3, HSBC HOLDINGS PLC & HSBC BANK USA, NATIONAL ASSOCIATION, U.S. RESOLUTION PLANS ¶ 3.2.3.3 (2015), https://www.fdic.gov/regulations/reform/resplans/plans/hsbc-idi-1512.pdf.
[4] *See* Ex. 4, *JP Morgan Chase Bank*, *N.A.*, SEC https://www.sec.gov/Archives/edgar/data/1327421/000001961716001021/0000019617-16-001021-index.htm (last visited May 6, 2020).

before the English Court, like the English Proceeding, have been recognized expressly as sufficient to satisfy the "international tribunal" prong of the Section 1782 test. *See, e.g., La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 361-62 (S.D.N.Y. 2014).

51. Significantly, the Second Circuit has ruled that "discovery sought pursuant to [Section 1782] need not be necessary for a party to prevail in the foreign proceeding" but rather must merely be "something that will be employed with some advantage or serve some use in the proceeding." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015). Moreover, "the foreign proceeding need not be pending, so long as it is 'within reasonable contemplation.'" *Id.* at 299 (quoting *Intel*, 542 U.S. at 259). Here, the requested discovery will unquestionably serve some use in the English Proceeding (which already has been commenced and is not merely "contemplated"), namely supporting Petitioner's allegations that the English Defendants breached the Loan Agreement, the Grandunion Guarantee, and the Zolotas Guarantee relating to the use of the loan proceeds and the non-dissipation of assets. Hewetson Decl. ¶ 5; *see also In re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries & other non-participants for use in Actions Pending in the Norway*, 249 F.R.D. 96, 99, 107 (S.D.N.Y. 2008) (granting application for Section 1782 discovery for use in foreign litigation involving claim for breach of contract).

52. Evidence of any transfer of assets by Respondents through bank account records goes directly to the Petitioner's principal allegations in the English Proceeding.

53. **Third**, Petitioner is an "interested person" within the meaning of 28 U.S.C. § 1782 because it is the claimant in the English Proceeding. Hewetson Decl. ¶ 8; *see also Intel*, 542 U.S. at 256 (explaining that there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke [Section 1782]"); *Lancaster Factoring Co. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) ("The legislative history to §

1782 makes plain that 'interested person' includes 'a party to the foreign ... litigation.'") (quoting S. Rep. No. 88-1580, at 8, *reprinted in* 1964 U.S.C.C.A.N. at 3789).

54. Accordingly, all three of the statutory requirements are satisfied.

## III. THE *INTEL* FACTORS WEIGH IN FAVOR OF GRANTING THE PETITION

55. The Supreme Court has identified four discretionary factors that a district court should consider when ruling on a Section 1782 application: (i) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (ii) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign . . . court or agency abroad to U.S. federal-court judicial assistance"; (iii) "whether the [Section 1782] request conceals an attempt to circumvent foreign proof-gathering restrictions; and (iv) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S at 264-65; *see also In re Catalyst Managerial Servs., DMCC*, 680 F. App'x 37, 38 (2d Cir. 2017) (summary order); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80-81 (2d Cir. 2012). Here, all four of the *Intel* factors weigh in favor of granting the Petition.

56. ***First***, none of the Respondents is a participant in the English Proceeding. Hewetson Decl. ¶ 6; *cf. Intel*, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . ., the need for [Section 1782] aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.")

57. ***Second***, there is no indication, or reason to believe, that the English Court would be unreceptive to U.S. federal-court judicial assistance by way of Section 1782 discovery. Hewetson Decl. ¶ 7; *see also In re Application of 000 Promneftstroy for an Order to Conduct Discovery for use in a Foreign Proceeding*, 134 F. Supp. 3d 789, 792 (S.D.N.Y. 2015) ("The Court of Appeals for the Second Circuit has instructed district courts to 'consider only

authoritative proof that a foreign tribunal would reject evidence obtained with the aid of [§] 1782.'")) (quoting *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir.1995)). Indeed, courts in this district routinely grant applications for Section 1782 discovery in connection with proceedings in England.  *See, e.g., In re Catalyst Managerial Servs., DMCC*, 680 F. App'x at 38, 41; *In re Children's Inv. Fund Found. (UK)*, 363 F. Supp. 3d 361, 364, 379 (S.D.N.Y. 2019); *Kraus*, 62 F. Supp. at 361-62.

58.     ***Third***, this application is not an attempt to circumvent any foreign proof-gathering restrictions and does not violate any English Court restrictions on gathering evidence. Hewetson Decl. ¶ 7; *see also La Suisse*, 62 F. Supp. at 362 ("There is no reason to believe that the effort to obtain discovery here will circumvent any policies of the U.K. regarding discovery").  In any event, the Second Circuit has held that there is no rule "requiring parties seeking discovery under [Section] 1782 to demonstrate that the information would be discoverable in the foreign jurisdiction." *Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 98 (2d Cir. 2009) (citing *Intel*, 542 U.S. at 261); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("Accordingly, as a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application").

59.     ***Finally***, the document sought by the proposed subpoenas are neither unduly burdensome nor intrusive.  Indeed, the proposed subpoenas have been narrowly tailored to seek discrete categories of documents that are likely to be in the possession, custody, or control of Respondents and relevant to the English Proceeding.  *See generally In re Application of Hornbeam Corp.*, 14 MC 424, 2014 WL 8775453, at *2 (S.D.N.Y. Dec. 24, 2014) ("In response to subpoenas containing similar language, the Banks have searched their electronic transaction databases for the relevant terms and have timely provided counsel with

simple electronic spreadsheets listing basic information relating to any wire transfers that satisfy the search parameters")  Moreover, and in any event, the Respondents will have all their rights protected under Rule 45 of the Federal Rules of Civil Procedure and may raise any proper objections each might have.

60. Accordingly, all four of the *Intel* discretionary factors weigh in favor of granting the Petition.

## **CONCLUSION**

WHEREFORE, because the Petition complies with the requirements of 28 U.S.C. § 1782 and the discretionary factors weigh in favor of it being granted, Petitioner respectfully moves the Court to issue an order, in the proposed, or substantially similar, form as **Exhibit E**: granting the Petition, authorizing the issuance of the subpoenas in the form attached hereto as **Exhibits A-D**, and authorizing Petitioner to issue additional subpoenas for the production of documents as it reasonably deems appropriate and as is consistent with the Federal Rules of Civil Procedure.

Dated:  May 8, 2020

Respectfully submitted,

By: _____/s/_____
      Thomas Vandenabeele

KELLNER HERLIHY GETTY & FRIEDMAN LLP
*Attorneys for Piraeus Bank*
470 Park Avenue South–7th Floor
New York, NY 10016-6819
Telephone: 212-889-2121
Email: tv@khgflaw.com