# EXHIBIT 5

Dated 28 August 2009


MARFIN EGNATIA BANK Societe Anonyme
as Lender


-and-


GRAND RODOSI INC
and
GRAND ANEMI LIMITED
as joint and several Borrowers


**FINANCIAL AGREEMENT**
Revolving Credit Facility of up to US $112,000,000




**INDEX**

1.   PURPOSE
2.   DEFINITIONS .......................................................................................... 1
3.   THE FACILITY – THE BORROWERS JOINT AND SEVERAL LIABILITY ....... 1
4.   AVAILABILITY – DESIGNATED TRANSACTIONS ............................... 17
5.   NOTICE OF DRAWDOWN ............................................................... 18
6.   INTEREST PERIODS ...................................................................... 20
7.   INTEREST .................................................................................... 21
8.   DEFAULT INTEREST ..................................................................... 22
9.   SUBSTITUTE BASIS ...................................................................... 22
11.  REPAYMENT ................................................................................ 23
12.  APPLICATION ............................................................................... 28
13.  EVIDENCE OF DEBT ..................................................................... 29
14   PAYMENTS ................................................................................... 29
15   CHANGE OF CIRCUMSTANCES .................................................... 30
16.  REPRESENTATIONS AND WARRANTIES ....................................... 31
17.  SECURITIES ................................................................................. 32
18   CONDITIONS PRECEDENT AND CONDITIONS SUBSEQUENT ......... 37
19   FINANCIAL AND GENERAL UNDERTAKINGS ................................... 41
20.  INSURANCE UNDERTAKINGS ....................................................... 44
21.  OPERATIONAL UNDERTAKINGS .................................................... 47
22   EARNINGS ACCOUNTS ................................................................. 52
23.  SECURITY MARGIN ...................................................................... 53
24.  EVENTS OF DEFAULT ................................................................... 53
25   SET-OFF ...................................................................................... 57
26   FEES ........................................................................................... 57
27.  EXPENSES ................................................................................... 57
28   INDEMNITY ................................................................................... 58
29   ENVIRONMENTAL INDEMNITY ...................................................... 58
30.  STAMP DUTIES ............................................................................. 58
31.  DETERMINATIONS ........................................................................ 58
32   NO WAIVER .................................................................................. 59
33   PARTIAL INVALIDITY ..................................................................... 59
34.  TRANSFER, ASSIGNMENT, PARTICIPATION, CHANGE OF LENDING BRANCH 59
35.  NON-IMMUNITY ............................................................................ 60
36.  NOTICES ...................................................................................... 60
37   SUPPLEMENTAL ........................................................................... 61
38   LAW AND JURISDICTION .............................................................. 62
39   THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS ........... 63

SCHEDULE 1 - FORM OF NOTICE OF DRAWDOWN ............................. 65
SCHEDULE 2 - FORM OF ACKNOWLEDGEMENT ................................. 67
SCHEDULE 3 - FORM OF BUDGET ..................................................... 68

THIS AGREEMENT is made the 28th day of August 2009

BETWEEN

1)      **MARFIN EGNATIA BANK Societe Anonyme** as lender; and

2)      **GRAND RODOSI INC.** and **GRAND ANEMI LIMITED** as joint and several borrowers

**1.      PURPOSE**

A.      This Agreement sets out the terms and conditions on which the Lender has agreed to make available to the Borrowers as joint and several borrowers a revolving credit facility, not exceeding at any relevant time the aggregate amount of One hundred Twelve million Dollars ($112,000,000) in multiple Advances in the following amounts and for the following purposes:

(i)     an Advance of up to Eighty Nine million Five hundred thousand Dollars ($89,500,000) for the purpose of refinancing in full certain outstanding indebtedness in relation to, *inter alia*, the Ships pursuant to the Existing Financial Agreements; and

(ii)    Advances in amounts approved by the Lender for the purpose of providing the Borrowers with working and investment capital.

B.      The Borrowers and the Lender have agreed to enter into Designated Transactions with the Lender pursuant to separate Confirmations.

**2.      DEFINITIONS**

2.1     In this Agreement the following terms shall have the following meanings, unless the context otherwise requires:

"**Acquisition**" means the acquisition by the Grandunion Guarantor of the Acquisition Shares of Aries Maritime on the terms of the Acquisition Documents;

"**Acquisition Date**" means the date on which Aries Maritime shall issue and sell to the Grandunion Guarantor and the Grandunion Guarantor shall purchase from Aries Maritime the Acquisition Shares;

"**Acquisition Documents**" means the LOI and any other document designated as an "Acquisition Document" by, *inter alios*, the Lender in connection with, *inter alia*, the Acquisition as the same may from time to time be amended, varied or supplemented and, in the singular, means any of them;

"**Acquisition Shares**" means 15,977,778 newly issued common shares, par value $0.01 per share of Aries Maritime and/or such other shares of the Aries Maritime, which shall be acquired by the Grandunion Guarantor pursuant to the Acquisition Documents;

1

**"Advance"** means the principal amount of each borrowing by the Borrowers under this Agreement (including for the avoidance of doubt each of the Refinancing Advance and the Working and Investment Capital Advances) or, if the context may require, so much thereof as shall for the time being be outstanding to the Lender hereunder or, as the case may be, the principal amount of that portion of each borrowing by the Borrowers under this Agreement for which the Borrowers select an Interest Period of a particular duration and, in the plural, means all of them;

**"Alpha Bulkers"** means Alpha Bulkers Inc., a corporation organised and existing under the laws of the Republic of the Marshall Islands, having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands;

**"Alpha Bulkers Shares"** means Five hundred (500) registered shares of no par value of Alpha Bulkers owned by the Grandunion Guarantor;

**"Alpha Bulkers Shares' Pledge"** means a first priority charge over the Alpha Bulkers Shares to be executed by the Grandunion Guarantor to secure the due payment of the Indebtedness in form and substance satisfactory to the Lender in its sole discretion, as the same may from time to time be further amended, varied or supplemented with the Lender's prior written consent;

**"Anemi Charter"** means the time charter dated 5 March 2008, as amended by addendum no 1 dated 2 June 2009 in respect of the Anemi Ship made between the Anemi Owner as owner and the Anemi Charterer as charterer for a period of eight (8) years or the Anemi Ship's dry-dock date, whichever is earlier and at a minimum daily hire rate of Twelve thousand Seven hundred ($12,700), as the same may from time to time be amended, varied or supplemented, with the Lender's prior written consent;

**"Anemi Charterer"** means Samsun Logix Corporation of Seoul, South Korea;

**"Anemi Earnings Account"** means the interest bearing deposit account opened by the Anemi Owner with the Lender numbered 0168999424 into which all the Earnings of the Anemi Ship are to be paid, in accordance with Clause 21 2, such account to include any substitute account or sub-account or revised account or revised designation or number whatsoever and any deposit account to which monies from the Anemi Earnings Account may from time to time be paid on a time deposit basis;

**"Anemi Owner"** means Grand Anemi Limited, a company duly formed and existing under the laws of the Republic of Malta, having its registered office at 198 Old Baker Street, Valletta, Malta;

**"Anemi Ship"** means the m.v. "GRAND ANEMI", a bulk carrier vessel, with gross tonnage of 41,688 tons and net tonnage of 25,530 tons, registered in the ownership of the Anemi Owner under the Maltese flag;

**"Applicable Accounting Principles"** means those accounting principles, standards and practices on which preparation of the Financial Statements is based, which are International Financial Reporting Standards (IFRS) and principles and practices adopted by the Grandunion Guarantor and its Subsidiaries at the date hereof or at any time hereafter and notified to and accepted by the Lender;

**"Applicable Limit"** means the maximum amount available for drawing hereunder at any relevant time and being on the date hereof One hundred Twelve million Dollars ($112,000,000) at it may be reduced in accordance with the provisions of this Agreement;

**"Applicable Margin"** means three point seventy five per cent (3.75 %) per annum;

**"Approved Brokers"** means the insurance brokers appointed by the Borrowers with the Lender's prior approval;

**"Aries Maritime"** means Aries Maritime Transport Limited, a company organized and existing under the laws of Bermuda, having its registered office at Canon's Court, 22 Victoria Street, Hamilton, Bermuda;

**"Aries Maritime Shares"** means 13,311,111 shares of Aries Maritime to be acquired by the Grandunion Guarantor upon completion of the Acquisition;

**"Aries Maritime Shares' Pledge"** means in relation to Aries Maritime, a first priority pledge and/or charge over the Aries Maritime Shares to be executed by the Grandunion Guarantor on or immediately prior to the Acquisition Date to secure the due payment of the Indebtedness in form and substance satisfactory to the Lender in its sole discretion, as the same may from time to time be further amended, varied or supplemented with the Lender's prior written consent;

**"Auditors"** means any first class firm of international accountants to be approved by the Lender;

**"Availability Period"** means the period commencing from the date of this Agreement and ending on the Termination Date;

**"Banking Day"** means a day on which banks and financial markets are open for business in Athens, New York and London and any other financial centre which the Lender may deem appropriate for the operation of the provisions of this Agreement;

**"Borrowers"** means together the Anemi Owner and the Rodosi Owner and, in the singular, means either of them;

**"Budget"** means, in respect of each Ship, a budget substantially in the form set out in Schedule 3 referred to in Clause 19.27;

"**Charter Assignment**" means in relation to each Ship, the first priority deed of assignment of the Charter in respect of that Ship made or, as the context may require, to be made between the Owner thereof and the Lender in form and substance satisfactory to the Lender in its sole discretion as the same may from time to time hereafter be amended, varied or supplemented and, in the plural, means both of them;

"**Charterers**" means together the Anemi Charterer and the Rodosi Charterer and, in the singular, means either of them;

"**Charters**" means together the Anemi Charter and the Rodosi Charter and, in the singular, means either of them;

"**Classification Society**" means, in respect of each Ship, Bureau Veritas, or such other classification society member of the IACS, as may be approved in writing by the Lender;

"**Commitment Letter**" means the letter dated 17 August 2009, issued by the Lender addressed to the Borrowers and the Grandunion Guarantor and accepted by the Grandunion Guarantor for and on behalf of itself, the Borrowers and the Personal Guarantor on 18 August 2009;

"**Compulsory Acquisition**" means requisition for title or other compulsory acquisition, requisition, appropriation, expropriation, deprivation, forfeiture or confiscation for any reason of a Ship by any Government Entity or other competent authority, whether de jure or de facto, but shall exclude requisition for use or hire not involving requisition of title;

"**Confirmation**" in relation to any continuing Designated Transaction, has the meaning given to it in the Master Agreement;

"**Control**" means in relation to a body corporate:

(a)     the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

     (i)     cast, or control the casting of, more than fifty per cent (50%) of the maximum number of votes that might be cast at a general meeting of such body corporate; or

     (ii)     appoint or remove all, or the majority, of the directors or other equivalent officers of such body corporate; or

     (ii)     give directions with respect to the operating and financial polices of such body corporate with which the directors or other equivalent officers of such body corporate are obliged to comply; and/or

(b)     the holding beneficially of more than fifty per cent (50%) of the issued share capital of such body corporate (excluding any part of that issued capital that carries no

4

right to participate beyond a specified amount in a distribution of either profits or capital),

and "**Controlled**" shall be construed accordingly;

"**Default Rate**" means the interest rate referred to in Clause 8.1;

"**Demand Date**" means the date on which the Lender shall make a demand upon the Borrowers for repayment of the Facility in accordance with Clause 11.1;

"**Designated Transaction**" means a Transaction which fulfils the following requirements:

(a)     it is entered into by the Borrowers pursuant to the Master Agreement with the Lender; and

(b)     its purpose is the hedging of the Borrowers' exposure under this Agreement to fluctuations in LIBOR arising from the funding of the Facility (or any part thereof) for a period expiring no later than the Repayment Date;

"**Dollars**" or "**$**" means the lawful currency for the time being of the United States of America;

"**Drawdown**" means the making of an Advance by the Lender to the Borrowers;

"**Drawdown Date**" means, in relation to each Advance, the date requested by the Borrowers for that Advance to be made available or (as the context requires) the date on which that Advance is actually made available;

"**Early Termination Date**", in relation to any continuing Designated Transaction, shall have the meaning given to it in the Master Agreement;

"**Earnings**" means in relation to each Ship all freight, hire, passage monies and any other amounts whatsoever which may at any time be earned by or become payable to or for the account of the Owner of that Ship or its agents arising out of or as a result of the ownership, possession, management and/or operation of that Ship by the Owner thereof or its agents or under any charter (including, without limitation, each Charter), contract or carriage or other contract (including a salvage or towage contract) for the use, operation or management of that Ship, all payments for any variation of any such contract and all damages for any breach of any such contract, all general average and salvage remuneration and all compensation for requisition for hire;

"**Earnings Account**" means in relation to:

(a)     the Rodosi Ship, the Rodosi Earnings Account; and

(b)     the Anemi Ship, the Anemi Earnings Account;

5

and, in the plural, means both of them;

"**Earnings Account Charge**" means in relation to each Earnings Account the first priority assignment, pledge and charge granted or, as the context may require, to be granted by the relevant Borrower to the Lender on any monies standing the credit of that Earnings Account in form and substance satisfactory to the Lender as the same may from time to time hereafter be amended, varied or supplemented and, in the plural, means both of them;

"**Encumbrance**" means a mortgage, pledge, lien, charge (whether fixed or floating), assignment, hypothecation, security interest, title retention, preferential right or trust arrangement and any other security agreement or arrangement whether now existing or arising in the future on the assets or revenue of the Borrowers or either of them or any other Security Party other than a pledge or lien arising by operation of law;

"**Environmental Approvals**" means any permit, licence, approval, ruling, certification, exemption or other authorisation relating to the Ships or either of them required under applicable Environmental Laws;

"**Environmental Claim**" means:

(a)     any claim by any governmental, judicial or regulatory authority which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law; or

(b)     any claim by any other person which relates to an Environmental Incident or to an alleged Environmental Incident;

and "**claim**" means a claim for damages, compensation, fines, penalties or any other payment of any kind whether or not similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset;

"**Environmental Incident**" means:

(a)     any release of Environmentally Sensitive Material from a Relevant Ship; or

(b)     any incident in which Environmentally Sensitive Material is released from a vessel other than a Relevant Ship and which involves a collision between a Relevant Ship and such other vessel or some other incident of navigation or operation, in either case, in connection with which a Relevant Ship is actually or potentially liable to be arrested, attached, detained or injuncted and/or a Relevant Ship and/or any owner and/or any other operator or manager thereof is at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident in which Environmentally Sensitive Material is released otherwise than from a Relevant Ship and in connection with which any Relevant Ship is actually or potentially liable to be arrested and/or where any owner and/or

6

any operator or manager of any Relevant Ship is at fault or otherwise liable to any legal or administrative action;

"**Environmental Law**" means any law relating to pollution or protection of the environment, to the carriage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material;

"**Environmentally Sensitive Material**" means oil, oil products and any other substance (including any chemical, gas or other hazardous or noxious substance), which is (or is capable of being or becoming) polluting, toxic or hazardous;

"**Event of Default**" means any event referred to in Clause 24;

"**Excess Risks**" means in relation to each Ship the proportion of claims for general average and salvage charges and under the ordinary running-down clause, which is not recoverable in consequence of the value at which that Ship is assessed for the purpose of such claims exceeding her insured value;

"**Existing Borrowers**" means collectively the Borrowers, Grand Nike Pte Ltd of Singapore, Grand Panagiotis Limited of the Republic of Malta and Cloud Maritime S.A. of the Republic of Liberia and, in the singular, means any of them;

"**Existing Financial Agreements**" means together (i) the financial agreement dated 25 February 2008 made by and among the Lender as lender and the Existing Borrowers as joint and several borrowers pursuant to which the Lender made available to the Existing Borrowers certain financial facilities of One hundred Thirty million Dollars ($130,000,000) and (ii) the overdraft facility agreement dated 26 March 2008 made by and among the Lender as lender and the Existing Borrowers as joint and several borrowers pursuant to which the Lender made available to the Existing Borrowers certain overdraft facility in the amount of Forty million Dollars ($ 40,000,000) or its equivalent in any alternative currency;

"**Expiration Date**" means the Original Expiration Date or any other date as the Lender may agree in writing in accordance with the provisions of Clauses 11.2 and 11.3, provided that if any such day is not a Banking Day the Expiration Date shall be the next succeeding day which is a Banking Day unless such next succeeding Banking Day falls in another calendar month in which event the Expiration Date shall be the immediately preceding Banking Day;

"**Facility**" means a revolving credit facility in the principal amount of up to One hundred Twelve million Dollars ($112,000,000) at any time outstanding to be made available to the Borrowers by the Lender in multiple Advances pursuant to the terms of Clause 1(A) and Clause 3 or, if the context may so require, so much thereof as shall for the time being be outstanding to the Lender hereunder;

"**Finance Documents**" means:

(a)      this Agreement;

7

(b)     the Master Agreement;

(c)     the Security Documents; and

(d)     any other document (whether creating an Encumbrance or not) which is executed at any time by any Security Party or any other person as security for, or to establish any form of subordination or priorities' arrangement in relation to any amount payable to the Lender under this Agreement and/or the Master Agreement or any of the documents referred to in this definition or in any other Clause of this Agreement;

"**Financial Statements**" means the audited by the Auditors or unaudited annual or quarterly financial statements of the Group, referred to in Clause 19.1 comprising in each case of a statement of income, balance sheet, cash flow statement and relative notes;

"**Flag State**" means:

(a)     in relation to the Rodosi Ship: the Republic of Liberia; and

(b)     in relation to the Anemi Ship: the Republic of Malta.

or in each case any other flag state which shall be acceptable to the Lender in its sole discretion;

"**General Assignment**" means in relation to each Ship the first priority deed of assignment relative to the Insurances, the Earnings and the Requisition Compensation of that Ship made or, as the context may require, to be made by and between the Owner of that Ship and the Lender in form and substance satisfactory to the Lender as the same may from time to time hereafter be amended, varied or supplemented;

"**Government Entity**" means and includes (whether having a distinct legal personality or not) any national or local government authority, board, commission, department, division, organ, instrumentality, court or agency or tribunal and any association, organisation or institution of which any of the foregoing is a member or to whose jurisdiction any of the foregoing is subject or in whose activities any of the foregoing is a participant;

"**Grandunion Guarantee**" means the guarantee and indemnity in respect of the Borrowers' obligations under this Agreement and the other Finance Documents executed or, as the context may require, to be executed by the Grandunion Guarantor in favour of the Lender in form and substance satisfactory to the Lender in its sole discretion as the same may from time to time be amended, varied or supplemented;

"**Grandunion Guarantor**" means Grandunion Inc., a corporation organized and existing under the laws of the Republic of the Marshall Islands, having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands;

"**Group**" means the Grandunion Guarantor and its Subsidiaries (whether direct or indirect and including without limitation the Borrowers and each Managing Subsidiary) from time to time during the Security Period and "**members of the Group**" shall be construed accordingly;

"**Guarantees**" means together the Grandunion Guarantee and the Personal Guarantee and, in the singular, means either of them;

"**Guarantors**" means together the Grandunion Guarantor and the Personal Guarantor and, in the singular, means either of them;

"**Indebtedness**" means any and all moneys, liabilities and obligations (whether actual or contingent, whether existing or hereafter arising, whether or not for the payment of money, and including, without limitation, the Master Agreement Liabilities and any obligation or liability to pay damages) which are now or which may at any time and from time to time hereafter be due, owing, payable or incurred or expressed to be due, owing, payable or incurred from the Borrowers or either of them (whether as principal, surety or otherwise) to the Lender under this Agreement, the Master Agreement and the other Finance Documents;

"**Insurance Documents**" means all slips, cover notes, contracts, policies, certificates of entry or other insurance documents evidencing or constituting the Insurances from time to time in effect,

"**Insurances**" means, collectively in relation to each Ship, all policies and contracts of insurance (which expression includes all entries of that Ship in a protection and indemnity or mutual hull or war risks association) or such other arrangements by way of insurance which are from time to time taken out or entered into in respect of or in connection with that Ship and its Earnings pursuant to this Agreement and including all benefits thereof including all claims of whatsoever nature and return of premiums;

"**Insurers**" means the underwriters, insurance companies, mutual insurance associations with or by which the Insurances are effected;

"**Interest Determination Date**" means the Banking Day which is two (2) Banking Days prior to the commencement of an Interest Period;

"**Interest Payment Date**" means each day on which interest is payable in accordance with Clause 7, provided that if any such day is not a Banking Day, the relevant Interest Payment Date shall be the next succeeding day which is a Banking Day, unless such next succeeding Banking Day falls into another calendar month, in which event, the relevant Interest Payment Date shall be the immediately preceding Banking Day;

"**Interest Period**" means each of the successive periods determined in accordance with Clause 6 of this Agreement during which the Facility or any part thereof is outstanding and for which an Interest Rate in respect thereof is to be established hereunder;

"**Interest Rate**" means for each Advance (save as provided in Clause 9) the rate of interest applicable to that Advance (or any part thereof) during each Interest Period in respect thereof which is/are conclusively certified by the Lender to the Borrowers to be the aggregate of (a) the Applicable Margin and (b) LIBOR or the Lender's cost of funding the relevant Advance, for Interest Periods of longer than six (6) months;

"**ISM Code**" means, in relation to its application to the Manager, the Borrowers, each Ship and her operation:

(a)     'The International Management Code for the Safe Operation of Ships and for Pollution Prevention', currently known or referred to as the 'ISM Code', adopted by the Assembly of the International Maritime Organisation by Resolution A 741(18) on 4 November 1993 and incorporated on 19 May 1994 into chapter IX of the International Convention for the Safety of Life at Sea 1974 (SOLAS 1974); and

(b)     all further resolutions, circulars, codes, guidelines, regulations and recommendations which are now or in the future issued by or on behalf of the International Maritime Organisation or any other entity with responsibility for implementing the ISM Code, including without limitation, the 'Guidelines on implementation or administering of the International Safety Management (ISM) Code by Administrations produced by the International Maritime Organisation pursuant to Resolution A.788(19) adopted on 25 November 1995,

as the same may be amended, supplemented or replaced from time to time;

"**ISM Code Documentation**" includes, in relation to each Ship:

(a)     the document of compliance (DOC) and safety management certificate (SMC) issued pursuant to the ISM Code in relation to that Ship within the periods specified by the ISM Code; and

(b)     all other documents and data which are relevant to the ISM SMS and its implementation and verification which the Lender may require; and

(c)     any other documents which are prepared or which are otherwise relevant to establish and maintain compliance of such Ship or the compliance of the relevant Owner and/or the Manager with the ISM Code which the Lender may require;

"**ISM SMS**" means, in relation to each Ship, the safety management system for that Ship which is required to be developed, implemented and maintained by each Owner under the ISM Code;

"**ISPS Code**" means the International Ship and Port Facility Security Code adopted by the International Maritime Organization Assembly as the same may have been or may be amended or supplemented from time to time;

"ISPS Code Documentation" includes in relation to each Ship:

(a) the International Ship Security Certificate issued pursuant to the ISPS Code in relation to that Ship within the periods specified by the ISPS Code; and

(b) all other documents and data which are relevant to the ISPS Code and its implementation and verification which the Lender may require;

"Lender" means Marfin Egnatia Bank Societe Anonyme, a company duly incorporated under the laws of the Republic of Greece, having its registered office at 20 Mitropoleos and Komninon , 546 24 Thessaloniki, Greece and acting in this case through its office at 91 Akti Miaouli, 185 38 Piraeus, Greece and shall include its successors and assigns;

"Letter of Undertaking" means a letter of undertaking executed or, as the context may require, to be executed by certain Subsidiaries of the Grandunion Guarantor in favour of the Lender, in such terms as the Lender may approve or require;

"LIBOR" means, for an Interest Period:

(a) the rate per annum equal to the offered quotation for deposits in Dollars for a period equal to, or as near as possible equal to, the relevant Interest Period which appears on the appropriate page of the Reuters Monitor Money Rates Service at or about 11 00 a.m. (London time) on the Interest Determination Date for that Interest Period (or on such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for Dollars); or

(b) if no rate is quoted on the appropriate page of the Reuters Monitor Money Rates Service, the rate per annum determined by the Lender to be the arithmetic mean (rounded upwards, if necessary, to the nearest one-sixteenth of one per cent) of the rates per annum at which deposits in Dollars are offered to the Lender by leading banks in the London Interbank Market at the Lender's request at or about 11.00 a.m. (London time) on the Interest Determination Date for that Interest Period for a period equal to that Interest Period and for delivery on the first Banking Day of it;

"Loan Account" means collectively the account or accounts maintained by the Lender referred to in Clause 13;

"LOI" means the non-binding letter of intent dated 24 June 2009 as amended by an Amendment No.1 dated 22 July 2009 entered into between the Grandunion Guarantor and Aries Maritime, setting out the proposed terms and conditions in connection with the Acquisition;

"Major Casualty" means, in relation to each Ship, any casualty to such Ship in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for



any relevant franchise or deductible, exceeds Five hundred thousand Dollars ($500,000) or the equivalent thereof in any other currency;

**"Management Agreement"** means, in relation to each Ship, the management agreement made or to be made between the Owner thereof and the Manager, in form and substance satisfactory to the Lender and as the same may from time to time be amended, varied or supplemented with the Lender's prior written consent;

**"Manager"** means the Managing Subsidiary and/or any other company approved by the Lender as manager of the Ships or either of them and, in the singular, means any of them;

**"Manager's Undertaking"** means, in relation to each Ship, a letter of undertaking including, where appropriate, an assignment of any obligatory insurances executed or, as the context may require, to be executed by the Manager in favour of the Lender, in such terms as the Lender may approve or require and, in the plural, means both of them;

**"Managing Subsidiary"** means (a) in respect of the Anemi Ship: Stamford Navigation Inc., of the Republic of Liberia, a Subsidiary of the Grandunion Guarantor and (b) in respect of the Rodosi Ship: Newfront Shipping S.A., of Panama, a Subsidiary of the Grandunion Guarantor;;

**"Market Value"** means in respect of each Ship, the value thereof determined in accordance with the provisions of Clause 21.26;

**"Master Agreement"** means the master swap agreement (on the 2002 ISDA Master Agreement (Multicurrency-Crossborder) form) and Schedule thereto both made or as the context may require to be made between the Borrowers and the Lender and includes all Designated Transactions from time to time entered into and Confirmations from time to time exchanged thereunder;

**"Master Agreement Assignment"** means the assignment of the Master Agreement in favour of the Lender, executed or, as the context requires, to be executed by the Borrowers in form and substance satisfactory to the Lender in its sole discretion as security for the Indebtedness, as the same may from time to time be amended, varied or supplemented;

**"Master Agreement Liabilities"** means at any relevant time all liabilities actual or contingent, present or future of the Borrowers to the Lender under the Master Agreement;

**"Maximum Permitted Swap Exposure"** an amount not exceeding the lesser of Ten million Five hundred thousand Dollars ($10,500,000) and ten per cent (10%) of the, at any time, outstanding principal amount of the Facility;

**"Mortgage"** means:

(a)     in relation to the Anemi Ship, together the first priority Maltese mortgage and deed of covenants collateral thereto; and

(b)     in relation to the Rodosi Ship, the first preferred Liberian mortgage,

granted or, as the context may require, to be granted by the Owner of that Ship to the Lender to secure the due payment of the Indebtedness in form and substance satisfactory to the Lender as the same may from time to time hereafter be amended, varied or supplemented, and, in the plural, means both of them;

"**Navios Maritime**" means Navios Maritime Holdings Inc., a corporation organised and existing under the laws of the Republic of the Marshall Islands, having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands;

"**Navios Maritime Shares**" means 1,870 shares of Series A Convertible Preferred Stock with liquidation preference of $10,000 per shares of Navios Maritime owned by the Grandunion Guarantor;

"**Navios Maritime Shares' Pledge**" means in relation to Navios Maritime, a first priority pledge and/or charge over the Navios Maritime Shares to be executed by the Grandunion Guarantor to secure the due payment of the Indebtedness in form and substance satisfactory to the Lender in its sole discretion, as the same may from time to time be further amended, varied or supplemented with the Lender's prior written consent;

"**Nomination Date**" means the Banking Day which is three (3) Banking Days prior to the commencement of an Interest Period;

"**Notice of Drawdown**" means each written notice given by the Borrowers to the Lender pursuant to Clause 5.1.4 substantially in the form set out in Schedule 1 hereto;

"**Original Expiration Date**" means the date falling one (1) year from the Drawdown Date of the Advance first to occur;

"**Owner**" means:

(a)     in relation to the Anemi Ship: the Anemi Owner; and

(b)     in relation to the Rodosi Ship: the Rodosi Owner,

and, in the plural, means both of them;

"**Permitted Liens**" means any supplier's, carrier's, workman's or similar lien arising in the ordinary course of business automatically by statute or by operation of law and not by way of contract in respect of amounts not yet due and payable but excluding any lien arising from any default or omission of the Security Parties or any of them;

13

"**Personal Guarantee**" means the guarantee in respect of the Borrowers' obligations, under this Agreement and the other Finance Documents, executed or, as the context may require, to be executed by the Personal Guarantor in favour of the Lender, in form and substance satisfactory to the Lender, in its sole discretion as same may from time to time be amended, varied or supplemented;

"**Personal Guarantor**" means the individual acceptable to the Lender in its sole discretion who shall execute the Personal Guarantee;

"**Protection and Indemnity risks**" means the usual risks covered by a protection and indemnity association that is a member of the International Group of Protection and Indemnity Associations, including the proportion not otherwise recoverable in case of collision under the ordinary running-down clause;

"**Refinancing Advance**" means the Advance referred to in Clause 1(A) (i);

"**Relevant Ship**" means each Ship and any other ship from time to time owned, managed or crewed by, or demise or bareboat chartered to an Owner or any other member of the Group;

"**Repayment Date**" means the earlier of the dates referred to in Clause 11.1, provided that if any such day is not a Banking Day the relevant Repayment Date shall be the next succeeding day which is a Banking Day unless such next succeeding Banking Day falls in another calendar month in which event the relevant Repayment Date shall be the immediately preceding Banking Day;

"**Requisition Compensation**" means all compensation payable by reason of any Compulsory Acquisition of a Ship other than requisition for hire;

"**Rodosi Charter**" means the time charter dated 7 January 2009 in respect of the Rodosi Ship made between the Rodosi Owner as owner and the Rodosi Charterer as charterer, for a period of three (3) years plus sixty (60) days more or less in the Rodosi Charterer's option and at a daily hire rate of Ten thousand Two hundred Dollars ($10,200) as the same may be amended, varied or supplemented, with the Lender's prior written consent;

"**Rodosi Charterer**" means TMT Bulk Corp. of Taipei, Taiwan;

"**Rodosi Earnings Account**" means the interest bearing deposit account opened by the Rodosi Owner with the Lender numbered 0169089429 into which all the Earnings of the Rodosi Ship are to be paid, in accordance with Clause 21.2, such account to include any substitute account or sub-account or revised account or revised designation or number whatsoever and any deposit account to which monies from the Rodosi Earnings Account may from time to time be paid on a time deposit basis;



"**Rodosi Owner**" means Grand Rodosi Inc., a corporation organized and existing under the laws of the Republic of Liberia, having its registered office at 80 Broad Street, Monrovia, Republic of Liberia;

"**Rodosi Ship**" means the m.v. "GRAND RODOSI", a bulk carrier vessel, with gross tonnage of 37,519 tons and net tonnage of 22,604 tons, registered in the ownership of the Rodosi Owner, under the Liberian flag;

"**Security Documents**" means collectively the Mortgages, the General Assignments, the Charter Assignments, the Guarantees, the Manager's Undertakings, the Letter of Undertaking, the Shares' Pledges, the Master Agreement Assignment and the Earnings Account Charges and where the context so admits this Agreement and any other agreement or document that may be executed at any time by the Borrowers, the other Security Parties or any other person as security for the due payment of the Indebtedness;

"**Security Parties**" means each party to the Finance Documents (other than the Lender and the Charterers) and, in the singular, means any of them;

"**Security Period**" means the period during which the Finance Documents remain in effect and ending when the Indebtedness is paid in full;

"**Shares**" means collectively the Aries Maritime Shares, the Navios Maritime Shares and the Alpha Bulkers Shares and, in the singular means any of them;

"**Shares' Pledges**" means together the Navios Maritime Shares' Pledge, the Aries Maritime Shares' Pledge and the Alpha Bulkers Shares' Pledge and, in the singular, means any of them;

"**Ships**" means together the Anemi Ship and the Rodosi Ship and, in the singular, means either of them;

"**Subject Documents**" means all of the Finance Documents, the Acquisition Documents, the Charters and the Management Agreements (none to be amended, varied, supplemented or modified without the consent of the Lender), and together with any other instrument, document or memorandum, scheduled to any of the documents referred to above, and any notice, consent to acknowledgement referred to in or required pursuant to any of the documents referred to above and any document, instrument or memorandum which secures any of the obligations of the Borrowers or either of them under any of the Finance Documents or under any other Subject Document;

"**Subsidiary**" of a person means: (a) any other person directly or indirectly Controlled by that person; or (b) any other person whose dividends or distributions on ordinary voting share capital that person is entitled to receive more than fifty per cent (50%); or (c) any entity (whether or not so Controlled) treated as a Subsidiary in the financial statements of that person from time to time;

15

"**Swap Exposure**" means, as at any relevant date the amount certified by the Lender (whose certificate shall in the absence of manifest error be conclusive and binding on the Borrowers) to be the aggregate net amount in Dollars which would be payable by the Borrowers to the Lender under (and calculated in accordance with) section 6(e) (Payments on Early Termination) of the Master Agreement if an Early Termination Date had occurred on the relevant date in relation to all continuing Designated Transactions;

"**Taxes**" means all present and future taxes, levies, imposts, duties, charges, fees, deductions and withholdings, and any restrictions or conditions resulting in a charge (other than taxes on the overall net income of the Lender) and "**Tax**" and "**Taxation**" shall be construed accordingly;

"**Termination Date**" means:

(i)     for the Refinancing Advance: 30 September 2009; and

(ii)    for each Working and Investment Capital Advance: the date falling one (1) month prior to the Original Expiration Date

or in each case such later date as the Lender may approve in writing;

"**Total Loss**" means in relation to each Ship:

(a)     the actual or constructive or compromised or arranged or agreed total loss of such Ship; or

(b)     Compulsory Acquisition of such Ship; or

(c)     the capture, seizure, arrest, detention or confiscation of such Ship by any Government Entity or by a person acting or purporting to act on behalf of any Government Entity where such Ship is not released or discharged within thirty (30) days or such lesser period provided in the War Risks Insurances;

"**Transaction**" has the meaning given to it in the Master Agreement;

"**War Risks**" includes all risks referred to in the Institute Time Clauses (Hulls) (1/10/83) and (1/11/95) including, but not limited to, the risk of mines, blocking and trapping, missing vessel, confiscation and all risks excluded by Clause 23 of the Institute Time Clauses (Hulls) (1/10/83) or Clause 24 of the Institute Time Clauses (Hulls) (1/11/1995); and

"**Working and Investment Capital Advances**" means the Advances referred to in Clause 1(A)(ii).

2.2     In this Agreement clause headings are for ease of reference only and shall be disregarded in the construction of this Agreement

16

2.3     In this Agreement unless the context otherwise requires:

2.3.1           words importing the singular number shall include the plural and vice versa;

2.3.2           fees, costs and expenses shall be exclusive of any value added tax or similar tax (if any) which shall accordingly be payable in addition;

2.3.3           any reference to a document or instrument is a reference to that document or instrument as the same may have been, or may from time to time be amended or supplemented;

2.3.4           the liquidation, winding-up or dissolution of a company or body corporate or the appointment of a receiver, administrative receiver, manager or administrator of or in relation to a company or corporation or any of its assets shall be construed so as to include any equivalent or analogous proceedings under the laws of the jurisdiction in which it is incorporated or any jurisdiction in which it carries on business or has assets or liabilities;

2.3.5           references to persons include any individual, partnership, firm, trust, body corporate, government, governmental body, authority, agency, unincorporated body of persons or association;

2.3.6           a reference to any enactment or statutory provision include any enactment or statutory provision which amends, extends, consolidates or replaces the same or which has been amended, extended, consolidated or replaced by the same and shall include any orders, regulations, codes of practice, instruments or other subordinated legislation made under the relevant enactment or statutory provision; and

2.3.7           the words "herein", "hereto" and "hereunder" refer to this Agreement as a whole and not to the particular Clause or Schedule in which the words may be used.

## 3.     THE FACILITY – THE BORROWERS JOINT AND SEVERAL LIABILITY

3.1     The Lender hereby agrees to make available to the Borrowers subject to the terms and the conditions hereof the Facility for the purposes stated in Clause 1(A) in an aggregate amount not exceeding at any relevant time One hundred Twelve million Dollars ($112,000,000) provided however that no Working and Investment Capital Advance shall be drawdown unless specifically approved by the Lender.

3.2     The Borrowers undertake to use the proceeds of each Advance in accordance with and for the purposes referred to in Clause 1(A); the Lender (although entitled) shall not be obliged to monitor the application of such proceeds.

3.3     All the liabilities and obligations of the Borrowers under this Agreement shall, whether expressed to be so or not, be joint and several so that each Borrower shall be jointly and severally responsible with the other Borrower for all liabilities and obligations of the

17

Borrowers under this Agreement and so that such liabilities and obligations shall not be impaired by:

(a)    any failure of this Agreement to be legal, valid, binding and enforceable in relation to either of the Borrowers whether as a result of lack of corporate capacity, due authorisation, effective execution or otherwise;

(b)    any giving of time, forbearance, indulgence, waiver or discharge in relation to either of the Borrowers or to any other party to the Security Documents; or

(c)    any other matter or event whatsoever which might have the effect of impairing all or any of the liabilities and obligations of either of the Borrowers.

3.4    Each of the Borrowers declares that it is and will, throughout the Security Period, remain a principal debtor for all amounts owing under this Agreement and neither of the Borrowers shall in any circumstances be construed to be a surety for the obligations of the other Borrower hereunder.

3.5    Until all sums owing to the Lender by the Borrowers under this Agreement, the Master Agreement and the other Finance Documents have been paid in full neither of the Borrowers (hereinafter called a "**Creditor Borrower**") will without the prior written consent of the Lender ask, demand, sue for, take or receive from the other Borrower or any other member of the Group (hereinafter called a "**Debtor Borrower**") by set-off or any other manner the whole or any part of all present and future sums, liabilities and obligations payable or owing by the Debtor Borrower to the Creditor Borrower whether actual or contingent jointly or severally or otherwise howsoever (such sums being hereinafter called the "**Subordinated Liabilities**") so long as any Senior Liabilities are outstanding to the Lender (for which purpose "**Senior Liabilities**" shall mean all present and future sums, liabilities and obligations whatsoever payable or owing by the Borrowers (or either of them) pursuant to the Finance Documents or any of them or otherwise whatsoever, whether actual or contingent jointly or severally or otherwise howsoever).

## 4.    AVAILABILITY – DESIGNATED TRANSACTIONS

4.1    Subject as herein provided, the Facility is available to the Borrowers to be drawn down during the Availability Period. Any part of a Facility which remains undrawn at the close of business in Athens on the Termination Date shall be automatically cancelled.

4.2    Any Designated Transaction shall be entered into on the basis of the Master Agreement and shall be concluded with the Lender.

4.3    No Designated Transaction may be entered into by the Borrowers:

4.3.1        if a material adverse change occurs in the financial condition or operation of any one or more of the Security Parties or any other member of the Group and/or if any other Event of Default occurs or an event which with the giving of notice or passage

of time or the combination of both or the fulfilment of any other condition, may become an Event of Default having occurred;

4.3.2     if the aggregate of (i) the Market Values of the Ships and (ii) the market values of the Shares and of any additional security provided to the Lender in accordance with Clause 23 (each valued by the Lender in accordance with normal banking practice) is less than 200% of the aggregate of (i) the Facility and (ii) the Swap Exposure unless such Designated Transaction is secured by cash deposits in amounts determined by the Lender, pledged in favour of the Lender; and

4.3.3     if by being entered into it would increase the Swap Exposure to a sum in excess of the Maximum Permitted Swap Exposure.

4.4     Notwithstanding any provision of this Agreement and/or the Master Agreement to the contrary, if for any reason a Designated Transaction has been entered into but the Facility is not drawn under this Agreement then, subject to Clause 4.5, the Lender shall be entitled but not obliged (and, where relevant, may do so without the consent of the Borrowers where it would otherwise be required whether under the Master Agreement or otherwise) to amend, supplement, cancel, net out, terminate, liquidate, transfer or assign all or any part of the rights, benefits and obligations created by such Designated Transaction and/or the Master Agreement and/or to obtain or re-establish any hedge or related trading position in any manner and with any person the Lender in its absolute discretion may determine.

4.5     If a Designated Transaction has been entered into but the Facility is not drawn down under this Agreement and the Lender in its absolute discretion agrees, following a written request of the Borrowers, that the Borrowers may be permitted to maintain all or part of a Designated Transaction, the Borrowers shall, within fifteen (15) days of being notified by the Lender of such requirement, provide the Lender with, or procure the provision to the Lender of, such additional security as shall in the opinion of the Lender be adequate to secure the performance of such Designated Transaction, which additional security shall take such form and be constituted by such documentation, as the Lender in its absolute discretion may approve or require.

4.6     The Borrowers shall on the first written demand of the Lender indemnify the Lender in respect of all losses, costs and expenses (including, but not limited to, legal costs and expenses) incurred or sustained by the Lender as a consequence of or in relation to the effecting of any matter or transactions referred to in Clauses 4.4 and 4.5.

4.7     Without prejudice to or limitation of the obligations of the Borrowers under Clause 4.6, in the event that the Lender exercises any of its rights under Clauses 4.4 or 4.5 and such exercise results in all or part of a Designated Transaction being terminated such termination shall be treated under the Master Agreement in the same manner as if it were a Terminated Transaction (as defined in section 14 of the Master Agreement) effected by the Lender after an Event of Default (as so defined in that section 14) by the Borrowers and, accordingly, the Lender shall be permitted to recover from the Borrowers a payment for early termination calculated in accordance with the provisions of section 6(e)(i) of the Master Agreement.

19

4.8     In the event that the Lender fails to enter into a Designated Transaction with the Borrowers, the Lender shall not be liable to the Borrowers to enter into such Designated Transaction nor to compensate the Borrowers for such failure.

## 5.     NOTICE OF DRAWDOWN

5.1     Subject to:

5.1.1           the receipt by the Lender of the documents specified in Clause 18 in form and substance satisfactory to the Lender and its legal advisers before the relevant Drawdown Date; and

5.1.2           no Event of Default or an event which with the giving of notice or passage of time or satisfaction of any other condition or any combination of the foregoing, may become an Event of Default having occurred; and

5.1.3           the representations and warranties set out in Clause 16 (updated *mutatis mutandis* to the relevant Drawdown Date) being true and correct; and

5.1.4           the receipt by the Lender of a Notice of Drawdown in the form set out in Schedule 1 hereto not later than 11.00 a.m. (London time) two (2) Banking Days prior to the relevant Drawdown Date setting out the date of the proposed Advance,

        each Advance shall be made available to the Borrowers in accordance with and on the terms and conditions of this Agreement.

5.2     Without prejudice to the generality of the foregoing provisions of this Clause 5 the Lender shall not be obliged to make available any Advance if, following its drawing, the covenant contained in Clause 23 (Security Margin) would cease to be complied with.

5.3     Unless otherwise expressly agreed between the Borrowers and the Lender no Advance shall be made:

5.3.1           if by being drawn down it would increase the Facility to a sum in excess of the Applicable Limit; and/or

5.3.2           in an amount of less than Five million Dollars ($5,000,000) or multiples thereof.

5.4     Each Notice of Drawdown shall be irrevocable and the Borrowers shall be bound to borrow in accordance with such notice.

5.5     On payment of the amount drawn down in respect of each Advance the Borrowers shall sign an Acknowledgement in the form set out in Schedule 2 hereto.

5.6 . If the Borrowers give a Notice of Drawdown pursuant to Clause 5.1.4 and the Lender makes arrangements on the basis of such notice to acquire Dollars in the London Interbank Market to fund an Advance or any part thereof and the Borrowers are not permitted or otherwise fail to borrow in accordance with such Notice of Drawdown (either on account of any condition precedent not being fulfilled or otherwise) the Borrowers shall indemnify the Lender against any damages, losses or expenses which the Lender may incur (either directly or indirectly) as a consequence of the failure by the Borrowers to borrow in accordance with such Notice of Drawdown.

5.7 The Borrowers may, at any time during the Availability Period, cancel the Facility or, as the case may be, any part thereof which remains undrawn in whole or in part (but if in part in a minimum of Five hundred thousand Dollars ($500,000) or a multiple thereof upon giving the Lender three (3) Banking Days' notice in writing to that effect Such notice once given shall be irrevocable and upon such cancellation taking effect the Facility shall be reduced accordingly. Notwithstanding any such cancellation pursuant to this Clause 5.7 the Borrowers shall continue to be liable for any and all amounts due to the Lender under this Agreement including without limitation any amounts due to the Lender under Clauses 7, 9, 15 and 28.

## 6.   INTEREST PERIODS

6.1 Subject to Clause 6.2, the Interest Periods applicable to each Advance shall (subject to market availability), be periods of a duration of three (3) or six (6) months (or such other periods as the Lender and the Borrowers may agree) as selected by the Borrowers by written notice to be received by the Lender not later than 11.00 a.m. (London time) on the relevant Nomination Date;

6.2 Notwithstanding the provisions of Clause 6.1:

6.2.1 the initial Interest Period in respect of each Advance shall commence on the Drawdown Date thereof and shall end on the expiry date thereof and each subsequent Interest Period for that Advance shall commence on the expiry of the preceding Interest Period in respect thereof;

6.2.2 if any Interest Period would otherwise end on a day which is not a Banking Day, that Interest Period shall be extended to the next succeeding day which is a Banking Day unless such next succeeding Banking Day falls in another calendar month in which event that Interest Period shall end upon the immediately preceding Banking Day;

6.2.3 if any Interest Period commences on the last Banking Day in a calendar month or if there is no numerically corresponding day in the month in which that Interest Period ends, that Interest Period shall end on the last Banking Day in that later month;

6.2.4 no Interest Period shall extend beyond the Repayment Date;

21

6 2.5      save as provided in Clause 6 2 1, if the Borrowers fail to select an Interest Period in accordance with the above, such Interest Period shall be of three (3) months duration or of such other duration as the Lender in its sole discretion may select; and

6 2 6      save as provided in Clause 6 2.1 the Borrowers shall not select more than one (1) Interest Period at any one time

## 7.    INTEREST

7.1    Subject to the terms of this Agreement the Borrowers shall pay to the Lender interest in respect of each Advance (or the relevant part thereof) accruing at the Interest Rate for each Interest Period relating thereto in arrears on the last day of each Interest Period, provided that where such Interest Period is of a duration longer than three (3) months, accrued interest in respect of such Advance (or such part thereof) shall be paid every three (3) months during such Interest Period and on the last day of such Interest Period.

7 2    Interest shall be calculated on the basis of the actual number of days elapsed and a three hundred and sixty (360) day year

7 3    The Interest Rate applicable for each Interest Period shall be calculated and determined by the Lender on each Interest Determination Date and each such determination of an Interest Rate hereunder shall be promptly notified by the Lender to the Borrowers at the beginning of each Interest Period in respect thereof

7 4    The Lender's certificate as to the Interest Rate applicable shall be final and (except in the case of manifest error) binding on the Borrowers and the other Security Parties

## 8.    DEFAULT INTEREST

8.1    In the event of a failure by the Borrowers to pay any amount on the date on which such amount is due and payable pursuant to this Agreement and/or the Master Agreement and/or the other Finance Documents and irrespective of any notice by the Lender or any other person to the Borrowers in respect of such failure, the Borrowers shall pay interest on such amount on demand from the date of such default up to the date of actual payment (as well after as before judgment) at the per annum rate which is the aggregate of (a) two point five per cent (2 5%) and (b) the Applicable Margin and (c) the rate at which the Lender in accordance with its normal practice is offered deposits in Dollars in the London Interbank Market for such period as the Lender may select at or about 11.00 a.m. (London time) on the Banking Day immediately following that on which the Lender becomes aware of the default and, so long as the default continues, such rate shall be recalculated on the same basis thereafter

8 2    Any interest which shall have accrued under Clause 8.1 in respect of an unpaid amount shall be due and payable at the end of the period by reference to which it is calculated or such other date or dates as the Lender may specify by written notice to the Borrowers

8 3     Clause 7.2 shall apply to the calculation of interest on amounts in default.

## 9.     SUBSTITUTE BASIS

9 1     If the Lender determines (which determination shall be conclusive) that:

9 1 1     at 11.00 a.m. (London time) on any Interest Determination Date the Lender was not being offered by banks in the London Interbank Market deposits in Dollars in the required amount and for the required period; or

9 1 2     LIBOR would not adequately reflect the cost of the Lender of making, funding or maintaining the Facility or any part thereof for the duration of the next succeeding Interest Period; or

9 1 3     by reason of circumstances affecting the London Interbank Market such deposits are not available to the Lender in such market; or

9 1 4     adequate and reasonable means do not or will not exist for the Lender to ascertain the Interest Rate applicable to the next succeeding Interest Period; or

9 1 5     Dollars will or may not continue to be freely transferable;

then, and in any such case the Lender shall give notice of any such event to the Borrowers and in case any of the above occurs on the Interest Determination Date prior to a Drawdown Date the Borrowers' right to borrow an Advance which remains available for borrowing shall be suspended during the continuation of such circumstances.

9.2     If, however, any of the events described in Clause 9 1 occurs on any other Interest Determination Date relative to an Advance or any part thereof, then the duration of the relevant Interest Period(s) shall be up to one (1) month and during such Interest Period the Interest Rate applicable to such Advance or the relevant part thereof shall be the rate per annum determined by the Lender rounded upwards to the nearest whole multiple of one sixteenth per cent (1/16th%) to be the aggregate of the Applicable Margin and the cost (expressed as a percentage rate per annum) to the Lender of funding the amount of such Advance or any part thereof during such Interest Period(s).

9 3     During such Interest Period(s) the Borrowers and the Lender shall negotiate in good faith in order to agree an Interest Rate or Rates and Interest Period or Periods satisfactory to the Borrowers and the Lender to be substituted for those which but for the occurrence of any such event as specified in this Clause would have applied. If the Borrowers and the Lender are unable to agree on such an Interest Rate(s) and Interest Period(s) by the day which is two (2) Banking Days before the end of the Interest Period referred to above, the Borrowers shall repay the Facility together with accrued interest thereon at the Interest Rate set out above together with all other amounts due under this Agreement relative to the Facility but

23

without any prepayment fee, on the last day of such Interest Period, whereupon both Facility shall be cancelled and no further Advances shall be made hereunder

## 10.. PREPAYMENT

10.1 If at any time during the Security Period, a Ship is sold or becomes a Total Loss or the Mortgage on that Ship is discharged, on the Total Loss Reduction Date or on the Disposal Reduction Date or on the date of discharge of Mortgage on that Ship (as the case may be), the Borrowers shall prepay such part of the Facility as is equal to the higher of (i) the Relevant Amount and (ii) such amount in Dollars as shall ensure that, following the relevant prepayment, the Security Margin referred to in Clause 23 is maintained

### Defined terms

For the purposes of this Clause 10.1:

(a)     **"Disposal Reduction Date"** means:

(i)     in relation to a Ship which has become a Total Loss, its Total Loss Reduction Date; or

(ii)    in relation to a Ship which is sold in accordance with the provisions of the relevant Security Documents, the date of completion of such sale by the transfer of title to such Ship to the purchaser in exchange for payment of the relevant purchase price; or

(iii)   in relation to a Ship the Mortgage on which is discharged following the request of the Borrowers and the consent of the Lender in accordance with this Clause 10.1, the date of discharge of such Mortgage by the Lender;

(b)     **"Total Loss Reduction Date"** means, in relation to a Ship which has become a Total Loss, the date which is the earlier of:

(i)     the date falling one hundred and eighty (180) days after that on which such Ship becomes a Total Loss; and

(ii)    the date upon which insurance proceeds are or Requisition Compensation is received in respect of such Total Loss by the relevant Owner (or the Lender pursuant to the relevant General Assignment or Mortgage); and

(c)     **"Relevant Amount"** means, in relation to a Ship which has become a Total Loss or is sold or the Mortgage of which is discharged in accordance with this Clause 10.1, the amount in Dollars which is equal to the amount of the Total Loss or sale or refinancing proceeds (as the case may be) of such Ship

PROVIDED HOWEVER THAT if, unless the Lender determines otherwise, at any time during the Security Period there is only one Ship subject to a Mortgage and the Mortgage on that Ship is discharged following the Borrowers' request or that Ship is sold (in both

- cases with the Lender's prior written consent) or becomes a Total Loss, on the Disposal Reduction Date or the Total Loss Reduction Date or on the date of discharge of the Mortgage on that Ship (as the case may be) the Borrowers shall mandatorily prepay the full amount of the Indebtedness to the Lender.

10 2    For the purposes of this Clause 10.1, a Total Loss shall be deemed to have occurred:

(a)     in the case of an actual total loss of a Ship on the actual date and at the time that Ship was lost or if such date is not known, the date on which such Ship was last reported;

(b)     in the case of a constructive total loss of a Ship upon the date and at the time notice of abandonment of such Ship is given to the Insurers of that Ship for the time being (provided a claim for such total loss is admitted by the Insurers) or, if the Insurers do not admit such a claim, or, in the event that such notice of abandonment is not given by the owner thereof to the Insurers of that Ship, on the date and at the time on which the incident which may result, in that Ship being subsequently determined to be a constructive total loss has occurred;

(c)     in the case of a compromised or arranged total loss of a Ship, on the date upon which a binding agreement as to such compromised or arranged total loss has been entered into by the Insurers of that Ship;

(d)     in the case of Compulsory Acquisition of a Ship, on the date upon which the relevant Compulsory Acquisition occurs; and

(e)     in the case of hijacking, theft, condemnation, capture, seizure, arrest, detention or confiscation of a Ship (other than where the same amounts to Compulsory Acquisition of such Ship) by any Government Entity, or by persons purporting to act on behalf of any Government Entity, which deprives the owner thereof of the use of that Ship for more than thirty (30) days, upon the expiry of the period of thirty (30) days after the date upon which the relevant hijacking, theft, condemnation, capture, seizure, arrest, detention or confiscation occurred.

10.3    If at any time during the Security Period, any Shares are sold (with the Lender's prior written consent), the Borrowers shall prepay to the Lender an amount equal to the sale proceeds of such Shares on the date of sale of such Shares

10 4    Unless an Event of Default shall have occurred (whereupon all moneys received by the Lender pursuant to Clauses 10 1 and/or 10.3 shall be applied in accordance with the provisions of Clause 12) any and all amounts prepaid pursuant to Clauses 10 1 and/or 10 3 shall be applied towards prepayment of the Facility in such manner as shall be determined by the Lender in its sole and absolute discretion; provided however that unless the Lender otherwise expressly agrees in writing, upon application of any sums so prepaid towards prepayment of the Facility, the Applicable Limit shall be reduced by the amounts so prepaid and applied

10.5    By giving not less than fifteen (15) Banking Days' prior written notice to the Lender the Borrowers may prepay all or any part of the Facility (but if in part the amount to be prepaid shall be One hundred thousand Dollars ($100,000) or a multiple thereof) at the end of the then current Interest Period. The Borrowers shall obtain any consent or approval from the relevant authorities that may be necessary to make any such prepayment of the Facility or any part thereof and if it fails to obtain and/or comply with the terms of such consent or approval and in consequence thereof the Lender has to repay the amount prepaid or the Lender incurs any penalty or loss then the Borrowers shall indemnify the Lender forthwith against all amounts so repaid and/or against all such penalties and losses incurred.

10.6    Unless the Lender otherwise expressly agrees in writing, all prepayments under Clause 10.5 shall be applied towards prepayment of the Facility in such manner as shall be determined by the Lender in its sole and absolute discretion, provided however that unless the Lender otherwise requires any sums so prepaid shall be available for reborrowing up to the Applicable Limit prevailing at the relevant time in accordance with the provisions of Clause 10.9.

10.7    Save as otherwise herein expressly provided, any prepayment of the Facility or any part thereof made or deemed to be made under this Agreement shall, if made otherwise than at the end of an Interest Period relative to the amounts prepaid, be made together with accrued interest thereon and such additional amount (if any) as the Lender may certify as necessary to compensate the Lender for any costs incurred or to be incurred by it as a result of such prepayment

10.8    Any notice of prepayment given by the Borrowers under this Agreement shall be irrevocable and the Borrowers shall be bound to prepay in accordance with each such notice.

10.9    Subject to other provisions of this Agreement (including, without limitation, Clauses 9.1, 10.4, 10.17, 11.1, 11.2, 11.3, 15.1 and 24) any prepayment made under this Agreement and applied against the Facility or any part thereof may be reborrowed hereunder.

10.10  The Borrowers may not prepay all or any part of the Facility except in accordance with the express terms of this Agreement

10.11  Subject to Clause 10.13, on or prior to any repayment or prepayment of the Facility or any part thereof under this Clause 10 or Clause 9 or Clause 15 or any other provision of this Agreement, the Borrowers shall wholly or partially reverse, offset, unwind or otherwise terminate one or more of the continuing Designated Transactions as applicable so that the notional principal amount of the continuing Designated Transactions thereafter remaining does not and will not in the future (taking into account the scheduled amortisation) exceed the amount of the Facility as reducing from time to time thereafter pursuant to Clause 11.3.

10.12  Unless otherwise agreed between the Borrowers and the Lender, if a Designated Transaction is terminated in circumstances where the Lender would be obliged to pay an amount to the Borrowers under the Master Agreement, the Borrowers hereby agree that

- such payment shall be applied towards prepayment of the Facility in such manner as the Lender shall determined in its sole discretion and authorise the Lender to apply such amount as appropriate.

10.13  If less than the full amount of the Facility remains outstanding following a prepayment under this Agreement and the Lender in its absolute discretion agrees, following a written request of the Borrowers, that the Borrowers may be permitted to maintain all or part of a Designated Transaction in an amount not wholly matched with or linked to all or part of the Facility, the Borrowers shall, within fifteen (15) days of being notified by the Lender of such requirement, provide the Lender with, or procure the provision to the Lender of, such additional security as shall in the opinion of the Lender be adequate to secure the performance of such Designated Transaction, which additional security shall take such form and be constituted by such documentation, as the Lender in its absolute discretion may approve or require.

10.14  Notwithstanding any provision of the Master Agreement to the contrary and the Borrowers' obligations under Clause 10.10, in the case of a prepayment of all or part of the Facility (including, without limitation, following the occurrence of a Total Loss of a Ship or upon a sale of a Ship or the discharge of the Mortgage on a Ship in accordance with Clause 10.1 or under any other provision of this Agreement) then, subject to Clause 10.13, the Lender shall be entitled but not obliged (and, where relevant, may do so without the consent of the Borrowers, where it would otherwise be required whether under the Master Agreement or otherwise) to amend, supplement, cancel, net out, terminate, liquidate, transfer or assign all or any part of the rights, benefits and obligations created by any Designated Transaction and/or the Master Agreement and/or to obtain or re-establish any hedge or related trading position in any manner and with any person the Lender in its absolute discretion may determine and both the Lender's and the Borrowers' continuing obligations under any Designated Transaction and/or the Master Agreement shall, unless agreed otherwise by the Lender, be calculated so far as the Lender considers it practicable by reference to the amended repayment schedule for the Facility taking into account the fact that less than the full amount of the Facility remains outstanding.

10.15  The Borrowers shall on the first written demand of the Lender indemnify the Lender in respect of all losses, costs and expenses (including, but not limited to, legal costs and expenses) incurred or sustained by the Lender as a consequence of or in relation to the effecting of any matter or transactions referred to in Clauses 10.11, 10.13 and 10.14

10.16  Without prejudice to or limitation of the obligations of the Borrowers under Clause 10.15, in the event that the Lender exercises any of its rights under Clauses 10.11 or 10.13 or 10.14 and such exercise results in all or part of a Designated Transaction being terminated such termination shall be treated under the Master Agreement in the same manner as if it were a Terminated Transaction (as defined in section 14 of the Master Agreement) effected by the Lender after an Event of Default (as so defined in that section 14) by the Borrowers and, accordingly, the Lender shall be permitted to recover from the Borrowers a payment for early termination calculated in accordance with the provisions of section 6(e)(i) of the Master Agreement.

27

10.17   At the end of each period to which each Budget relates, the Lender shall determine on the basis of trading accounts for each Ship and such other evidence as the Lender may require, whether the Borrowers had a surplus of funds (the "**Surplus Earnings**") over the Borrowers' requirements for operation and maintenance of the Ships during the relevant quarterly period (after meeting their other obligations to the Lender under this Agreement). Upon such determination by the Lender, the Borrowers shall forthwith pay to the Lender an amount equal to the amount of the Surplus Earnings and such amount shall be applied towards prepayment of the Facility; provided however that, unless the Lender determine otherwise, upon prepayment and application of such amounts towards the Facility in accordance with this Clause 10.17, the Applicable Limit shall be reduced by the amount so prepaid and applied and such amounts may not be re-borrowed.

## 11.   REPAYMENT

11.1   Subject as hereinafter provided, the aggregate of all outstanding amounts of the Facility shall be repaid by the Borrowers upon the earlier of:

  i)      the Original Expiration Date or, subject to Clause 11.2 in the case of any extension or renewal of the Facility pursuant to Clause 11.3, the last Banking Day of the period specified in the Lender's notice referred to in Clause 11.3; and

  ii)     the Demand Date, provided however that unless an Event of Default has occurred the Lender shall give a ninety (90) days prior written notice to the Borrowers of its intention to make a demand for repayment hereunder

  whereupon in either such case, the Facility shall be cancelled and no further Advances shall be drawn down.

11.2   The Borrowers may request in writing an extension of the Facility for further periods of up to twelve (12) months, PROVIDED THAT such request must be addressed to the Lender at least twenty (20) Business Days prior to the Original Expiration Date or (in case the Facility has already been extended pursuant to the terms of this Clause) twenty (20) Banking Days prior to the relevant Expiration Date specified in the Lender's notice referred to in Clause 11.3

11.3   The Lender may (in its sole and absolute discretion) by a notice in writing to the Borrowers, consent to the request of the Borrowers referred to in Clause 11.2 above and agree to the extension of the Facility for one or more periods of up to twelve (12) months. PROVIDED HOWEVER THAT the Lender may at its discretion, upon giving its consent to such extension adjust the Applicable Limit as it may deem appropriate. If the Lender does not give such consent as aforesaid, all outstanding amounts of the Facility shall be repayable in accordance with Clause 11.1. Any such notice shall be without prejudice to the Lender's right to make demand upon the Borrowers at any time pursuant to Clause 11.1 (ii).

11.4   Each amount payable in respect of the Facility shall be paid in Dollars.

28

**12.- APPLICATION**

All moneys received by the Lender under or pursuant to any of the Agreement and/or the other Finance Documents and expressed to be applicable in accordance with the provisions of this Clause 12 shall be held by the Lender, to be applied in the following manner:

(a) first, in or towards payment of all sums other than principal of or interest on the Facility which may be owing to the Lender under this Agreement and the other Finance Documents or any of them;

(b) second, in or towards payment of the amounts owing (whether actually or contingently) to the Lender under the Master Agreement (calculated as at the actual Early Termination Date applying to each particular Designated Transaction, or if no such Early Termination Date shall have occurred, calculated as if an Early Termination Date occurred on the date of application or distribution hereunder);

(c) third, in or towards payment to the Lender of any default interest and/or overdue principal payments payable to the Lender under the Finance Documents;

(d) fourth, in or towards payment to the Lender of any interest owing in respect of the Facility or any part thereof,

(e) fifth, in or towards payment to the Lender of principal owing in respect of the Facility;

(f) sixth, in or towards payment to the Lender of any amount due to it in accordance with the provisions of Clauses 10 7 and 28 by reason of any such payment in respect of the Facility not being effected on the last day of an Interest Period in respect of the total amount of the Facility;

(g) seventh, at any time on or after the occurrence of an Event of Default in retention of a sum equal to the total of any and all other amounts which (in the reasonable opinion of the Lender) although not then due to the Lender under this Agreement and the other Finance Documents will become so due to the Lender, such sums thereafter to be applied by the Lender from time to time in accordance with this Clause 12; and

(h) eighth, the surplus (if any) shall be paid to the Borrowers or to whomsoever else may be entitled to receive such surplus

**13.    EVIDENCE OF DEBT**

13.1    The Lender shall maintain in accordance with its usual practice one or more Loan Accounts in the name of the Borrowers evidencing the Indebtedness which shall be in the "account current" referred to in the Mortgage over the Anemi Ship.

13.2    In any legal action or proceedings arising out of or in connection with this Agreement and/or the other Finance Documents the entries made in the Loan Account(s) maintained pursuant to Clause 13.1 shall be conclusive evidence (save in the case of manifest error) of the existence and amounts of the liabilities of the Borrowers therein recorded.

## 14.    PAYMENTS

14.1    All amounts payable under this Agreement and/or the other Finance Documents by the Borrowers, including amounts payable under this Clause 14, shall be paid in full to the Lender without set-off or counterclaim or retention and free and clear of and without any deduction or withholding for or on account of any Taxes

14.2    In the event the Borrowers are required by law to make any such deduction or withholding from any payment hereunder then the Borrowers shall forthwith pay to the Lender such additional amount as will result in the immediate receipt by the Lender (as the case may be) of the full amount which would have been received hereunder had no such deduction or withholding been made, but if the Lender shall be or become entitled to any Tax credit or relief in respect of any Tax which is deducted from any payment by the Borrowers and if the Lender in its sole determination actually receives a benefit from such Tax credit or relief in its country of domicile, incorporation or residence, the Lender shall, subject to any laws or regulations applicable thereto, pay to the Borrowers after such benefit is effectively received by the Lender such amounts (which shall be conclusively certified by the Lender) as shall ensure that the net amount actually retained by the Lender is equal to the amount which would have been retained if there had been no such deduction; the Borrowers shall immediately forward to the Lender official receipt of the relevant taxation or other authority or other evidence acceptable to the Lender of the amount deducted or withheld as aforesaid, provided that in the event that it shall be illegal for the Borrowers to pay such additional amount as is referred to in this Clause 14.2 then the Indebtedness shall be repayable by the Borrowers to the Lender on demand.

14.3    All payments to be made by the Borrowers under this Agreement and/or the other Finance Documents shall be made in Dollars in immediately available and freely transferable and convertible funds not later than 11.00 a.m London time on the date upon which the relevant payment is due to the Lender at such account as the Lender may from time to time nominate by written notice to the Borrowers.

14.4    The Borrowers undertake to indemnify the Lender against any loss incurred by the Lender as a result of any judgment or order being given or made for the payment of any amount due under this Agreement, the Master Agreement and/or the other Finance Documents and such judgment or order being expressed in a currency other than the currency in which the payment was due under this Agreement, the Master Agreement and/or the other Finance Documents and as a result of any variation having occurred in rates of exchange between the date on which the currency is converted for the purpose of such judgment or order and the date of actual payment thereof. This indemnity shall constitute a separate and independent liability of the Borrowers and shall continue in force and effect notwithstanding any such judgment or order as aforesaid

## 15.    CHANGE OF CIRCUMSTANCES

15.1    If:

15.1.1    any law, regulation, treaty or official directive (whether or not having the force of law) or the interpretation thereof by any authority charged with the administration thereof:

    (a)    subjects the Lender to any Tax with respect to payments of principal of or interest on the Facility or any other amount payable hereunder; or

    (b)    changes the basis of Taxation of payments to the Lender of principal of or interest on the Facility or of any other amount payable hereunder (other than a change in the rate of Tax on the overall net income of the Lender); or

    (c)    imposes, modifies or deems applicable any reserve and/or special deposit requirements against or in respect of assets or liabilities of, or deposits with or for the account of, or loans or credit extended by any office of the Lender; or

    (d)    imposes on the Lender any other condition affecting this Agreement, the Facility or any part thereof or its funding; or

15.1.2    the Lender complies with any request, law, regulation (including any which relates to capital adequacy or liquidity control or which affects the manner in which the Lender allocates capital resources to its obligations under this Agreement (including without limitation, those resulting from the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement ("**Basel II**") or any other law or regulation which implements Basel II) or directive from any applicable fiscal or monetary authority (whether or not having the force of law) and as a result of any of the foregoing either directly or indirectly:

    (a)    the cost to the Lender of making, funding or maintaining the Facility or any part thereof is increased; or

    (b)    the amount of principal, interest or other amount payable to the Lender or the effective return to the Lender hereunder is reduced; or

    (c)    the Lender makes any payment or foregoes any interest or other return on or calculated by reference to the gross amount receivable by it from the Borrowers hereunder,

then and in each such case upon demand from time to time the Borrowers shall pay to the Lender such amount as shall compensate the Lender for such increased cost, reduction, payment or foregone interest or other return. If the Lender is entitled to make a claim pursuant to this Clause it shall notify the Borrowers of the event by reason of which it is so entitled and shall submit to the Borrowers a certificate setting out details of the event giving rise to such compensation, the amount thereof and the manner in which it has been calculated and in the absence of manifest error such certificate shall be conclusive.

On receipt of such certificate the Borrowers shall have the option to prepay within ninety (90) days the Facility together with all interest accrued thereof and all costs and other amounts (including amounts payable referred to above and any amount payable under Clause 10.7) payable to the Lender hereunder. If the Borrowers decide to exercise such option they shall give written notice to the Lender and prepay the amount due to the Lender within ninety (90) days of the receipt of the certificate referred to above. The Lender's duties and liabilities hereunder shall be cancelled on the giving of such notice.

15.2    Notwithstanding anything to the contrary herein contained, if any change in law, regulation or treaty or in the interpretation or application thereof by any authority charged with the administration thereof shall make it unlawful for the Lender to make, fund or maintain the Facility or any part thereof, the Lender may by written notice thereof to the Borrowers declare that the Lender's duty to provide the Borrowers with the Facility shall be terminated forthwith whereupon the Borrowers will prepay forthwith (or if permitted by law on the next following Interest Payment Date) the Facility together with all interest accrued thereon and all other amounts payable to the Lender hereunder including the amounts due under Clause 10.7. The Lender's duties and liabilities hereunder shall be cancelled on the giving of such notice.

15.3    If any of the events referred to in Clause 15.1 or Clause 15.2 shall occur, but without prejudice to the liability of the Borrowers to prepay the Facility, the Borrowers and the Lender concerned shall negotiate in good faith with a view to agreeing terms for making the Facility available from another jurisdiction, or funding the Facility from alternative sources or otherwise restructuring the Facility on a basis which is not unlawful.

## 16.    REPRESENTATIONS AND WARRANTIES

16.1    The Borrowers hereby represent and warrant to the Lender that:

16.1.1          each Security Party is a company or corporation duly formed and validly existing under the laws of the country of its incorporation and has the power and authority to own its assets and carry on business in each jurisdiction in which it owns assets or carries on business;

16.1.2          each Security Party has power to enter into this Agreement and the other Subject Documents to which it is a party and to perform and discharge its/his/her duties and liabilities hereunder and thereunder and (in the case of the Borrowers) to borrow hereunder and to enter into Designated Transactions and each Security Party has

taken all necessary action (whether corporate or otherwise) required to authorise the execution, delivery and performance of this Agreement and the other Subject Documents and the borrowings to be made hereunder;

16.1.3 the execution, delivery and performance of this Agreement and the other Subject Documents will not contravene or exceed the powers granted to each Security Party or by, or any provision of, any law or regulation in any jurisdiction to which the Security Parties or any of them are/is subject, any order or decree of any governmental agency or court of or in any jurisdiction to which the Security Parties or any of them are/is subject, the certificates of incorporation, the other constitutional documents of the Security Parties or any of them or any mortgage, deed, contract or agreement to which the Security Parties or any of them is/are a party and which is binding upon the Security Parties' assets, and will not cause any Encumbrance to arise over or attach to all or any part of any Security Party's revenues or assets nor require any Security Party to create any such Encumbrance;

16.1.4 all consents, licences, approvals, registrations, authorisations or declarations (including, without limitation, all foreign exchange control approvals) in any jurisdiction to which the Security Parties or any of them is/are subject required to enable the Borrowers to borrow hereunder and to enter into Designated Transactions and the Borrowers and the other Security Parties lawfully to enter into and perform and discharge their respective duties and liabilities under this Agreement and the other Subject Documents to which each of them is a party and to ensure that the duties and liabilities of each of the Borrowers and the other Security Parties hereunder and thereunder are legal, valid and enforceable in accordance with the terms of this Agreement and the other Subject Documents to which each of them is a party and to make this Agreement and the other Subject Documents admissible in evidence in such aforesaid jurisdictions have been obtained or made and are in full force and effect;

16.1.5 this Agreement and each of the other Subject Documents to which each Security Party is a party constitute the legal, valid, binding and unconditional duties and liabilities of each Security Party as is a party thereto, enforceable against such Security Party in accordance with the terms hereof or thereof;

16.1.6 no Security Party has failed to pay when due any material amount or to perform any material duty under the provisions of any agreement relating to indebtedness in excess in aggregate of Five hundred thousand Dollars ($500,000) to which it is a party or by which it may be bound and no event has occurred and is continuing which constitutes, or which with the giving of notice or lapse of time or both would constitute, a material breach or default by such Security Party under any such agreement;

16.1.7 no litigation or administrative proceedings in any court, arbitration tribunal or governmental authority are pending or, to the knowledge of the Borrowers or any of

33

them, threatened against any Security Party or any of its assets which might materially adversely affect such Security Party's ability to perform and discharge its duties and liabilities hereunder and under the other Subject Documents to which it/he/she is a party thereto,

16.1.8    the Financial Statements are complete and correct and present fairly the position of the members of the Group and the results of the operations of the members of the Group ended on such date, and have been prepared in accordance with the Applicable Accounting Principles consistently applied and give a true and fair view of the financial condition, assets and liabilities of the members of the Group therein stated at the date to which such Financial Statements have been prepared and since that date there has been no adverse change in the financial conditions of the business, assets or operation of the members of the Group therein stated or the Group taken as a whole (as the case may be);

16.1.9    the information provided to the Lender in relation to this transaction is true and correct in all material respects and does not omit any information necessary to make any of the information so provided not misleading;

16.1.10   the copy of each Subject Document delivered by the Borrowers to the Lender is a true and complete copy thereof;

16.1.11   none of the parties to the Subject Documents is in default thereunder;

16.1.12   none of the Security Parties is in default under any agreement to which it/he is a party or by which it may be bound and no litigation, arbitration, tax claim, administrative proceeding or investigation is current or pending or (to its knowledge) threatened;

16.1.13   the financial condition of the Borrowers and the other Security Parties has not suffered any material deterioration since that condition was last disclosed to the Lender;

16.1.14   all the obligations and liabilities of the Borrowers hereunder rank and will rank at least *pari passu* in right of payments with all other unsubordinated indebtedness of the Borrowers or any of them;

16.1.15   save as disclosed to the Lender in writing neither the Borrowers nor any other Security Party has incurred any indebtedness or authorised or accepted any capital commitments (other than that normally associated with the day to day operation or trading of the Ships, where appropriate);

16.1.16   no Taxes are imposed by deduction withholding or otherwise or any other payment to be made by any Security Party under this Agreement and/or any other of the Subject Documents or are imposed on or by virtue of the execution or delivery of the Agreement and/or any other of the Subject Documents or any document or

34

instrument to be executed or delivered hereunder or thereunder and all relevant tax returns have been filed;

16.1.17    the choice of law agreed to govern this Agreement and/or any other Subject Document and the submission to the jurisdiction of the courts agreed in each of the Subject Documents are or will be on execution of the respective Subject Documents valid and binding on the Borrowers and any other Security Party which is a party thereto;

16.1.18    no Encumbrance exists on any Security Party's assets except as permitted by this Agreement;

16.1.19    the giving of the Grandunion Guarantee is to the commercial benefit of the relevant Grandunion Guarantor in that such Guarantor belongs to the same group of companies as the Borrowers and has a financial and commercial interest in the Facility being extended to the Borrowers and by giving its Guarantee, such Guarantor furthers its own business interests within the scope of its constitutional documents;

16.1.20    the giving of the Personal Guarantee pursuant to this Agreement by the Personal Guarantor is to the commercial benefit of the Personal Guarantor;

16.1.21    each of the Subject Documents is in full force and effect and constitute the valid binding and enforceable obligations of the Borrower which is a party thereto and the other parties to it and there has been no breach of the terms or the obligations of any party to it thereunder and no person has disputed or repudiated or disclaimed any liability under it or indicated that it does not consider itself bound by or does not intend to comply with any of the terms of any such documents;

16.1.22    the Borrowers and the other Security Parties have filed all tax and other fiscal returns required to be filed by any tax authority to which they are subject and neither of the Borrowers nor any other Security Party has an office in England or in the United States of America;

16.1.23    no member of the Group is overdue in the payment of any amount in respect of Tax;

16.1.24    each Owner is the legal and beneficial owner of the Ship owned by it under the laws of the relevant Flag State;

16.1.25    each Ship is in the absolute and unencumbered ownership of its Owner save as contemplated by this Agreement and the other Finance Documents;

16.1.26    each Ship maintains the highest class with her Classification Society free of all recommendations and qualifications of her Classification Society or other conditions or notations affecting class;

16.1.27        each Ship is operationally seaworthy;

16.1.28        except for the registration of each Mortgage at the appropriate Registry of ships, it is not necessary or advisable to ensure the legality, validity, enforceability or admissibility in evidence of this Agreement and the other Subject Documents, that any of them be filed, recorded or enrolled with any governmental authority or agency or that they be stamped with any stamp, registration or similar transaction tax in the United Kingdom or in the Republic of Greece or in the Republic of the Marshall Islands or in the Republic of Liberia or in the Republic of Malta or in any other country where any Security Party carries on business;

16.1.29        each Ship complies with all relevant laws, regulations and requirements (statutory or otherwise), including without limitation, the ISM Code, the ISPS Code, the ISM Code Documentation, the ISPS Code Documentation as are applicable to (i) ships registered under the laws of the relevant Flag State and (ii) engaged in the same or a similar service as such Ship is or is to be engaged;

16.1.30        each Ship is insured in accordance with the provisions of this Agreement in respect of Insurances;

16.1.31        each Ship is managed by the Manager under the terms of the relevant Management Agreement;

16.1.32        each Owner and the Manager comply with the provisions of all Environmental Laws in respect of each Ship;

16.1.33        each Owner and the Manager have obtained all Environmental Approvals and are in compliance with all such Environmental Approvals in respect of each Ship as appropriate;

16.1.34        neither the Borrowers nor the Manager have received notice of any Environmental Claim that alleges that either Owner and/or the Manager is not in compliance with any Environmental Law or any Environmental Approval in respect of each Ship;

16.1.35        there is no Environmental Claim pending against each Owner, the Manager or each Ship; and

16.1.36        no Environmental Incident has occurred which could or might give rise to any Environmental Claim against each Owner, the Manager and each Ship.

16.2    The representations and warranties of the Borrowers set out in Clause 16.1 above shall survive the execution of this Agreement and shall be deemed to be repeated on each Drawdown Date and on each Interest Payment Date with respect to the facts and circumstances existing at each such time as if made at such time.

## 17. -   SECURITIES

17.1    The Borrowers hereby agree that the Security Documents shall secure with first priority, the due payment of the Indebtedness.

17.2    It is declared and agreed in relation to the security created by the Security Documents that:

17.2.1          it shall be held by the Lender as a continuing security for the payment of the Indebtedness;

17.2.2          the security so created shall not be satisfied or discharged by intermediate payment or satisfaction of any part of the amount secured thereunder;

17.2.3          the security so created shall be in addition to and shall not in any way be prejudiced or affected by any collateral or other security now or hereafter held by the Lender for all or any part of the amounts thereby secured; and

17.2.4          every power and right given to the Lender hereunder shall be in addition to and not in limitation of any and every other power or right of the Lender under the Security Documents and may be exercised from time to time in such order and as often as the Lender may consider appropriate.

## 18. ·   CONDITIONS PRECEDENT AND CONDITIONS SUBSEQUENT

18.1    Notwithstanding the provisions of Clause 5, the agreement of the Lender to permit the Drawdown of any Advance hereunder is subject to the condition that the Lender shall have received not later than the Drawdown Date in respect of such Advance the following documents or evidence in form and substance satisfactory to the Lender and its legal advisers:

18.1.1          a certificate as to the shareholding of each Security Party, signed by the secretary or a director of that Security Party, stating the full names of the persons or persons legally and beneficially entitled as shareholders/stockholders of the entire issued and outstanding shares/stock of that Security Party and a copy, certified as a true copy by the secretary of each Security Party of the resolutions of the board of directors and of the shareholders of each Security Party authorising the transaction contemplated hereby and authorising a person or persons to sign or execute on behalf of each Security Party this Agreement, each Notice of Drawdown (as in the form of Schedule 1 thereof), each Acknowledgement (as in the form of Schedule 2 hereof) and the other Finance Documents as is a party thereto;

18.1.2          the originals of any power or powers of attorney granted pursuant to Clause 18.1.1;

18.1.3          specimen signatures, duly authenticated of the person or persons referred to in Clause 18.1.1;

37

18 1 4          certificates or other evidence satisfactory to the Lender in its sole discretion of the existence and good standing of each Security Party, dated not more than fifteen (15) days before the date of this Agreement;

18 1 5          copies, duly certified as a true copy by the respective secretaries of each Security Party of the certificate of incorporation and the other constitutional documents of each Security Party;

18.1 6          evidence that each Earnings Account has been duly opened by the relevant Borrower(s) as appropriate and all mandate forms, signature cards and authorities have been duly delivered and that each of such accounts is free of all liens or charges other than the liens and charges in favour of the Lender referred to herein;

18.1.7          certified copies of all documents (with a certified translation if an original is not in English) evidencing any other necessary action (including but without limitation governmental approval, consents, licences, authorisations, validations or exemptions which the Lender or its legal advisers may require) by or of parties with respect to this Agreement and the other Finance Documents;

18 1.8          the Grandunion Guarantee duly executed by the Grandunion Guarantor;

18 1 9          the Personal Guarantee duly executed by the Personal Guarantor;

18 1 10         the Earnings Account Charges duly executed by each of the Borrowers, as appropriate;

18.1 11         the Shares' Pledges (other than the Aries Maritime Shares' Pledge) duly executed by the Grandunion Guarantor together with the original of the relevant share certificates in respect of all relevant shares;

18 1 12         evidence that the fees payable to the Lender in accordance with Clause 26 have been duly paid;

18 1 13         the Master Agreement duly executed between the Borrowers and the Lender;

18.1. 14        the Master Agreement Assignment duly executed by the Borrowers;

18 1 15         evidence that an amount of Twenty thousand Euros (€ 20,000) has been paid to the Lender's Greek and English law legal advisors in respect of their fees in connection with this Agreement and the other Finance Documents;

18 1 16         evidence that an amount of One thousand Euros (€1,000) has been paid to the Lender's Liberian and Marshall Islands law legal advisors in respect of their fees in connection with this Agreement and the other Finance Documents;



18.4.17      evidence that payment has been made to the Lender's U.S. law legal counsels in respect of their fees in connection with this Agreement and the other Finance Documents;

18.1.18      evidence that an amount of Two thousand Euros (€2,000) has been paid to the Lender's Maltese legal counsels in respect of their fees in connection with this Agreement and the other Finance Documents;

18.1.19      letter from HFW Nominees Limited to the Lender confirming acceptance of their appointment as agents for service of process in England under Clause 38.4;

18.1.20      a letter from Mr. George Livanos to the Lender confirming acceptance of his appointment as agent for service of process in Greece under Clause 38.5

18.1.21      the opinion letters from Marshall Islands, Liberia, Malta and such other legal counsels as the Lender may require, all acceptable to the Lender, in relation to this Agreement and the other Finance Documents referred to in this Clause 18.1, and in form and substance satisfactory to the Lender;

18.1.22      copies of the Management Agreements and of the Charters certified as true and complete copies thereof by the Borrowers' legal counsel;

18.1.23      the Letter of Undertaking duly executed by the relevant Subsidiaries of the Grandunion Guarantor;

18.1.24      the Mortgages over each Ship duly executed by the Owner thereof and notarised or legalised as appropriate and duly recorded at the appropriate registry of ships;

18.1.25      the General Assignment and the Charter Assignment in respect of each Ship duly executed by the parties thereto;

18.1.26      the notices of assignment of the Insurances and of the Earnings in respect of each Ship duly signed by the relevant Owner thereof;

18.1.27      the notices of assignment of the Earnings and of the Charter in respect of each Ship duly signed by the Owner thereof and acknowledged by the relevant Charterer as appropriate;

18.1.28      if required by the Lender, a survey report for each Ship issued by a surveyor appointed by and/or acceptable to the Lender at the expense of the relevant Owner certifying the condition of such Ship;

18.1.29      evidence that save for the Encumbrances created by the relevant Finance Documents there is no Encumbrance whatsoever on each Ship except in favour of the Lender;

18.1.30        evidence that each Ship is insured in accordance with the provisions of this Agreement;

18.1.31        evidence that each Ship is classed at the highest classification status with the Classification Society, free of overdue recommendations or other conditions or notations affecting her class;

18.1.32        market valuations on the basis specified in Clause 21.27 issued by reputable sale and purchase brokers appointed by or acceptable to the Lender, at the expense of the Borrowers, certifying the Market Value of each Ship;

18.1.33        certified copies of the classification and international safety and trading certificates of the relevant Ship issued by the Classification Society of each Ship free of recommendations or other conditions or notations affecting her class;

18.1.34        evidence that the each Ship will be registered in the ownership of the relevant Owner under the laws of the relevant Flag State, free from registered Encumbrances other than the Mortgage registered thereon;

18.1.35        copies of the ISM Code Documentation and the ISPS Code Documentation in relation to each Ship, the Owner thereof and the Manager;

18.1.36        the Manager's Undertaking in respect of each Ship duly executed by the Manager; and

18.1.37        evidence that all indebtedness in relation to (a) the Existing Financial Agreements, (b) the facility letter dated 17 January 2007 as amended by an addendum No. 1 dated 6 May 2008, both made by and among (i) the Lender as lender and (ii) YIOSONAS MARITIME S.A. of the Marshall Islands, ANTARIOS MARITIME S.A. of the Marshall Islands and NEW WAVE SHIPPING LIMITED of Malta as joint and several borrowers and (c) the overdraft facility agreement dated 21 June 2007 (the "GU Overdraft") made between the Lender as lender and the Grandunion Guarantor as borrower, has been repaid in full; and

18.1.38        confirmation from (i) the Existing Borrowers that the revolving facility and overdraft facility available pursuant to the Existing Financial Agreements and (ii) the Grandunion Guarantor that the overdraft facility available pursuant to the GU Overdraft are now cancelled and no further drawdowns will be made thereunder;

18.1.39        such further documents and evidence as the Lender may hereafter request

18.2    If the Lender, at its discretion, permits an Advance or any part thereof to be borrowed before certain of the conditions referred to in Clause 18.1 are satisfied, the Borrowers shall ensure that those conditions are satisfied within five (5) Banking Days after the relevant Drawdown Date (or such longer period as the Lender specifies).

18.3  The Borrowers shall ensure and procure that the Lender shall receive on or prior to the Acquisition Date the following documents or evidence in form and substance satisfactory to the Lender and its legal advisors:

18.3.1  each of the matters specified in any Acquisition Document as conditions precedent to the Acquisition shall have been satisfied (or waived by the Grandunion Guarantor with the Lender's prior written consent);

18.3.2  copies of any and all Acquisition Documents;

18.3.3  the Aries Maritime Shares' Pledge duly executed by the Grandunion Guarantor;

18.3.4  evidence that payment has been made to the Lender's Bermuda legal counsel in respect of their fees in connection with this Agreement and the other Finance Documents; and

18.3.5  the opinion letters from Bermuda, United States and such other legal counsels as the Lender may require, all acceptable to the Lender in relation to the Aries Maritime Shares' Pledge the Acquisition Documents and such other matters as the Lender may require in its absolute discretion.

## 19.  FINANCIAL AND GENERAL UNDERTAKINGS

The Borrowers hereby jointly and severally undertake with the Lender that throughout the Security Period the Borrowers shall (and shall procure that each other relevant Security Party shall) comply with the following provisions of this Clause 19, except as the Lender may otherwise permit:

19.1  to supply the Lender with two (2) copies of (i) the annual Financial Statements of the Group audited by the Auditors as soon as available but in any event not later than one hundred and eighty (180) days after the end of the relevant period to which they relate starting with the 2008 Financial Statements and (ii) the quarterly unaudited Financial Statements of the Group as soon as available but in any event not later than ninety (90) days after the end of the relevant quarterly period starting with the accounts for the quarterly period ending 31 December 2009 and (iii) such other information with regard to the business, properties or condition, financial or otherwise, of each member of the Group as the Lender may from time to time reasonably request;

19.2  to procure that the Financial Statements to be delivered from time to time in accordance with Clause 19.1 shall be prepared in accordance with the Applicable Accounting Principles;

19.3  to obtain promptly at any time and from time to time such registrations, licenses, consents and approvals as may be required in respect of this Agreement and the other Subject Documents under any applicable law or regulation to enable them to perform and discharge

41

their duties and liabilities hereunder and thereunder and promptly supply the Lender with copies thereof;

19.4    to ensure that at all times the claims of the Lender against each Security Party under this Agreement and the other Finance Documents rank at least *pari passu* with the claims of all its other unsecured creditors save those whose claims are preferred by any bankruptcy, insolvency or other similar laws of general application;

19.5    to deliver to the Lender translations into English (certified by an authorised translator) of any documents which have to be delivered to the Lender under the terms of this Agreement or the other Finance Documents, the originals of which are not in the English language;

19.6    not to make any loans or advances to, or any investments in, any person, firm, corporation or joint venture (or to any officer, director, stockholder, employee or customer of any such person),

19.7    not to borrow any money or permit any such borrowing to continue or incur any indebtedness whatsoever other than the Facility, the Swap Exposure or other than by way of subordinated shareholders' loans or enter into any agreement for payment on deferred terms (otherwise than on customary suppliers' credit terms) or any equipment lease or contract hire agreement other than in the ordinary course of business;

19.8    not to assume, guarantee or otherwise undertake the liability of any person, firm or company (otherwise than pursuant to the terms hereof and in the ordinary course of operation or trading of the Ships);

19.9    not to authorise or accept any capital commitments (save and except in connection with the ordinary course of operation or trading of the Ships where appropriate);

19.10   not to declare or pay any dividends or repay any shareholders' loans or make any distributions to their shareholders in any form whatsoever;

19.11   not to and procure that the Manager and each Security Party shall not change the nature of their/its business or commence any business other than the ownership and operation of ships;

19.12   not to (save and except as provided in this Agreement or otherwise in favour of the Lender), create or permit to exist any Encumbrance whatsoever on the Ships or either of them or on any of the other property or assets, real or personal of the Borrowers or either of them whether now owned or hereafter acquired, other than a Permitted Lien without the prior written consent of the Lender;

19.13   without prejudice to the obligations of the Borrowers under Clause 19.14, promptly after the happening of an Event of Default or an event which with the giving of notice or passage of time or satisfaction of any other condition or any combination of the foregoing, may become

- an Event of Default having occurred, to notify the Lender of such event and of the steps (if any) which are being taken to nullify or mitigate its effect;

19.14 from time to time (but not more than once every six (6) months) on request by the Lender, to deliver to it a certificate signed by a director or officer of the Borrowers confirming that, save as may be notified in detail in such certificate, no Event of Default or an event which with the giving of notice or passage of time or satisfaction of any other condition or any combination of the foregoing, may become an Event of Default having occurred and is then subsisting to be accompanied by such evidence as to the information and matters contained in such certificate as the Lender may from time to time reasonably require;

19 15 to ensure and procure that each Security Party shall maintain its corporate existence under the laws of the country of its incorporation and shall comply with all relevant legislation and laws and regulations applicable to it;

19.16 to pay and to ensure and procure that the other Security Parties shall pay all Taxes, assessments and other governmental charges when the same fall due, except to the extent that the same are being contested in good faith by appropriate proceedings and adequate reserves have been set aside for their payment if such proceedings fail and ensure and procure that all relevant tax returns of the Borrowers and the other Security Parties shall be properly and timely filed;

19.17 not to and ensure that the Grandunion Guarantor and the Personal Guarantor shall not convey, assign, transfer, sell or otherwise or dispose of the Ships or either of them or any of the other property, assets or rights owned by the Borrowers or by the Grandunion Guarantor or by the Personal Guarantor whether present or future, without the prior written consent of the Lender;

19.18 to send (or procure that it is sent) to the Lender as soon as the same is instituted (or, to the knowledge of the Borrowers or any of them threatened), details of any litigation, arbitration or administrative proceedings against or involving the Borrowers (or either of them) and/or the other Security Parties (or any of them) or the Ships (or either of them) or the Shares (or any of them), which is likely to have a material adverse effect on the Borrowers (or either of them), the other Security Parties (or any of them) or the operation of the Ships (or either of them);

19.19 to comply (and ensure that each other Security Party will comply) with all laws regulations treaties and conventions applicable to the Borrowers, the other Security Parties and the Ships and to carry on the Ships all certificates and other documents which may from time to time be required to evidence such compliance;

19.20 not to and ensure and procure that each Security Party shall not dissolve, merge into or consolidate with any other company or person and procure that no change in the management or the legal or beneficial ownership of the Borrowers, the other Security Parties and the Ships shall be effected;

19.21    to ensure and procure that no change of Control in the Grandunion Guarantor shall occur without the Lender's prior written consent;

19.22    to execute and procure the execution by each other Security Party of any further document or documents required by the Lender in order to perfect or complete the security created by the Finance Documents;

19.23    to use the proceeds of the Facility for the Borrowers' benefit and under their full responsibility and exclusively for the purposes specified in this Agreement;

19.24    to ensure and procure that at all times throughout the Security Period the Borrowers and/or the Guarantors shall maintain with the Lender to the credit of any account held with the Lender (including the Earnings Accounts) free cash deposits having minimum average quarterly balances of an aggregate amount equal to the interest payable under this Agreement for the next three (3) months;

19.25    to ensure and procure that on the Acquisition Date the Aries Maritime Shares' Charge shall be executed by the Grandunion Guarantor;

19.26    to ensure and procure that the Swap Exposure shall not exceed the Maximum Permitted Swap Exposure,

19.27    to supply the Lender with quarterly Budgets showing all forecasted operating expenses and disbursements of whatsoever nature in relation to the Ships (on a per-Ship basis) in such detail and such form as the Lender shall require. The said Budgets shall be delivered to the Lender as soon as possible prior to, and in any event not more later than seven (7) days before the expiry of the quarterly period to which the previous Budget relates with the first such period expiring on 31 December 2009; and

19.28    to deliver to the Lender such documents and evidence as the Lender shall from time to time require relating to the verification of identity and knowledge of the Lender's customers and the compliance by the Lender with all necessary "know your customer" or similar checks, always on the basis of applicable laws and regulations or the Lender's own internal guidelines, in each case as such laws, regulations or internal guidelines apply from time to time.

## 20.    INSURANCE UNDERTAKINGS

The Borrowers hereby jointly and severally undertake with the Lender that throughout the Security Period the Borrowers shall (at the expense of the Borrowers and upon such terms, in such amounts and with such Insurers as shall from time to time be approved in writing by the Lender) comply with the following provisions of this Clause 20, except as the Lender may otherwise permit:

20.1    to insure and keep insured the Ships in Dollars or such other currency as may be approved in writing by the Lender, in the full insurable value of the Ships but in no event for an

- aggregate amount which is less than one hundred and thirty per cent (130%) of the Market Values of the Ships subject to a Mortgage against fire, marine and other risks (including Excess Risks) and War Risks covered by hull and machinery policies;

20 2 to enter each Ship in the name of the relevant Owner for her full value and tonnage in a protection and indemnity association approved by the Lender with unlimited liability if available otherwise for the highest possible standard cover for the time being $1,000,000,000 for oil pollution and for excess oil spillage and pollution liability insurance for the highest possible standard cover against all Protection and Indemnity Risks;

20 3 if either Ship enters the territorial waters of the United States of America for any reason whatsoever, to take out such additional insurance to cover such risks as may be necessary in order to obtain a Certificate of Financial Responsibility from the United States Coastguard;

20 4 upon the Lender's request, to effect loss of hire and/or Earnings, insurance on the Ships or either of them (as may be required by the Lender) in respect of charterparties which exceed six (6) months duration and otherwise on such terms and in such amounts as the Lender may instruct the Borrowers as being necessary or appropriate;

20 5 to effect such additional insurances as may reasonably be requested by the Lender to maintain the scope of the existing cover of the Insurances;

20 6 to renew the Insurances at least fourteen (14) days before the relevant Insurances expire and to procure that the Approved Brokers shall promptly confirm in writing to the Lender as and when each such renewal is effected;

20.7 punctually to pay all premiums, calls, contributions or other sums payable in respect of the Insurances and to produce all relevant receipts when so required in writing by the Lender;

20.8 to pay to the Lender on demand all premiums or other amounts payable by the Lender in effecting a mortgagee's interest policy and a mortgagee's interest (additional perils) insurance policy in the name of the Lender upon such terms and conditions and with such insurers and for such amounts as the Lender may require, the aggregate of which amounts in the case of the Ships subject to a Mortgage shall not be less than one hundred and ten per cent (110%) of the Market Values of the Ships and under such wording and conditions acceptable to the Lender;

20.9 to arrange for the execution of such guarantees as may from time to time be required by any Protection and Indemnity or War Risks association;

20.10 to give notice of assignment of the Insurances to the Insurers in the form set out in Schedule 2 to each of the General Assignments and to procure that a copy of each notice of assignment shall be endorsed upon or attached to the relevant Insurance Documents;

20.11 to procure that the Insurance Documents shall be deposited with the Approved Brokers and that such brokers shall provide the Lender with certified copies thereof and shall issue to

the Lender a letter or letters of undertaking in such form as the Lender shall reasonably require;

20.12   to procure that the Protection and Indemnity and/or War Risks associations in which each of the Ships is entered shall provide the Lender with a letter or letters of undertaking in their standard form and shall provide the Lender with a copy of the certificates of entry;

20.13   to procure that the Insurance Documents (including all certificates of entry in any Protection and Indemnity and/or War Risks association) shall contain loss payable clauses in the form set out in Schedule 3 or Schedule 4 (as may be appropriate) to each General Assignment;

20.14   to procure that the Insurance Documents shall provide that the lien or set off for unpaid premiums or calls shall be limited to only the premiums or calls due in relation to the Insurances on the Ships and for fourteen (14) days prior written notice to be given to the Lender by the Insurers (such notice to be given even if the Insurers have not received an appropriate enquiry from the Lender) in the event of cancellation or termination of Insurances and in the event of the non-payment of the premium or calls, the right to pay the said premium or calls within a reasonable time;

20.15   promptly to provide the Lender with full information regarding any casualties or damage to either Ship in an amount in excess of Three hundred thousand Dollars ($300,000) or in consequence whereof any of the Ships has become or may become a Total Loss;

20.16   at the request of the Lender, to provide the Lender, at the Borrowers' cost, with a detailed report issued by a firm of marine insurance brokers or consultants appointed by the Lender in relation to the Insurances;

20.17   not to do any act nor voluntarily suffer nor permit any act to be done whereby any Insurance shall or may be suspended or avoided and not to suffer nor permit either Ship to engage in any voyage nor to carry any cargo not permitted under the Insurances in effect without first covering such Ship to the amount herein provided for with insurance satisfactory to the Lender for such voyage or the carriage of such cargo;

20.18   (without limitation to the generality of the foregoing) in particular not permit either Ship to enter or trade to any zone which is declared a war zone by any Government or by such Ship's War Risks Insurers unless there shall have been effected by the Borrowers as appropriate and at their expense such special insurance as the War Risk Insurers may require;

20.19   to procure that all amounts payable under the Insurances are paid in accordance with the loss payable clause in the form set out in Schedule 3 or Schedule 4 (as may be appropriate) to each General Assignment and to apply and procure that all amounts as are paid to the relevant Owner are applied to the repair of the damage and the reparation of the loss in respect of which the said amounts shall have been received; and

20 20    should any Ship be laid up for any period, to arrange "lay up" Insurances for such Ship during such period, at their own cost and upon such terms and conditions, in such amounts and with such Insurers as shall from time to time be approved in writing by the Lender

## 21.    OPERATIONAL UNDERTAKINGS

The Borrowers hereby jointly and severally undertake with the Lender that throughout the Security Period the Borrowers shall (and shall procure that each other relevant Security Party shall) comply with the following provisions of this Clause 21.1 except as the Lender may otherwise permit:

21 1    to ensure and procure that each Ship shall be duly registered under the laws of the relevant Flag State in the ownership of its Owner and each Owner shall not do or suffer to be done anything whereby such registration may be forfeited or imperilled;

21.2    to ensure that all Earnings of each Ship shall be paid into the relevant Earnings Account opened in the name of the Owner of such Ship;

21 3    to ensure that when due and payable, all taxes, assessments, levies, governmental charges, fines and penalties lawfully imposed on and enforceable against the Ships or any of them shall be paid by the Borrowers, unless contested in good faith and by the appropriate proceedings;

21.4    to ensure that neither Ship (or any share thereof or interest therein) shall be sold transferred, mortgaged, charged, hypothecated or abandoned (save in the case of maritime necessity) and neither the Insurances nor the Earnings of the Ships or either of them will be assigned without the prior written consent of the Lender which it shall have the power to withhold;

21.5    to ensure that neither Ship shall be operated in any manner contrary to any law or regulations in any relevant jurisdiction, including, without limitation the ISM Code and ISPS Code and none of the Owners and the Manager shall engage in any unlawful trade or carry any cargo that will expose the relevant Ship to penalty, forfeiture or capture and in the event of hostilities in any part of the world (whether a war be declared or not) not employ either Ship or voluntarily suffer her employment in carrying any contraband goods;

21.6    to ensure that no Owner shall create or permit to be created or continued any lien or Encumbrance(s) on its Ship and/or the Insurances and/or the Earnings of its Ship (other than Permitted Liens) and/or shall satisfy all claims and demands which if unpaid might in law or by statute or otherwise create a lien or Encumbrance(s) and (without prejudice to the generality of the foregoing) no lien or Encumbrance(s) shall be created or permitted to be created or continued on its Ship for any reason whatsoever other than Permitted Liens;

21.7    to ensure that on the request of the Lender, each Owner shall provide and procure that the Lender shall be provided with satisfactory evidence that the wages, allotments, insurance and pension contributions of the Master and crew of its Ship are being paid in accordance

with the articles of agreement relating to such Ship and the relevant regulations and that all deductions from the remuneration of the Master and crew in respect of any tax liability (including social insurance contributions) are being made and accounted for to the relevant authority and that the Master of its Ship has no claim for disbursements other than those properly incurred by him in the ordinary trading of such Ship on the voyage then in progress;

21.8    if any writ or proceedings shall be issued against either Ship or if either Ship shall be otherwise attached, arrested or detained by any proceeding in any court or tribunal or by any government or other authority, the Owners shall immediately notify and procure that the Lender shall be notified thereof by telefax confirmed by letter and as soon as practicably possible thereafter cause such Ship to be released and all liens or Encumbrance(s) (except for the Mortgage and any Permitted Liens on such Ship) thereon to be discharged;

21.9    save for the Charters, no Owner shall without the prior written consent of the Lender (which consent shall not be unreasonably withheld) voyage or time charter its Ship or place her under contract for employment for any period which when aggregated with any optional periods of extension contained in the said charter or contract, would exceed six (6) months duration; provided however that in the event of a Ship being employed (with the Lender's prior written consent) under any demise or bareboat charter or any charter which when aggregated with any optional periods contained in such charter would exceed six (6) months duration, the Lender shall be furnished forthwith with (a) details and documentary evidence satisfactory to the Lender in its sole discretion in respect of the new employment, (b) upon Lender's request, a specific assignment in favour of the Lender of the benefit of such charter together with a notice of any such assignment addressed to the relevant charterer and endorsed with an acknowledgement of receipt by the relevant charterer all in form and substance satisfactory to the Lender and (c) upon Lender's request, a specific agreement of subordination of the rights of such charterer to the rights of the Lender;

21.10   neither of the Owners shall without the prior written consent of the Lender (which it shall have full power to withhold) demise charter its Ship for any period whatsoever;

21.11   neither of the Owners shall without the prior written consent of the Lender (which it shall have full power to withhold) deliver its Ship into the possession of any person or persons for effecting repairs or renewals to such Ship the cost of which will exceed the amount of Three hundred thousand Dollars ($300,000) unless such person or persons shall have given a written undertaking to the Lender not to exercise any lien or right of detention on such Ship in respect of the cost of such repairs or renewals;

21.12   at all times and at the Owners' own expense, each Owner shall maintain its Ship in a seaworthy condition and in good running order and repair in accordance with first class ship ownership and ship management practice and keep and procure that its Ship is kept in such condition as will entitle him to the highest classification status with the Classification Society free from recommendations and notations which have not been complied with in accordance with their terms and procure that the Lender is provided with certificates issued

- by their Classification Society that such classification status is maintained and with copies of all other classification certificates as the Lender may request in writing;

21.13 each Owner shall submit its Ship regularly to such periodical or other surveys as may be required for classification purposes and, if so required by the Lender in writing, supply and procure that the Lender is supplied with copies of all survey reports issued in respect thereof;

21.14 the Owners shall notify and procure that the Lender is notified immediately by telefax of any recommendation or requirement imposed on the Ships by their Classification Society, their Insurers or by any other competent authority that is not complied with in accordance with its terms;

21.15 the Owners shall give and procure that the Lender is given with reasonable prior notice of any proposed dry docking or any underwater survey of a Ship so that the Lender (if it so desires) can arrange for a representative to be present;

21.16 the Owners shall authorise and procure that the Classification Society and all other regulatory authorities of the Ships are authorised to disclose to the Lender any information or documents requested by the Lender relating to the classification, repair, maintenance or seaworthiness of the Ships;

21.17 the Borrowers shall comply with all legal requirements whether imposed by enactment, regulation, common law or otherwise and have on board the Ships as and when legally required valid certificates showing compliance therewith;

21.18 without prejudice to Clause 21.17, the Owners shall take all necessary and proper precautions to prevent any infringements of the Anti-Drug Abuse Act of 1986 of the United States of America or any similar legislation applicable to the Ships in any jurisdiction in or to which a Ship shall be employed or trade or which may otherwise be applicable to a Ship, the Owners or either of them or any other Security Party and, if the Lender shall so require, the Owners shall enter into a "Carrier Initiative Agreement" with the United States Customs Service and to procure that such agreement (or any similar agreement hereafter introduced by any agency of the United States of America) is maintained in full force and effect by the Owners;

21.19 the Owners shall comply with and procure that the Manager and all servants and agents of the Owners and the Manager or any charterer of the Ships shall comply with, the ISM Code, the ISPS Code, all Environmental Laws and all legislation of any state or government in relation to the Ships, their ownership, operation and management or to the business of the Owners including, without limitation, requirements relating to manning, submission of oil spill response plans, designation of qualified individuals and establishing financial responsibility;

21.20 the Owners shall hold or procure that the Manager shall hold all appropriate ISM Documentation and provide the Lender with copies of the relevant ISM Code

49

Documentation and ISPS Code Documentation duly issued to the Owners, the Manager and the Ships pursuant to the ISM Code and the ISPS Code;

21.21   the Owners shall keep or procure that it is kept onboard each Ship a copy of all relevant ISM Code Documentation and ISPS Code Documentation respectively;

21.22   the Owners shall perform and discharge all duties and liabilities imposed on the Owners or either of them under any charter (including, without limitation, the Charters), bill of lading or other contract relating to the Ships;

21.23   the Owners shall not remove or permit the removal of any part of either Ship or any equipment belonging thereto, nor make or permit to be made any alteration in the structure type or speed of either Ship which materially reduced the value of such Ship (unless such removal or alteration is required by statute or by her Classification Society) without the prior written consent of the Lender which it shall have full power to withhold;

21.24   at all reasonable times and on reasonable notice, the Owners shall permit and procure that the Lender or its authorised representative is permitted full and complete access to the Ships for the purpose of inspecting the state and condition of the Ships and their cargo and papers and at the written request of the Lender deliver and procure the delivery for inspection copies of any and all contracts and documents relating to the Ships whether on board or not;

21.25   the Owners shall keep and procure that the Lender is kept fully informed as to the use, the employment and the position of each Ship and promptly provide and procure that the Lender is provided with information concerning the classification, status and insurance of each Ship from time to time as and when so required in writing by the Lender;

21.26   when so requested by the Lender, the Owners shall appoint and procure that two (2) independent sale and purchase shipbrokers shall be appointed, nominated by the Lender to give valuations of each Ship without physical inspection and on the basis of an arms length purchase by a willing buyer from a willing seller and, unless the Lender otherwise requires, without taking into account the relevant Charter or any other charterparty in respect thereof; all costs and fees payable in connection with such valuations shall be paid by the Owners and the value of each Ship shall be determined by taking into account the average of the aforesaid valuations;

21.27   in the event of Compulsory Acquisition of a Ship by any Government Entity, the Owners shall execute and procure the execution of any assignment that the Lender may request in relation to any and all amounts which such Government Entity shall be liable to pay as Requisition Compensation for such Ship or for her use and if received by the Owners to pay and procure the payment of such amounts immediately to the Lender;

21.28   each Owner shall appoint and procure the appointment of the Manager as manager of its Ship and shall not vary or terminate this appointment without the Lender's prior written consent;

21.29    the Owners shall execute and deliver to the Lender such documents of transfer as the Lender may require in the event of sale of any of the Ships pursuant to any power of sale contained in the Mortgages or any of them or which the Lender may have in law;

21.30    the Owners shall not employ the Ships or either of them nor allow their employment in any manner contrary to any law or regulation in any relevant jurisdiction including, but not limited to, the ISM Code and the ISPS Code;

21.31    the Owners shall immediately notify the Lender by fax, confirmed forthwith by letter, of:

(i)     any casualty in respect of a Ship which is or is likely to be or to become a Major Casualty;

(ii)    any occurrence as a result of which a Ship has become or is, by the passing of time or otherwise, likely to become a Total Loss;

(iii)   any requirement or recommendation made by any insurer or classification society or by any competent authority in respect of a Ship which is not complied with in accordance with its terms;

(iv)    any arrest or detention of a Ship, any exercise or purported exercise of any lien on a Ship or her Earnings or her Insurances or any requisition of a Ship for hire;

(v)     any intended dry docking of a Ship;

(vi)    any Environmental Claim made against the Owners or either of them or in connection with a Ship or any Environmental Incident in respect thereof;

(vii)   any claim for breach of the ISM Code or the ISPS Code, being made against the Owners or either of them and/or the Manager or otherwise in connection with a Ship; or

(viii)  any other matter, event or incident, actual or threatened the effect of which will or could lead to the ISM Code and/or the ISPS Code not being complied with;

and advise and procure that the Lender shall be advised in writing on a regular basis and in such detail as the Lender shall require of the Owners' or any other person's response to any of those events or matters;

21.32    each Owner shall keep prominently in the Chart Room and in the Master's cabin of its Ship a framed duly completed notice printed in plain type of such size that the area of print shall cover a space not less than six inches wide and nine inches high reading as follows:

"NOTICE OF MORTGAGE

This Ship is owned by [name of Owner] (the "Owner") and is subject to a [first priority mortgage and accompanying deed of covenants] [preferred Mortgage] in favour of **MARFIN**

**EGNATIA BANK Societe Anonyme**. Under the terms of the said mortgage [and deed of covenants] a certified copy of which is preserved with the Ship's papers neither the Owner nor the Captain nor any officer or agent nor any charterer of this Ship nor any other person whatsoever has any power, right or authority whatever to create, incur or permit the imposition on this Ship any commitments or encumbrances except for crews wages accrued for not more than three (3) months or salvage "; and

21.33   each Owner shall comply with its respective obligations under each Subject Document and shall not vary, amend or terminate any of the aforesaid documents.

## 22.   EARNINGS ACCOUNTS

22.1    The Lender acknowledges that the Borrowers shall, unless and until an Event of Default (or any event which only with the giving of notice or passage of time or a determination by the Lender and/or satisfaction of any condition or any combination of the foregoing may become an Event of Default) shall occur and the Lender shall direct to the contrary, be entitled from time to time, to require that moneys for the time being standing to the credit of the Earnings Accounts or either of them be transferred in such amounts and for such periods as the Borrowers select to fixed-term deposit accounts (**"deposit accounts"**) opened in the name of the Borrowers with the Lender. Neither of the Borrowers shall be entitled to withdraw moneys standing to the credit of the Earnings Accounts which are the relevant subject of a fixed term deposit until the expiry of the period of such deposit unless the Borrowers shall, on withdrawing such moneys pay to the Lender on demand any loss or expense which the Lender shall certify that it has sustained or incurred as a result of such withdrawal being made prior to the expiry of the period of the relevant deposit and the Lender shall be entitled to debit the relevant Earnings Account for the amount so certified prior to such withdrawal being made. Without prejudice to the foregoing in the event that any moneys so deposited are to be applied pursuant to Clause 12, the Borrowers shall, on such application being made, pay to the Lender on demand any loss or expense which the Lender shall certify that it has sustained or incurred as a result of such application being made prior to the expiry of the period of the relevant deposit and the Lender shall be entitled to debit the relevant Earnings Account for the amount so certified prior to such application being made. Any deposit accounts shall, for all the purposes of the Finance Documents, be deemed to be sub-accounts of the relevant Earnings Accounts from which the moneys deposited in the deposit accounts were transferred and all references in the Finance Documents to the Earnings Accounts or either of them shall be deemed to include the deposit accounts deemed as aforesaid to be sub-accounts thereof.

22.2    Each Borrower hereby undertakes to ensure that, throughout the Security Period all payments by the Lender to the Borrowers under each Designated Transaction are paid to any Earnings Account.

22.3    The Borrowers (without prejudice to the terms of each General Assignment) hereby undertake to pay all the Earnings of each Ship to the relevant Earnings Account. Unless and until the Lender gives notice to the Borrowers that it requires that all Earnings be paid

directly to the Lender (which notice may only be given by the Lender if an Event of Default has occurred), all amounts in the Earnings Accounts shall be applied as follows:

(i)     first, towards the payment of fees and costs that are due and payable by the Borrowers to the Lender under the Finance Documents; and

(ii)    second, any balance thereafter remaining in the Earnings Accounts shall be available to the Borrowers.

## 23.    SECURITY MARGIN

In the event that during the Security Period the aggregate of (i) the Market Values of the Ships subject to a Mortgage determined pursuant to Clause 21.26 and (ii) the market value of the Shares and the value of any additional security (each valued by the Lender in accordance with normal banking practice) previously provided to the Lender pursuant to this Clause 23, is less than (i) during the first (1st) year of the Availability Period one hundred per cent (100%) and (ii) at any time thereafter one hundred twenty per cent (120%) of the aggregate of the Facility and the Swap Exposure, then the Borrowers shall within twenty one (21) Banking Days of receipt of a notice from the Lender advising the Borrowers of the amount of such deficiency (which notice shall be conclusive) **either** provide to the Lender additional security (valued in accordance with normal banking practice) which shall in all respects be satisfactory to the Lender so that the aggregate of (i) the Market Values of the Ships subject to a Mortgage (determined in accordance with Clause 21.26) and (ii) the market value of the Shares and the value of any additional security (each valued by the Lender in accordance with normal banking practice) previously provided to the Lender pursuant to this Clause 23 is at least (i) during the first (1st) year of the Availability Period one hundred per cent (100%) and (ii) at any time thereafter one hundred twenty per cent (120%) of the aggregate of the Facility and the Swap Exposure, or prepay part of the Facility in accordance with Clause 10 so that the aggregate Market Values of the Ships subject to a Mortgage (determined in accordance with Clause 21.26) and (ii) the market value of the Shares and the value of any additional security (each valued by the Lender in accordance with normal banking practice) previously provided to the Lender pursuant to this Clause 23 is at least (i) during the first (1st) year of the Availability Period one hundred per cent (100%) and (ii) at any time thereafter one hundred twenty per cent (120%) of the aggregate of the Facility and the Swap Exposure.

## 24.    EVENTS OF DEFAULT

24.1    If:

24.1.1          the Borrowers or either of them or any other Security Party fail to pay on the due date for payment any amount which shall have become due hereunder or under the other Finance Documents;

24.1.2          any representation, warranty or statement made by the Borrowers or either of them or any other Security Party in this Agreement or in any of the other Finance

Documents or any certificate, statement or opinion delivered or made hereunder or under the Subject Documents or in connection herewith or with the Subject Documents shall be incorrect or inaccurate when made in any material respect;

24.1.3    an Event of Default under any of the Subject Documents (as defined therein) shall occur;

24.1.4    the Borrowers or either of them or any other Security Party fail(s) duly and punctually to perform or observe any other term of this Agreement and/or the Master Agreement and in any such case such failure, if capable of remedy, shall continue for fourteen (14) days after the Lender shall have given to the Borrowers notice in writing of such failure;

24.1.5    except when contested in good faith and by the appropriate proceedings, any other indebtedness of the Borrowers, the other Security Parties or any of them exceeding in aggregate Five hundred thousand Dollars ($500,000), shall become due and payable or, with the giving of notice or lapse of time or both, capable of being declared due and payable prior to its stated maturity by reason of any circumstance entitling the creditor(s) thereof to declare such indebtedness due and payable and such indebtedness is not paid within fourteen (14) days thereof;

24.1.6    the Borrowers or either of them or any other Security Party or any other member of the Group shall enter into voluntary or involuntary bankruptcy, liquidation or dissolution, or shall become insolvent, or an administrator, administrative receiver, receiver or liquidator shall be appointed of all or a material part of its undertaking or assets or proceedings are commenced by or against them/it under any reorganisation, arrangement, readjustment of debts, dissolution or liquidation law or regulation, or if any event shall occur which, under the relevant system of law, shall have an equivalent effect;

24.1.7    the Borrowers or either of them or any other Security Party or any other member of the Group shall cease or threaten to cease to carry on the whole or a substantial part of their/its business;

24.1.8    the Borrowers or either of them or any other Security Party or any other member of the Group shall transfer or dispose of all or a substantial part of their/its assets whether by one or a series of transactions, related or not;

24.1.9    the Subject Documents or any of them shall cease, in whole or in part, to be valid, binding and enforceable;

24.1.10   the Borrowers or either of them shall sell, transfer, dispose of or encumber their/its Ship or any interest or share therein, or agree so to do (other than Permitted Liens) without the prior written consent of the Lender;

24.1.11      either Ship shall become a Total Loss and the Borrowers shall fail to make the
             mandatory prepayment required to be made under Clause 10.1 in respect of such
             Total Loss within the time therein set forth;

24.1.12      any governmental or other consent, licence or authority required to make this
             Agreement and/or any of the other Finance Documents legal, valid, binding,
             enforceable and admissible in evidence or required to enable the Borrowers or
             either of them or any other Security Party to perform their/its respective duties and
             discharge their/its liabilities hereunder or under the other Finance Documents is
             withdrawn or ceases to be in full force and effect unless the Borrowers or such
             other Security Party procures that such consent, licence or authority is reinstated or
             re-issued to the satisfaction of the Lender within fifteen (15) calendar days of the
             said withdrawal or cessation;

24.1.13      any distress or execution is levied or enforced against a material (in the opinion of
             the Lender) part of the property and assets of the Borrowers or either of them or
             any other Security Party and such distress or execution is not withdrawn or
             discharged within ten (10) Banking Days; or

24.1.14      the Borrowers or either of them or any other Security Party or any other member of
             the Group shall stop payment of, or shall be unable to, or shall admit inability to pay
             their/its debts as they fall due, or shall enter into any composition or other
             arrangement with their/its creditors generally or shall declare a general moratorium
             on the payment of indebtedness;

24.1.15      the fulfilment of any one or more of the obligations covenants and undertakings
             contained in any one or more of this Agreement, the other Finance Documents and
             any other documents executed pursuant hereto or thereto or the exercise of any of
             the rights vested in the Lender hereunder or thereunder becoming either unlawful
             under any applicable law or unauthorised by any authority having jurisdiction or
             otherwise impossible;

24.1.16      if the Personal Guarantor dies or otherwise ceases to be actively involved in the
             business of the Borrowers and the Borrowers failing upon Lender's request to
             provide the Lender with a guarantee from an alternative Personal Guarantor
             acceptable to the Lender in its sole discretion within sixty (60) days from such
             request;

24.1.17      if (a) an Event of Default or Potential Event of Default (in each case as defined in
             the Master Agreement) has occurred and is continuing under the Master
             Agreement or (b) an Early Termination Date (as defined in the Master Agreement)
             has occurred or been or become capable of being effectively designated under the
             Master Agreement or (c) a person entitled to do so gives notice of an Early
             Termination Date under Section 6(b)(iv) of the Master Agreement or (d) the Master
             Agreement is terminated, cancelled, suspended, rescinded or revoked or otherwise
             ceases to remain in full force and effect for any reason;

24 1 18        a material adverse change occurs in the financial condition or operation of any one or more of the Security Parties or any other member of the Group;

24 1.19        if any Security Party or any Charterer repudiates or evidences an intention to repudiate any one or more of the Subject Documents or if any Subject Document is rescinded or cancelled or terminated or amended or varied, without the Lender's prior written consent; or

24 1.20        if either Ship is arrested or detained and such arrest or detention is not released within fourteen (14) days, or an order for the sale of either Ship is made by a court of competent jurisdiction or the Borrowers cease to retain possession and/or control of either Ship for a period in excess of fourteen (14) days

then, and in any such event and at any time thereafter, the Lender may by written notice to the Borrowers declare that the Facility of the Lender shall be cancelled, whereupon the same shall be cancelled and declare the Indebtedness immediately due and payable whereupon the same shall become so payable to the Lender

24 2        All amounts received by the Lender under or pursuant to any of the Finance Documents after the happening of any Event of Default shall be applied by the Lender in payment of the Indebtedness in accordance with the terms of Clause 12.

24 3        On the occurrence of an Event of Default the Lender shall have the right and power to order the Ships or either of them to proceed forthwith at the Borrowers' risk and expense to a port or place nominated by the Lender. The Borrowers undertake to give the necessary instructions to the Master of each Ship to comply with any such order of the Lender and if the Borrowers fail to give such instructions for any reason whatsoever the Lender shall have the right and power to give such instructions direct to the Master(s).

24 4        On the occurrence of any Event of Default the Lender shall be entitled but not obliged to, exercise all its rights under the Master Agreement and to, *inter alia*, cancel, net out, unwind, terminate or liquidate all or any part of the rights, benefits and obligations created by any Designated Transaction and/or the Master Agreement. Without prejudice to or limitation of the obligations of the Borrowers hereunder and under the Master Agreement, in the event that the Lender exercises any of its rights under the Master Agreement and such exercise results in all or part of a Designated Transaction being terminated, such termination shall constitute a Terminated Transaction (as defined in section 14 of the Master Agreement) effected by the Lender after an Event of Default (as so defined in that section 14) by the Borrower and, accordingly, the Lender shall be entitled to recover from the Borrowers a payment for early termination calculated in accordance with the provisions of section 6(e)(i) of the Master Agreement

**25. - SET-OFF**

25.1    The Lender shall have the right, in addition to all rights of set off, combination, lien or otherwise which it has at law or under any agreement between the Lender and the Borrowers or any of them at any time without demand after the occurrence of an Event of Default:

25.1.1    to set off any amount to the credit of any existing accounts of the Borrowers or either of them and/or the Grandunion Guarantor with the Lender (whether deposit, loan or any other account) including, without limitation, the Earnings Accounts in or towards satisfaction of all amounts due from the Borrowers under this Agreement and/or the other Finance Documents; and

25.1.2    to transfer and apply any amount standing to the credit of any such existing accounts of the Borrowers or either of them and/or the Grandunion Guarantor and/or the Personal Guarantor with any associate or subsidiary of the Lender in or towards satisfaction of all amounts due from the Borrowers or either of them under this Agreement and/or the other Finance Documents

25.2    Where such set-off or transfer requires the conversion of one currency into another, such conversion shall be calculated at the spot rate as conclusively determined by the Lender for purchasing such currency with the currency in which the relevant amounts are denominated on the date of actual payment

**26.    FEES**

26.1    The Borrowers shall pay to the Lender a renewal fee (the "**Renewal Fee**") of Thirty thousand Dollars ($30,000) on each date on which the Lender may agree to an extension of the Expiration Date in accordance with Clauses 11.2 and 11.3.

26.2    The Borrowers shall also pay to the Lender a commitment fee (the "**Commitment Fee**") of zero point five per cent (0.5%) per annum on the amount of the Facility which is from time to time available and has not been drawn down from the date of acceptance of the Commitment Letter until the expiry of the Availability Period, such Commitment Fee to be payable on each relevant Termination Date, such Commitment Fee shall be calculated upon the exact number of days which have elapsed on the basis of a year consisting of three hundred and sixty (360) days and shall be payable quarterly in arrears and on each relevant Termination Date.

**27.    EXPENSES**

27.1    Whether or not the Facility or any part thereof, is actually drawn down the Borrowers shall reimburse the Lender on demand for all costs, charges and expenses incurred by the Lender in connection with the preparation, negotiation and conclusion of this Agreement and the other Finance Documents including fees and expenses of the Lender's legal advisers

27.2    The Borrowers shall reimburse the Lender on demand for all charges and expenses (including legal fees) incurred by the Lender in or in connection with the exercise of the Lender's rights and powers under this Agreement and the other Finance Documents (including but not limited to the fees and charges of auditors, brokers, surveyors and lawyers instructed by the Lender) and with the actual, attempted or purported enforcement of, or preservation of rights under this Agreement and the other Finance Documents.

28.    **INDEMNITY**

The Borrowers hereunder jointly and severally undertake and agree to indemnify the Lender, upon the Lender's first demand, from and against any losses, costs or expenses (including legal expenses) which they incur in consequence of any Event of Default including (but without limitation) all losses (including loss of profit for the current Interest Period), premiums and penalties incurred or to be incurred in liquidating or redeploying deposits made by third parties or funds acquired or arranged to advance or maintain the Facility or any part thereof and any liability items which arise, or are asserted, under or in connection with any law relating to safety at sea.

29.    **ENVIRONMENTAL INDEMNITY**

The Borrowers jointly and severally undertake to indemnify the Lender against all damages, losses, liabilities, costs, expenses, penalties, fines or proceedings which may be incurred or paid by or imposed on the Lender directly or indirectly at any time (whether before or after the Indebtedness has been repaid in full) pursuant to any Environmental Law or any other environmental legislation of any state or government which would not have been incurred or paid by or imposed on the Lender had it not entered into this Agreement and/or the other Finance Documents.

30.    **STAMP DUTIES**

The Borrowers shall pay any and all stamp, registration and similar taxes and charges of whatsoever nature which may be payable or determined to be payable on, or in connection with, the execution, registration, notarisation, performance or enforcement of this Agreement or the other Finance Documents. The Borrowers shall indemnify the Lender against any and all liabilities with respect to or resulting from delay or omission on the part of the Borrowers or any of them to pay any such taxes.

31.    **DETERMINATIONS**

Each determination of an Interest Rate or a Default Rate or of any amount in respect of principal or interest or fees or expenses by the Lender in accordance with this Agreement and every other determination or certification by the Lender under this Agreement shall be conclusive and binding on the Borrowers in the absence of manifest error.

## 32. NO WAIVER

No failure to exercise and no delay on the part of the Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or power preclude any other or future exercise thereof or the exercise of any other right or power. The rights, powers and remedies herein provided are cumulative and not exclusive of any rights, powers or remedies provided by law.

## 33. PARTIAL INVALIDITY

In the event that any term or condition of this Agreement is rendered or declared illegal, invalid or inoperative in whole or in part by any statute rule or regulation or any decision of any court or tribunal of competent jurisdiction then such determination or declaration shall neither affect the validity of any other term or condition of this Agreement which (save as aforesaid) will remain in full force and effect nor the legality, validity or enforceability of such term or condition under the laws of any other jurisdiction.

## 34. TRANSFER, ASSIGNMENT, PARTICIPATION, CHANGE OF LENDING BRANCH

34.1 This Agreement shall bind and be to the benefit of the Borrowers and the Lender and their respective successors and permitted assigns.

34.2 Neither of the Borrowers may assign any of its rights, powers, duties or liabilities hereunder without the prior written consent of the Lender which it shall have full power to withhold.

34.3 The Lender may, without prior notice or the consent of the Borrowers or any other Security Party, at any time assign, transfer all or part of the Facility and its rights and powers under this Agreement to any other bank or other financial institution (the "**Transferee Lender**"). The Lender shall notify the Borrowers of any such assignment or transfer as soon as practicable.

34.4 The Lender may at any time and from time to time change its lending office in respect of the whole or any part of its participation in the Facility. The Lender shall notify the Borrowers of any such change in the lending office as soon as is practicable

34.5 If the Lender transfers or assigns, transfers or in any other manner grants participation in respect of all or any part of its rights, powers duties and liabilities hereunder pursuant to Clause 34.3 the Borrowers undertake immediately on being requested to do so by the Lender and at the cost of the Lender to enter into and procure that the other parties to the Finance Documents shall enter into, such documents as may be necessary or desirable to transfer to the relevant assignee, transferee or participant all or the relevant part of the Lender's interest in the Finance Documents and all relevant references in this Agreement and the Finance Documents to the Lender shall thereafter be construed as a reference to the Lender and/or such assignee, transferee or participant (as the case may be) to the extent of their respective interests.

34.6     The Lender may disclose to a potential assignee, transferee of participant or to any other person who may propose entering into contractual relations with the Lender in relation to this Agreement such information about the Borrowers and the other Security Parties as the Lender shall consider appropriate.

## 35.     NON-IMMUNITY

35.1     Neither of the Borrowers nor any other Security Party has any right of immunity from set-off, suit or execution, attachment or other legal process under the laws of the United Kingdom, or the Republic of Greece or the Republic of the Marshall Islands, or the Republic of Liberia or Malta or Bermuda.

35.2     The exercise by each of the Borrowers of its rights and performance and discharge of its duties and liabilities hereunder will constitute commercial acts done and performed for private and commercial purposes.

35.3     To the extent that the Borrowers or either of them may in any jurisdiction in which proceedings may at any time be taken for the enforcement of this Agreement and/or any of the other Finance Documents claim for themselves or their assets immunity from suit, judgment, execution, attachment (whether, before judgment or otherwise) or other legal process, and to the extent that in any such jurisdiction there may be attributed to themselves or their assets any such immunity (whether or not claimed), the Borrowers hereby irrevocably agree not to claim and hereby irrevocably waive any such immunity to the full extent permitted by the laws of such jurisdiction.

## 36.     NOTICES

36.1     Unless otherwise specifically provided, any notice under or in connection with any Finance Document shall be given by letter or fax; and references in the Finance Documents to written notices, notices in writing and notices signed by particular persons shall be construed accordingly.

36.2     A notice shall be sent:

(a)     to the Borrowers:          c/o STAMFORD NAVIGATION INC.
                                   1-7, Flessa & 83, Akti Miaouli
                                   185 38 Piraeus
                                   Greece
                                   Fax No.: +30 213 0148408

(b)     to the Lender at:          24B Kifissias Avenue
                                   151 25 Maroussi
                                   Attiki, Greece
                                   Fax No: +30 210 6896358

or to such other address as the relevant party may notify the other in writing.

36.3    Subject to Clauses 36.4 and 36.5:

    (a)    a notice which is delivered personally or posted shall be deemed to be served, and shall take effect, at the time when it is delivered;

    (b)    a notice which is sent by fax shall be deemed to be served, and shall take effect, two (2) hours after its transmission is completed.

36.4    However, if under Clause 36.3 a notice would be deemed to be served:

    (a)    on a day which is not a Banking Day in the place of receipt; or

    (b)    on such a Banking Day, but after 5 p.m. local time;

the notice shall (subject to Clause 36.5) be deemed to be served, and shall take effect, at 9 a.m. on the next day which is such a Banking Day.

36.5    Clauses 36.3 and 36.4 do not apply if the recipient of a notice notifies the sender within one (1) hour after the time at which the notice would otherwise be deemed to be served that the notice has been received in a form, which is illegible in a material respect.

36.6    A notice under or in connection with a Finance Document shall not be invalid by reason that the manner of serving it does not comply with the requirements of this Agreement or, where appropriate, any other Finance Document under which it is served if the failure to serve it in accordance with the requirements of this Agreement or other Finance Document, as the case may be, has not caused any party to suffer any significant loss or prejudice.

36.7    Any notice under or in connection with a Finance Document shall be in English.

36.8    In this Clause "notice" includes any demand, consent, authorisation, approval, instruction, waiver or other communication.

**37    SUPPLEMENTAL**

37.1    The rights and remedies which the Finance Documents give to the Lender are:

    (a)    cumulative,

    (b)    may be exercised as often as appears expedient; and

    (c)    shall not, unless a Finance Document explicitly and specifically states so, be taken to exclude or limit any right or remedy conferred by any law.

37.2    If any provision of a Finance Document is or subsequently becomes void, unenforceable or illegal, that shall not affect the validity, enforceability or legality of the other provisions of that Finance Document or of the provisions of any other Finance Document.

37.3    A Finance Document may be executed in any number of counterparts.

37.4    A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

37.5    This Agreement supersedes the terms and conditions contained in any correspondence relating to the subject matter of this Agreement exchanged between the Lender and the Borrowers or their representatives prior to the date of this Agreement including, without limitation, the Commitment Letter.

## 38.    LAW AND JURISDICTION

38.1    This Agreement shall be governed by, and construed in accordance with, English law.

38.2    Subject to Clause 38.3, the courts of England shall have exclusive jurisdiction to settle any disputes, which may arise out of or in connection with this Agreement.

38.3    Clause 38.2 is for the exclusive benefit of the Lender, which reserves the right:

(a)    to commence proceedings in relation to any matter which arises out of or in connection with this Agreement in the courts of the Republic of Greece and/or any country other than England or Greece and which have or claim jurisdiction to that matter; and

(b)    to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in England or Greece or without commencing proceedings in England or Greece.

The Borrowers shall not commence any proceedings in any country other than England in relation to a matter, which arises out of or in connection with this Agreement.

38.4    The Borrowers irrevocably appoint HFW Nominees Limited, presently at Friary Court, 65 Crutched Friars, London EC3N 2AE, England, to act as its/their agent to receive and accept on their/its behalf any process or other document relating to any proceedings in the English courts which are connected with this Agreement.

38.5    The Borrowers irrevocably designate and appoint Mr. George Livanos, an Attorney-at-law with offices at 2 Thesmoforiou Street, Piraeus 18454, Greece, as agent for the service of process in Greece ("*antiklitos*") and agree to consider any legal process or any demand or notice made served by or on behalf of the Lender on the said agent as being made to the Borrowers. The designation of such an authorized agent ("antiklitos") shall remain irrevocable until all Indebtedness shall have been paid in full in accordance with the terms of this Agreement and the other Finance Documents.

38.6    Nothing in this Clause 38 shall exclude or limit any right which the Lender may have (whether under the law of any country, an international convention or otherwise) with regard

- to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

38 7    In this Clause 38, "proceedings" means proceedings of any kind, including an application for a provisional or protective measure or enforcement court order (*diatagi pliromis*).

## 39.    THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS

In case of any conflict between the provisions of this Agreement and any of the other Finance Documents the provisions of this Agreement shall prevail.

AS WITNESS the hands of the duly authorised representatives of the parties hereto the day and year first above written

**EXECUTION PAGE**

**SIGNED** by

and by          CHAELIS M.                          )

for and on behalf of                               )

**MARFIN EGNATIA BANK Societe Anonyme**            )

in the presence of:                                )

VASILIKI KATSOULI
Attorney-at law
V&P Law Firm
15 Filikis Eterias Square,
106 73 Athens, Greece

CHAELIS M.                    Stavros Yagos


**SIGNED** by   ELENI MAMANTIDI                     )

for and on behalf of                               )

**GRAND RODOSI INC.**                              )

in the presence of:                                )

VASILIKI KATSOULI
Attorney-at-law
V&P Law Firm
15 Filikis Eterias Square,
106 73 Athens, Greece


**SIGNED** by   ELENI MAMANTIDI.                    )

for and on behalf of                               )

**GRAND ANEMI LIMITED**                            )

in the presence of:                                )

VASILIKI KATSOULI
Attorney-at-law
V&P Law Firm
15 Filikis Eterias Square,
106 73 Athens, Greece

64

## SCHEDULE 1

## FORM OF NOTICE OF DRAWDOWN

TO.     MARFIN EGNATIA BANK Societe Anonyme
        24B Kifissias Avenue
        151 25 Maroussi
        Attiki, Greece

Date: [●] 2009

Dear Sirs,

### Financial Agreement made to Grand Rodosi Inc. and Grand Anemi Limited

1.      We refer to the financial agreement dated [●] 2009 (the "**Financial Agreement**") and made
        between ourselves, as joint and several Borrowers and yourselves as Lender, in connection
        with a revolving credit facility of up to One hundred Twelve million Dollars ($112,000,000)

        Terms defined in the Financial Agreement have their defined meanings when used in this
        Notice of Drawdown.

2.      We request to borrow [an] Advance[s] as follows:

        (a)     Amount: $ [●];

        (b)     Drawdown Date: [●] 2009;

        (c)     Duration of the first Interest Period shall be [●] months; and

        (d)     Payment instructions: account in the name of [●] and numbered [●] with [●] of [●].

3.      We represent and warrant that:

        (a)     the representations and warranties in Clause 16 of the Financial Agreement and in
                the other Finance Documents would remain true and not misleading if repeated on
                the date of this notice with reference to the circumstances now existing;

        (b)     no Event of Default has occurred or will result from the borrowing of the above
                Advance[s].

4.      This notice cannot be revoked without your prior written consent

5.      [We authorise you to deduct from the proceeds of the above Advance[s] the amount of [(a) the commitment fee referred to in Clause 26 2 and (b)] all legal fees payable pursuant to Clause 18 1 15]

Yours faithfully,

For and on behalf of
**GRAND RODOSI INC.**


..................  .. .. .. ...........  .
Attorney-in-Fact


For and on behalf of
**GRAND ANEMI LIMITED**


.. .. ......  .. .. .. .. .. .. .. .
Attorney-in-Fact

## SCHEDULE 2

## FORM OF ACKNOWLEDGEMENT

Date: [●]

**Financial Agreement dated [●] 2009 (the "Financial Agreement")**

We the undersigned Borrowers declare that in connection with the above Financial Agreement we received [an] Advance[s] in the amount of [●] Dollars ($[●]) value [●]

Capitalised terms used herein shall have the respective meanings specified in the Financial Agreement.

Yours faithfully,

For and on behalf of
**GRAND RODOSI INC.**

...............................................................
Attorney-in-Fact

For and on behalf of
**GRAND ANEMI LIMITED**

...............................................................
Attorney-in-Fact

67

**SCHEDULE 3**

**FORM OF BUDGET**

Dated ........................... 2009

MARFIN EGNATIA BANK Societe Anonyme
**as Lender**

-and-

GRAND RODOSI INC.
and
GRAND ANEMI LIMITED
**as joint and several Borrowers**

**FINANCIAL AGREEMENT**
Revolving Credit Facility of up to US $112,000,000



## INDEX

1.    PURPOSE..................................................................................................

2.    DEFINITIONS .......................................................................................... 1

3.    THE FACILITY – THE BORROWERS JOINT AND SEVERAL LIABILITY ................ 1

4.    AVAILABILITY – DESIGNATED TRANSACTIONS......................................... 17

5.    NOTICE OF DRAWDOWN ........................................................................ 18

6.    INTEREST PERIODS ............................................................................... 20

7.    INTEREST ............................................................................................. 21

8.    DEFAULT INTEREST ............................................................................... 22

9.    SUBSTITUTE BASIS ............................................................................... 22

11.   REPAYMENT.......................................................................................... 23

12.   APPLICATION ........................................................................................ 28

13.   EVIDENCE OF DEBT ............................................................................... 29

14.   PAYMENTS ........................................................................................... 29

15.   CHANGE OF CIRCUMSTANCES ............................................................... 30

16.   REPRESENTATIONS AND WARRANTIES ................................................... 31

17.   SECURITIES.......................................................................................... 32

18.   CONDITIONS PRECEDENT AND CONDITIONS SUBSEQUENT...................... 37

19.   FINANCIAL AND GENERAL UNDERTAKINGS.............................................. 37

20.   INSURANCE UNDERTAKINGS .................................................................. 41

21.   OPERATIONAL UNDERTAKINGS............................................................... 44

22.   EARNINGS ACCOUNTS .......................................................................... 47

23.   SECURITY MARGIN................................................................................ 52

24.   EVENTS OF DEFAULT ............................................................................ 53

25.   SET-OFF............................................................................................... 53

26.   FEES.................................................................................................... 57

27.   EXPENSES............................................................................................ 57

28.   INDEMNITY ........................................................................................... 57

29.   ENVIRONMENTAL INDEMNITY ................................................................. 58

30.   STAMP DUTIES...................................................................................... 58

31.   DETERMINATIONS.................................................................................. 58

32.   NO WAIVER........................................................................................... 58

33.   PARTIAL INVALIDITY.............................................................................. 59

34.   TRANSFER, ASSIGNMENT, PARTICIPATION, CHANGE OF LENDING BRANCH. 59

35.   NON-IMMUNITY ..................................................................................... 59

36.   NOTICES .............................................................................................. 60

37    SUPPLEMENTAL .................................................................................... 60

38.   LAW AND JURISDICTION ........................................................................ 61

39.   THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS ...................... 62

                                                                                       63

SCHEDULE 1 - FORM OF NOTICE OF DRAWDOWN .......................................... 65

SCHEDULE 2 - FORM OF ACKNOWLEDGEMENT.............................................. 67

SCHEDULE 3 - FORM OF BUDGET................................................................. 68



THIS AGREEMENT is made the 28th day of August 2009

BETWEEN

1) **MARFIN EGNATIA BANK Societe Anonyme** as lender; and

2) **GRAND RODOSI INC.** and **GRAND ANEMI LIMITED** as joint and several borrowers.

## 1. PURPOSE

A. This Agreement sets out the terms and conditions on which the Lender has agreed to make available to the Borrowers as joint and several borrowers a revolving credit facility, not exceeding at any relevant time the aggregate amount of One hundred Twelve million Dollars ($112,000,000) in multiple Advances in the following amounts and for the following purposes:

   (i) an Advance of up to Eighty Nine million Five hundred thousand Dollars ($89,500,000) for the purpose of refinancing in full certain outstanding indebtedness in relation to, *inter alia*, the Ships pursuant to the Existing Financial Agreements; and

   (ii) Advances in amounts approved by the Lender for the purpose of providing the Borrowers with working and investment capital.

B. The Borrowers and the Lender have agreed to enter into Designated Transactions with the Lender pursuant to separate Confirmations.

## 2. DEFINITIONS

2.1 In this Agreement the following terms shall have the following meanings, unless the context otherwise requires:

"**Acquisition**" means the acquisition by the Grandunion Guarantor of the Acquisition Shares of Aries Maritime on the terms of the Acquisition Documents;

"**Acquisition Date**" means the date on which Aries Maritime shall issue and sell to the Grandunion Guarantor and the Grandunion Guarantor shall purchase from Aries Maritime the Acquisition Shares;

"**Acquisition Documents**" means the LOI and any other document designated as an "Acquisition Document" by, *inter alios*, the Lender in connection with, *inter alia*, the Acquisition as the same may from time to time be amended, varied or supplemented and, in the singular, means any of them;

"**Acquisition Shares**" means 15,977,778 newly issued common shares, par value $0.01 per share of Aries Maritime and/or such other shares of the Aries Maritime, which shall be acquired by the Grandunion Guarantor pursuant to the Acquisition Documents;



1

"**Advance**" means the principal amount of each borrowing by the Borrowers under this Agreement (including for the avoidance of doubt each of the Refinancing Advance and the Working and Investment Capital Advances) or, if the context may require, so much thereof as shall for the time being be outstanding to the Lender hereunder or, as the case may be, the principal amount of that portion of each borrowing by the Borrowers under this Agreement for which the Borrowers select an Interest Period of a particular duration and, in the plural, means all of them;

"**Alpha Bulkers**" means Alpha Bulkers Inc., a corporation organised and existing under the laws of the Republic of the Marshall Islands, having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands;

"**Alpha Bulkers Shares**" means Five hundred (500) registered shares of no par value of Alpha Bulkers owned by the Grandunion Guarantor;

"**Alpha Bulkers Shares' Pledge**" means a first priority charge over the Alpha Bulkers Shares to be executed by the Grandunion Guarantor to secure the due payment of the Indebtedness in form and substance satisfactory to the Lender in its sole discretion, as the same may from time to time be further amended, varied or supplemented with the Lender's prior written consent;

"**Anemi Charter**" means the time charter dated 5 March 2008, as amended by addendum no. 1 dated 2 June 2009 in respect of the Anemi Ship made between the Anemi Owner as owner and the Anemi Charterer as charterer for a period of eight (8) years or the Anemi Ship's dry-dock date, whichever is earlier and at a minimum daily hire rate of Twelve thousand Seven hundred ($12,700), as the same may from time to time be amended, varied or supplemented, with the Lender's prior written consent;

"**Anemi Charterer**" means Samsun Logix Corporation of Seoul, South Korea;

"**Anemi Earnings Account**" means the interest bearing deposit account opened by the Anemi Owner with the Lender numbered 0168999424 into which all the Earnings of the Anemi Ship are to be paid, in accordance with Clause 21.2, such account to include any substitute account or sub-account or revised account or revised designation or number whatsoever and any deposit account to which monies from the Anemi Earnings Account may from time to time be paid on a time deposit basis;

"**Anemi Owner**" means Grand Anemi Limited, a company duly formed and existing under the laws of the Republic of Malta, having its registered office at 198 Old Baker Street, Valletta, Malta;

"**Anemi Ship**" means the m.v. "GRAND ANEMI", a bulk carrier vessel, with gross tonnage of 41,688 tons and net tonnage of 25,530 tons, registered in the ownership of the Anemi Owner under the Maltese flag;



"**Applicable Accounting Principles**" means those accounting principles, standards and practices on which preparation of the Financial Statements is based, which are International Financial Reporting Standards (IFRS) and principles and practices adopted by the Grandunion Guarantor and its Subsidiaries at the date hereof or at any time hereafter and notified to and accepted by the Lender;

"**Applicable Limit**" means the maximum amount available for drawing hereunder at any relevant time and being on the date hereof One hundred Twelve million Dollars ($112,000,000) at it may be reduced in accordance with the provisions of this Agreement;

"**Applicable Margin**" means three point seventy five per cent (3.75 %) per annum;

"**Approved Brokers**" means the insurance brokers appointed by the Borrowers with the Lender's prior approval;

"**Aries Maritime**" means Aries Maritime Transport Limited, a company organized and existing under the laws of Bermuda, having its registered office at Canon's Court, 22 Victoria Street, Hamilton, Bermuda;

"**Aries Maritime Shares**" means 13,311,111 shares of Aries Maritime to be acquired by the Grandunion Guarantor upon completion of the Acquisition;

"**Aries Maritime Shares' Pledge**" means in relation to Aries Maritime, a first priority pledge and/or charge over the Aries Maritime Shares to be executed by the Grandunion Guarantor on or immediately prior to the Acquisition Date to secure the due payment of the Indebtedness in form and substance satisfactory to the Lender in its sole discretion, as the same may from time to time be further amended, varied or supplemented with the Lender's prior written consent;

"**Auditors**" means any first class firm of international accountants to be approved by the Lender;

"**Availability Period**" means the period commencing from the date of this Agreement and ending on the Termination Date;

"**Banking Day**" means a day on which banks and financial markets are open for business in Athens, New York and London and any other financial centre which the Lender may deem appropriate for the operation of the provisions of this Agreement;

"**Borrowers**" means together the Anemi Owner and the Rodosi Owner and, in the singular, means either of them;

"**Budget**" means, in respect of each Ship, a budget substantially in the form set out in Schedule 3 referred to in Clause 19.27;





3

"**Charter Assignment**" means in relation to each Ship, the first priority deed of assignment of the Charter in respect of that Ship made or, as the context may require, to be made between the Owner thereof and the Lender in form and substance satisfactory to the Lender in its sole discretion as the same may from time to time hereafter be amended, varied or supplemented and, in the plural, means both of them;

"**Charterers**" means together the Anemi Charterer and the Rodosi Charterer and, in the singular, means either of them;

"**Charters**" means together the Anemi Charter and the Rodosi Charter and, in the singular, means either of them;

"**Classification Society**" means, in respect of each Ship, Bureau Veritas, or such other classification society member of the IACS, as may be approved in writing by the Lender;

"**Commitment Letter**" means the letter dated 17 August 2009, issued by the Lender addressed to the Borrowers and the Grandunion Guarantor and accepted by the Grandunion Guarantor for and on behalf of itself, the Borrowers and the Personal Guarantor on 18 August 2009;

"**Compulsory Acquisition**" means requisition for title or other compulsory acquisition, requisition, appropriation, expropriation, deprivation, forfeiture or confiscation for any reason of a Ship by any Government Entity or other competent authority, whether de jure or de facto, but shall exclude requisition for use or hire not involving requisition of title;

"**Confirmation**" in relation to any continuing Designated Transaction, has the meaning given to it in the Master Agreement;

"**Control**" means in relation to a body corporate:

(a)     the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

   (i)     cast, or control the casting of, more than fifty per cent (50%) of the maximum number of votes that might be cast at a general meeting of such body corporate; or

   (ii)    appoint or remove all, or the majority, of the directors or other equivalent officers of such body corporate; or

   (ii)    give directions with respect to the operating and financial polices of such body corporate with which the directors or other equivalent officers of such body corporate are obliged to comply; and/or

(b)     the holding beneficially of more than fifty per cent (50%) of the issued share capital of such body corporate (excluding any part of that issued capital that carries no

4

right to participate beyond a specified amount in a distribution of either profits or capital),

and "**Controlled**" shall be construed accordingly;

"**Default Rate**" means the interest rate referred to in Clause 8.1;

"**Demand Date**" means the date on which the Lender shall make a demand upon the Borrowers for repayment of the Facility in accordance with Clause 11.1;

"**Designated Transaction**" means a Transaction which fulfils the following requirements:

(a)     it is entered into by the Borrowers pursuant to the Master Agreement with the Lender; and

(b)     its purpose is the hedging of the Borrowers' exposure under this Agreement to fluctuations in LIBOR arising from the funding of the Facility (or any part thereof) for a period expiring no later than the Repayment Date;

"**Dollars**" or "**$**" means the lawful currency for the time being of the United States of America;

"**Drawdown**" means the making of an Advance by the Lender to the Borrowers;

"**Drawdown Date**" means, in relation to each Advance, the date requested by the Borrowers for that Advance to be made available or (as the context requires) the date on which that Advance is actually made available;

"**Early Termination Date**", in relation to any continuing Designated Transaction, shall have the meaning given to it in the Master Agreement;

"**Earnings**" means in relation to each Ship all freight, hire, passage monies and any other amounts whatsoever which may at any time be earned by or become payable to or for the account of the Owner of that Ship or its agents arising out of or as a result of the ownership, possession, management and/or operation of that Ship by the Owner thereof or its agents or under any charter (including, without limitation, each Charter), contract or carriage or other contract (including a salvage or towage contract) for the use, operation or management of that Ship, all payments for any variation of any such contract and all damages for any breach of any such contract, all general average and salvage remuneration and all compensation for requisition for hire;

"**Earnings Account**" means in relation to:

(a)     the Rodosi Ship, the Rodosi Earnings Account; and

(b)     the Anemi Ship, the Anemi Earnings Account;

5

and, in the plural, means both of them;

"**Earnings Account Charge**" means in relation to each Earnings Account the first priority assignment, pledge and charge granted or, as the context may require, to be granted by the relevant Borrower to the Lender on any monies standing the credit of that Earnings Account in form and substance satisfactory to the Lender as the same may from time to time hereafter be amended, varied or supplemented and, in the plural, means both of them;

"**Encumbrance**" means a mortgage, pledge, lien, charge (whether fixed or floating), assignment, hypothecation, security interest, title retention, preferential right or trust arrangement and any other security agreement or arrangement whether now existing or arising in the future on the assets or revenue of the Borrowers or either of them or any other Security Party other than a pledge or lien arising by operation of law;

"**Environmental Approvals**" means any permit, licence, approval, ruling, certification, exemption or other authorisation relating to the Ships or either of them required under applicable Environmental Laws;

"**Environmental Claim**" means:

(a)     any claim by any governmental, judicial or regulatory authority which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law; or

(b)     any claim by any other person which relates to an Environmental Incident or to an alleged Environmental Incident;

and "**claim**" means a claim for damages, compensation, fines, penalties or any other payment of any kind whether or not similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset;

"**Environmental Incident**" means:

(a)     any release of Environmentally Sensitive Material from a Relevant Ship; or

(b)     any incident in which Environmentally Sensitive Material is released from a vessel other than a Relevant Ship and which involves a collision between a Relevant Ship and such other vessel or some other incident of navigation or operation, in either case, in connection with which a Relevant Ship is actually or potentially liable to be arrested, attached, detained or injuncted and/or a Relevant Ship and/or any owner and/or any other operator or manager thereof is at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident in which Environmentally Sensitive Material is released otherwise than from a Relevant Ship and in connection with which any Relevant Ship is actually or potentially liable to be arrested and/or where any owner and/or

6

any operator or manager of any Relevant Ship is at fault or otherwise liable to any legal or administrative action;

**"Environmental Law"** means any law relating to pollution or protection of the environment, to the carriage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material;

**"Environmentally Sensitive Material"** means oil, oil products and any other substance (including any chemical, gas or other hazardous or noxious substance), which is (or is capable of being or becoming) polluting, toxic or hazardous;

**"Event of Default"** means any event referred to in Clause 24;

**"Excess Risks"** means in relation to each Ship the proportion of claims for general average and salvage charges and under the ordinary running-down clause, which is not recoverable in consequence of the value at which that Ship is assessed for the purpose of such claims exceeding her insured value;

**"Existing Borrowers"** means collectively the Borrowers, Grand Nike Pte Ltd. of Singapore, Grand Panagiotis Limited of the Republic of Malta and Cloud Maritime S.A. of the Republic of Liberia and, in the singular, means any of them;

**"Existing Financial Agreements"** means together (i) the financial agreement dated 25 February 2008 made by and among the Lender as lender and the Existing Borrowers as joint and several borrowers pursuant to which the Lender made available to the Existing Borrowers certain financial facilities of One hundred Thirty million Dollars ($130,000,000) and (ii) the overdraft facility agreement dated 26 March 2008 made by and among the Lender as lender and the Existing Borrowers as joint and several borrowers pursuant to which the Lender made available to the Existing Borrowers certain overdraft facility in the amount of Forty million Dollars ($ 40,000,000) or its equivalent in any alternative currency;

**"Expiration Date"** means the Original Expiration Date or any other date as the Lender may agree in writing in accordance with the provisions of Clauses 11.2 and 11.3, provided that if any such day is not a Banking Day the Expiration Date shall be the next succeeding day which is a Banking Day unless such next succeeding Banking Day falls in another calendar month in which event the Expiration Date shall be the immediately preceding Banking Day;

**"Facility"** means a revolving credit facility in the principal amount of up to One hundred Twelve million Dollars ($112,000,000) at any time outstanding to be made available to the Borrowers by the Lender in multiple Advances pursuant to the terms of Clause 1(A) and Clause 3 or, if the context may so require, so much thereof as shall for the time being be outstanding to the Lender hereunder;

**"Finance Documents"** means:

(a)     this Agreement;

(b)     the Master Agreement;

(c)     the Security Documents; and

(d)     any other document (whether creating an Encumbrance or not) which is executed at any time by any Security Party or any other person as security for, or to establish any form of subordination or priorities' arrangement in relation to any amount payable to the Lender under this Agreement and/or the Master Agreement or any of the documents referred to in this definition or in any other Clause of this Agreement;

"**Financial Statements**" means the audited by the Auditors or unaudited annual or quarterly financial statements of the Group, referred to in Clause 19.1 comprising in each case of a statement of income, balance sheet, cash flow statement and relative notes;

"**Flag State**" means:

(a)     in relation to the Rodosi Ship: the Republic of Liberia; and

(b)     in relation to the Anemi Ship: the Republic of Malta.

or in each case any other flag state which shall be acceptable to the Lender in its sole discretion;

"**General Assignment**" means in relation to each Ship the first priority deed of assignment relative to the Insurances, the Earnings and the Requisition Compensation of that Ship made or, as the context may require, to be made by and between the Owner of that Ship and the Lender in form and substance satisfactory to the Lender as the same may from time to time hereafter be amended, varied or supplemented;

"**Government Entity**" means and includes (whether having a distinct legal personality or not) any national or local government authority, board, commission, department, division, organ, instrumentality, court or agency or tribunal and any association, organisation or institution of which any of the foregoing is a member or to whose jurisdiction any of the foregoing is subject or in whose activities any of the foregoing is a participant;

"**Grandunion Guarantee**" means the guarantee and indemnity in respect of the Borrowers' obligations under this Agreement and the other Finance Documents executed or, as the context may require, to be executed by the Grandunion Guarantor in favour of the Lender in form and substance satisfactory to the Lender in its sole discretion as the same may from time to time be amended, varied or supplemented;

"**Grandunion Guarantor**" means Grandunion Inc., a corporation organized and existing under the laws of the Republic of the Marshall Islands, having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands;

8

"**Group**" means the Grandunion Guarantor and its Subsidiaries (whether direct or indirect and including without limitation the Borrowers and each Managing Subsidiary) from time to time during the Security Period and "**members of the Group**" shall be construed accordingly;

"**Guarantees**" means together the Grandunion Guarantee and the Personal Guarantee and, in the singular, means either of them;

"**Guarantors**" means together the Grandunion Guarantor and the Personal Guarantor and, in the singular, means either of them;

"**Indebtedness**" means any and all moneys, liabilities and obligations (whether actual or contingent, whether existing or hereafter arising, whether or not for the payment of money, and including, without limitation, the Master Agreement Liabilities and any obligation or liability to pay damages) which are now or which may at any time and from time to time hereafter be due, owing, payable or incurred or expressed to be due, owing, payable or incurred from the Borrowers or either of them (whether as principal, surety or otherwise) to the Lender under this Agreement, the Master Agreement and the other Finance Documents;

"**Insurance Documents**" means all slips, cover notes, contracts, policies, certificates of entry or other insurance documents evidencing or constituting the Insurances from time to time in effect;

"**Insurances**" means, collectively in relation to each Ship, all policies and contracts of insurance (which expression includes all entries of that Ship in a protection and indemnity or mutual hull or war risks association) or such other arrangements by way of insurance which are from time to time taken out or entered into in respect of or in connection with that Ship and its Earnings pursuant to this Agreement and including all benefits thereof including all claims of whatsoever nature and return of premiums;

"**Insurers**" means the underwriters, insurance companies, mutual insurance associations with or by which the Insurances are effected;

"**Interest Determination Date**" means the Banking Day which is two (2) Banking Days prior to the commencement of an Interest Period;

"**Interest Payment Date**" means each day on which interest is payable in accordance with Clause 7, provided that if any such day is not a Banking Day, the relevant Interest Payment Date shall be the next succeeding day which is a Banking Day, unless such next succeeding Banking Day falls into another calendar month, in which event, the relevant Interest Payment Date shall be the immediately preceding Banking Day;

"**Interest Period**" means each of the successive periods determined in accordance with Clause 6 of this Agreement during which the Facility or any part thereof is outstanding and for which an Interest Rate in respect thereof is to be established hereunder;

9

"**Interest Rate**" means for each Advance (save as provided in Clause 9) the rate of interest applicable to that Advance (or any part thereof) during each Interest Period in respect thereof which is/are conclusively certified by the Lender to the Borrowers to be the aggregate of (a) the Applicable Margin and (b) LIBOR or the Lender's cost of funding the relevant Advance, for Interest Periods of longer than six (6) months;

"**ISM Code**" means, in relation to its application to the Manager, the Borrowers, each Ship and her operation:

(a)     'The International Management Code for the Safe Operation of Ships and for Pollution Prevention', currently known or referred to as the 'ISM Code', adopted by the Assembly of the International Maritime Organisation by Resolution A.741(18) on 4 November 1993 and incorporated on 19 May 1994 into chapter IX of the International Convention for the Safety of Life at Sea 1974 (SOLAS 1974); and

(b)     all further resolutions, circulars, codes, guidelines, regulations and recommendations which are now or in the future issued by or on behalf of the International Maritime Organisation or any other entity with responsibility for implementing the ISM Code, including without limitation, the 'Guidelines on implementation or administering of the International Safety Management (ISM) Code by Administrations produced by the International Maritime Organisation pursuant to Resolution A.788(19) adopted on 25 November 1995,

as the same may be amended, supplemented or replaced from time to time;

"**ISM Code Documentation**" includes, in relation to each Ship:

(a)     the document of compliance (DOC) and safety management certificate (SMC) issued pursuant to the ISM Code in relation to that Ship within the periods specified by the ISM Code; and

(b)     all other documents and data which are relevant to the ISM SMS and its implementation and verification which the Lender may require; and

(c)     any other documents which are prepared or which are otherwise relevant to establish and maintain compliance of such Ship or the compliance of the relevant Owner and/or the Manager with the ISM Code which the Lender may require;

"**ISM SMS**" means, in relation to each Ship, the safety management system for that Ship which is required to be developed, implemented and maintained by each Owner under the ISM Code;

"**ISPS Code**" means the International Ship and Port Facility Security Code adopted by the International Maritime Organization Assembly as the same may have been or may be amended or supplemented from time to time;

"ISPS Code Documentation" includes in relation to each Ship:

(a)  the International Ship Security Certificate issued pursuant to the ISPS Code in relation to that Ship within the periods specified by the ISPS Code; and

(b)  all other documents and data which are relevant to the ISPS Code and its implementation and verification which the Lender may require;

"Lender" means Marfin Egnatia Bank Societe Anonyme, a company duly incorporated under the laws of the Republic of Greece, having its registered office at 20 Mitropoleos and Komninon , 546 24 Thessaloniki, Greece and acting in this case through its office at 91 Akti Miaouli, 185 38 Piraeus, Greece and shall include its successors and assigns;

"Letter of Undertaking" means a letter of undertaking executed or, as the context may require, to be executed by certain Subsidiaries of the Grandunion Guarantor in favour of the Lender, in such terms as the Lender may approve or require;

"LIBOR" means, for an Interest Period:

(a)  the rate per annum equal to the offered quotation for deposits in Dollars for a period equal to, or as near as possible equal to, the relevant Interest Period which appears on the appropriate page of the Reuters Monitor Money Rates Service at or about 11.00 a.m. (London time) on the Interest Determination Date for that Interest Period (or on such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for Dollars); or

(b)  if no rate is quoted on the appropriate page of the Reuters Monitor Money Rates Service, the rate per annum determined by the Lender to be the arithmetic mean (rounded upwards, if necessary, to the nearest one-sixteenth of one per cent) of. the rates per annum at which deposits in Dollars are offered to the Lender by leading banks in the London Interbank Market at the Lender's request at or about 11.00 a.m. (London time) on the Interest Determination Date for that Interest Period for a period equal to that Interest Period and for delivery on the first Banking Day of it;

"Loan Account" means collectively the account or accounts maintained by the Lender referred to in Clause 13;

"LOI" means the non-binding letter of intent dated 24 June 2009 as amended by an Amendment No.1 dated 22 July 2009 entered into between the Grandunion Guarantor and Aries Maritime, setting out the proposed terms and conditions in connection with the Acquisition;

"Major Casualty" means, in relation to each Ship, any casualty to such Ship in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for

any relevant franchise or deductible, exceeds Five hundred thousand Dollars ($500,000) or the equivalent thereof in any other currency;

"**Management Agreement**" means, in relation to each Ship, the management agreement made or to be made between the Owner thereof and the Manager, in form and substance satisfactory to the Lender and as the same may from time to time be amended, varied or supplemented with the Lender's prior written consent;

"**Manager**" means the Managing Subsidiary and/or any other company approved by the Lender as manager of the Ships or either of them and, in the singular, means any of them;

"**Manager's Undertaking**" means, in relation to each Ship, a letter of undertaking including, where appropriate, an assignment of any obligatory insurances executed or, as the context may require, to be executed by the Manager in favour of the Lender, in such terms as the Lender may approve or require and, in the plural, means both of them;

"**Managing Subsidiary**" means (a) in respect of the Anemi Ship: Stamford Navigation Inc., of the Republic of Liberia, a Subsidiary of the Grandunion Guarantor and (b) in respect of the Rodosi Ship: Newfront Shipping S.A., of Panama, a Subsidiary of the Grandunion Guarantor;;

"**Market Value**" means in respect of each Ship, the value thereof determined in accordance with the provisions of Clause 21.26;

"**Master Agreement**" means the master swap agreement (on the 2002 ISDA Master Agreement (Multicurrency-Crossborder) form) and Schedule thereto both made or as the context may require to be made between the Borrowers and the Lender and includes all Designated Transactions from time to time entered into and Confirmations from time to time exchanged thereunder;

"**Master Agreement Assignment**" means the assignment of the Master Agreement in favour of the Lender, executed or, as the context requires, to be executed by the Borrowers in form and substance satisfactory to the Lender in its sole discretion as security for the Indebtedness, as the same may from time to time be amended, varied or supplemented;

"**Master Agreement Liabilities**" means at any relevant time all liabilities actual or contingent, present or future of the Borrowers to the Lender under the Master Agreement;

"**Maximum Permitted Swap Exposure**" an amount not exceeding the lesser of Ten million Five hundred thousand Dollars ($10,500,000) and ten per cent (10%) of the, at any time, outstanding principal amount of the Facility;

"**Mortgage**" means:

(a)     in relation to the Anemi Ship, together the first priority Maltese mortgage and deed of covenants collateral thereto; and

(b)    in relation to the Rodosi Ship, the first preferred Liberian mortgage,

granted or, as the context may require, to be granted by the Owner of that Ship to the Lender to secure the due payment of the Indebtedness in form and substance satisfactory to the Lender as the same may from time to time hereafter be amended, varied or supplemented, and, in the plural, means both of them;

"Navios Maritime" means Navios Maritime Holdings Inc., a corporation organised and existing under the laws of the Republic of the Marshall Islands, having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH96960, Marshall Islands;

"Navios Maritime Shares" means 1,870 shares of Series A Convertible Preferred Stock with liquidation preference of $10,000 per shares of Navios Maritime owned by the Grandunion Guarantor;

"Navios Maritime Shares' Pledge" means in relation to Navios Maritime, a first priority pledge and/or charge over the Navios Maritime Shares to be executed by the Grandunion Guarantor to secure the due payment of the Indebtedness in form and substance satisfactory to the Lender in its sole discretion, as the same may from time to time be further amended, varied or supplemented with the Lender's prior written consent;

"Nomination Date" means the Banking Day which is three (3) Banking Days prior to the commencement of an Interest Period;

"Notice of Drawdown" means each written notice given by the Borrowers to the Lender pursuant to Clause 5.1.4 substantially in the form set out in Schedule 1 hereto;

"Original Expiration Date" means the date falling one (1) year from the Drawdown Date of the Advance first to occur;

"Owner" means:

(a)    in relation to the Anemi Ship: the Anemi Owner; and

(b)    in relation to the Rodosi Ship: the Rodosi Owner,

and, in the plural, means both of them;

"Permitted Liens" means any supplier's, carrier's, workman's or similar lien arising in the ordinary course of business automatically by statute or by operation of law and not by way of contract in respect of amounts not yet due and payable but excluding any lien arising from any default or omission of the Security Parties or any of them;

13

**"Personal Guarantee"** means the guarantee in respect of the Borrowers' obligations, under this Agreement and the other Finance Documents, executed or, as the context may require, to be executed by the Personal Guarantor in favour of the Lender, in form and substance satisfactory to the Lender, in its sole discretion as same may from time to time be amended, varied or supplemented;

**"Personal Guarantor"** means the individual acceptable to the Lender in its sole discretion who shall execute the Personal Guarantee;

**"Protection and Indemnity risks"** means the usual risks covered by a protection and indemnity association that is a member of the International Group of Protection and Indemnity Associations, including the proportion not otherwise recoverable in case of collision under the ordinary running-down clause;

**"Refinancing Advance"** means the Advance referred to in Clause 1(A) (i);

**"Relevant Ship"** means each Ship and any other ship from time to time owned, managed or crewed by, or demise or bareboat chartered to an Owner or any other member of the Group;

**"Repayment Date"** means the earlier of the dates referred to in Clause 11.1, provided that if any such day is not a Banking Day the relevant Repayment Date shall be the next succeeding day which is a Banking Day unless such next succeeding Banking Day falls in another calendar month in which event the relevant Repayment Date shall be the immediately preceding Banking Day;

**"Requisition Compensation"** means all compensation payable by reason of any Compulsory Acquisition of a Ship other than requisition for hire;

**"Rodosi Charter"** means the time charter dated 7 January 2009 in respect of the Rodosi Ship made between the Rodosi Owner as owner and the Rodosi Charterer as charterer, for a period of three (3) years plus sixty (60) days more or less in the Rodosi Charterer's option and at a daily hire rate of Ten thousand Two hundred Dollars ($10,200) as the same may be amended, varied or supplemented, with the Lender's prior written consent;

**"Rodosi Charterer"** means TMT Bulk Corp. of Taipei, Taiwan;

**"Rodosi Earnings Account"** means the interest bearing deposit account opened by the Rodosi Owner with the Lender numbered 0169089429 into which all the Earnings of the Rodosi Ship are to be paid, in accordance with Clause 21.2, such account to include any substitute account or sub-account or revised account or revised designation or number whatsoever and any deposit account to which monies from the Rodosi Earnings Account may from time to time be paid on a time deposit basis;

14



"**Rodosi Owner**" means Grand Rodosi Inc., a corporation organized and existing under the laws of the Republic of Liberia, having its registered office at 80 Broad Street, Monrovia, Republic of Liberia;

"**Rodosi Ship**" means the m.v. "GRAND RODOSI", a bulk carrier vessel, with gross tonnage of 37,519 tons and net tonnage of 22,604 tons, registered in the ownership of the Rodosi Owner, under the Liberian flag;

"**Security Documents**" means collectively the Mortgages, the General Assignments, the Charter Assignments, the Guarantees, the Manager's Undertakings, the Letter of Undertaking, the Shares' Pledges, the Master Agreement Assignment and the Earnings Account Charges and where the context so admits this Agreement and any other agreement or document that may be executed at any time by the Borrowers, the other Security Parties or any other person as security for the due payment of the Indebtedness;

"**Security Parties**" means each party to the Finance Documents (other than the Lender and the Charterers) and, in the singular, means any of them;

"**Security Period**" means the period during which the Finance Documents remain in effect and ending when the Indebtedness is paid in full;

"**Shares**" means collectively the Aries Maritime Shares, the Navios Maritime Shares and the Alpha Bulkers Shares and, in the singular means any of them;

"**Shares' Pledges**" means together the Navios Maritime Shares' Pledge, the Aries Maritime Shares' Pledge and the Alpha Bulkers Shares' Pledge and, in the singular, means any of them;

"**Ships**" means together the Anemi Ship and the Rodosi Ship and, in the singular, means either of them;

"**Subject Documents**" means all of the Finance Documents, the Acquisition Documents, the Charters and the Management Agreements (none to be amended, varied, supplemented or modified without the consent of the Lender), and together with any other instrument, document or memorandum, scheduled to any of the documents referred to above, and any notice, consent to acknowledgement referred to in or required pursuant to any of the documents referred to above and any document, instrument or memorandum which secures any of the obligations of the Borrowers or either of them under any of the Finance Documents or under any other Subject Document;

"**Subsidiary**" of a person means: (a) any other person directly or indirectly Controlled by that person; or (b) any other person whose dividends or distributions on ordinary voting share capital that person is entitled to receive more than fifty per cent (50%); or (c) any entity (whether or not so Controlled) treated as a Subsidiary in the financial statements of that person from time to time;

15

"**Swap Exposure**" means, as at any relevant date the amount certified by the Lender (whose certificate shall in the absence of manifest error be conclusive and binding on the Borrowers) to be the aggregate net amount in Dollars which would be payable by the Borrowers to the Lender under (and calculated in accordance with) section 6(e) (Payments on Early Termination) of the Master Agreement if an Early Termination Date had occurred on the relevant date in relation to all continuing Designated Transactions;

"**Taxes**" means all present and future taxes, levies, imposts, duties, charges, fees, deductions and withholdings, and any restrictions or conditions resulting in a charge (other than taxes on the overall net income of the Lender) and "**Tax**" and "**Taxation**" shall be construed accordingly;

"**Termination Date**" means:

(i)     for the Refinancing Advance: 30 September 2009; and

(ii)    for each Working and Investment Capital Advance: the date falling one (1) month prior to the Original Expiration Date

or in each case such later date as the Lender may approve in writing;

"**Total Loss**" means in relation to each Ship:

(a)    the actual or constructive or compromised or arranged or agreed total loss of such Ship; or

(b)    Compulsory Acquisition of such Ship; or

(c)    the capture, seizure, arrest, detention or confiscation of such Ship by any Government Entity or by a person acting or purporting to act on behalf of any Government Entity where such Ship is not released or discharged within thirty (30) days or such lesser period provided in the War Risks Insurances;

"**Transaction**" has the meaning given to it in the Master Agreement;

"**War Risks**" includes all risks referred to in the Institute Time Clauses (Hulls) (1/10/83) and (1/11/95) including, but not limited to, the risk of mines, blocking and trapping, missing vessel, confiscation and all risks excluded by Clause 23 of the Institute Time Clauses (Hulls) (1/10/83) or Clause 24 of the Institute Time Clauses (Hulls) (1/11/1995); and

"**Working and Investment Capital Advances**" means the Advances referred to in Clause 1(A)(ii).

2.2     In this Agreement clause headings are for ease of reference only and shall be disregarded in the construction of this Agreement.



2.3     In this Agreement unless the context otherwise requires:

2.3.1           words importing the singular number shall include the plural and vice versa;

2.3.2           fees, costs and expenses shall be exclusive of any value added tax or similar tax (if any) which shall accordingly be payable in addition;

2.3.3           any reference to a document or instrument is a reference to that document or instrument as the same may have been, or may from time to time be amended or supplemented;

2.3.4           the liquidation, winding-up or dissolution of a company or body corporate or the appointment of a receiver, administrative receiver, manager or administrator of or in relation to a company or corporation or any of its assets shall be construed so as to include any equivalent or analogous proceedings under the laws of the jurisdiction in which it is incorporated or any jurisdiction in which it carries on business or has assets or liabilities;

2.3.5           references to persons include any individual, partnership, firm, trust, body corporate, government, governmental body, authority, agency, unincorporated body of persons or association;

2.3.6           a reference to any enactment or statutory provision include any enactment or statutory provision which amends, extends, consolidates or replaces the same or which has been amended, extended, consolidated or replaced by the same and shall include any orders, regulations, codes of practice, instruments or other subordinated legislation made under the relevant enactment or statutory provision; and

2.3.7           the words "herein", "hereto" and "hereunder" refer to this Agreement as a whole and not to the particular Clause or Schedule in which the words may be used.

## 3.    THE FACILITY -- THE BORROWERS JOINT AND SEVERAL LIABILITY

3.1     The Lender hereby agrees to make available to the Borrowers subject to the terms and the conditions hereof the Facility for the purposes stated in Clause 1(A) in an aggregate amount not exceeding at any relevant time One hundred Twelve million Dollars ($112,000,000) provided however that no Working and Investment Capital Advance shall be drawdown unless specifically approved by the Lender.

3.2     The Borrowers undertake to use the proceeds of each Advance in accordance with and for the purposes referred to in Clause 1(A); the Lender (although entitled) shall not be obliged to monitor the application of such proceeds.

3.3     All the liabilities and obligations of the Borrowers under this Agreement shall, whether expressed to be so or not, be joint and several so that each Borrower shall be jointly and severally responsible with the other Borrower for all liabilities and obligations of the

Borrowers under this Agreement and so that such liabilities and obligations shall not be impaired by:

(a)   any failure of this Agreement to be legal, valid, binding and enforceable in relation to either of the Borrowers whether as a result of lack of corporate capacity, due authorisation, effective execution or otherwise;

(b)   any giving of time, forbearance, indulgence, waiver or discharge in relation to either of the Borrowers or to any other party to the Security Documents; or

(c)   any other matter or event whatsoever which might have the effect of impairing all or any of the liabilities and obligations of either of the Borrowers.

3.4   Each of the Borrowers declares that it is and will, throughout the Security Period, remain a principal debtor for all amounts owing under this Agreement and neither of the Borrowers shall in any circumstances be construed to be a surety for the obligations of the other Borrower hereunder.

3.5   Until all sums owing to the Lender by the Borrowers under this Agreement, the Master Agreement and the other Finance Documents have been paid in full neither of the Borrowers (hereinafter called a "**Creditor Borrower**") will without the prior written consent of the Lender ask, demand, sue for, take or receive from the other Borrower or any other member of the Group (hereinafter called a "**Debtor Borrower**") by set-off or any other manner the whole or any part of all present and future sums, liabilities and obligations payable or owing by the Debtor Borrower to the Creditor Borrower whether actual or contingent jointly or severally or otherwise howsoever (such sums being hereinafter called the "**Subordinated Liabilities**") so long as any Senior Liabilities are outstanding to the Lender (for which purpose "**Senior Liabilities**" shall mean all present and future sums, liabilities and obligations whatsoever payable or owing by the Borrowers (or either of them) pursuant to the Finance Documents or any of them or otherwise whatsoever, whether actual or contingent jointly or severally or otherwise howsoever).

## 4.   AVAILABILITY – DESIGNATED TRANSACTIONS

4.1   Subject as herein provided, the Facility is available to the Borrowers to be drawn down during the Availability Period. Any part of a Facility which remains undrawn at the close of business in Athens on the Termination Date shall be automatically cancelled.

4.2   Any Designated Transaction shall be entered into on the basis of the Master Agreement and shall be concluded with the Lender.

4.3   No Designated Transaction may be entered into by the Borrowers:

4.3.1   if a material adverse change occurs in the financial condition or operation of any one or more of the Security Parties or any other member of the Group and/or if any other Event of Default occurs or an event which with the giving of notice or passage

18



of time or the combination of both or the fulfilment of any other condition, may become an Event of Default having occurred;

4.3.2      if the aggregate of (i) the Market Values of the Ships and (ii) the market values of the Shares and of any additional security provided to the Lender in accordance with Clause 23 (each valued by the Lender in accordance with normal banking practice) is less than 200% of the aggregate of (i) the Facility and (ii) the Swap Exposure unless such Designated Transaction is secured by cash deposits in amounts determined by the Lender, pledged in favour of the Lender; and

4.3.3      if by being entered into it would increase the Swap Exposure to a sum in excess of the Maximum Permitted Swap Exposure.

4.4      Notwithstanding any provision of this Agreement and/or the Master Agreement to the contrary, if for any reason a Designated Transaction has been entered into but the Facility is not drawn under this Agreement then, subject to Clause 4.5, the Lender shall be entitled but not obliged (and, where relevant, may do so without the consent of the Borrowers where it would otherwise be required whether under the Master Agreement or otherwise) to amend, supplement, cancel, net out, terminate, liquidate, transfer or assign all or any part of the rights, benefits and obligations created by such Designated Transaction and/or the Master Agreement and/or to obtain or re-establish any hedge or related trading position in any manner and with any person the Lender in its absolute discretion may determine.

4.5      If a Designated Transaction has been entered into but the Facility is not drawn down under this Agreement and the Lender in its absolute discretion agrees, following a written request of the Borrowers, that the Borrowers may be permitted to maintain all or part of a Designated Transaction, the Borrowers shall, within fifteen (15) days of being notified by the Lender of such requirement, provide the Lender with, or procure the provision to the Lender of, such additional security as shall in the opinion of the Lender be adequate to secure the performance of such Designated Transaction, which additional security shall take such form and be constituted by such documentation, as the Lender in its absolute discretion may approve or require.

4.6      The Borrowers shall on the first written demand of the Lender indemnify the Lender in respect of all losses, costs and expenses (including, but not limited to, legal costs and expenses) incurred or sustained by the Lender as a consequence of or in relation to the effecting of any matter or transactions referred to in Clauses 4.4 and 4.5.

4.7      Without prejudice to or limitation of the obligations of the Borrowers under Clause 4.6, in the event that the Lender exercises any of its rights under Clauses 4.4 or 4.5 and such exercise results in all or part of a Designated Transaction being terminated such termination shall be treated under the Master Agreement in the same manner as if it were a Terminated Transaction (as defined in section 14 of the Master Agreement) effected by the Lender after an Event of Default (as so defined in that section 14) by the Borrowers and, accordingly, the Lender shall be permitted to recover from the Borrowers a payment for early termination calculated in accordance with the provisions of section 6(e)(i) of the Master Agreement.



4.8     In the event that the Lender fails to enter into a Designated Transaction with the Borrowers, the Lender shall not be liable to the Borrowers to enter into such Designated Transaction nor to compensate the Borrowers for such failure.

## 5.     NOTICE OF DRAWDOWN

5.1     Subject to:

5.1.1     the receipt by the Lender of the documents specified in Clause 18 in form and substance satisfactory to the Lender and its legal advisers before the relevant Drawdown Date; and

5.1.2     no Event of Default or an event which with the giving of notice or passage of time or satisfaction of any other condition or any combination of the foregoing, may become an Event of Default having occurred; and

5.1.3     the representations and warranties set out in Clause 16 (updated *mutatis mutandis* to the relevant Drawdown Date) being true and correct; and

5.1.4     the receipt by the Lender of a Notice of Drawdown in the form set out in Schedule 1 hereto not later than 11.00 a.m. (London time) two (2) Banking Days prior to the relevant Drawdown Date setting out the date of the proposed Advance,

each Advance shall be made available to the Borrowers in accordance with and on the terms and conditions of this Agreement.

5.2     Without prejudice to the generality of the foregoing provisions of this Clause 5 the Lender shall not be obliged to make available any Advance if, following its drawing, the covenant contained in Clause 23 (Security Margin) would cease to be complied with.

5.3     Unless otherwise expressly agreed between the Borrowers and the Lender no Advance shall be made:

5.3.1     if by being drawn down it would increase the Facility to a sum in excess of the Applicable Limit; and/or

5.3.2     in an amount of less than Five million Dollars ($5,000,000) or multiples thereof.

5.4     Each Notice of Drawdown shall be irrevocable and the Borrowers shall be bound to borrow in accordance with such notice.

5.5     On payment of the amount drawn down in respect of each Advance the Borrowers shall sign an Acknowledgement in the form set out in Schedule 2 hereto.



5.6    If the Borrowers give a Notice of Drawdown pursuant to Clause 5.1.4 and the Lender makes arrangements on the basis of such notice to acquire Dollars in the London Interbank Market to fund an Advance or any part thereof and the Borrowers are not permitted or otherwise fail to borrow in accordance with such Notice of Drawdown (either on account of any condition precedent not being fulfilled or otherwise) the Borrowers shall indemnify the Lender against any damages, losses or expenses which the Lender may incur (either directly or indirectly) as a consequence of the failure by the Borrowers to borrow in accordance with such Notice of Drawdown.

5.7    The Borrowers may, at any time during the Availability Period, cancel the Facility or, as the case may be, any part thereof which remains undrawn in whole or in part (but if in part in a minimum of Five hundred thousand Dollars ($500,000) or a multiple thereof upon giving the Lender three (3) Banking Days' notice in writing to that effect. Such notice once given shall be irrevocable and upon such cancellation taking effect the Facility shall be reduced accordingly. Notwithstanding any such cancellation pursuant to this Clause 5.7 the Borrowers shall continue to be liable for any and all amounts due to the Lender under this Agreement including without limitation any amounts due to the Lender under Clauses 7, 9, 15 and 28.

## 6.    INTEREST PERIODS

6.1    Subject to Clause 6.2, the Interest Periods applicable to each Advance shall (subject to market availability) be periods of a duration of three (3) or six (6) months (or such other periods as the Lender and the Borrowers may agree) as selected by the Borrowers by written notice to be received by the Lender not later than 11.00 a.m. (London time) on the relevant Nomination Date;

6.2    Notwithstanding the provisions of Clause 6.1:

6.2.1    the initial Interest Period in respect of each Advance shall commence on the Drawdown Date thereof and shall end on the expiry date thereof and each subsequent Interest Period for that Advance shall commence on the expiry of the preceding Interest Period in respect thereof;

6.2.2    if any Interest Period would otherwise end on a day which is not a Banking Day, that Interest Period shall be extended to the next succeeding day which is a Banking Day unless such next succeeding Banking Day falls in another calendar month in which event that Interest Period shall end upon the immediately preceding Banking Day;

6.2.3    if any Interest Period commences on the last Banking Day in a calendar month or if there is no numerically corresponding day in the month in which that Interest Period ends, that Interest Period shall end on the last Banking Day in that later month;

6.2.4    no Interest Period shall extend beyond the Repayment Date;



21

6.2.5    save as provided in Clause 6.2.1, if the Borrowers fail to select an Interest Period in accordance with the above, such Interest Period shall be of three (3) months duration or of such other duration as the Lender in its sole discretion may select; and

6.2.6    save as provided in Clause 6.2.1 the Borrowers shall not select more than one (1) Interest Period at any one time.

## 7.    INTEREST

7.1    Subject to the terms of this Agreement the Borrowers shall pay to the Lender interest in respect of each Advance (or the relevant part thereof) accruing at the Interest Rate for each Interest Period relating thereto in arrears on the last day of each Interest Period, provided that where such Interest Period is of a duration longer than three (3) months, accrued interest in respect of such Advance (or such part thereof) shall be paid every three (3) months during such Interest Period and on the last day of such Interest Period.

7.2    Interest shall be calculated on the basis of the actual number of days elapsed and a three hundred and sixty (360) day year.

7.3    The Interest Rate applicable for each Interest Period shall be calculated and determined by the Lender on each Interest Determination Date and each such determination of an Interest Rate hereunder shall be promptly notified by the Lender to the Borrowers at the beginning of each Interest Period in respect thereof.

7.4    The Lender's certificate as to the Interest Rate applicable shall be final and (except in the case of manifest error) binding on the Borrowers and the other Security Parties.

## 8.    DEFAULT INTEREST

8.1    In the event of a failure by the Borrowers to pay any amount on the date on which such amount is due and payable pursuant to this Agreement and/or the Master Agreement and/or the other Finance Documents and irrespective of any notice by the Lender or any other person to the Borrowers in respect of such failure, the Borrowers shall pay interest on such amount on demand from the date of such default up to the date of actual payment (as well after as before judgment) at the per annum rate which is the aggregate of (a) two point five per cent (2.5%) and (b) the Applicable Margin and (c) the rate at which the Lender in accordance with its normal practice is offered deposits in Dollars in the London Interbank Market for such period as the Lender may select at or about 11.00 a.m. (London time) on the Banking Day immediately following that on which the Lender becomes aware of the default and, so long as the default continues, such rate shall be recalculated on the same basis thereafter.

8.2    Any interest which shall have accrued under Clause 8.1 in respect of an unpaid amount shall be due and payable at the end of the period by reference to which it is calculated or such other date or dates as the Lender may specify by written notice to the Borrowers.



8.3     Clause 7.2 shall apply to the calculation of interest on amounts in default.

## 9.     SUBSTITUTE BASIS

9.1     If the Lender determines (which determination shall be conclusive) that:

9.1.1           at 11.00 a.m. (London time) on any Interest Determination Date the Lender was not being offered by banks in the London Interbank Market deposits in Dollars in the required amount and for the required period; or

9.1.2           LIBOR would not adequately reflect the cost of the Lender of making, funding or maintaining the Facility or any part thereof for the duration of the next succeeding Interest Period; or

9.1.3           by reason of circumstances affecting the London Interbank Market such deposits are not available to the Lender in such market; or

9.1.4           adequate and reasonable means do not or will not exist for the Lender to ascertain the Interest Rate applicable to the next succeeding Interest Period; or

9.1.5           Dollars will or may not continue to be freely transferable;

then, and in any such case the Lender shall give notice of any such event to the Borrowers and in case any of the above occurs on the Interest Determination Date prior to a Drawdown Date the Borrowers' right to borrow an Advance which remains available for borrowing shall be suspended during the continuation of such circumstances.

9.2     If, however, any of the events described in Clause 9.1 occurs on any other Interest Determination Date relative to an Advance or any part thereof, then the duration of the relevant Interest Period(s) shall be up to one (1) month and during such Interest Period the Interest Rate applicable to such Advance or the relevant part thereof shall be the rate per annum determined by the Lender rounded upwards to the nearest whole multiple of one sixteenth per cent (1/16th%) to be the aggregate of the Applicable Margin and the cost (expressed as a percentage rate per annum) to the Lender of funding the amount of such Advance or any part thereof during such Interest Period(s).

9.3     During such Interest Period(s) the Borrowers and the Lender shall negotiate in good faith in order to agree an Interest Rate or Rates and Interest Period or Periods satisfactory to the Borrowers and the Lender to be substituted for those which but for the occurrence of any such event as specified in this Clause would have applied. If the Borrowers and the Lender are unable to agree on such an Interest Rate(s) and Interest Period(s) by the day which is two (2) Banking Days before the end of the Interest Period referred to above, the Borrowers shall repay the Facility together with accrued interest thereon at the Interest Rate set out above together with all other amounts due under this Agreement relative to the Facility but

without any prepayment fee, on the last day of such Interest Period, whereupon both Facility shall be cancelled and no further Advances shall be made hereunder.

## 10. PREPAYMENT

10.1 If at any time during the Security Period, a Ship is sold or becomes a Total Loss or the Mortgage on that Ship is discharged, on the Total Loss Reduction Date or on the Disposal Reduction Date or on the date of discharge of Mortgage on that Ship (as the case may be), the Borrowers shall prepay such part of the Facility as is equal to the higher of (i) the Relevant Amount and (ii) such amount in Dollars as shall ensure that, following the relevant prepayment, the Security Margin referred to in Clause 23 is maintained.

### Defined terms

For the purposes of this Clause 10.1:

(a) **"Disposal Reduction Date"** means:

    (i) in relation to a Ship which has become a Total Loss, its Total Loss Reduction Date; or

    (ii) in relation to a Ship which is sold in accordance with the provisions of the relevant Security Documents, the date of completion of such sale by the transfer of title to such Ship to the purchaser in exchange for payment of the relevant purchase price; or

    (iii) in relation to a Ship the Mortgage on which is discharged following the request of the Borrowers and the consent of the Lender in accordance with this Clause 10.1, the date of discharge of such Mortgage by the Lender;

(b) **"Total Loss Reduction Date"** means, in relation to a Ship which has become a Total Loss, the date which is the earlier of:

    (i) the date falling one hundred and eighty (180) days after that on which such Ship becomes a Total Loss; and

    (ii) the date upon which insurance proceeds are or Requisition Compensation is received in respect of such Total Loss by the relevant Owner (or the Lender pursuant to the relevant General Assignment or Mortgage); and

(c) **"Relevant Amount"** means, in relation to a Ship which has become a Total Loss or is sold or the Mortgage of which is discharged in accordance with this Clause 10.1, the amount in Dollars which is equal to the amount of the Total Loss or sale or refinancing proceeds (as the case may be) of such Ship.

PROVIDED HOWEVER THAT if, unless the Lender determines otherwise, at any time during the Security Period there is only one Ship subject to a Mortgage and the Mortgage on that Ship is discharged following the Borrowers' request or that Ship is sold (in both

24



cases with the Lender's prior written consent) or becomes a Total Loss, on the Disposal Reduction Date or the Total Loss Reduction Date or on the date of discharge of the Mortgage on that Ship (as the case may be) the Borrowers shall mandatorily prepay the full amount of the Indebtedness to the Lender.

10.2    For the purposes of this Clause 10.1, a Total Loss shall be deemed to have occurred:

(a)    in the case of an actual total loss of a Ship on the actual date and at the time that Ship was lost or if such date is not known, the date on which such Ship was last reported;

(b)    in the case of a constructive total loss of a Ship upon the date and at the time notice of abandonment of such Ship is given to the Insurers of that Ship for the time being (provided a claim for such total loss is admitted by the Insurers) or, if the Insurers do not admit such a claim, or, in the event that such notice of abandonment is not given by the owner thereof to the Insurers of that Ship, on the date and at the time on which the incident which may result, in that Ship being subsequently determined to be a constructive total loss has occurred;

(c)    in the case of a compromised or arranged total loss of a Ship, on the date upon which a binding agreement as to such compromised or arranged total loss has been entered into by the Insurers of that Ship;

(d)    in the case of Compulsory Acquisition of a Ship, on the date upon which the relevant Compulsory Acquisition occurs; and

(e)    in the case of hijacking, theft, condemnation, capture, seizure, arrest, detention or confiscation of a Ship (other than where the same amounts to Compulsory Acquisition of such Ship) by any Government Entity, or by persons purporting to act on behalf of any Government Entity, which deprives the owner thereof of the use of that Ship for more than thirty (30) days, upon the expiry of the period of thirty (30) days after the date upon which the relevant hijacking, theft, condemnation, capture, seizure, arrest, detention or confiscation occurred.

10.3    If at any time during the Security Period, any Shares are sold (with the Lender's prior written consent), the Borrowers shall prepay to the Lender an amount equal to the sale proceeds of such Shares on the date of sale of such Shares.

10.4    Unless an Event of Default shall have occurred (whereupon all moneys received by the Lender pursuant to Clauses 10.1 and/or 10.3 shall be applied in accordance with the provisions of Clause 12) any and all amounts prepaid pursuant to Clauses 10.1 and/or 10.3 shall be applied towards prepayment of the Facility in such manner as shall be determined by the Lender in its sole and absolute discretion; provided however that unless the Lender otherwise expressly agrees in writing, upon application of any sums so prepaid towards prepayment of the Facility, the Applicable Limit shall be reduced by the amounts so prepaid and applied.



10.5     By giving not less than fifteen (15) Banking Days' prior written notice to the Lender the Borrowers may prepay all or any part of the Facility (but if in part the amount to be prepaid shall be One hundred thousand Dollars ($100,000) or a multiple thereof) at the end of the then current Interest Period. The Borrowers shall obtain any consent or approval from the relevant authorities that may be necessary to make any such prepayment of the Facility or any part thereof and if it fails to obtain and/or comply with the terms of such consent or approval and in consequence thereof the Lender has to repay the amount prepaid or the Lender incurs any penalty or loss then the Borrowers shall indemnify the Lender forthwith against all amounts so repaid and/or against all such penalties and losses incurred.

10.6     Unless the Lender otherwise expressly agrees in writing, all prepayments under Clause 10.5 shall be applied towards prepayment of the Facility in such manner as shall be determined by the Lender in its sole and absolute discretion; provided however that unless the Lender otherwise requires any sums so prepaid shall be available for reborrowing up to the Applicable Limit prevailing at the relevant time in accordance with the provisions of Clause 10.9.

10.7     Save as otherwise herein expressly provided, any prepayment of the Facility or any part thereof made or deemed to be made under this Agreement shall, if made otherwise than at the end of an Interest Period relative to the amounts prepaid, be made together with accrued interest thereon and such additional amount (if any) as the Lender may certify as necessary to compensate the Lender for any costs incurred or to be incurred by it as a result of such prepayment.

10.8     Any notice of prepayment given by the Borrowers under this Agreement shall be irrevocable and the Borrowers shall be bound to prepay in accordance with each such notice.

10.9     Subject to other provisions of this Agreement (including, without limitation, Clauses 9.1, 10.4, 10.17, 11.1, 11.2, 11.3, 15.1 and 24) any prepayment made under this Agreement and applied against the Facility or any part thereof may be reborrowed hereunder.

10.10    The Borrowers may not prepay all or any part of the Facility except in accordance with the express terms of this Agreement.

10.11    Subject to Clause 10.13, on or prior to any repayment or prepayment of the Facility or any part thereof under this Clause 10 or Clause 9 or Clause 15 or any other provision of this Agreement, the Borrowers shall wholly or partially reverse, offset, unwind or otherwise terminate one or more of the continuing Designated Transactions as applicable so that the notional principal amount of the continuing Designated Transactions thereafter remaining does not and will not in the future (taking into account the scheduled amortisation) exceed the amount of the Facility as reducing from time to time thereafter pursuant to Clause 11.3.

10.12    Unless otherwise agreed between the Borrowers and the Lender, if a Designated Transaction is terminated in circumstances where the Lender would be obliged to pay an amount to the Borrowers under the Master Agreement, the Borrowers hereby agree that

26



such payment shall be applied towards prepayment of the Facility in such manner as the Lender shall determined in its sole discretion and authorise the Lender to apply such amount as appropriate.

10.13 If less than the full amount of the Facility remains outstanding following a prepayment under this Agreement and the Lender in its absolute discretion agrees, following a written request of the Borrowers, that the Borrowers may be permitted to maintain all or part of a Designated Transaction in an amount not wholly matched with or linked to all or part of the Facility, the Borrowers shall, within fifteen (15) days of being notified by the Lender of such requirement, provide the Lender with, or procure the provision to the Lender of, such additional security as shall in the opinion of the Lender be adequate to secure the performance of such Designated Transaction, which additional security shall take such form and be constituted by such documentation, as the Lender in its absolute discretion may approve or require.

10.14 Notwithstanding any provision of the Master Agreement to the contrary and the Borrowers' obligations under Clause 10.10, in the case of a prepayment of all or part of the Facility (including, without limitation, following the occurrence of a Total Loss of a Ship or upon a sale of a Ship or the discharge of the Mortgage on a Ship in accordance with Clause 10.1 or under any other provision of this Agreement) then, subject to Clause 10.13, the Lender shall be entitled but not obliged (and, where relevant, may do so without the consent of the Borrowers, where it would otherwise be required whether under the Master Agreement or otherwise) to amend, supplement, cancel, net out, terminate, liquidate, transfer or assign all or any part of the rights, benefits and obligations created by any Designated Transaction and/or the Master Agreement and/or to obtain or re-establish any hedge or related trading position in any manner and with any person the Lender in its absolute discretion may determine and both the Lender's and the Borrowers' continuing obligations under any Designated Transaction and/or the Master Agreement shall, unless agreed otherwise by the Lender, be calculated so far as the Lender considers it practicable by reference to the amended repayment schedule for the Facility taking into account the fact that less than the full amount of the Facility remains outstanding.

10.15 The Borrowers shall on the first written demand of the Lender indemnify the Lender in respect of all losses, costs and expenses (including, but not limited to, legal costs and expenses) incurred or sustained by the Lender as a consequence of or in relation to the effecting of any matter or transactions referred to in Clauses 10.11, 10.13 and 10.14.

10.16 Without prejudice to or limitation of the obligations of the Borrowers under Clause 10.15, in the event that the Lender exercises any of its rights under Clauses 10.11 or 10.13 or 10.14 and such exercise results in all or part of a Designated Transaction being terminated such termination shall be treated under the Master Agreement in the same manner as if it were a Terminated Transaction (as defined in section 14 of the Master Agreement) effected by the Lender after an Event of Default (as so defined in that section 14) by the Borrowers and, accordingly, the Lender shall be permitted to recover from the Borrowers a payment for early termination calculated in accordance with the provisions of section 6(e)(i) of the Master Agreement.

10.17   At the end of each period to which each Budget relates, the Lender shall determine on the basis of trading accounts for each Ship and such other evidence as the Lender may require, whether the Borrowers had a surplus of funds (the "**Surplus Earnings**") over the Borrowers' requirements for operation and maintenance of the Ships during the relevant quarterly period (after meeting their other obligations to the Lender under this Agreement). Upon such determination by the Lender, the Borrowers shall forthwith pay to the Lender an amount equal to the amount of the Surplus Earnings and such amount shall be applied towards prepayment of the Facility; provided however that, unless the Lender determine otherwise, upon prepayment and application of such amounts towards the Facility in accordance with this Clause 10.17, the Applicable Limit shall be reduced by the amount so prepaid and applied and such amounts may not be re-borrowed.

## 11.   REPAYMENT

11.1   Subject as hereinafter provided, the aggregate of all outstanding amounts of the Facility shall be repaid by the Borrowers upon the earlier of:

   i)   the Original Expiration Date or, subject to Clause 11.2 in the case of any extension or renewal of the Facility pursuant to Clause 11.3, the last Banking Day of the period specified in the Lender's notice referred to in Clause 11.3; and

   ii)   the Demand Date, provided however that unless an Event of Default has occurred the Lender shall give a ninety (90) days prior written notice to the Borrowers of its intention to make a demand for repayment hereunder

   whereupon in either such case, the Facility shall be cancelled and no further Advances shall be drawn down.

11.2   The Borrowers may request in writing an extension of the Facility for further periods of up to twelve (12) months, PROVIDED THAT such request must be addressed to the Lender at least twenty (20) Business Days prior to the Original Expiration Date or (in case the Facility has already been extended pursuant to the terms of this Clause) twenty (20) Banking Days prior to the relevant Expiration Date specified in the Lender's notice referred to in Clause 11.3

11.3   The Lender may (in its sole and absolute discretion) by a notice in writing to the Borrowers, consent to the request of the Borrowers referred to in Clause 11.2 above and agree to the extension of the Facility for one or more periods of up to twelve (12) months. PROVIDED HOWEVER THAT the Lender may at its discretion, upon giving its consent to such extension adjust the Applicable Limit as it may deem appropriate. If the Lender does not give such consent as aforesaid, all outstanding amounts of the Facility shall be repayable in accordance with Clause 11.1. Any such notice shall be without prejudice to the Lender's right to make demand upon the Borrowers at any time pursuant to Clause 11.1 (ii).

11.4   Each amount payable in respect of the Facility shall be paid in Dollars.

## 12. APPLICATION

All moneys received by the Lender under or pursuant to any of the Agreement and/or the other Finance Documents and expressed to be applicable in accordance with the provisions of this Clause 12 shall be held by the Lender, to be applied in the following manner:

(a) first, in or towards payment of all sums other than principal of or interest on the Facility which may be owing to the Lender under this Agreement and the other Finance Documents or any of them;

(b) second, in or towards payment of the amounts owing (whether actually or contingently) to the Lender under the Master Agreement (calculated as at the actual Early Termination Date applying to each particular Designated Transaction, or if no such Early Termination Date shall have occurred, calculated as if an Early Termination Date occurred on the date of application or distribution hereunder);

(c) third, in or towards payment to the Lender of any default interest and/or overdue principal payments payable to the Lender under the Finance Documents;

(d) fourth, in or towards payment to the Lender of any interest owing in respect of the Facility or any part thereof;

(e) fifth, in or towards payment to the Lender of principal owing in respect of the Facility;

(f) sixth, in or towards payment to the Lender of any amount due to it in accordance with the provisions of Clauses 10.7 and 28 by reason of any such payment in respect of the Facility not being effected on the last day of an Interest Period in respect of the total amount of the Facility;

(g) seventh, at any time on or after the occurrence of an Event of Default in retention of a sum equal to the total of any and all other amounts which (in the reasonable opinion of the Lender) although not then due to the Lender under this Agreement and the other Finance Documents will become so due to the Lender, such sums thereafter to be applied by the Lender from time to time in accordance with this Clause 12; and

(h) eighth, the surplus (if any) shall be paid to the Borrowers or to whomsoever else may be entitled to receive such surplus.

## 13. EVIDENCE OF DEBT

13.1 The Lender shall maintain in accordance with its usual practice one or more Loan Accounts in the name of the Borrowers evidencing the Indebtedness which shall be in the "account current" referred to in the Mortgage over the Anemi Ship.

29

13.2    In any legal action or proceedings arising out of or in connection with this Agreement and/or the other Finance Documents the entries made in the Loan Account(s) maintained pursuant to Clause 13.1 shall be conclusive evidence (save in the case of manifest error) of the existence and amounts of the liabilities of the Borrowers therein recorded.

## 14.    PAYMENTS

14.1    All amounts payable under this Agreement and/or the other Finance Documents by the Borrowers, including amounts payable under this Clause 14, shall be paid in full to the Lender without set-off or counterclaim or retention and free and clear of and without any deduction or withholding for or on account of any Taxes.

14.2    In the event the Borrowers are required by law to make any such deduction or withholding from any payment hereunder then the Borrowers shall forthwith pay to the Lender such additional amount as will result in the immediate receipt by the Lender (as the case may be) of the full amount which would have been received hereunder had no such deduction or withholding been made, but if the Lender shall be or become entitled to any Tax credit or relief in respect of any Tax which is deducted from any payment by the Borrowers and if the Lender in its sole determination actually receives a benefit from such Tax credit or relief in its country of domicile, incorporation or residence, the Lender shall, subject to any laws or regulations applicable thereto, pay to the Borrowers after such benefit is effectively received by the Lender such amounts (which shall be conclusively certified by the Lender) as shall ensure that the net amount actually retained by the Lender is equal to the amount which would have been retained if there had been no such deduction; the Borrowers shall immediately forward to the Lender official receipt of the relevant taxation or other authority or other evidence acceptable to the Lender of the amount deducted or withheld as aforesaid, provided that in the event that it shall be illegal for the Borrowers to pay such additional amount as is referred to in this Clause 14.2 then the Indebtedness shall be repayable by the Borrowers to the Lender on demand.

14.3    All payments to be made by the Borrowers under this Agreement and/or the other Finance Documents shall be made in Dollars in immediately available and freely transferable and convertible funds not later than 11.00 a.m. London time on the date upon which the relevant payment is due to the Lender at such account as the Lender may from time to time nominate by written notice to the Borrowers.

14.4    The Borrowers undertake to indemnify the Lender against any loss incurred by the Lender as a result of any judgment or order being given or made for the payment of any amount due under this Agreement, the Master Agreement and/or the other Finance Documents and such judgment or order being expressed in a currency other than the currency in which the payment was due under this Agreement, the Master Agreement and/or the other Finance Documents and as a result of any variation having occurred in rates of exchange between the date on which the currency is converted for the purpose of such judgment or order and the date of actual payment thereof. This indemnity shall constitute a separate and independent liability of the Borrowers and shall continue in force and effect notwithstanding any such judgment or order as aforesaid.

30

## 15.    CHANGE OF CIRCUMSTANCES

15.1    If:

15.1.1    any law, regulation, treaty or official directive (whether or not having the force of law) or the interpretation thereof by any authority charged with the administration thereof:

(a)    subjects the Lender to any Tax with respect to payments of principal of or interest on the Facility or any other amount payable hereunder; or

(b)    changes the basis of Taxation of payments to the Lender of principal of or interest on the Facility or of any other amount payable hereunder (other than a change in the rate of Tax on the overall net income of the Lender); or

(c)    imposes, modifies or deems applicable any reserve and/or special deposit requirements against or in respect of assets or liabilities of, or deposits with or for the account of, or loans or credit extended by any office of the Lender; or

(d)    imposes on the Lender any other condition affecting this Agreement, the Facility or any part thereof or its funding; or

15.1.2    the Lender complies with any request, law, regulation (including any which relates to capital adequacy or liquidity control or which affects the manner in which the Lender allocates capital resources to its obligations under this Agreement (including without limitation, those resulting from the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement ("**Basel II**") or any other law or regulation which implements Basel II) or directive from any applicable fiscal or monetary authority (whether or not having the force of law) and as a result of any of the foregoing either directly or indirectly:

(a)    the cost to the Lender of making, funding or maintaining the Facility or any part thereof is increased; or

(b)    the amount of principal, interest or other amount payable to the Lender or the effective return to the Lender hereunder is reduced; or

(c)    the Lender makes any payment or foregoes any interest or other return on or calculated by reference to the gross amount receivable by it from the Borrowers hereunder,



31

then and in each such case upon demand from time to time the Borrowers shall pay to the Lender such amount as shall compensate the Lender for such increased cost, reduction, payment or foregone interest or other return. If the Lender is entitled to make a claim pursuant to this Clause it shall notify the Borrowers of the event by reason of which it is so entitled and shall submit to the Borrowers a certificate setting out details of the event giving rise to such compensation, the amount thereof and the manner in which it has been calculated and in the absence of manifest error such certificate shall be conclusive.

On receipt of such certificate the Borrowers shall have the option to prepay within ninety (90) days the Facility together with all interest accrued thereof and all costs and other amounts (including amounts payable referred to above and any amount payable under Clause 10.7) payable to the Lender hereunder. If the Borrowers decide to exercise such option they shall give written notice to the Lender and prepay the amount due to the Lender within ninety (90) days of the receipt of the certificate referred to above. The Lender's duties and liabilities hereunder shall be cancelled on the giving of such notice.

15.2    Notwithstanding anything to the contrary herein contained, if any change in law, regulation or treaty or in the interpretation or application thereof by any authority charged with the administration thereof shall make it unlawful for the Lender to make, fund or maintain the Facility or any part thereof, the Lender may by written notice thereof to the Borrowers declare that the Lender's duty to provide the Borrowers with the Facility shall be terminated forthwith whereupon the Borrowers will prepay forthwith (or if permitted by law on the next following Interest Payment Date) the Facility together with all interest accrued thereon and all other amounts payable to the Lender hereunder including the amounts due under Clause 10.7. The Lender's duties and liabilities hereunder shall be cancelled on the giving of such notice.

15.3    If any of the events referred to in Clause 15.1 or Clause 15.2 shall occur, but without prejudice to the liability of the Borrowers to prepay the Facility, the Borrowers and the Lender concerned shall negotiate in good faith with a view to agreeing terms for making the Facility available from another jurisdiction, or funding the Facility from alternative sources or otherwise restructuring the Facility on a basis which is not unlawful.

## 16.    REPRESENTATIONS AND WARRANTIES

16.1    The Borrowers hereby represent and warrant to the Lender that:

16.1.1          each Security Party is a company or corporation duly formed and validly existing under the laws of the country of its incorporation and has the power and authority to own its assets and carry on business in each jurisdiction in which it owns assets or carries on business;

16.1.2          each Security Party has power to enter into this Agreement and the other Subject Documents to which it is a party and to perform and discharge its/his/her duties and liabilities hereunder and thereunder and (in the case of the Borrowers) to borrow hereunder and to enter into Designated Transactions and each Security Party has

taken all necessary action (whether corporate or otherwise) required to authorise the execution, delivery and performance of this Agreement and the other Subject Documents and the borrowings to be made hereunder;

16.1.3     the execution, delivery and performance of this Agreement and the other Subject Documents will not contravene or exceed the powers granted to each Security Party or by, or any provision of, any law or regulation in any jurisdiction to which the Security Parties or any of them are/is subject, any order or decree of any governmental agency or court of or in any jurisdiction to which the Security Parties or any of them are/is subject, the certificates of incorporation, the other constitutional documents of the Security Parties or any of them or any mortgage, deed, contract or agreement to which the Security Parties or any of them is/are a party and which is binding upon the Security Parties' assets, and will not cause any Encumbrance to arise over or attach to all or any part of any Security Party's revenues or assets nor require any Security Party to create any such Encumbrance;

16.1.4     all consents, licences, approvals, registrations, authorisations or declarations (including, without limitation, all foreign exchange control approvals) in any jurisdiction to which the Security Parties or any of them is/are subject required to enable the Borrowers to borrow hereunder and to enter into Designated Transactions and the Borrowers and the other Security Parties lawfully to enter into and perform and discharge their respective duties and liabilities under this Agreement and the other Subject Documents to which each of them is a party and to ensure that the duties and liabilities of each of the Borrowers and the other Security Parties hereunder and thereunder are legal, valid and enforceable in accordance with the terms of this Agreement and the other Subject Documents to which each of them is a party and to make this Agreement and the other Subject Documents admissible in evidence in such aforesaid jurisdictions have been obtained or made and are in full force and effect;

16.1.5     this Agreement and each of the other Subject Documents to which each Security Party is a party constitute the legal, valid, binding and unconditional duties and liabilities of each Security Party as is a party thereto, enforceable against such Security Party in accordance with the terms hereof or thereof;

16.1.6     no Security Party has failed to pay when due any material amount or to perform any material duty under the provisions of any agreement relating to indebtedness in excess in aggregate of Five hundred thousand Dollars ($500,000) to which it is a party or by which it may be bound and no event has occurred and is continuing which constitutes, or which with the giving of notice or lapse of time or both would constitute, a material breach or default by such Security Party under any such agreement;

16.1.7     no litigation or administrative proceedings in any court, arbitration tribunal or governmental authority are pending or, to the knowledge of the Borrowers or any of

33

them, threatened against any Security Party or any of its assets which might materially adversely affect such Security Party's ability to perform and discharge its duties and liabilities hereunder and under the other Subject Documents to which it/he/she is a party thereto;

16.1.8    the Financial Statements are complete and correct and present fairly the position of the members of the Group and the results of the operations of the members of the Group ended on such date, and have been prepared in accordance with the Applicable Accounting Principles consistently applied and give a true and fair view of the financial condition, assets and liabilities of the members of the Group therein stated at the date to which such Financial Statements have been prepared and since that date there has been no adverse change in the financial conditions of the business, assets or operation of the members of the Group therein stated or the Group taken as a whole (as the case may be);

16.1.9    the information provided to the Lender in relation to this transaction is true and correct in all material respects and does not omit any information necessary to make any of the information so provided not misleading;

16.1.10    the copy of each Subject Document delivered by the Borrowers to the Lender is a true and complete copy thereof;

16.1.11    none of the parties to the Subject Documents is in default thereunder;

16.1.12    none of the Security Parties is in default under any agreement to which it/he is a party or by which it may be bound and no litigation, arbitration, tax claim, administrative proceeding or investigation is current or pending or (to its knowledge) threatened;

16.1.13    the financial condition of the Borrowers and the other Security Parties has not suffered any material deterioration since that condition was last disclosed to the Lender;

16.1.14    all the obligations and liabilities of the Borrowers hereunder rank and will rank at least *pari passu* in right of payments with all other unsubordinated indebtedness of the Borrowers or any of them;

16.1.15    save as disclosed to the Lender in writing neither the Borrowers nor any other Security Party has incurred any indebtedness or authorised or accepted any capital commitments (other than that normally associated with the day to day operation or trading of the Ships, where appropriate);

16.1.16    no Taxes are imposed by deduction withholding or otherwise or any other payment to be made by any Security Party under this Agreement and/or any other of the Subject Documents or are imposed on or by virtue of the execution or delivery of the Agreement and/or any other of the Subject Documents or any document or

instrument to be executed or delivered hereunder or thereunder and all relevant tax returns have been filed;

16.1.17    the choice of law agreed to govern this Agreement and/or any other Subject Document and the submission to the jurisdiction of the courts agreed in each of the Subject Documents are or will be on execution of the respective Subject Documents valid and binding on the Borrowers and any other Security Party which is a party thereto;

16.1.18    no Encumbrance exists on any Security Party's assets except as permitted by this Agreement;

16.1.19    the giving of the Grandunion Guarantee is to the commercial benefit of the relevant Grandunion Guarantor in that such Guarantor belongs to the same group of companies as the Borrowers and has a financial and commercial interest in the Facility being extended to the Borrowers and by giving its Guarantee, such Guarantor furthers its own business interests within the scope of its constitutional documents;

16.1.20    the giving of the Personal Guarantee pursuant to this Agreement by the Personal Guarantor is to the commercial benefit of the Personal Guarantor;

16.1.21    each of the Subject Documents is in full force and effect and constitute the valid binding and enforceable obligations of the Borrower which is a party thereto and the other parties to it and there has been no breach of the terms or the obligations of any party to it thereunder and no person has disputed or repudiated or disclaimed any liability under it or indicated that it does not consider itself bound by or does not intend to comply with any of the terms of any such documents;

16.1.22    the Borrowers and the other Security Parties have filed all tax and other fiscal returns required to be filed by any tax authority to which they are subject and neither of the Borrowers nor any other Security Party has an office in England or in the United States of America;

16.1.23    no member of the Group is overdue in the payment of any amount in respect of Tax;

16.1.24    each Owner is the legal and beneficial owner of the Ship owned by it under the laws of the relevant Flag State;

16.1.25    each Ship is in the absolute and unencumbered ownership of its Owner save as contemplated by this Agreement and the other Finance Documents;

16.1.26    each Ship maintains the highest class with her Classification Society free of all recommendations and qualifications of her Classification Society or other conditions or notations affecting class;



16.1.27          each Ship is operationally seaworthy;

16.1.28          except for the registration of each Mortgage at the appropriate Registry of ships, it is not necessary or advisable to ensure the legality, validity, enforceability or admissibility in evidence of this Agreement and the other Subject Documents, that any of them be filed, recorded or enrolled with any governmental authority or agency or that they be stamped with any stamp, registration or similar transaction tax in the United Kingdom or in the Republic of Greece or in the Republic of the Marshall Islands or in the Republic of Liberia or in the Republic of Malta or in any other country where any Security Party carries on business;

16.1.29          each Ship complies with all relevant laws, regulations and requirements (statutory or otherwise), including without limitation, the ISM Code, the ISPS Code, the ISM Code Documentation, the ISPS Code Documentation as are applicable to (i) ships registered under the laws of the relevant Flag State and (ii) engaged in the same or a similar service as such Ship is or is to be engaged;

16.1.30          each Ship is insured in accordance with the provisions of this Agreement in respect of Insurances;

16.1.31          each Ship is managed by the Manager under the terms of the relevant Management Agreement;

16.1.32          each Owner and the Manager comply with the provisions of all Environmental Laws in respect of each Ship;

16.1.33          each Owner and the Manager have obtained all Environmental Approvals and are in compliance with all such Environmental Approvals in respect of each Ship as appropriate;

16.1.34          neither the Borrowers nor the Manager have received notice of any Environmental Claim that alleges that either Owner and/or the Manager is not in compliance with any Environmental Law or any Environmental Approval in respect of each Ship;

16.1.35          there is no Environmental Claim pending against each Owner, the Manager or each Ship; and

16.1.36          no Environmental Incident has occurred which could or might give rise to any Environmental Claim against each Owner, the Manager and each Ship.

16.2          The representations and warranties of the Borrowers set out in Clause 16.1 above shall survive the execution of this Agreement and shall be deemed to be repeated on each Drawdown Date and on each Interest Payment Date with respect to the facts and circumstances existing at each such time as if made at such time.



17. **SECURITIES**

17.1    The Borrowers hereby agree that the Security Documents shall secure with first priority, the due payment of the Indebtedness.

17.2    It is declared and agreed in relation to the security created by the Security Documents that:

17.2.1    it shall be held by the Lender as a continuing security for the payment of the Indebtedness;

17.2.2    the security so created shall not be satisfied or discharged by intermediate payment or satisfaction of any part of the amount secured thereunder;

17.2.3    the security so created shall be in addition to and shall not in any way be prejudiced or affected by any collateral or other security now or hereafter held by the Lender for all or any part of the amounts thereby secured; and

17.2.4    every power and right given to the Lender hereunder shall be in addition to and not in limitation of any and every other power or right of the Lender under the Security Documents and may be exercised from time to time in such order and as often as the Lender may consider appropriate.

18. **CONDITIONS PRECEDENT AND CONDITIONS SUBSEQUENT**

18.1    Notwithstanding the provisions of Clause 5, the agreement of the Lender to permit the Drawdown of any Advance hereunder is subject to the condition that the Lender shall have received not later than the Drawdown Date in respect of such Advance the following documents or evidence in form and substance satisfactory to the Lender and its legal advisers:

18.1.1    a certificate as to the shareholding of each Security Party, signed by the secretary or a director of that Security Party, stating the full names of the persons or persons legally and beneficially entitled as shareholders/stockholders of the entire issued and outstanding shares/stock of that Security Party and a copy, certified as a true copy by the secretary of each Security Party of the resolutions of the board of directors and of the shareholders of each Security Party authorising the transaction contemplated hereby and authorising a person or persons to sign or execute on behalf of each Security Party this Agreement, each Notice of Drawdown (as in the form of Schedule 1 thereof), each Acknowledgement (as in the form of Schedule 2 hereof) and the other Finance Documents as is a party thereto;

18.1.2    the originals of any power or powers of attorney granted pursuant to Clause 18.1.1;

18.1.3    specimen signatures, duly authenticated of the person or persons referred to in Clause 18.1.1;

18.1.4 certificates or other evidence satisfactory to the Lender in its sole discretion of the existence and good standing of each Security Party, dated not more than fifteen (15) days before the date of this Agreement;

18.1.5 copies, duly certified as a true copy by the respective secretaries of each Security Party of the certificate of incorporation and the other constitutional documents of each Security Party;

18.1.6 evidence that each Earnings Account has been duly opened by the relevant Borrower(s) as appropriate and all mandate forms, signature cards and authorities have been duly delivered and that each of such accounts is free of all liens or charges other than the liens and charges in favour of the Lender referred to herein;

18.1.7 certified copies of all documents (with a certified translation if an original is not in English) evidencing any other necessary action (including but without limitation governmental approval, consents, licences, authorisations, validations or exemptions which the Lender or its legal advisers may require) by or of parties with respect to this Agreement and the other Finance Documents;

18.1.8 the Grandunion Guarantee duly executed by the Grandunion Guarantor;

18.1.9 the Personal Guarantee duly executed by the Personal Guarantor;

18.1.10 the Earnings Account Charges duly executed by each of the Borrowers, as appropriate;

18.1.11 the Shares' Pledges (other than the Aries Maritime Shares' Pledge) duly executed by the Grandunion Guarantor together with the original of the relevant share certificates in respect of all relevant shares;

18.1.12 evidence that the fees payable to the Lender in accordance with Clause 26 have been duly paid;

18.1.13 the Master Agreement duly executed between the Borrowers and the Lender;

18.1.14 the Master Agreement Assignment duly executed by the Borrowers;

18.1.15 evidence that an amount of Twenty thousand Euros (€ 20,000) has been paid to the Lender's Greek and English law legal advisors in respect of their fees in connection with this Agreement and the other Finance Documents;

18.1.16 evidence that an amount of One thousand Euros (€1,000) has been paid to the Lender's Liberian and Marshall Islands law legal advisors in respect of their fees in connection with this Agreement and the other Finance Documents;



38

18.1.17     evidence that payment has been made to the Lender's U.S. law legal counsels in respect of their fees in connection with this Agreement and the other Finance Documents;

18.1.18     evidence that an amount of Two thousand Euros (€2,000) has been paid to the Lender's Maltese legal counsels in respect of their fees in connection with this Agreement and the other Finance Documents;

18.1.19     letter from HFW Nominees Limited to the Lender confirming acceptance of their appointment as agents for service of process in England under Clause 38.4;

18.1.20     a letter from Mr. George Livanos to the Lender confirming acceptance of his appointment as agent for service of process in Greece under Clause 38.5.

18.1.21     the opinion letters from Marshall Islands, Liberia, Malta and such other legal counsels as the Lender may require, all acceptable to the Lender, in relation to this Agreement and the other Finance Documents referred to in this Clause 18.1, and in form and substance satisfactory to the Lender;

18.1.22     copies of the Management Agreements and of the Charters certified as true and complete copies thereof by the Borrowers' legal counsel;

18.1.23     the Letter of Undertaking duly executed by the relevant Subsidiaries of the Grandunion Guarantor;

18.1.24     the Mortgages over each Ship duly executed by the Owner thereof and notarised or legalised as appropriate and duly recorded at the appropriate registry of ships;

18.1.25     the General Assignment and the Charter Assignment in respect of each Ship duly executed by the parties thereto;

18.1.26     the notices of assignment of the Insurances and of the Earnings in respect of each Ship duly signed by the relevant Owner thereof;

18.1.27     the notices of assignment of the Earnings and of the Charter in respect of each Ship duly signed by the Owner thereof and acknowledged by the relevant Charterer as appropriate;

18.1.28     if required by the Lender, a survey report for each Ship issued by a surveyor appointed by and/or acceptable to the Lender at the expense of the relevant Owner certifying the condition of such Ship;

18.1.29     evidence that save for the Encumbrances created by the relevant Finance Documents there is no Encumbrance whatsoever on each Ship except in favour of the Lender;



39

18.1.30    evidence that each Ship is insured in accordance with the provisions of this Agreement;

18.1.31    evidence that each Ship is classed at the highest classification status with the Classification Society, free of overdue recommendations or other conditions or notations affecting her class;

18.1.32    market valuations on the basis specified in Clause 21.27 issued by reputable sale and purchase brokers appointed by or acceptable to the Lender, at the expense of the Borrowers, certifying the Market Value of each Ship;

18.1.33    certified copies of the classification and international safety and trading certificates of the relevant Ship issued by the Classification Society of each Ship free of recommendations or other conditions or notations affecting her class;

18.1.34    evidence that the each Ship will be registered in the ownership of the relevant Owner under the laws of the relevant Flag State, free from registered Encumbrances other than the Mortgage registered thereon;

18.1.35    copies of the ISM Code Documentation and the ISPS Code Documentation in relation to each Ship, the Owner thereof and the Manager;

18.1.36    the Manager's Undertaking in respect of each Ship duly executed by the Manager; and

18.1.37    evidence that all indebtedness in relation to (a) the Existing Financial Agreements, (b) the facility letter dated 17 January 2007 as amended by an addendum No. 1 dated 6 May 2008, both made by and among (i) the Lender as lender and (ii) YIOSONAS MARITIME S.A. of the Marshall Islands, ANTARIOS MARITIME S.A. of the Marshall Islands and NEW WAVE SHIPPING LIMITED of Malta as joint and several borrowers and (c) the overdraft facility agreement dated 21 June 2007 (the "**GU Overdraft**") made between the Lender as lender and the Grandunion Guarantor as borrower, has been repaid in full; and

18.1.38    confirmation from (i) the Existing Borrowers that the revolving facility and overdraft facility available pursuant to the Existing Financial Agreements and (ii) the Grandunion Guarantor that the overdraft facility available pursuant to the GU Overdraft are now cancelled and no further drawdowns will be made thereunder;

18.1.39    such further documents and evidence as the Lender may hereafter request.

18.2    If the Lender, at its discretion, permits an Advance or any part thereof to be borrowed before certain of the conditions referred to in Clause 18.1 are satisfied, the Borrowers shall ensure that those conditions are satisfied within five (5) Banking Days after the relevant Drawdown Date (or such longer period as the Lender specifies).



40

18.3    The Borrowers shall ensure and procure that the Lender shall receive on or prior to the Acquisition Date the following documents or evidence in form and substance satisfactory to the Lender and its legal advisors:

18.3.1    each of the matters specified in any Acquisition Document as conditions precedent to the Acquisition shall have been satisfied (or waived by the Grandunion Guarantor with the Lender's prior written consent);

18.3.2    copies of any and all Acquisition Documents;

18.3.3    the Aries Maritime Shares' Pledge duly executed by the Grandunion Guarantor;

18.3.4    evidence that payment has been made to the Lender's Bermuda legal counsel in respect of their fees in connection with this Agreement and the other Finance Documents; and

18.3.5    the opinion letters from Bermuda, United States and such other legal counsels as the Lender may require, all acceptable to the Lender in relation to the Aries Maritime Shares' Pledge the Acquisition Documents and such other matters as the Lender may require in its absolute discretion.

## 19.    FINANCIAL AND GENERAL UNDERTAKINGS

The Borrowers hereby jointly and severally undertake with the Lender that throughout the Security Period the Borrowers shall (and shall procure that each other relevant Security Party shall) comply with the following provisions of this Clause 19, except as the Lender may otherwise permit:

19.1    to supply the Lender with two (2) copies of (i) the annual Financial Statements of the Group audited by the Auditors as soon as available but in any event not later than one hundred and eighty (180) days after the end of the relevant period to which they relate starting with the 2008 Financial Statements and (ii) the quarterly unaudited Financial Statements of the Group as soon as available but in any event not later than ninety (90) days after the end of the relevant quarterly period starting with the accounts for the quarterly period ending 31 December 2009 and (iii) such other information with regard to the business, properties or condition, financial or otherwise, of each member of the Group as the Lender may from time to time reasonably request;

19.2    to procure that the Financial Statements to be delivered from time to time in accordance with Clause 19.1 shall be prepared in accordance with the Applicable Accounting Principles;

19.3    to obtain promptly at any time and from time to time such registrations, licenses, consents and approvals as may be required in respect of this Agreement and the other Subject Documents under any applicable law or regulation to enable them to perform and discharge

their duties and liabilities hereunder and thereunder and promptly supply the Lender with copies thereof;

19.4    to ensure that at all times the claims of the Lender against each Security Party under this Agreement and the other Finance Documents rank at least *pari passu* with the claims of all its other unsecured creditors save those whose claims are preferred by any bankruptcy, insolvency or other similar laws of general application;

19.5    to deliver to the Lender translations into English (certified by an authorised translator) of any documents which have to be delivered to the Lender under the terms of this Agreement or the other Finance Documents, the originals of which are not in the English language;

19.6    not to make any loans or advances to, or any investments in, any person, firm, corporation or joint venture (or to any officer, director, stockholder, employee or customer of any such person);

19.7    not to borrow any money or permit any such borrowing to continue or incur any indebtedness whatsoever other than the Facility, the Swap Exposure or other than by way of subordinated shareholders' loans or enter into any agreement for payment on deferred terms (otherwise than on customary suppliers' credit terms) or any equipment lease or contract hire agreement other than in the ordinary course of business;

19.8    not to assume, guarantee or otherwise undertake the liability of any person, firm or company (otherwise than pursuant to the terms hereof and in the ordinary course of operation or trading of the Ships);

19.9    not to authorise or accept any capital commitments (save and except in connection with the ordinary course of operation or trading of the Ships where appropriate);

19.10   not to declare or pay any dividends or repay any shareholders' loans or make any distributions to their shareholders in any form whatsoever;

19.11   not to and procure that the Manager and each Security Party shall not change the nature of their/its business or commence any business other than the ownership and operation of ships;

19.12   not to (save and except as provided in this Agreement or otherwise in favour of the Lender), create or permit to exist any Encumbrance whatsoever on the Ships or either of them or on any of the other property or assets, real or personal of the Borrowers or either of them whether now owned or hereafter acquired, other than a Permitted Lien without the prior written consent of the Lender;

19.13   without prejudice to the obligations of the Borrowers under Clause 19.14, promptly after the happening of an Event of Default or an event which with the giving of notice or passage of time or satisfaction of any other condition or any combination of the foregoing, may become



an Event of Default having occurred, to notify the Lender of such event and of the steps (if any) which are being taken to nullify or mitigate its effect;

19.14   from time to time (but not more than once every six (6) months) on request by the Lender, to deliver to it a certificate signed by a director or officer of the Borrowers confirming that, save as may be notified in detail in such certificate, no Event of Default or an event which with the giving of notice or passage of time or satisfaction of any other condition or any combination of the foregoing, may become an Event of Default having occurred and is then subsisting to be accompanied by such evidence as to the information and matters contained in such certificate as the Lender may from time to time reasonably require;

19.15   to ensure and procure that each Security Party shall maintain its corporate existence under the laws of the country of its incorporation and shall comply with all relevant legislation and laws and regulations applicable to it;

19.16   to pay and to ensure and procure that the other Security Parties shall pay all Taxes, assessments and other governmental charges when the same fall due, except to the extent that the same are being contested in good faith by appropriate proceedings and adequate reserves have been set aside for their payment if such proceedings fail and ensure and procure that all relevant tax returns of the Borrowers and the other Security Parties shall be properly and timely filed;

19.17   not to and ensure that the Grandunion Guarantor and the Personal Guarantor shall not convey, assign, transfer, sell or otherwise or dispose of the Ships or either of them or any of the other property, assets or rights owned by the Borrowers or by the Grandunion Guarantor or by the Personal Guarantor whether present or future, without the prior written consent of the Lender;

19.18   to send (or procure that it is sent) to the Lender as soon as the same is instituted (or, to the knowledge of the Borrowers or any of them threatened), details of any litigation, arbitration or administrative proceedings against or involving the Borrowers (or either of them) and/or the other Security Parties (or any of them) or the Ships (or either of them) or the Shares (or any of them), which is likely to have a material adverse effect on the Borrowers (or either of them), the other Security Parties (or any of them) or the operation of the Ships (or either of them);

19.19   to comply (and ensure that each other Security Party will comply) with all laws regulations treaties and conventions applicable to the Borrowers, the other Security Parties and the Ships and to carry on the Ships all certificates and other documents which may from time to time be required to evidence such compliance;

19.20   not to and ensure and procure that each Security Party shall not dissolve, merge into or consolidate with any other company or person and procure that no change in the management or the legal or beneficial ownership of the Borrowers, the other Security Parties and the Ships shall be effected;



43

19.21   to ensure and procure that no change of Control in the Grandunion Guarantor shall occur without the Lender's prior written consent;

19.22   to execute and procure the execution by each other Security Party of any further document or documents required by the Lender in order to perfect or complete the security created by the Finance Documents;

19.23   to use the proceeds of the Facility for the Borrowers' benefit and under their full responsibility and exclusively for the purposes specified in this Agreement;

19.24   to ensure and procure that at all times throughout the Security Period the Borrowers and/or the Guarantors shall maintain with the Lender to the credit of any account held with the Lender (including the Earnings Accounts) free cash deposits having minimum average quarterly balances of an aggregate amount equal to the interest payable under this Agreement for the next three (3) months;

19.25   to ensure and procure that on the Acquisition Date the Aries Maritime Shares' Charge shall be executed by the Grandunion Guarantor;

19.26   to ensure and procure that the Swap Exposure shall not exceed the Maximum Permitted Swap Exposure;

19.27   to supply the Lender with quarterly Budgets showing all forecasted operating expenses and disbursements of whatsoever nature in relation to the Ships (on a per-Ship basis) in such detail and such form as the Lender shall require. The said Budgets shall be delivered to the Lender as soon as possible prior to, and in any event not more later than seven (7) days before the expiry of the quarterly period to which the previous Budget relates with the first such period expiring on 31 December 2009; and

19.28   to deliver to the Lender such documents and evidence as the Lender shall from time to time require relating to the verification of identity and knowledge of the Lender's customers and the compliance by the Lender with all necessary **"know your customer"** or similar checks, always on the basis of applicable laws and regulations or the Lender's own internal guidelines, in each case as such laws, regulations or internal guidelines apply from time to time.

## 20.   INSURANCE UNDERTAKINGS

The Borrowers hereby jointly and severally undertake with the Lender that throughout the Security Period the Borrowers shall (at the expense of the Borrowers and upon such terms, in such amounts and with such Insurers as shall from time to time be approved in writing by the Lender) comply with the following provisions of this Clause 20, except as the Lender may otherwise permit:

20.1   to insure and keep insured the Ships in Dollars or such other currency as may be approved in writing by the Lender, in the full insurable value of the Ships but in no event for an

aggregate amount which is less than one hundred and thirty per cent (130%) of the Market Values of the Ships subject to a Mortgage against fire, marine and other risks (including Excess Risks) and War Risks covered by hull and machinery policies;

20.2    to enter each Ship in the name of the relevant Owner for her full value and tonnage in a protection and indemnity association approved by the Lender with unlimited liability if available otherwise for the highest possible standard cover for the time being $1,000,000,000 for oil pollution and for excess oil spillage and pollution liability insurance for the highest possible standard cover against all Protection and Indemnity Risks;

20.3    if either Ship enters the territorial waters of the United States of America for any reason whatsoever, to take out such additional insurance to cover such risks as may be necessary in order to obtain a Certificate of Financial Responsibility from the United States Coastguard;

20.4    upon the Lender's request, to effect loss of hire and/or Earnings, Insurance on the Ships or either of them (as may be required by the Lender) in respect of charterparties which exceed six (6) months duration and otherwise on such terms and in such amounts as the Lender may instruct the Borrowers as being necessary or appropriate;

20.5    to effect such additional Insurances as may reasonably be requested by the Lender to maintain the scope of the existing cover of the Insurances;

20.6    to renew the Insurances at least fourteen (14) days before the relevant Insurances expire and to procure that the Approved Brokers shall promptly confirm in writing to the Lender as and when each such renewal is effected;

20.7    punctually to pay all premiums, calls, contributions or other sums payable in respect of the Insurances and to produce all relevant receipts when so required in writing by the Lender;

20.8    to pay to the Lender on demand all premiums or other amounts payable by the Lender in effecting a mortgagee's interest policy and a mortgagee's interest (additional perils) insurance policy in the name of the Lender upon such terms and conditions and with such insurers and for such amounts as the Lender may require, the aggregate of which amounts in the case of the Ships subject to a Mortgage shall not be less than one hundred and ten per cent (110%) of the Market Values of the Ships and under such wording and conditions acceptable to the Lender;

20.9    to arrange for the execution of such guarantees as may from time to time be required by any Protection and Indemnity or War Risks association;

20.10   to give notice of assignment of the Insurances to the Insurers in the form set out in Schedule 2 to each of the General Assignments and to procure that a copy of each notice of assignment shall be endorsed upon or attached to the relevant Insurance Documents;

20.11   to procure that the Insurance Documents shall be deposited with the Approved Brokers and that such brokers shall provide the Lender with certified copies thereof and shall issue to

45

the Lender a letter or letters of undertaking in such form as the Lender shall reasonably require;

20.12 to procure that the Protection and Indemnity and/or War Risks associations in which each of the Ships is entered shall provide the Lender with a letter or letters of undertaking in their standard form and shall provide the Lender with a copy of the certificates of entry;

20.13 to procure that the Insurance Documents (including all certificates of entry in any Protection and Indemnity and/or War Risks association) shall contain loss payable clauses in the form set out in Schedule 3 or Schedule 4 (as may be appropriate) to each General Assignment;

20.14 to procure that the Insurance Documents shall provide that the lien or set off for unpaid premiums or calls shall be limited to only the premiums or calls due in relation to the Insurances on the Ships and for fourteen (14) days prior written notice to be given to the Lender by the Insurers (such notice to be given even if the Insurers have not received an appropriate enquiry from the Lender) in the event of cancellation or termination of Insurances and in the event of the non-payment of the premium or calls, the right to pay the said premium or calls within a reasonable time;

20.15 promptly to provide the Lender with full information regarding any casualties or damage to either Ship in an amount in excess of Three hundred thousand Dollars ($300,000) or in consequence whereof any of the Ships has become or may become a Total Loss;

20.16 at the request of the Lender, to provide the Lender, at the Borrowers' cost, with a detailed report issued by a firm of marine insurance brokers or consultants appointed by the Lender in relation to the Insurances;

20.17 not to do any act nor voluntarily suffer nor permit any act to be done whereby any Insurance shall or may be suspended or avoided and not to suffer nor permit either Ship to engage in any voyage nor to carry any cargo not permitted under the Insurances in effect without first covering such Ship to the amount herein provided for with insurance satisfactory to the Lender for such voyage or the carriage of such cargo;

20.18 (without limitation to the generality of the foregoing) in particular not permit either Ship to enter or trade to any zone which is declared a war zone by any Government or by such Ship's War Risks Insurers unless there shall have been effected by the Borrowers as appropriate and at their expense such special insurance as the War Risk Insurers may require;

20.19 to procure that all amounts payable under the Insurances are paid in accordance with the loss payable clause in the form set out in Schedule 3 or Schedule 4 (as may be appropriate) to each General Assignment and to apply and procure that all amounts as are paid to the relevant Owner are applied to the repair of the damage and the reparation of the loss in respect of which the said amounts shall have been received; and

20.20   should any Ship be laid up for any period, to arrange "lay up" Insurances for such Ship during such period, at their own cost and upon such terms and conditions, in such amounts and with such Insurers as shall from time to time be approved in writing by the Lender.

## 21.   OPERATIONAL UNDERTAKINGS

The Borrowers hereby jointly and severally undertake with the Lender that throughout the Security Period the Borrowers shall (and shall procure that each other relevant Security Party shall) comply with the following provisions of this Clause 21.1 except as the Lender may otherwise permit:

21.1   to ensure and procure that each Ship shall be duly registered under the laws of the relevant Flag State in the ownership of its Owner and each Owner shall not do or suffer to be done anything whereby such registration may be forfeited or imperilled;

21.2   to ensure that all Earnings of each Ship shall be paid into the relevant Earnings Account opened in the name of the Owner of such Ship;

21.3   to ensure that when due and payable, all taxes, assessments, levies, governmental charges, fines and penalties lawfully imposed on and enforceable against the Ships or any of them shall be paid by the Borrowers, unless contested in good faith and by the appropriate proceedings;

21.4   to ensure that neither Ship (or any share thereof or interest therein) shall be sold transferred, mortgaged, charged, hypothecated or abandoned (save in the case of maritime necessity) and neither the Insurances nor the Earnings of the Ships or either of them will be assigned without the prior written consent of the Lender which it shall have the power to withhold;

21.5   to ensure that neither Ship shall be operated in any manner contrary to any law or regulations in any relevant jurisdiction, including, without limitation the ISM Code and ISPS Code and none of the Owners and the Manager shall engage in any unlawful trade or carry any cargo that will expose the relevant Ship to penalty, forfeiture or capture and in the event of hostilities in any part of the world (whether a war be declared or not) not employ either Ship or voluntarily suffer her employment in carrying any contraband goods;

21.6   to ensure that no Owner shall create or permit to be created or continued any lien or Encumbrance(s) on its Ship and/or the Insurances and/or the Earnings of its Ship (other than Permitted Liens) and/or shall satisfy all claims and demands which if unpaid might in law or by statute or otherwise create a lien or Encumbrance(s) and (without prejudice to the generality of the foregoing) no lien or Encumbrance(s) shall be created or permitted to be created or continued on its Ship for any reason whatsoever other than Permitted Liens;

21.7   to ensure that on the request of the Lender, each Owner shall provide and procure that the Lender shall be provided with satisfactory evidence that the wages, allotments, insurance and pension contributions of the Master and crew of its Ship are being paid in accordance



with the articles of agreement relating to such Ship and the relevant regulations and that all deductions from the remuneration of the Master and crew in respect of any tax liability (including social insurance contributions) are being made and accounted for to the relevant authority and that the Master of its Ship has no claim for disbursements other than those properly incurred by him in the ordinary trading of such Ship on the voyage then in progress;

21.8    if any writ or proceedings shall be issued against either Ship or if either Ship shall be otherwise attached, arrested or detained by any proceeding in any court or tribunal or by any government or other authority, the Owners shall immediately notify and procure that the Lender shall be notified thereof by telefax confirmed by letter and as soon as practicably possible thereafter cause such Ship to be released and all liens or Encumbrance(s) (except for the Mortgage and any Permitted Liens on such Ship) thereon to be discharged;

21.9    save for the Charters, no Owner shall without the prior written consent of the Lender (which consent shall not be unreasonably withheld) voyage or time charter its Ship or place her under contract for employment for any period which when aggregated with any optional periods of extension contained in the said charter or contract, would exceed six (6) months duration; provided however that in the event of a Ship being employed (with the Lender's prior written consent) under any demise or bareboat charter or any charter which when aggregated with any optional periods contained in such charter would exceed six (6) months duration, the Lender shall be furnished forthwith with (a) details and documentary evidence satisfactory to the Lender in its sole discretion in respect of the new employment, (b) upon Lender's request, a specific assignment in favour of the Lender of the benefit of such charter together with a notice of any such assignment addressed to the relevant charterer and endorsed with an acknowledgement of receipt by the relevant charterer all in form and substance satisfactory to the Lender and (c) upon Lender's request, a specific agreement of subordination of the rights of such charterer to the rights of the Lender;

21.10   neither of the Owners shall without the prior written consent of the Lender (which it shall have full power to withhold) demise charter its Ship for any period whatsoever;

21.11   neither of the Owners shall without the prior written consent of the Lender (which it shall have full power to withhold) deliver its Ship into the possession of any person or persons for effecting repairs or renewals to such Ship the cost of which will exceed the amount of Three hundred thousand Dollars ($300,000) unless such person or persons shall have given a written undertaking to the Lender not to exercise any lien or right of detention on such Ship in respect of the cost of such repairs or renewals;

21.12   at all times and at the Owners' own expense, each Owner shall maintain its Ship in a seaworthy condition and in good running order and repair in accordance with first class ship ownership and ship management practice and keep and procure that its Ship is kept in such condition as will entitle him to the highest classification status with the Classification Society free from recommendations and notations which have not been complied with in accordance with their terms and procure that the Lender is provided with certificates issued



48

by their Classification Society that such classification status is maintained and with copies of all other classification certificates as the Lender may request in writing;

21.13    each Owner shall submit its Ship regularly to such periodical or other surveys as may be required for classification purposes and, if so required by the Lender in writing, supply and procure that the Lender is supplied with copies of all survey reports issued in respect thereof;

21.14    the Owners shall notify and procure that the Lender is notified immediately by telefax of any recommendation or requirement imposed on the Ships by their Classification Society, their Insurers or by any other competent authority that is not complied with in accordance with its terms;

21.15    the Owners shall give and procure that the Lender is given with reasonable prior notice of any proposed dry docking or any underwater survey of a Ship so that the Lender (if it so desires) can arrange for a representative to be present;

21.16    the Owners shall authorise and procure that the Classification Society and all other regulatory authorities of the Ships are authorised to disclose to the Lender any information or documents requested by the Lender relating to the classification, repair, maintenance or seaworthiness of the Ships;

21.17    the Borrowers shall comply with all legal requirements whether imposed by enactment, regulation, common law or otherwise and have on board the Ships as and when legally required valid certificates showing compliance therewith;

21.18    without prejudice to Clause 21.17, the Owners shall take all necessary and proper precautions to prevent any infringements of the Anti-Drug Abuse Act of 1986 of the United States of America or any similar legislation applicable to the Ships in any jurisdiction in or to which a Ship shall be employed or trade or which may otherwise be applicable to a Ship, the Owners or either of them or any other Security Party and, if the Lender shall so require, the Owners shall enter into a "Carrier Initiative Agreement" with the United States Customs Service and to procure that such agreement (or any similar agreement hereafter introduced by any agency of the United States of America) is maintained in full force and effect by the Owners;

21.19    the Owners shall comply with and procure that the Manager and all servants and agents of the Owners and the Manager or any charterer of the Ships shall comply with, the ISM Code, the ISPS Code, all Environmental Laws and all legislation of any state or government in relation to the Ships, their ownership, operation and management or to the business of the Owners including, without limitation, requirements relating to manning, submission of oil spill response plans, designation of qualified individuals and establishing financial responsibility;

21.20    the Owners shall hold or procure that the Manager shall hold all appropriate ISM Documentation and provide the Lender with copies of the relevant ISM Code

49

Documentation and ISPS Code Documentation duly issued to the Owners, the Manager and the Ships pursuant to the ISM Code and the ISPS Code;

21.21   the Owners shall keep or procure that it is kept onboard each Ship a copy of all relevant ISM Code Documentation and ISPS Code Documentation respectively;

21.22   the Owners shall perform and discharge all duties and liabilities imposed on the Owners or either of them under any charter (including, without limitation, the Charters), bill of lading or other contract relating to the Ships;

21.23   the Owners shall not remove or permit the removal of any part of either Ship or any equipment belonging thereto, nor make or permit to be made any alteration in the structure type or speed of either Ship which materially reduced the value of such Ship (unless such removal or alteration is required by statute or by her Classification Society) without the prior written consent of the Lender which it shall have full power to withhold;

21.24   at all reasonable times and on reasonable notice, the Owners shall permit and procure that the Lender or its authorised representative is permitted full and complete access to the Ships for the purpose of inspecting the state and condition of the Ships and their cargo and papers and at the written request of the Lender deliver and procure the delivery for inspection copies of any and all contracts and documents relating to the Ships whether on board or not;

21.25   the Owners shall keep and procure that the Lender is kept fully informed as to the use, the employment and the position of each Ship and promptly provide and procure that the Lender is provided with information concerning the classification, status and insurance of each Ship from time to time as and when so required in writing by the Lender;

21.26   when so requested by the Lender, the Owners shall appoint and procure that two (2) independent sale and purchase shipbrokers shall be appointed, nominated by the Lender to give valuations of each Ship without physical inspection and on the basis of an arms length purchase by a willing buyer from a willing seller and, unless the Lender otherwise requires, without taking into account the relevant Charter or any other charterparty in respect thereof; all costs and fees payable in connection with such valuations shall be paid by the Owners and the value of each Ship shall be determined by taking into account the average of the aforesaid valuations;

21.27   in the event of Compulsory Acquisition of a Ship by any Government Entity, the Owners shall execute and procure the execution of any assignment that the Lender may request in relation to any and all amounts which such Government Entity shall be liable to pay as Requisition Compensation for such Ship or for her use and if received by the Owners to pay and procure the payment of such amounts immediately to the Lender;

21.28   each Owner shall appoint and procure the appointment of the Manager as manager of its Ship and shall not vary or terminate this appointment without the Lender's prior written consent;



21.29   the Owners shall execute and deliver to the Lender such documents of transfer as the Lender may require in the event of sale of any of the Ships pursuant to any power of sale contained in the Mortgages or any of them or which the Lender may have in law;

21.30   the Owners shall not employ the Ships or either of them nor allow their employment in any manner contrary to any law or regulation in any relevant jurisdiction including, but not limited to, the ISM Code and the ISPS Code;

21.31   the Owners shall immediately notify the Lender by fax, confirmed forthwith by letter, of:

(i)     any casualty in respect of a Ship which is or is likely to be or to become a Major Casualty;

(ii)    any occurrence as a result of which a Ship has become or is, by the passing of time or otherwise, likely to become a Total Loss;

(iii)   any requirement or recommendation made by any insurer or classification society or by any competent authority in respect of a Ship which is not complied with in accordance with its terms;

(iv)    any arrest or detention of a Ship, any exercise or purported exercise of any lien on a Ship or her Earnings or her Insurances or any requisition of a Ship for hire;

(v)     any intended dry docking of a Ship;

(vi)    any Environmental Claim made against the Owners or either of them or in connection with a Ship or any Environmental Incident in respect thereof;

(vii)   any claim for breach of the ISM Code or the ISPS Code, being made against the Owners or either of them and/or the Manager or otherwise in connection with a Ship; or

(viii)  any other matter, event or incident, actual or threatened the effect of which will or could lead to the ISM Code and/or the ISPS Code not being complied with;

and advise and procure that the Lender shall be advised in writing on a regular basis and in such detail as the Lender shall require of the Owners' or any other person's response to any of those events or matters;

21.32   each Owner shall keep prominently in the Chart Room and in the Master's cabin of its Ship a framed duly completed notice printed in plain type of such size that the area of print shall cover a space not less than six inches wide and nine inches high reading as follows:

"NOTICE OF MORTGAGE

This Ship is owned by [name of Owner] (the "**Owner**") and is subject to a [first priority mortgage and accompanying deed of covenants] [preferred Mortgage] in favour of **MARFIN**

**EGNATIA BANK Societe Anonyme**. Under the terms of the said mortgage [and deed of covenants] a certified copy of which is preserved with the Ship's papers neither the Owner nor the Captain nor any officer or agent nor any charterer of this Ship nor any other person whatsoever has any power, right or authority whatever to create, incur or permit the imposition on this Ship any commitments or encumbrances except for crews wages accrued for not more than three (3) months or salvage."; and

21.33 each Owner shall comply with its respective obligations under each Subject Document and shall not vary, amend or terminate any of the aforesaid documents.

## 22.    EARNINGS ACCOUNTS

22.1 The Lender acknowledges that the Borrowers shall, unless and until an Event of Default (or any event which only with the giving of notice or passage of time or a determination by the Lender and/or satisfaction of any condition or any combination of the foregoing may become an Event of Default) shall occur and the Lender shall direct to the contrary, be entitled from time to time, to require that moneys for the time being standing to the credit of the Earnings Accounts or either of them be transferred in such amounts and for such periods as the Borrowers select to fixed-term deposit accounts (**"deposit accounts"**) opened in the name of the Borrowers with the Lender. Neither of the Borrowers shall be entitled to withdraw moneys standing to the credit of the Earnings Accounts which are the relevant subject of a fixed term deposit until the expiry of the period of such deposit unless the Borrowers shall, on withdrawing such moneys pay to the Lender on demand any loss or expense which the Lender shall certify that it has sustained or incurred as a result of such withdrawal being made prior to the expiry of the period of the relevant deposit and the Lender shall be entitled to debit the relevant Earnings Account for the amount so certified prior to such withdrawal being made. Without prejudice to the foregoing in the event that any moneys so deposited are to be applied pursuant to Clause 12, the Borrowers shall, on such application being made, pay to the Lender on demand any loss or expense which the Lender shall certify that it has sustained or incurred as a result of such application being made prior to the expiry of the period of the relevant deposit and the Lender shall be entitled to debit the relevant Earnings Account for the amount so certified prior to such application being made. Any deposit accounts shall, for all the purposes of the Finance Documents, be deemed to be sub-accounts of the relevant Earnings Accounts from which the moneys deposited in the deposit accounts were transferred and all references in the Finance Documents to the Earnings Accounts or either of them shall be deemed to include the deposit accounts deemed as aforesaid to be sub-accounts thereof.

22.2 Each Borrower hereby undertakes to ensure that, throughout the Security Period all payments by the Lender to the Borrowers under each Designated Transaction are paid to any Earnings Account.

22.3 The Borrowers (without prejudice to the terms of each General Assignment) hereby undertake to pay all the Earnings of each Ship to the relevant Earnings Account. Unless and until the Lender gives notice to the Borrowers that it requires that all Earnings be paid



directly to the Lender (which notice may only be given by the Lender if an Event of Default has occurred), all amounts in the Earnings Accounts shall be applied as follows:

(i)      first, towards the payment of fees and costs that are due and payable by the Borrowers to the Lender under the Finance Documents; and

(ii)     second, any balance thereafter remaining in the Earnings Accounts shall be available to the Borrowers.

## 23.    SECURITY MARGIN

In the event that during the Security Period the aggregate of (i) the Market Values of the Ships subject to a Mortgage determined pursuant to Clause 21.26 and (ii) the market value of the Shares and the value of any additional security (each valued by the Lender in accordance with normal banking practice) previously provided to the Lender pursuant to this Clause 23, is less than (i) during the first $(1^{st})$ year of the Availability Period one hundred per cent (100%) and (ii) at any time thereafter one hundred twenty per cent (120%) of the aggregate of the Facility and the Swap Exposure, then the Borrowers shall within twenty one (21) Banking Days of receipt of a notice from the Lender advising the Borrowers of the amount of such deficiency (which notice shall be conclusive) **either** provide to the Lender additional security (valued in accordance with normal banking practice) which shall in all respects be satisfactory to the Lender so that the aggregate of (i) the Market Values of the Ships subject to a Mortgage (determined in accordance with Clause 21.26) and (ii) the market value of the Shares and the value of any additional security (each valued by the Lender in accordance with normal banking practice) previously provided to the Lender pursuant to this Clause 23 is at least (i) during the first $(1^{st})$ year of the Availability Period one hundred per cent (100%) and (ii) at any time thereafter one hundred twenty per cent (120%) of the aggregate of the Facility and the Swap Exposure, or prepay part of the Facility in accordance with Clause 10 so that the aggregate Market Values of the Ships subject to a Mortgage (determined in accordance with Clause 21.26) and (ii) the market value of the Shares and the value of any additional security (each valued by the Lender in accordance with normal banking practice) previously provided to the Lender pursuant to this Clause 23 is at least (i) during the first $(1^{st})$ year of the Availability Period one hundred per cent (100%) and (ii) at any time thereafter one hundred twenty per cent (120%) of the aggregate of the Facility and the Swap Exposure.

## 24.    EVENTS OF DEFAULT

24.1    If:

24.1.1    the Borrowers or either of them or any other Security Party fail to pay on the due date for payment any amount which shall have become due hereunder or under the other Finance Documents;

24.1.2    any representation, warranty or statement made by the Borrowers or either of them or any other Security Party in this Agreement or in any of the other Finance

Documents or any certificate, statement or opinion delivered or made hereunder or under the Subject Documents or in connection herewith or with the Subject Documents shall be incorrect or inaccurate when made in any material respect;

24.1.3      an Event of Default under any of the Subject Documents (as defined therein) shall occur;

24.1.4      the Borrowers or either of them or any other Security Party fail(s) duly and punctually to perform or observe any other term of this Agreement and/or the Master Agreement and in any such case such failure, if capable of remedy, shall continue for fourteen (14) days after the Lender shall have given to the Borrowers notice in writing of such failure;

24.1.5      except when contested in good faith and by the appropriate proceedings, any other indebtedness of the Borrowers, the other Security Parties or any of them exceeding in aggregate Five hundred thousand Dollars ($500,000), shall become due and payable or, with the giving of notice or lapse of time or both, capable of being declared due and payable prior to its stated maturity by reason of any circumstance entitling the creditor(s) thereof to declare such indebtedness due and payable and such indebtedness is not paid within fourteen (14) days thereof;

24.1.6      the Borrowers or either of them or any other Security Party or any other member of the Group shall enter into voluntary or involuntary bankruptcy, liquidation or dissolution, or shall become insolvent, or an administrator, administrative receiver, receiver or liquidator shall be appointed of all or a material part of its undertaking or assets or proceedings are commenced by or against them/it under any reorganisation, arrangement, readjustment of debts, dissolution or liquidation law or regulation, or if any event shall occur which, under the relevant system of law, shall have an equivalent effect;

24.1.7      the Borrowers or either of them or any other Security Party or any other member of the Group shall cease or threaten to cease to carry on the whole or a substantial part of their/its business;

24.1.8      the Borrowers or either of them or any other Security Party or any other member of the Group shall transfer or dispose of all or a substantial part of their/its assets whether by one or a series of transactions, related or not;

24.1.9      the Subject Documents or any of them shall cease, in whole or in part, to be valid, binding and enforceable;

24.1.10     the Borrowers or either of them shall sell, transfer, dispose of or encumber their/its Ship or any interest or share therein, or agree so to do (other than Permitted Liens) without the prior written consent of the Lender;

24.1.11   either Ship shall become a Total Loss and the Borrowers shall fail to make the mandatory prepayment required to be made under Clause 10.1 in respect of such Total Loss within the time therein set forth;

24.1.12   any governmental or other consent, licence or authority required to make this Agreement and/or any of the other Finance Documents legal, valid, binding, enforceable and admissible in evidence or required to enable the Borrowers or either of them or any other Security Party to perform their/its respective duties and discharge their/its liabilities hereunder or under the other Finance Documents is withdrawn or ceases to be in full force and effect unless the Borrowers or such other Security Party procures that such consent, licence or authority is reinstated or re-issued to the satisfaction of the Lender within fifteen (15) calendar days of the said withdrawal or cessation;

24.1.13   any distress or execution is levied or enforced against a material (in the opinion of the Lender) part of the property and assets of the Borrowers or either of them or any other Security Party and such distress or execution is not withdrawn or discharged within ten (10) Banking Days; or

24.1.14   the Borrowers or either of them or any other Security Party or any other member of the Group shall stop payment of, or shall be unable to, or shall admit inability to pay their/its debts as they fall due, or shall enter into any composition or other arrangement with their/its creditors generally or shall declare a general moratorium on the payment of indebtedness;

24.1.15   the fulfilment of any one or more of the obligations covenants and undertakings contained in any one or more of this Agreement, the other Finance Documents and any other documents executed pursuant hereto or thereto or the exercise of any of the rights vested in the Lender hereunder or thereunder becoming either unlawful under any applicable law or unauthorised by any authority having jurisdiction or otherwise impossible;

24.1.16   if the Personal Guarantor dies or otherwise ceases to be actively involved in the business of the Borrowers and the Borrowers failing upon Lender's request to provide the Lender with a guarantee from an alternative Personal Guarantor acceptable to the Lender in its sole discretion within sixty (60) days from such request;

24.1.17   if (a) an Event of Default or Potential Event of Default (in each case as defined in the Master Agreement) has occurred and is continuing under the Master Agreement or (b) an Early Termination Date (as defined in the Master Agreement) has occurred or been or become capable of being effectively designated under the Master Agreement or (c) a person entitled to do so gives notice of an Early Termination Date under Section 6(b)(iv) of the Master Agreement or (d) the Master Agreement is terminated, cancelled, suspended, rescinded or revoked or otherwise ceases to remain in full force and effect for any reason;



24.1.18    a material adverse change occurs in the financial condition or operation of any one or more of the Security Parties or any other member of the Group;

24.1.19    if any Security Party or any Charterer repudiates or evidences an intention to repudiate any one or more of the Subject Documents or if any Subject Document is rescinded or cancelled or terminated or amended or varied, without the Lender's prior written consent; or

24.1.20    if either Ship is arrested or detained and such arrest or detention is not released within fourteen (14) days, or an order for the sale of either Ship is made by a court of competent jurisdiction or the Borrowers cease to retain possession and/or control of either Ship for a period in excess of fourteen (14) days

then, and in any such event and at any time thereafter, the Lender may by written notice to the Borrowers declare that the Facility of the Lender shall be cancelled, whereupon the same shall be cancelled and declare the Indebtedness immediately due and payable whereupon the same shall become so payable to the Lender.

24.2    All amounts received by the Lender under or pursuant to any of the Finance Documents after the happening of any Event of Default shall be applied by the Lender in payment of the Indebtedness in accordance with the terms of Clause 12.

24.3    On the occurrence of an Event of Default the Lender shall have the right and power to order the Ships or either of them to proceed forthwith at the Borrowers' risk and expense to a port or place nominated by the Lender. The Borrowers undertake to give the necessary instructions to the Master of each Ship to comply with any such order of the Lender and if the Borrowers fail to give such instructions for any reason whatsoever the Lender shall have the right and power to give such instructions direct to the Master(s).

24.4    On the occurrence of any Event of Default the Lender shall be entitled but not obliged to, exercise all its rights under the Master Agreement and to, *inter alia*, cancel, net out, unwind, terminate or liquidate all or any part of the rights, benefits and obligations created by any Designated Transaction and/or the Master Agreement. Without prejudice to or limitation of the obligations of the Borrowers hereunder and under the Master Agreement, in the event that the Lender exercises any of its rights under the Master Agreement and such exercise results in all or part of a Designated Transaction being terminated, such termination shall constitute a Terminated Transaction (as defined in section 14 of the Master Agreement) effected by the Lender after an Event of Default (as so defined in that section 14) by the Borrower and, accordingly, the Lender shall be entitled to recover from the Borrowers a payment for early termination calculated in accordance with the provisions of section 6(e)(i) of the Master Agreement.



**25.   SET-OFF**

25.1   The Lender shall have the right, in addition to all rights of set off, combination, lien or otherwise which it has at law or under any agreement between the Lender and the Borrowers or any of them at any time without demand after the occurrence of an Event of Default:

25.1.1   to set off any amount to the credit of any existing accounts of the Borrowers or either of them and/or the Grandunion Guarantor with the Lender (whether deposit, loan or any other account) including, without limitation, the Earnings Accounts in or towards satisfaction of all amounts due from the Borrowers under this Agreement and/or the other Finance Documents; and

25.1.2   to transfer and apply any amount standing to the credit of any such existing accounts of the Borrowers or either of them and/or the Grandunion Guarantor and/or the Personal Guarantor with any associate or subsidiary of the Lender in or towards satisfaction of all amounts due from the Borrowers or either of them under this Agreement and/or the other Finance Documents.

25.2   Where such set-off or transfer requires the conversion of one currency into another, such conversion shall be calculated at the spot rate as conclusively determined by the Lender for purchasing such currency with the currency in which the relevant amounts are denominated on the date of actual payment.

**26.   FEES**

26.1   The Borrowers shall pay to the Lender a renewal fee (the "**Renewal Fee**") of Thirty thousand Dollars ($30,000) on each date on which the Lender may agree to an extension of the Expiration Date in accordance with Clauses 11.2 and 11.3.

26.2   The Borrowers shall also pay to the Lender a commitment fee (the "**Commitment Fee**") of zero point five per cent (0.5%) per annum on the amount of the Facility which is from time to time available and has not been drawn down from the date of acceptance of the Commitment Letter until the expiry of the Availability Period, such Commitment Fee to be payable on each relevant Termination Date, such Commitment Fee shall be calculated upon the exact number of days which have elapsed on the basis of a year consisting of three hundred and sixty (360) days and shall be payable quarterly in arrears and on each relevant Termination Date.

**27.   EXPENSES**

27.1   Whether or not the Facility or any part thereof, is actually drawn down the Borrowers shall reimburse the Lender on demand for all costs, charges and expenses incurred by the Lender in connection with the preparation, negotiation and conclusion of this Agreement and the other Finance Documents including fees and expenses of the Lender's legal advisers.



27.2    The Borrowers shall reimburse the Lender on demand for all charges and expenses (including legal fees) incurred by the Lender in or in connection with the exercise of the Lender's rights and powers under this Agreement and the other Finance Documents (including but not limited to the fees and charges of auditors, brokers, surveyors and lawyers instructed by the Lender) and with the actual, attempted or purported enforcement of, or preservation of rights under this Agreement and the other Finance Documents.

## 28.    INDEMNITY

The Borrowers hereunder jointly and severally undertake and agree to indemnify the Lender, upon the Lender's first demand, from and against any losses, costs or expenses (including legal expenses) which they incur in consequence of any Event of Default including (but without limitation) all losses (including loss of profit for the current Interest Period), premiums and penalties incurred or to be incurred in liquidating or redeploying deposits made by third parties or funds acquired or arranged to advance or maintain the Facility or any part thereof and any liability items which arise, or are asserted, under or in connection with any law relating to safety at sea.

## 29.    ENVIRONMENTAL INDEMNITY

The Borrowers jointly and severally undertake to indemnify the Lender against all damages, losses, liabilities, costs, expenses, penalties, fines or proceedings which may be incurred or paid by or imposed on the Lender directly or indirectly at any time (whether before or after the Indebtedness has been repaid in full) pursuant to any Environmental Law or any other environmental legislation of any state or government which would not have been incurred or paid by or imposed on the Lender had it not entered into this Agreement and/or the other Finance Documents.

## 30.    STAMP DUTIES

The Borrowers shall pay any and all stamp, registration and similar taxes and charges of whatsoever nature which may be payable or determined to be payable on, or in connection with, the execution, registration, notarisation, performance or enforcement of this Agreement or the other Finance Documents. The Borrowers shall indemnify the Lender against any and all liabilities with respect to or resulting from delay or omission on the part of the Borrowers or any of them to pay any such taxes.

## 31.    DETERMINATIONS

Each determination of an Interest Rate or a Default Rate or of any amount in respect of principal or interest or fees or expenses by the Lender in accordance with this Agreement and every other determination or certification by the Lender under this Agreement shall be conclusive and binding on the Borrowers in the absence of manifest error.

## 32.    NO WAIVER

No failure to exercise and no delay on the part of the Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or power preclude any other or future exercise thereof or the exercise of any other right or power. The rights, powers and remedies herein provided are cumulative and not exclusive of any rights, powers or remedies provided by law.

## 33.    PARTIAL INVALIDITY

In the event that any term or condition of this Agreement is rendered or declared illegal, invalid or inoperative in whole or in part by any statute rule or regulation or any decision of any court or tribunal of competent jurisdiction then such determination or declaration shall neither affect the validity of any other term or condition of this Agreement which (save as aforesaid) will remain in full force and effect nor the legality, validity or enforceability of such term or condition under the laws of any other jurisdiction.

## 34.    TRANSFER, ASSIGNMENT, PARTICIPATION, CHANGE OF LENDING BRANCH

34.1    This Agreement shall bind and be to the benefit of the Borrowers and the Lender and their respective successors and permitted assigns.

34.2    Neither of the Borrowers may assign any of its rights, powers, duties or liabilities hereunder without the prior written consent of the Lender which it shall have full power to withhold.

34.3    The Lender may, without prior notice or the consent of the Borrowers or any other Security Party, at any time assign, transfer all or part of the Facility and its rights and powers under this Agreement to any other bank or other financial institution (the "**Transferee Lender**"). The Lender shall notify the Borrowers of any such assignment or transfer as soon as practicable.

34.4    The Lender may at any time and from time to time change its lending office in respect of the whole or any part of its participation in the Facility. The Lender shall notify the Borrowers of any such change in the lending office as soon as is practicable.

34.5    If the Lender transfers or assigns, transfers or in any other manner grants participation in respect of all or any part of its rights, powers duties and liabilities hereunder pursuant to Clause 34.3 the Borrowers undertake immediately on being requested to do so by the Lender and at the cost of the Lender to enter into and procure that the other parties to the Finance Documents shall enter into, such documents as may be necessary or desirable to transfer to the relevant assignee, transferee or participant all or the relevant part of the Lender's interest in the Finance Documents and all relevant references in this Agreement and the Finance Documents to the Lender shall thereafter be construed as a reference to the Lender and/or such assignee, transferee or participant (as the case may be) to the extent of their respective interests.



34.6 The Lender may disclose to a potential assignee, transferee of participant or to any other person who may propose entering into contractual relations with the Lender in relation to this Agreement such information about the Borrowers and the other Security Parties as the Lender shall consider appropriate.

## 35. NON-IMMUNITY

35.1 Neither of the Borrowers nor any other Security Party has any right of immunity from set-off, suit or execution, attachment or other legal process under the laws of the United Kingdom, or the Republic of Greece or the Republic of the Marshall Islands, or the Republic of Liberia or Malta or Bermuda.

35.2 The exercise by each of the Borrowers of its rights and performance and discharge of its duties and liabilities hereunder will constitute commercial acts done and performed for private and commercial purposes.

35.3 To the extent that the Borrowers or either of them may in any jurisdiction in which proceedings may at any time be taken for the enforcement of this Agreement and/or any of the other Finance Documents claim for themselves or their assets immunity from suit, judgment, execution, attachment (whether, before judgment or otherwise) or other legal process, and to the extent that in any such jurisdiction there may be attributed to themselves or their assets any such immunity (whether or not claimed), the Borrowers hereby irrevocably agree not to claim and hereby irrevocably waive any such immunity to the full extent permitted by the laws of such jurisdiction.

## 36. NOTICES

36.1 Unless otherwise specifically provided, any notice under or in connection with any Finance Document shall be given by letter or fax; and references in the Finance Documents to written notices, notices in writing and notices signed by particular persons shall be construed accordingly.

36.2 A notice shall be sent:

(a)    to the Borrowers:    c/o STAMFORD NAVIGATION INC.
1-7, Flessa & 83, Akti Miaouli
185 38 Piraeus
Greece
Fax No.: +30 213 0148408

(b)    to the Lender at:    24B Kifissias Avenue
151 25 Maroussi
Attiki, Greece
Fax No: +30 210 6896358

or to such other address as the relevant party may notify the other in writing.



36.3    Subject to Clauses 36.4 and 36.5:

(a)    a notice which is delivered personally or posted shall be deemed to be served, and shall take effect, at the time when it is delivered;

(b)    a notice which is sent by fax shall be deemed to be served, and shall take effect, two (2) hours after its transmission is completed.

36.4    However, if under Clause 36.3 a notice would be deemed to be served:

(a)    on a day which is not a Banking Day in the place of receipt; or

(b)    on such a Banking Day, but after 5 p.m. local time;

the notice shall (subject to Clause 36.5) be deemed to be served, and shall take effect, at 9 a.m. on the next day which is such a Banking Day.

36.5    Clauses 36.3 and 36.4 do not apply if the recipient of a notice notifies the sender within one (1) hour after the time at which the notice would otherwise be deemed to be served that the notice has been received in a form, which is illegible in a material respect.

36.6    A notice under or in connection with a Finance Document shall not be invalid by reason that the manner of serving it does not comply with the requirements of this Agreement or, where appropriate, any other Finance Document under which it is served if the failure to serve it in accordance with the requirements of this Agreement or other Finance Document, as the case may be, has not caused any party to suffer any significant loss or prejudice.

36.7    Any notice under or in connection with a Finance Document shall be in English.

36.8    In this Clause "notice" includes any demand, consent, authorisation, approval, instruction, waiver or other communication.

## 37    SUPPLEMENTAL

37.1    The rights and remedies which the Finance Documents give to the Lender are:

(a)    cumulative;

(b)    may be exercised as often as appears expedient; and

(c)    shall not, unless a Finance Document explicitly and specifically states so, be taken to exclude or limit any right or remedy conferred by any law.

37.2    If any provision of a Finance Document is or subsequently becomes void, unenforceable or illegal, that shall not affect the validity, enforceability or legality of the other provisions of that Finance Document or of the provisions of any other Finance Document.

37.3    A Finance Document may be executed in any number of counterparts.

37.4    A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Agreement.

37.5    This Agreement supersedes the terms and conditions contained in any correspondence relating to the subject matter of this Agreement exchanged between the Lender and the Borrowers or their representatives prior to the date of this Agreement including, without limitation, the Commitment Letter.

## 38.    LAW AND JURISDICTION

38.1    This Agreement shall be governed by, and construed in accordance with, English law.

38.2    Subject to Clause 38.3, the courts of England shall have exclusive jurisdiction to settle any disputes, which may arise out of or in connection with this Agreement.

38.3    Clause 38.2 is for the exclusive benefit of the Lender, which reserves the right:

(a)    to commence proceedings in relation to any matter which arises out of or in connection with this Agreement in the courts of the Republic of Greece and/or any country other than England or Greece and which have or claim jurisdiction to that matter; and

(b)    to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in England or Greece or without commencing proceedings in England or Greece.

The Borrowers shall not commence any proceedings in any country other than England in relation to a matter, which arises out of or in connection with this Agreement.

38.4    The Borrowers irrevocably appoint HFW Nominees Limited, presently at Friary Court, 65 Crutched Friars, London EC3N 2AE, England, to act as its/their agent to receive and accept on their/its behalf any process or other document relating to any proceedings in the English courts which are connected with this Agreement.

38.5    The Borrowers irrevocably designate and appoint Mr. George Livanos, an Attorney-at-law with offices at 2 Thesmoforiou Street, Piraeus 18454, Greece, as agent for the service of process in Greece ("*antiklitos*") and agree to consider any legal process or any demand or notice made served by or on behalf of the Lender on the said agent as being made to the Borrowers. The designation of such an authorized agent ("antiklitos") shall remain irrevocable until all Indebtedness shall have been paid in full in accordance with the terms of this Agreement and the other Finance Documents.

38.6    Nothing in this Clause 38 shall exclude or limit any right which the Lender may have (whether under the law of any country, an international convention or otherwise) with regard



62

to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

38.7   In this Clause 38, "proceedings" means proceedings of any kind, including an application for a provisional or protective measure or enforcement court order (*diatagi pliromis*).

## 39.   THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS

In case of any conflict between the provisions of this Agreement and any of the other Finance Documents the provisions of this Agreement shall prevail.

AS WITNESS the hands of the duly authorised representatives of the parties hereto the day and year first above written.



**EXECUTION PAGE**

**SIGNED** by )
and by )
for and on behalf of )
**MARFIN EGNATIA BANK Societe Anonyme** )
in the presence of: )


**SIGNED** by )
for and on behalf of )
**GRAND RODOSI INC.** )
in the presence of: )


**SIGNED** by )
for and on behalf of )
**GRAND ANEMI LIMITED** )
in the presence of: )



64

## SCHEDULE 1

## FORM OF NOTICE OF DRAWDOWN

TO:     MARFIN EGNATIA BANK Societe Anonyme
        24B Kifissias Avenue
        151 25 Maroussi
        Attiki, Greece

Date: [●] 2009

Dear Sirs,

### Financial Agreement made to Grand Rodosi Inc. and Grand Anemi Limited

1.  We refer to the financial agreement dated [●] 2009 (the "**Financial Agreement**") and made between ourselves, as joint and several Borrowers and yourselves as Lender, in connection with a revolving credit facility of up to One hundred Twelve million Dollars ($112,000,000).

    Terms defined in the Financial Agreement have their defined meanings when used in this Notice of Drawdown.

2.  We request to borrow [an] Advance[s] as follows:

    (a)     Amount: $ [●];

    (b)     Drawdown Date: [●] 2009;

    (c)     Duration of the first Interest Period shall be [●] months; and

    (d)     Payment instructions: account in the name of [●] and numbered [●] with [●] of [●].

3.  We represent and warrant that:

    (a)     the representations and warranties in Clause 16 of the Financial Agreement and in the other Finance Documents would remain true and not misleading if repeated on the date of this notice with reference to the circumstances now existing;

    (b)     no Event of Default has occurred or will result from the borrowing of the above Advance[s].

4.  This notice cannot be revoked without your prior written consent.

65

5.      [We authorise you to deduct from the proceeds of the above Advance[s] the amount of [(a) the commitment fee referred to in Clause 26.2 and (b)] all legal fees payable pursuant to Clause 18.1.15]

Yours faithfully,

For and on behalf of
**GRAND RODOSI INC.**


……………………………..
Attorney-in-Fact


For and on behalf of
**GRAND ANEMI LIMITED**


……………………………..
Attorney-in-Fact

66



## SCHEDULE 2

## FORM OF ACKNOWLEDGEMENT

Date:  [●]

**Financial Agreement dated [●] 2009 (the "Financial Agreement")**

We the undersigned Borrowers declare that in connection with the above Financial Agreement we received [an] Advance[s] in the amount of [●] Dollars ($[●]) value [●].

Capitalised terms used herein shall have the respective meanings specified in the Financial Agreement.

Yours faithfully,

For and on behalf of
**GRAND RODOSI INC.**

…………………………..
Attorney-in-Fact

For and on behalf of
**GRAND ANEMI LIMITED**

…………………………..
Attorney-in-Fact



**SCHEDULE 3**

**FORM OF BUDGET**



**SCHEDULE 3**

**Form of Master Agreement**



# ISDA®

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of …. …………….. 2009

**MARFIN EGNATIA BANK Societe Anonyme**          and          **GRAND RODOSI INC.** of Liberia and
**GRAND ANEMI LIMITED** of Malta (acting jointly and
severally)

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be
governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and
other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the
purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are
together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:—

1.   **Interpretation**

(a)     *Definitions.* The terms defined in Section 14 and elsewhere in this Master Agreement will have the
meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the
other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency
between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the
purpose of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master
Agreement and all Confirmations form a single agreement between the parties (collectively referred to as
this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)     *General Conditions.*

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by
it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place
of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in
freely transferable funds and in the manner customary for payments in the required currency. Where
settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on
the due date in the manner customary for the relevant obligation unless otherwise specified in the
relevant Confirmation or elsewhere in this Agreement.



1

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting of Payments.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or



2

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    *Liability*. If:—

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

## 3.    Representations

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement). If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified or such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it, any of its Credit



3

Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g)     *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

## 4.     Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information.* It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)     any other documents specified in the Schedule or any Confirmation; and

    (iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply With Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party

(d)     *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.     Events of Default and Termination Events

(a)     *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)     *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)    *Breach of Agreement; Repudiation of Agreement.*

    (1)     Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

    (2)     the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)   *Credit Support Default.*

    (1)     Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

    (2)     the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)     *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

    (1)     defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

    (2)     defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

    (3)     defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

    (4)     disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or



5

such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)     *Cross-Default.* If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

(1)     a default, event of default or other similar condition or event (however described ) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable; or

(2)     a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)    *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)     is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (I) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)   *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganizes, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganization, reincorporation or reconstitution:—

(1)     the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

(2)     the benefits of any Credit Support Document fail to extend (without the consent of the

other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:-

(i)     *Illegality*. After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

(1)     for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)     for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

(ii)     *Force Majeure Event*. After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

(1)     the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)     such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;



7

(iii)    *Tax Event.* Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or  (B));

(iv)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganizing, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)    X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the date of this Master Agreement) to, or reorganizes, reincorporates or reconstitutes into or as, another entity;

(2)    any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)    X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

(vi)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Hierarchy of Events.*

(i)    An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(1) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

(ii)    Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.



(iii)    If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)    *Deferral of Payments and Deliveries During Waiting Period.* If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, each payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until:—

(i)    the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

(ii)    if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)    *Inability of Head or Home Office to Perform Obligations of Branch.* If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(1) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

**6.    Early Termination; Close-Out Netting**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require. If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.



If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)  **Two Affected Parties.** If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

(iv)  **Right to Terminate.**

    (1)  If:—

        (A)  a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

        (B)  a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

    (2)  If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:—

        (A)  Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions. Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

        (B)  ′ An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)  **Effect of Designation.**

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).



(d)     *Calculations; Payment Date.*

(i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

(ii)     *Payment Date.* An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (i) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

(i)     *Events of Default.* If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of Early Termination Amount to the Defaulting Party.

(ii)     *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)     One Affected Party. Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i),except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

(2)     Two Affected Parties. Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

(3)     Mid-Market Events. If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:—

(A)     if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

(B)     in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.



11

(iii)     *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)     *Adjustment for Illegality or Force Majeure Event.* The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event. Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

(v)     *Pre-Estimate.* The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)     *Set-Off.* Any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("Other Amounts") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest. This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

**7.     Transfer**

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)     party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)     a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

12

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

## 9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)    *Amendments.* An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging

system), each of which will be deemed an original.

(ii)   The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)   *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)   *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(h)   *Interest and Compensation.*

(i)   *Prior to Early Termination.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction:—

(1)   *Interest on Defaulted Payments.* If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

(2)   · *Compensation for Defaulted Deliveries.* If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate. The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

(3)   *Interest on Deferred Payments.* If:—

(A)   a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate;

(B)   a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with

14

respect to that party occurs, at the Applicable Deferral Rate; or

(C)     a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)     *Compensation for Deferred Deliveries.* If:—

(A)     a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)     a delivery is deferred pursuant to Section 5(d); or

(C)     a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(c), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required)                                                                                                                                     if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)     *Early Termination.* Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:—

(1)     *Unpaid Amounts.* For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)     *Interest on Early Termination Amounts.* If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)     *Interest Calculation.* Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

## 10.     Offices; Multibranch Parties

(a)     If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the

place of booking or its jurisdiction of incorporation or organization, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or home office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred. This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)      If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)      The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office. Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction. Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

**11.      Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.      Notices**

(a)      *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated:—

(i)      if in writing and delivered in person or by courier, on the date it is delivered;

(ii)      if sent by telex, on the date the recipient's answerback is received;

(iii)      if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)      if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted;

(v)      if sent by electronic messaging system, on the date it is received; or

(vi)      if sent by e-mail, on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Details.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

**13.      Governing Law and Jurisdiction**

(a)      *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction.* With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

16

(i)     submits:—

(1)     if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

(2)     if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

(ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.; and

(iii)     agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process.* Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12(a)(i), 12(a)(iii) or 12(a)(iv). Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Representation"* has the meaning specified in Section 3.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Agreement"* has the meaning specified in Section 1(c).

*"Applicable Close-out Rate"* means:—

(a)     in respect of the determination of an Unpaid Amount:—

17

    (i)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

    (ii)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

    (iii)   in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

    (iv)   in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)    in respect of an Early Termination Amount:—

    (i)     for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable:—

        (1)    if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

        (2)    if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

        (3)    in all other cases, the Applicable Deferral Rate; and

    (ii)    for the period from (and including) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable to (but excluding) the date of actual payment:—

        (1)    if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

        (2)    if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

        (3)    if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

        (4)    in all other cases, the Termination Rate.

"*Applicable Deferral Rate*" means:—

(a)    for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

(b)    for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)    for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(i)(3) and (b)(ii)(1) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount.

"*Automatic Early Termination*" has the meaning specified in Section 6(a).

"*Burdened Party*" has the meaning specified in Section 5(b)(iv).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter

into the relevant Transaction.

"*Close-out Amount*" means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realized under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:—

(i)     quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)     information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)     information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilized. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1)     application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

(2)     application of different valuation methods to terminated Transactions or group of Terminated Transactions depending on the type, complexity or number of the Terminated Transactions or group of Terminated

Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention Court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Cross-Default"* means the event specified in Section 5(a)(vi).

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Designated Event"* has the meaning specified in Section 5(b)(v).

*"Determining Party"* means the party determining a Close-out Amount.

*"Early Termination Amount"* has the meaning specified in Section 6(e).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"electronic messages"* does not include e-mails but does include documents expressed in markup languages, and *"electronic messaging system"* will be construed accordingly.

*"English law"* means the law of England and Wales, and *"English"* will be construed accordingly.

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Force Majeure Event"* has the meaning specified in Section 5(b).

*"General Business Day"* means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or

operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognized principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section  2(b), in the place where the relevant new account is to be located and (de) in relation to Section  5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d), a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii).

*"Multiple Transaction Payment Netting"* has the meaning specified in Section 2(c).

*"Non-affected Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

*"Payee"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"rate of exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Stamp Tax Jurisdiction*" has the meaning specified in Section 4(e).

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

"*Termination Currency*" means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, Euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

"*Termination Event*" means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

22

"*Threshold Amount*" means the amount, if any, specified as such in the Schedule.

"*Transaction*" has the meaning specified in the preamble.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) or due but for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains  unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties/

"*Waiting Period*" means:—

(a)      in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)      in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.



IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

For and on behalf of
**MARFIN EGNATIA BANK Societe Anonyme**

For and on behalf of
**GRAND RODOSI INC.**

By:_____

By:_____

Name:

Name:

and

Title:

By:_____

Date:  _____

Name:

Date:  _____

For and on behalf of
**GRAND ANEMI LIMITED**

By:_____

Name:

Title:

Date:  _____

24





# ISDA®

International Swap Dealers Association, Inc.

## SCHEDULE
## to the
## 2002 Master Agreement

### dated as of

................................ 2009

between

### MARFIN EGNATIA BANK Societe Anonyme
("Party A")

### and

### GRAND RODOSI INC. of Liberia GRAND ANEMI LIMITED of Malta
(together "**Party B**", acting jointly and severally)

**Part 1.**          **TERMINATION PROVISIONS.**

(a)  "*Specified Entity*" means in relation to Party A for the purpose of:--

Section 5(a)(v), None.

Section 5(a)(vi), None.

Section 5(a)(vii), None.

Section 5(b)(v), None.

and in relation to Party B for the purpose of:--

Section 5(a)(v), Any Affiliate.

Section 5(a)(vi), Any Affiliate.

Section 5(a)(vii), Any Affiliate.

Section 5(b)(v). Any Affiliate.

(b)  "*Specified Transaction*" will have the meaning specified in Section 14 of this Agreement and will also mean any contract or transaction which already exists or is entered into in the future between Party A and Party B (or any Specified Entity of such Party or any Credit Support Provider of such Party) including without prejudice to the afore-mentioned any securities options, margin loans, short sales and any other similar transaction.

(c)  The "*Cross Default*" provisions of Section 5(a)(vi) will not apply to Party A and will apply to Party B, except that the following provision shall be inserted at the end of Section 5 a (vi): "provided, however, notwithstanding the foregoing, that an Event of Default shall not occur

under either (1) or (2) above if (A) the default, Event of Default or other similar event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature and funds were available to such party to enable it to make the relevant payment when due and such payment is in fact made on or before the third Local Business Day following receipt of written notice from the other party of such failure to pay, or (B) such party was precluded from paying, or was unable to pay, using reasonable means, by reason of force majeure, act of State, illegality or impossibility".

*"Specified Indebtedness"* means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of money borrowed or money raised under any bond, note, redeemable preference share or any obligation under any letter of credit or finance lease, except that such term shall not include obligations in respect of deposits received in the ordinary course of either party's banking business, if any.

*"Threshold Amount"* means with respect to Party B, zero.

(d) The *"Credit Event Upon Merger"* provisions of Section 5(b)(v) will apply to Party A and will apply to Party B.

(e) The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B, provided, however, that where there is an Event of Default under Section 5 (a) (vii) (1), (3), (4), (5), (6) or the extent analogous thereto, (8), and the Defaulting Party is governed by a system of law that would not otherwise permit termination to take place, then the Automatic Early Termination provision of Section 6(a) will apply.

(f) *"Termination Currency"* means the currency selected by the Non-Defaulting Party or the Non-Affected Party, as the case may be, or, in circumstances where there are two Affected Parties, as agreed by Party A and Party B. However, the Termination Currency shall be one of the currencies in which payments in respect of Transactions are required to be made by the Confirmations. If the currency selecteted is not freely available, or where there are two Affected Parties, and Party A and Party B cannot agree on a Termination Currency, the Termination Currency shall be Euro.

(g) *"Additional Termination Event"* means any Event of Default under the Financial Agreement (as defined hereafter).

## Part 2.     TAX REPRESENTATIONS.

(a)     *Payer Representations.* For the purpose of Section 3(e) of this Agreement, Party A and Party B each makes the following representation: -

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, except that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    ***Payee Representations.***   For the purpose of Section 3(f) of this Agreement, Party A and Party B will not make any representation.

## Part 3.         AGREEMENT TO DELIVER DOCUMENTS.

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable.

(a)    Tax forms, documents and certificates to be delivered are: N/A

(b)    Other documents to be delivered are:

| Party required to Deliver document | Form/Document Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence reasonably satisfactory to the other party of (i) authority of such party to enter into the agreement and any transactions (e.g. BoD Resolution) and (ii) the authority and specimen signatures of each officer of the relevant party authorized to sign this Agreement on behalf of such party and any Confirmation hereunder. | As soon as practicable prior to or at the latest upon execution of this Agreement. | Yes |
| Party A and Party B | A letter from the Process Agent designated pursuant to paragraph b of Part 4 of this Schedule in which such process agent agrees to act as agent for service of process with respect to this Agreement and each Transaction and to forward promptly to anyone of the Parties hereto all process received by such process agent. | Upon execution of this Agreement | Yes |
| Party B | Certificate or other evidence satisfactory to Party A in its sole discretion, in respect of the existence and good standing of Party B | Upon execution of this Agreement | Yes |
| Party B | A copy of the Annual Report and that of any Credit Support Provider (if any) thereof containing audited, combined, financial statements certified by independent certified public accountants and prepared in accordance with generally accepted accounting principles in the country in which such party and such Credit Support Provider is organized, for the most recently ended financial year | As soon as available and in any event within 180 days after the end of each fiscal year of each party and of the Credit Support Provider (if any) | Yes |

27



| Party required to Deliver document | Form/Document Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | A copy of all relevant formation documents (such as certificate of formation, articles of incorporation, partnership agreement, trust agreement and/or central register of charities), disclosure documents (such as offering memorandum, prospectus, memorandum and articles of association and/or audited financial statement), a list of all principals (such as directors / trustees / general partners) (in each case as may be amended from time to time) and the government-issued or taxpayer identification number (as applicable), and any other documentation required to meet customer identification program requirements. | Upon execution of this Agreement and as deemed necessary for any further documentation. | Yes |
| Party B | A duly executed and delivered copy of the Credit Support Document (if any) | Upon execution of this Agreement | Yes |
| Party B | Such other documents as the other party may reasonably request. | Upon request | Yes |

## Part 4.    MISCELLANEOUS

(a)   *Addresses for Notices.*  For the purpose of Section 12(a) of this Agreement: -

Addresses for notices or communications to Party A:
Marfin Egnatia Bank Societe Anonyme
24B, Kifissias Ave.
Maroussi 151 25
Greece
Attention:        Head of Legal Department
Telephone No.:   +30 210 8170000
Facsimile No.:    +30 210 6896333

Addresses for notices or communications to Party B:
Address:          c/o STAMFORD NAVIGATION INC.
                  1-7, Flessa & 83, Akti Miaouli

                  Piraeus 185 38

                  Greece
Attention:        Mr. Michail Zolotas
Telephone No:     + 30 213 0148400
Facsimile No:     +30 213 0148408
Electronic Messaging System Details: -

28

Specific Instructions: -

(b) **Process Agent.** For the purpose of Section 13(c) of this Agreement: -

Party A appoints as its Process Agent:  MFG Capital Partners Limited
14 Cavendish Place,
London, W1G 9DJ
UK

Party B appoints as its Process Agent:  HFW Nominees Limited
Friary Court, 65 Crutched Friars
London EC3N 2AE
England

(c) **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d) **Multibranch Party.** For the purpose of Section 10(c) of this Agreement: -

Party A is not a Multibranch Party.
Party B is not a Multibranch Party.

(e) **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f) **Credit Support Document.** Details of any Credit Support Document:

Party B's obligations to Party A under this Agreement and all Transactions contemplated hereby are secured by the Security Documents (as such term is defined in the Financial Agreement) all of which shall be deemed to be Credit Support Documents for the purpose of this Agreement, all to be executed and registered (if required) with the appropriate authorities, in favour of *inter alia* Party A.

(g) **Credit Support Provider.**
Credit Support Provider means in relation to Party A: N/A
Credit Support Provider means in relation to Party B: the Security Parties (as such term is defined in the Financial Agreement)

(h) **Governing Law.** This Agreement will be governed by and construed in accordance with English law.

(i) **Netting of Payments.** Either party may notify the other in writing, not less than one Local Business Day in advance of one or more Scheduled Payment Dates that with regard to payments due on that date, Multiple Transaction Payment Netting will apply. Except to the extent that such advance written notice shall have been given, subparagraph "Multiple Transaction Payment Netting" will not apply for the purposes of Section 2 (c) of this Agreement.

(j) **"Affiliate"** will have the meaning specified in Section 14 of this Agreement.

(k) **Absence of Litigation.** For the purpose of Section 3(c): -

"Specified Entity" means in relation to Party A, none.

"Specified Entity" means in relation to Party B, Any Affiliate.





(l)   *No Agency.*   The provisions of Section 3(g) will apply to this Agreement. Section 3 (a) of this Agreement is hereby amended by the deletion of "and" at the end of sub-clause (iv), the substitution of a semi-colon for the full-stop at the end of sub-clause (v) and the addition of the following at the end thereof:

"and (vi) No Agency. It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement or any Transaction as principal and not as agent of any person".

(m)   *Additional Representation* will apply.   For the purpose of Section 3 of this Agreement, the following will constitute an Additional Representation: -

*Relationship Between Parties.*   Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction): -

1.   *Non-Reliance.*   It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

2.   *Assessment and Understanding.*   It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

3.   *Status of Parties.*   The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

4.   *Regulatory Approval.* Party B further represents for the purposes of Section 3 of this Agreement that no approval is required from any regulator or relevant authority to enter into this Agreement and any Transactions governed hereby in compliance with all relevant legislation, or that if such approval is required, that it is duly licensed by, or has the approval from, any regulator or relevant authority to do so, which approval is in full force and effect.

(n)   *Recording of Conversations.*   Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, and (ii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

# Part 5.   OTHER PROVISIONS.

(a)   *Escrow Payments.* If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that

date are to be made in escrow. In this case deposit of the payment due earlier on that date shall be made by 2.00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, provided this escrow agent is independent of either party and has a long term credit rating of at least A3 (Moody's) or A- (S&P) as the case may be, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on the same date, to return the payment deposited to the party that paid it into escrow.

The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall procure that the intended recipient of the deposited amount shall be entitled to the interest on the deposited amount (offered by the escrow agent at 11.00 a.m. local time for that day for overnight deposits in the relevant currency in the office where the deposited payment is held) if that payment is not released by 5.00 p.m. local time on the date it is deposited, for any reason other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in time.

(b)    *Bankruptcy.* Section 5 (a) (vii) (3) of this Agreement is hereby amended by the substitution of the following therefor.

"(3) sends a notice convening a meeting to propose a voluntary arrangement of creditors, or any class thereof, or makes a general assignment, arrangement or composition with or for the benefit of its creditors, or any class thereof".

(c)    *Severability.* If any term, provision, covenant or condition of the Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if the Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as the Agreement so modified continues to express, without material change, the original intentions of the Parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the Parties of this Agreement. It shall in particular be understood that this severability clause shall not affect the single agreement concept of Section 1 (c) of this Agreement.

(d)    *Netting.* In the event that any Terminated Transaction cannot be aggregated and netted against all other Terminated Transactions under Section 6(e) of the Agreement, such excluded Terminated Transactions shall be aggregated and netted amongst themselves to the fullest extent permitted by law.

(e)    *Set-Off.* Section 6 (f) of this Agreement is hereby amended by the substitution of the following therefor.

(f) Set-off. Any amount (the "Early Termination Amount") payable to one party (the "Payee") by the other party (the "Payer") under Section 6(e), in circumstances where there is a Defaulting Party or one Affected Party in the case where a Termination Event under Section 5(b)(iv) has occurred, will, at the option of the party ("X") other than the Defaulting Party or the Affected Party (and without prior notice to the Defaulting Party or the Affected Party), be reduced by its set-off against any amount(s) (the "Other Agreement Amount") payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer, irrespective of the currency, place of payment or booking office of the obligation) under any other agreement(s) between the Payee and the Payer or instrument(s) or undertaking(s) issued or executed by one party to, or in favour of,

31

the other party (and the Other Agreement Amount will be discharged promptly and in all respects to the extent it is so set-off). X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Agreement Amount (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If an obligation is unascertained, X may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6 (f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which a party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(f)     ***Definitions.***   This Agreement, each Confirmation, and each Transaction is subject to the 2000 ISDA Definitions, the Annex to the 2000 ISDA Definitions, and any other definitions specified in the relevant Confirmation for such Transaction, as each of such definitions may be amended, supplemented, replaced, updated, restated or modified from time to time (the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), and will be governed in all respects by the Definitions (except that references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions").   The Definitions, as so modified, are incorporated by reference in, and made part of, this Agreement and each Confirmation as if set forth in full in this Agreement and such Confirmation.   In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail.   In the event of any inconsistency between the provisions of any Confirmation and this Agreement or the Definitions, such Confirmation will prevail for the purpose of the relevant Transaction.

(g)     ***Prior Transactions Subject to this Agreement.***   Any transaction entered into between the parties, now existing or hereafter which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), any combination of these transactions or any other transaction identified as a Transaction in this Agreement or the relevant confirmation whether before, on or after the effective date of this Agreement, is incorporated into this Agreement by reference, shall be a Transaction hereunder and shall be subject to the terms herein.

(h)     ***Financial Agreement Definitions.***   Section 14 of this Agreement is amended by the incorporation of the following Definition:

"***Financial Agreement***" means the separate loan agreement dated ................... 2009 (the "**Financial Agreement**") (as the same may be modified, amended, supplemented, assigned or novated from time to time) entered into by and between (i) Party A as lender and (ii) Party B as joint and several borrowers, whereby Party A has agreed to make available a revolving credit facility of up to One hundred Twelve million Dollars ($112,000,000) to Party B as joint and several borrowers, for the purposes therein set forth.

Words and expressions defined in the Financial Agreement and not otherwise defined in the Agreement are incorporated into this Agreement by reference. The parties acknowledge and agree that such definitions and any amendments made to such definitions from time to time shall continue to be effective notwithstanding that the facility under the Financial Agreement has been repaid or the Financial Agreement has ceased to be of effect for any reason. In the event of any inconsistency between those definitions and provisions and this Agreement, this Agreement will govern.

(i)     *Additional Events of Default.* With respect to Party B it shall constitute an Event of Default under this Agreement if:
(i) a material adverse change in its business, operations, assets or financial or other condition shall have occurred and is continuing; or
(ii) any Event of Default under and as referred to in the Financial Agreement shall simultaneously constitute an Event of Default of Party B under this Agreement.

(j)     **Joint and Several Liability**

Section 9 of this Agreement shall be amended by adding the following subsection (i):

"(i) **Joint and Several Liability.** The obligations and liabilities under this Agreement of each of the persons collectively referred to as "Party B" are joint and several. Unless the context otherwise requires every reference to "Party B" will be taken to refer to any one or more (including all) such persons respectively. Further, if any such person should enter into a Transaction with Party A, all persons referred to as Party B will be bound by that Transaction in accordance with it terms and the terms of this Agreement, regardless of whether all or only one such person signs or issues the Confirmation."

33



**IN WITNESS WHEREOF**, the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

For and on behalf of
**MARFIN EGNATIA BANK**
**Societe Anonyme**

For and on behalf of
**GRAND RODOSI INC.**

By:_____

Name:

and
By:_____

Name:

By:_____

Name:

Title:

Date:   _____

Date:   _____

For and on behalf of
**GRAND ANEMI LIMITED**

By:_____

Name:

Title:

Date:   _____

34