# EXHIBIT 12

EXECUTION VERSION

## SALE AND TRANSFER AGREEMENT

**THIS AGREEMENT** is made on 28th June, 2013

**BETWEEN:**

(1) **INVESTMENT BANK OF GREECE,** a banking institution incorporated under the laws of the Hellenic Republic with its corporate seat at 24B Kifissias Avenue, 15125, Athens, Greece and registered with the register of the sociétés anonymes under the number GEMI 3664201000 (formerly 45090/06/B/00/4) (the "**IBG**"), lawfully represented for the execution of this Agreement by Messrs Michalis Papparis and Michalis Andreadis;

(2) **PIRAEUS BANK, S.A.,** a banking institution incorporated under the laws of the Hellenic Republic with its corporate seat at 4, Amerikis Street, 10564 Athens, Greece and registered with the register of the Greek sociétés anonymes under the number GEMI 225501000 (formerly 6055/06/B/86/B/04) (the "**Purchaser**") lawfully represented for the execution of this Agreement by Mr. Stavros Lekkakos;

(3) **CYPRUS POPULAR BANK PUBLIC Co Ltd**, a banking institution incorporated in Cyprus with registered office at 154, Limassol Avenue, 2025 Nicosia, Cyprus (the "**CPB**"), lawfully represented for the execution of this Agreement by Mrs Andri Antoniades, Special Administrator; and

(4) **BANK OF CYPRUS PUBLIC COMPANY LIMITED**, a banking institution incorporated in Cyprus with registered office at 51 Stassinos Street, Ayia Paraskevi, Strovolos, P.O. Box 24884, CY-1398 Nicosia, Cyprus (the "**BOC**") lawfully represented for the execution of this Agreement by Messrs Christos Sorotos and Eliza Livadiotou.

**WHEREAS:**

(A) IBG is a subsidiary of **CPB**, a banking institution incorporated under the laws of the Republic of Cyprus, and currently under resolution for the purposes of the Resolution of Credit and other Institutions Law of 2013 of the Republic of Cyprus (the "**Cypriot Resolution Law**");

(B) By virtue of the decree of the Central Bank of Cyprus dated 26 March 2013, Regulatory Administrative Act 97/2013 (the "**Decree**"), issued under articles 5(1) and 12(a), 7(1) and 9 of the Cypriot Resolution Law, CPB and the Purchaser entered into a sale and transfer agreement dated 26 March 2013 (the "**March 2013 STA**") for the purchase and assumption, by the Purchaser, of certain assets and deposits of CPB in accordance with and under the terms thereof;

1

(C)    IBG operates as a banking institution in Greece, being authorized and regulated by the Bank of Greece and mainly engages in the field of investment banking and related services to its clients;

(D)    By virtue of the Decree the rights and obligations of CPB under March 2013 STA have been transferred to BOC;

(E)    IBG, BOC and CPB, for the purposes of the March 2013 STA, in order to fulfill their respective obligations set out therein and in full discharge thereof (notwithstanding settlement provisions of par. 3.5. hereunder), wish to give effect to the provisions of the March 2013 STA and hereby sell and the Purchaser purchases and assumes, respectively certain deposits of IBG with effect from the Valuation Time and certain loans with effect from the Transfer Time on the terms set out in this Agreement; and

(F)    The Bank of Greece has been notified of and has granted its consent to the purchase and assumption, by the Purchaser, of the Transferred Assets.

**IT IS AGREED** as follows:

## 1.    DEFINITIONS

In this agreement:

"**Agreement**" means this agreement along and any schedules hereto, that constitute integral part hereof;

"**Business Day**" means a day (other than Saturday or Sunday) on which banks are open for business in Athens;

"**Deposits**" means the credit balances of customer accounts recorded as at the Valuation Time in the books of IBG, except for the Excluded Deposits. For the avoidance of doubt Deposits shall also include the credit balances corresponding to relevant accounts identified in Schedule 3 hereto;.

"**Deloitte Adjustment Report**" means the duly executed report to be issued for the purposes of and in accordance with the provisions of the March 2013 STA;

"**Encumbrance**" means any charge, mortgage, security, lien, equity, power of sale, hypothecation, or other right exercisable by third parties;

"**Excluded Deposits**" means the credit balances of the accounts of IBG, recorded as at the Valuation Time, as identified in Schedule 2 hereto which include the credit balances of the deposit accounts as verified in the Deloitte Adjustment Report, plus the credit balances of any additional accounts recorded as at the Valuation Time as verified in the Verification Report;

"**Greek Loans**" means all loan receivables (whether in the form of a note or otherwise and together with related accrued interest and Related Security), as recorded in the books of IBG on 15 March 2013, all as identified in the files named "subsidiaries Laiki" on the CD signed for the purposes of identification by the parties to the March 2013 STA and verified as such in the Deloitte Adjustment Report, except for those loans identified in Schedules 4A and 4B hereto; For the avoidance of doubt, Greek Loans shall also include the 15% of the amounts referred to in Schedule 4C hereto;

"**Independent Expert**" means Deloitte Hadjipavlou Sofianos & Campanis S.A., an auditing firm jointly appointed hereby to act as such by the parties in accordance with and for the purposes of this Agreement;

"**March 2013 STA**" has the meaning given to it in Recital B and is attached hereto as Schedule 1;

"**Proceedings**" means any proceeding, suit or action arising out of or in connection with this Agreement;

"**Regulations**" means Presidential Decree 178/2002 of the Hellenic Republic;

"**Related Security**" means any mortgage, hypothecation, prenotation, charge (whether fixed or floating), assignment or assignment by way of security, lien, pledge, encumbrance, guarantee, indemnity or any other form of security whatsoever given or provided by a customer or any other person in relation to the Greek Loans;

"**IBG's Employees**" means those individuals employed by IBG immediately prior to the Transfer Time who are engaged to work in connection with the Transferred Assets, as identified to the Purchaser by IBG and included in Schedule 6 hereto;

"**Settlement Amount**" means Euro [20.310.536.39] as calculated and identified as per each reference date in Schedule 5 hereto and as finally verified as at the Transfer Time (if applicable) by the Verification Report of the Independent Expert, following reconciliation procedure of par. 3.2. and 3.4. hereunder;

"**Taxation**" or "**Tax**" means all forms of taxation (including VAT) whether direct or indirect and whether levied by reference to income, profits, gains, net wealth, asset values, turnover, added value or other reference and statutory, governmental, state, provincial, local governmental or municipal impositions, duties, contributions, stamp duties, registration fees, rates and levies (including without limitation, social security contributions, special contributions ([«έκτακτη εισφορά»]) whenever and wherever imposed (whether imposed by way of a withholding or deduction for or on account of tax or otherwise) in respect of any Transferred Assets and all penalties, charges, costs and interest relating thereto;

3

"**Transferred Assets**" means: (a) the Greek Loans, (b) the Deposits, (c) amounts of actuarial redundancy liability for IBG Employees, and (d) excerpts of the books and records of IBG related and associated with and pertaining to the Greek Loans, the Deposits and the IBG Employees;

"**Transfer Date**" means 28th June 2013;

"**Transfer Time**" means 17.00 in Greece on the Transfer Date;

"**Valuation Time**" means close of business in Greece on 15 March 2013; and

"**Verification Report**" means the report to be issued by the Independent Expert in accordance with the reconciliation procedure of par. 3.2. and 3.4. hereunder.

2. **SALE AND PURCHASE OF ASSETS**

2.1. Subject to and in accordance with this Agreement IBG hereby sells, assigns and transfers, and the Purchaser hereby purchases and acquires, the Transferred Assets with effect from the Valuation Time.

2.2. IBG shall do all such things as the Purchaser shall reasonably request to perfect the transfer to the Purchaser of the Transferred Assets, including co-operating with the Purchaser in the obtaining of any necessary third party consents, to the extent required.

2.3. Save as provided in clause 2.4 below, the Greek Loans shall be transferred to the Purchaser free from all Encumbrances.

2.4. Where any Greek Loans are on the Transfer Date secured as collateral for covered bonds issued by IBG (if any), IBG shall not be obliged to transfer such Greek Loans at the Transfer Time but shall, within five Business Days following the Transfer Date, arrange for them to be released from any such collateral and transferred to the Purchaser free from all Encumbrances.

2.5. Subject to and in accordance with this Agreement, the Purchaser hereby agrees with IBG to cumulatively assume (in Greek: σωρευτική αναδοχή) as at the Transfer Time the liability of repayment of the Deposits towards the relevant depositors, being third party clients of IBG, excluding its subsidiaries, and the Purchaser agrees to indemnify IBG against any liability in respect of the Deposits or any matter or thing done or omitted to be done by the Purchaser in relation to them after the Transfer Time.

2.6. Where any property held as a Related Security is also held as collateral for any other advance made by IBG (other than a Greek Loan) the parties shall discuss in good faith the adoption of an agreed process to

4

EXECUTION VERSION

govern their relationship in respect of that collateral, to the extent permitted by applicable law and banking confidentiality.

2.7. As of the Transfer Time and having regard to the obligations of IBG under clause 2.8. hereunder, the Purchaser shall, at no cost of IBG, assume the administration and servicing of the Greek Loans.

2.8. Subject to term 2.7, the parties shall cooperate and use their best commercial efforts in connection with the transition of the administration of the Greek Loans and Deposits by IBG to the Purchaser, taking into account the need to minimize both the cost of such transition and the disruption to the ongoing business activities of the parties, as well as the effective and compliant administration and servicing of the Greek Loans and Deposits and compliance with banking secrecy, personal data and the national and European anti-money laundering and counter terrorist financing laws and regulations and the respective reporting obligations. Such cooperation will include, *inter alia*, reasonable technical assistance in data extraction parameterization of existing systems, conversion/migration of client accounts, data products/applications and other electronic information as may reasonably be required to the Purchaser IT blueprint systems and data mapping and related consultation about both existing systems and the conversion itself in the terms that may be agreed from time to time.

2.9. Subject to term 2.7, where a third party consent or a third party agreement is required in order for IBG to provide any of operational or administrational assistance thereof, as well any assistance required for the effective and compliant administration and servicing of the Greek Loans and Deposits by the Purchaser, IBG shall secure that all required third party consents or third party agreements are obtained or entered into, it being understood that, should a required third party consent be withheld or a third party agreement not be entered into, IBG shall find an alternative third party provider or other solutions in the terms and conditions that they may deem convenient, so that IBG's operations regarding Greek Loans and Deposits continues to operate smoothly, in the fashion it did operate prior to Transfer Date. IBG shall provide the Purchaser with all assistance it may reasonably request in connection with the discussions and negotiations with the third party suppliers and shall cooperate on a best commercial endeavours basis to deal with any difficulties and/or obstacles arising in respect thereof. The Purchaser shall promptly inform and cooperate with IBG upon becoming aware of any problems or dispute that may arise in connection with third party consents or third party agreements that are currently counterparties of IBG.

2.10. Within five (5) business days of the Transfer Date, IBG shall, at the cost of the Purchaser, procure delivery to the Purchaser of the originals and/or true copies of all contracts, records and relevant documents in

5

EXECUTION VERSION

connection with the Transferred Assets for the purposes of assumption, administration and servicing thereof and compliance of the Purchaser with the national anti-money laundering and counter terrorist financing laws and regulations and any respective reporting obligations. IBG shall be entitled to keep originals and/or copies of the above documents as well as of any electronic data (including records pertaining to history files of transactions) with respect to transactions entered intro prior to the Transfer Date in connection with the Transferred Assets, for its own use and records and in order to comply with any and all obligations imposed to IBG from time to time by any applicable legislation and/or contract.

2.11.   It is expressly agreed between IBG and the Purchaser that information included in the Schedules hereto may constitute privileged and confidential information under the applicable banking secrecy laws, rules and regulation and the parties hereto agree to continue to treat them as such and to refrain from the unauthorized use and/or disclosure to any other person, unless on a "need to know basis" or obligated to act so by force of decree or order by any judicial, administrative or other authority.

2.12.   IBG and the Purchaser shall, within one month of the date of this Agreement, cooperate in good faith and shall enter into a transitional services agreement ("**TSA**") under which the Purchaser shall provide to IBG such services that are necessary to ensure the effective and compliant continuation of operations of IBG, as those services had been provided to IBG by CPB prior to the entry into force of the March 2013 STA. The term of the TSA shall not exceed the period of three (3) months from its execution.

2.13.   Notwithstanding the provisions of sections 3 and 4 below, as soon as reasonably practicable following the date of the Agreement, IBG and the Purchaser shall, acting in good faith, indemnify each other over any and all amounts relating with Taxes, charges, interest on the use of funds, contributions of L. 128/1975 as well as the economic benefit in connection with the Transferred Assets, for the period of between the Valuation Date and the Transfer Time.

3.   **SETTLEMENT AMOUNT**

3.1.   As part of the amounts due to IBG, i.e. those referred in Schedule 2 of the March 2013 STA and the amount payable under the Deloitte Adjustment Report, all with regard to IBG, and subject to term 3.5. hereunder, the Purchaser shall be obliged to pay the Settlement Amount, i.e. the aggregate of the amount equivalent to (a) the difference in the Deposits as at the Transfer Time with the Deposits, as verified and identified in the Deloitte Adjustment Report (in accordance with the provisions of clause 13.2. of the March 2013

6

STA); and (b) the difference in the Greek Loans as at the Transfer Time with the Greek Loans as verified and identified in the Deloitte Adjustment Report.

3.2. The Settlement Amount shall be subject to a reconciliation provided by force of the Verification Report of the Independent Expert who shall:

    (A) verify the existence, as at the Valuation Time, of the Greek Loans and the difference in the Greek Loans as at the Transfer Time with the Greek Loans as at the Valuation Time;

    (B) verify the existence and amounts of the Deposits at the Valuation Time and the difference in the Deposits as at the Transfer Time with the Deposits as at the Valuation Time.

3.3. The Independent Expert shall act as an expert and not an arbitrator and the parties shall seek to instruct him on the basis that he will owe a duty of care to the Hellenic Financial Stability Fund and to IBG and shall be instructed to report to IBG and the Purchaser within five (5) business days following the Transfer Time. His determination shall (in the absence of manifest error) be final and binding on the parties. The costs of the Independent Expert will be borne equally by IBG and the Purchaser.

3.4. Following his review, the Independent Expert shall issue the Verification Report to the Purchaser and to IBG setting out his calculation of the Settlement Amount. Any reconciliation amount shall be payable by the obligor party within seven (7) days following receipt of the Verification Report by the Independent Expert.

3.5. Given that the transfer of the Transferred Assets falls within the framework of March 2013 STA and no further adjustment procedure shall apply herein, other that the one set out herein and in art. 5 March 2013 STA, any payment of the Settlement Amount to IBG shall be made on and subject to the uniform settlement between the March 2013 STA parties, according to the terms and conditions set out herein and the March 2013 STA.

## 4. TAXATION

4.1. Notwithstanding any other provision of this Agreement, the Purchaser shall be responsible for the payment of all Taxation payable in respect of the matters contemplated by this Agreement and shall reimburse IBG upon demand for the payment of any such Taxation.

4.2. Reference is made to the fact that the provisions of art. 23 of Law 1731/1987 shall apply to this agreement.

EXECUTION VERSION

**5.   ANTI – TRUST**

5.1.   If, for any reason, the Hellenic Competition Commission resolves, within the merger control process, on the imposition of particular structural or behavioral measures (such as, without limitation, the divestiture of the Deposits and/or Greek Loans) for the protection of effective competition, the Purchaser undertakes to comply with and adopt such measures where necessary to avoid rescission if this Agreement or the imposition of any requirement on IBG to purchase back any assets sold pursuant to this Agreement, to reassume any Deposits or to refund any amount to the Purchaser.

**6.   EMPLOYEES**

6.1.   IBG and the Purchaser agree that the Regulations shall apply for the IBG's Employees set out in Schedule 6.

6.2.   With effect from the Transfer Time all wages, salaries, periodic outgoings and other liabilities in respect of the IBG's Employees shall be borne exclusively by the Purchaser. All wages, salaries, periodic outgoings and other liabilities in respect of the IBG's Employees pertaining to the period prior to the Transfer Time shall be borne exclusively by IBG and IBG shall at all times keep the Purchaser indemnified against those liabilities and all actions, proceedings, costs, damages, claims and demands in respect of them.

**7.   ASSIGNMENT**

7.1.   Neither party may assign, transfer, change or otherwise deal with all or any of its rights under the Transferred Assets  nor may it grant, declare, create or dispose of any right or interest in the Transferred Assets and/or this Agreement without the prior written consent of the other party.

7.2.   This Agreement is binding on and ensures for the benefit of the successors, assigns or legal personal representatives of the parties.

**8.   NO WARRANTIES**

The Purchaser acknowledges that:

(A)   it is acquiring the Transferred Assets on an "as is" basis and no right of rescission may be exercised in relation to this Agreement; and

8

EXECUTION VERSION

(B)   in entering into this Agreement, it has not relied on any warranty, representation, guarantee or (other than as expressly set out in this Agreement) undertaking, promise, inducement or indemnity by IBG or any of their respective officers, employees, professional advisers or agents in respect of any aspect of this Agreement.

## 9.    NOTICES

9.1.   Except where expressly stated otherwise, a notice under this Agreement shall only be effective if it is in writing. E – mail is permitted where this has been provided by a party in accordance with this clause.

9.2.   Notices under this Agreement shall be sent to a party at its address and (if provided) for the attention of the individual set out below:

If to the attention of IBG:

| | |
|---|---|
| Name: | Michalis Papparis and Michalis Andreadis |
| Address: | 24B Kifissias Avenue, 15125, Athens, Greece |
| E-mail: | mpapparis@cpb.gr and MAndreadis@ibg.gr |

If to the attention of the Purchaser:

| | |
|---|---|
| Name: | Stavros Lekkakos |
| Address: | 4 Amerikis, 10564, Athens, Greece |
| E-mail: | SLekkakos@piraeusbank.gr |

Provided that a party may change its notice details on giving notice to the other party of the change in accordance with this clause. That notice shall only be effective on the date falling five clear Business Days after the notification has been received or such later date as may be specified in the notice.

9.3.   Any notice given under this Agreement shall, in the absence of earlier receipt, be deemed to have been duly given as follows:

(A)   if delivered personally, on delivery;

(B)   if sent by first class post, two clear Business Days after the date of posting;

(C)   if sent by airmail six clear Business Days after the date of posting; and

9

EXECUTION VERSION

(D)     if sent by e – mail, at the expiry of 48 hours after the time it
        was sent.

9.4.    Any notice given under this Agreement outside Working Hours in the
        place to which it is addressed shall be deemed not to have been given
        until the start of the next period of Working Hours in such place.

## 10.   GOVERNING LAW

10.1.   This Agreement and any dispute, controversy, proceedings or claim of
        whatever nature arising out of or in any way relating to this Agreement
        or its formation (including non – contractual disputes or claims) shall
        be governed by and construed in accordance with Greek Law.

## 11.   JURISDICTION

11.1.   The courts of Athens, Greece are to have jurisdiction to settle any
        dispute, whether contractual or non – contractual arising out of or in
        connection with this Agreement. Any Proceedings may be brought in
        the Greek courts.

11.2.   Each party irrevocably submits and agrees to submit to the jurisdiction
        of the Greek courts.


**[REMAINDER OF THE PAGE INTENTIONALLY OMITTED BLANK]**

10

EXECUTION VERSION

**Schedule 1**

**[March 2013 STA]**

11

EXECUTION VERSION

**EXECUTION VERSION**

## SALE AND TRANSFER AGREEMENT

**THIS AGREEMENT** is made on 26 March, 2013

**BETWEEN:**

(1) **CYPRUS POPULAR BANK PUBLIC CO LTD**, a banking institution incorporated in Cyprus with registered office at 154, Limassol Avenue, 2025 Nicosia, Cyprus (the "**Seller**"); and

(2) **PIRAEUS BANK, S.A.**, a banking institution incorporated under the laws of the Hellenic Republic with its corporate seat at 4, Amerikis St., 105 64 Athens, Greece and registered with the register of the Greek *sociétés anonymes* under the number GEMI 225501000 (formerly 6065/06/B/86/B/04) (the "**Purchaser**").

**WHEREAS:**

(A) The Seller, a bank incorporated in the Republic of Cyprus, has carried on a banking business through certain branches in Greece;

(B) The Seller is an institution under resolution for the purposes of the Resolution of Credit and other Institutions Law of 2013 of the Republic of Cyprus (the "**Resolution Law**");

(C) Under the Resolution Law the Resolution Authority has issued a decree relating to the sale to the Purchaser of the Greek Operations of the Seller, which decree qualifies as a reorganisation measure in the sense of Directive 201/24/EC on the reorganisation and winding up of credit institutions; and

(D) The Seller wishes to sell and the Purchaser wishes to purchase and assume, respectively, certain assets and deposits of the Seller's Greek Operations (as defined below) with effect from the Transfer Time on the terms set out in this Agreement.

**IT IS AGREED** as follows:

**1.    DEFINITIONS**

In this Agreement:

"**Adjustment Amount**" means €275m.;

"**Asset Value**" means:

(A)    the Transfer Value; plus

(B)    the net book value at the Valuation Time of the PE Assets and the Properties; plus

(C)    the Cash;

515233540

$\mathcal{N}$    P.D.    $\mathcal{N}$

2

"**Branches**" means the banking branches situated in the Hellenic Republic through which the Seller carries on its banking activity in Greece;

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for business in Nicosia and Athens;

"**Capital Amount**" means an amount equal to 9 per cent. of the Transfer Value;

"**Cash**" means notes or coins belonging to the Seller held at Branches, in ATMs situated in Greece or in transit in Greece at the Valuation Time, plus notes used to replenish the Seller's ATMs between the Valuation Time and the Transfer Time, less notes withdrawn by persons who are not customers of the Seller;

"**Deposits**" means the credit balances recorded as at the Valuation Time in the books of the Seller's operations in Greece or in the books of IBG (net of margin accounts in the case of IBG), together with related accrued and unpaid interest;

"**Encumbrance**" means any charge, mortgage, security, lien, equity, power of sale, hypothecation or other right exercisable by third parties;

"**Funding Gap**" means the amount by which the Asset Value exceeds the aggregate of (i) the Value of the Deposits; and (ii) the Capital Amount;

"**Greek Business Employees**" means those individuals employed by the Seller to work in the Greek Operations immediately prior to the Transfer Time;

"**Greek Loans**" means all loan receivables (whether in the form of a note or otherwise and including leasing and factoring), and together with related accrued interest and Related Security), as recorded in the books of the Seller or any of the Subsidiaries on 15 March 2013, as well as all shipping and other loans of the Seller or any of the Subsidiaries which were originated by and are managed in Greece and currently booked in the Cypriot loan book, all as identified in the files named "CYPRUS POPULAR BANK" and "subsidiaries Laiki" on the CD signed for the purposes of identification by the parties;

"**Greek Operations**" means the Seller's operations in Greece;

"**IBG**" means Investment Bank of Greece S.A., a subsidiary of the Seller;

"**Independent Expert**" means a major international auditing firm jointly appointed by the Seller and the Purchaser;

"**Initial Funding Gap Amount**" means the sum of €1.453bn.;

"**PIMCO Report**" means the report prepared by PIMCO dated 1 February 2013 entitled "Independent Due Diligence of the Banking System of Cyprus" (based on a reference date of 30 June 2012);

3

"PE Assets" means all the plant, machinery, equipment (including computer equipment and software), furniture, fixtures and fittings owned by (i) the Seller and located at the Branches and other Properties; or (ii) any of the Subsidiaries as at the Transfer Time;

"Proceedings" means any proceeding, suit or action arising out of or in connection with this Agreement or the negotiation, existence, validity or enforceability of this Agreement, whether contractual or non-contractual;

"Properties" means:

(A)    such right, title and interest as is owned by the Seller or any Subsidiary in respect of real estate in the Branches or any other premises in Greece owned and used by the Seller wholly or mainly for the purposes of the Greek Operations; and

(B)    real estate of the Seller or any Subsidiary constituting the underlying assets in any financial leasing agreement;

"Regulations" means Presidential Decree 178/2002 of the Hellenic Republic;

"Related Security" means any mortgage, hypothecation, prenotation, charge (whether fixed or floating), assignment or assignment by way of security, lien, pledge, encumbrance, guarantee, indemnity or any other form of security whatsoever given or provided by a customer or any other person in relation to the Greek Loans;

"Resolution Authority" means the Central Bank of Cyprus acting in its capacity as resolution authority under the Resolution Law;

"Resolution Law" has the meaning given to it in Recital B;

"Seller Trademarks" means the trademarks, trade-names and logos which are registered in the name of the Seller and used in the course of its Greek Operations as at the Transfer Time;

"Subsidiaries" means Marfin Leasing S.A., Marfin Factors & Forfaiters S.A. and IBG, and "Subsidiary" shall be construed accordingly;

"Taxation" or "Tax" means all forms of taxation (including VAT) whether direct or indirect and whether levied by reference to income, profits, gains, net wealth, asset values, turnover, added value or other reference and statutory, governmental, state, provincial, local governmental or municipal impositions, duties, contributions, stamp duties, registration fees, rates and levies (including, without limitation, social security contributions, special contributions {έκτακτη εισφορά} and any payroll taxes) whenever and wherever imposed (whether imposed by way of a withholding or deduction for or on account of tax or otherwise) in respect of any Transferred Assets and all penalties, charges, costs and interest relating thereto;

"Transfer Balance Sheet" means the transfer balance sheet produced by the Seller and attached as Schedule 2;

P·D.

4

"**Transferred Assets**" means the assets, properties and rights of the Seller set out in Schedule 1 but excluding any deferred tax assets of the Seller;

"**Transfer Date**" means 26 March 2013;

"**Transfer Time**" means 17:00 in Greece on the Transfer Date;

"**Transfer Value**" means the aggregate value of the Greek Loans (net of provisions) as at the Valuation Time, minus the additional expected losses on the basis of the PIMCO Report (adverse scenario), plus the pre-provision profitability calculated by PIMCO in its adverse scenario, all as indicated in the Transfer Balance Sheet;

"**Valuation Time**" means close of business in Greece on 15 March 2013; and

"**Value of the Deposits**" means the aggregate gross amount as at the Valuation Time of the Deposits.

2.    **SALE AND PURCHASE OF ASSETS**

2.1    Subject to and in accordance with this Agreement the Seller hereby sells, assigns and transfers, and the Purchaser hereby purchases and acquires, the Transferred Assets with effect from the Transfer Time.

2.2    The Seller shall do all such things as the Purchaser shall reasonably request to perfect the transfer to the Purchaser of the Transferred Assets, including co-operating with the Purchaser in the obtaining of any necessary third party consents, to the extent required.

2.3    Save as provided in clause 2.4 below, the Greek Loans shall be transferred to the Purchaser free from all Encumbrances.

2.4    Where any Greek Loans are on the Transfer Date secured as collateral for covered bonds issued by the Seller, the Seller shall not be obliged to transfer such Greek Loans at the Transfer Time but shall, within five Business Days following the Transfer Date, arrange for them to be released from any such collateral and transferred to the Purchaser free from all Encumbrances.

2.5    The PE Assets shall be transferred to the Purchaser subject to all liens, claims, charges and encumbrances and hire, hire purchase and credit sale agreements applicable to them.

2.6    Risk in the PE Assets shall pass with effect from the Transfer Time.

2.7    Subject to and in accordance with this Agreement, the Purchaser hereby agrees with the Seller to cumulatively assume (in Greek: σωρευτική αναδοχή) as at the Transfer Time the liability of repayment of the Deposits towards the relevant depositors and the Purchaser agrees to indemnify the Seller against any liability in respect of the Deposits or any matter or thing done or omitted to be done by the Purchaser in relation to them after the Transfer Time .

515233540

6

2.8   Where any property held as a Related Security is also held as collateral for any other advance made by the Seller (other than a Greek Loan) the parties shall discuss in good faith the adoption of an agreed process to govern their relationship in respect of that collateral, to the extent permitted by applicable law and banking confidentiality.

2.9   The Seller owns or is subject to certain off-balance sheet assets and liabilities which are associated with customer loan relationships of the Greek Operations but do not form part of the liabilities to be assumed by the Purchaser hereunder. As soon as reasonably practicable following the date of this Agreement the Seller and the Purchaser shall use their respective best endeavours to enter into an agreement under which the Purchaser shall purchase such assets and assume such liabilities. The agreement of the Purchaser to enter into such an agreement shall be subject to:

(A)   the nature and amounts of such items being clearly identified; and

(B)   the valuation of those items being on a basis consistent with the PIMCO Report (adverse scenario) and after adding the pre-provision profitability calculated by PIMCO in its adverse scenario.

2.10   Pending the transfer and assumption of the assets and liabilities referred to in clause 2.9 the Purchaser shall provide such assistance as shall be within its control and reasonably requested by the Seller in order to administer them. The Purchaser's obligation under this clause shall expire in respect of any assets and liabilities in the event that either party elects not to include such assets or liabilities in any such agreement as is referred to in clause 2.9 or in the event that the Parties fail to reach such an agreement by 31 May 2013.

3.   **PROPERTIES**

3.1   The Seller shall enter into such documentation (notarial or otherwise) as may be required under Greek law in order to transfer to the Purchaser the legal title to the Properties free from all Encumbrances. Such transfers shall be made together with any existing leases granted by the Seller in respect of the Properties.

3.2   The Seller undertakes to comply with all formalities which shall be required of it under Greek law in order to enable the Purchaser to complete the transfer of the Properties to the Purchaser as soon as reasonably practicable after the Transfer Date. The Purchaser shall complete such transfers as soon as reasonably practicable.

3.3   As an additional undertaking, the Seller agrees to deliver to the Purchaser, no later than the Transfer Time, an irrevocable and unconditional notarial apostilled power of attorney authorising the Purchaser to proceed with the transfer of the Property, to the Purchaser and to complete all required formalities in Greece including the submission of tax returns and making of all requisite declarations on behalf of the Seller.

818233640

X    P.D.

6

3.4   The Seller hereby grants to the Purchaser the right to use any premises leased by the Seller in respect of its Greek Operations, whether Branches or otherwise, and the Purchaser shall be responsible as against the Seller for the payment of:

(A)   the rentals due under, and shall otherwise observe the terms of, the respective lease agreements as from the Transfer Time; and

(B)   any other amount due by the Seller in respect of the leased premises as from the Transfer Time,

and in each case the Purchaser shall indemnify the Seller against any liabilities arising as a result of any failure to do so and/or as a result of granting to the Purchaser a right to use the leased premises.

3.5   In the event that, at any time during the period of 12 months from the Transfer Time, the Purchaser requests the Seller by notice in writing to terminate any lease of any leased Property the Seller shall, within 30 days of receipt of such request, endeavour to do so. If the Seller fails to comply with this clause it shall be responsible for any additional rental and other outgoings payable in respect of such Property which would not have been payable but for such failure. For the avoidance of doubt, any amounts paid by the Seller as a result of such termination shall be promptly reimbursed by the Purchaser.

4.   PURCHASE PRICE AND FUNDING GAP

4.1   As consideration for the purchase of the Transferred Assets the Purchaser shall pay to the Seller in immediately available funds by the Transfer Time an amount equal to €258m., being 66.66 percent of the Capital Amount minus the Adjustment Amount.

4.2   By the Transfer Time the Purchaser shall pay to the Seller, or, if the amount is negative, the Seller shall pay to the Purchaser, an amount in cash equal to the Initial Funding Gap Amount. For the avoidance of doubt, the Initial Funding Gap Amount is not part of the purchase price.

5.   ADJUSTMENT

5.1   The Seller and the Purchaser shall jointly appoint the Independent Expert to:

(A)   calculate the amount of the Funding Gap as at the Transfer Time;

(B)   verify the existence as at the Valuation Time, and eligibility as Greek Loans, of the loans listed in the CD referred to in the definition of "Greek Loans";

(C)   verify the existence and amount of the Deposits at the Valuation Time;

(D)   determine the amount of Cash as at the Transfer Time; and

(E)   verify the existence and net book value of the PE Assets and the Properties as at the Valuation Time.

P D.

7

5.2    For the avoidance of doubt:

    (A)    the scope of work of the Independent Expert shall not involve any recalculation of any actual or projected losses in respect of the Greek Loans; and

    (B)    Greek Loans transferred to the Purchaser under clause 2.4 or 13.1 (whether or not within the five Business Day period referred to therein) shall for the purposes of paragraph 5.1 above be deemed to have been transferred at the Transfer Time. Greek Loans not transferred to the Purchaser under clause 2.4 or 13.1 shall cease to qualify as Greek Loans for the purpose of the Independent Expert's process.

5.3    The Independent Expert shall act as an expert and not an arbitrator and the parties shall seek to instruct him on the basis that he will owe a duty of care to the Hellenic Financial Stability Fund and to the Central Bank of Cyprus and shall be instructed to report to the parties within 21 days following the Transfer Time.  His determination shall (in the absence of manifest error) be final and binding on the parties. The costs of the Independent Expert will be borne equally by the Seller and the Purchaser.

5.4    The Purchaser shall give the Independent Expert such access to the books, records and employees of the Greek Operations as he may reasonably require to carry out his functions. The Seller shall procure that the Independent Expert shall be given such information and/or extracts from the PIMCO Report as shall be necessary in order to enable him to carry out the terms of his engagement.

5.5    Following his review, the Independent Expert shall issue a statement to the Purchaser and to the Seller setting out his calculation of (i) the Funding Gap and (ii) the Capital Amount.

5.6    Within 7 days following receipt of the Independent Expert's statement under clause 5.3:

    (A)    if the Funding Gap is greater than the Initial Funding Gap Amount, the Purchaser shall pay to the Seller in cash an amount equal to the excess;

    (B)    if the Funding Gap is less than the Initial Funding Gap Amount, the Seller shall pay to the Purchaser in cash an amount equal to the shortfall; and

    (C)    if the Capital Amount is less than €800m., the Seller shall pay to the Purchaser in cash an amount equal to 66.66 per cent. of the shortfall.

P. D.

8

**6.     TAXATION**

6.1     Notwithstanding any other provision of this Agreement, the Purchaser shall be responsible for the payment of all Taxation payable in respect of the matters contemplated by this Agreement and shall reimburse the Seller upon demand for the payment of any such Taxation.

6.2     The Seller and the Purchaser explicitly recognise that the aggregate of the assets transferred and the liabilities assumed under this Agreement form a business as a going concern.

**7.     ANTI-TRUST**

If, for any reason, the Hellenic Competition Commission resolves, within the merger control process, on the imposition of particular structural or behavioural measures (such as, without limitation, the divestiture of the Deposits and/or Greek Loans) for the protection of effective competition, the Purchaser undertakes to comply with and adopt such measures where necessary to avoid rescission of this Agreement or the imposition of any requirement on the Seller to purchase back any assets sold pursuant to this Agreement, to reassume any Deposits or to refund any amount to the Purchaser.

**8.     PROVISION OF SERVICES POST TRANSFER**

8.1     The Seller and Purchaser shall, within one month of the date of this Agreement, enter into a transitional services agreement (the "**TSA**") under which the Seller shall provide to the Purchaser such services relating to the administration of the Greek Loans and Deposits as the Seller is able to provide and the Purchaser may reasonably request. The term of such agreement shall be 18 months from the Transfer Time or such shorter period as the Purchaser shall require.

8.2     The services provided under the TSA shall be at no cost to the Purchaser for the period ending twelve months from the Transfer Time and thereafter shall be provided at cost to the Seller.  The TSA shall include a mechanism under which the cost of providing the services as from the end of twelve months from the Transfer Time is independently verified by an appropriate independent third party.

8.3     During the one month period referred to in clause 8.1 the Seller shall provide to the Purchaser, free of charge, such services relating to the administration of the Greek Loans and the Deposits as are necessary to ensure the effective and compliant administration of the Greek Operations.

8.4     Each of the parties shall (at the expense of the other party) give to the other party such assistance, information and access to personnel as shall be reasonably requested by that party in order to assist it in the pursuit or defence of any litigation proceedings in which such party may be or become involved in relation to the Greek Operations or in connection with any Tax issues arising in respect of the Greek Operations.

515235640

P.D.

9

**9.    EMPLOYEES**

9.1    The Seller and the Purchaser agree that the Regulations will apply to the Greek Business Employees.

9.2    With effect from the Transfer Time all wages, salaries,  periodic outgoings and other liabilities in respect of the Greek Business Employees shall be borne exclusively by the Purchaser. All wages, salaries, periodic outgoings and other liabilities in respect of the Greek Business Employees pertaining to the period prior to the Transfer Time shall be borne exclusively by the Seller and the Seller shall at all times keep the Purchaser indemnified against those liabilities and all actions, proceedings, costs, damages, claims and demands in respect of them.

**10.    ASSIGNMENT**

10.1   Save for any transfer by Decree of a Resolution Authority under any applicable law, neither party may assign, transfer, charge or otherwise deal with all or any of its rights under this Agreement nor may it grant, declare, create or dispose of any right or interest in it without the prior written consent of the other party.

10.2   This Agreement is binding on and enures for the benefit of the successors, assigns or legal personal representatives of the parties.

**11.    NO WARRANTIES**

The Purchaser acknowledges that:

(A)    it is acquiring the Transferred Assets on an "as is" basis and no right of rescission may be exercised in relation to this Agreement; and

(B)    in entering into this Agreement, it has not relied on any warranty, representation, guarantee or (other than as expressly set out in this Agreement) undertaking, promise, inducement or indemnity by the Seller or any of their respective officers, employees, professional advisers or agents in respect of any aspect of this Agreement.

**12.    LIMITED TRADEMARK LICENCE**

12.1   The Seller hereby grants to the Purchaser a limited, non-exclusive and non-transferable licence to use but not to sublicense the Seller Licensed Trademarks, under the terms and conditions herein (the "**Limited Licence**"), for a term of 12 months after the Transfer Date (the "**Term**").

12.2   For the avoidance of any doubt, the Purchaser shall be under no obligation to pay any fees, or other cost or expenses to the Seller for the use of the Seller Licensed Trademarks during the Term.

12.3 By the expiration of the Term, the Purchaser shall have removed or otherwise obliterated all Seller Licensed Trademarks from all assets and other materials owned or used by the Purchaser, including any credit or debit cards, premises, buildings, vehicles, equipment, stationery, packaging materials, displays, signs, advertising, publicity releases, promotional or marketing materials, manuals, forms, websites, emails, computer software and systems.

12.4 The Purchaser shall promptly notify the Seller in writing of any act of infringement, passing off or illegal or unauthorised use or misuse of the Seller Licensed Trademarks or any claim or action involving any of the Seller Licensed Trademarks which come to its attention during the Term.

12.5 Notwithstanding the Term of the licence granted pursuant to this clause, the Purchaser shall use its reasonable endeavours to cease using the Seller Licensed Trademarks as soon as reasonably practicable.

12.6 The Purchaser shall indemnify the Seller against any positive direct damages or loss suffered by the Seller as a result of the use by the Purchaser of any of the Seller's Licensed Trademarks.

13. **SUBSIDIARIES**

13.1 The Seller shall, within 21 days following the date of this Agreement, procure that each of the Subsidiaries shall transfer to the Purchaser, and the Purchaser shall acquire:

(A) its Greek Loans;

(B) its Properties; and

(C) its PE Assets,

in each case on terms equivalent to those of this Agreement (save that no further Adjustment Amount shall apply).

13.2 The Purchaser shall assume the IBG Deposits with effect from the Valuation Time and shall indemnify IBG against any liability thereunder. Within 18 days following the date of this Agreement the Purchaser shall, and the Seller shall procure that the Investment Bank of Greece S.A. shall, enter into an agreement to give effect to this clause.

14. **NOTICES**

14.1 Except where expressly stated otherwise, a notice under this Agreement shall only be effective if it is in writing. E-mail is permitted where this has been provided by a party in accordance with this clause.

14.2 Notices under this Agreement shall be sent to a party at its address and (if provided) for the attention of the individual set out below:

$\mathcal{N}$ P.D.

| Party and title of individual | Address | E-mail address |
|---|---|---|
| Purchaser<br><br>George Poulopoulos, CFO | 4, Amerikis St., 105 64 Athens, Greece | gpoulopoulos@piraeusbank.gr |
| Seller<br><br>Panicos Demetriades | c/o Central Bank of Cyprus as Resolution Authority for the Seller<br><br>80, Kennedy Avenue, P.O. Box 25529, CY-1076 Nicosia, Cyprus | panicos.demetriades@centralb ank.gov.cy |

Provided that a party may change its notice details on giving notice to the other party of the change in accordance with this clause. That notice shall only be effective on the date falling five clear Business Days after the notification has been received or such later date as may be specified in the notice.

14.3 Any notice given under this Agreement shall, in the absence of earlier receipt, be deemed to have been duly given as follows:

(A) if delivered personally, on delivery;

(B) if sent by first class post, two clear Business Days after the date of posting;

(C) if sent by airmail six clear Business Days after the date of posting; and

(D) if sent by e-mail, at the expiry of 48 hours after the time it was sent.

14.4 Any notice given under this Agreement outside 9 a.m. to 2.30 p.m. ("Working Hours") in the place to which it is addressed shall be deemed not to have been given until the start of the next period of Working Hours in such place.

## 15. GOVERNING LAW

15.1 This Agreement and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this Agreement or its formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with Greek Law.

12

16. **JURISDICTION**

16.1 The courts of Athens, Greece are to have jurisdiction to settle any dispute, whether contractual or non-contractual arising out of or in connection with this Agreement. Any Proceedings may be brought in the Greek courts.

16.2 Each party irrevocably submits and agrees to submit to the jurisdiction of the Greek courts.

17. **SERVICE AGENT**

The Seller shall within ten Business Days appoint and notify to the Purchaser an agent for the service of any Proceedings in the Hellenic Republic.

**AS WITNESS** the hands of the duly authorised representatives of the parties on the date which appears first on page 1.

518253540

P.D.

13

## SCHEDULE 1

### THE TRANSFERRED ASSETS

1.   The Greek Loans;

2.   the goodwill of the Greek Operations;

3.   the Properties;

4.   the PE assets;;

5.   all intellectual property rights owned by Seller which relate exclusively to the Greek Operations; and

6.   all books and records relating exclusively to the Greek Operations.

14

## SCHEDULE 2

### TRANSFER BALANCE SHEET



SCHEDULE 2

# SCHEDULE 2 - TRANSFER BALANCE SHEET

P.O.

15

**SIGNATORIES**

SIGNED by
for **CYPRUS POPULAR BANK
PUBLIC CO LTD**

SIGNED by
for **PIRAEUS BANK, S.A.**

816233840

P · D

## Schedule 2

## [EXCLUDED DEPOSITS]

**A. Excluded deposits in accordance with March 2013 STA**

| Product Code | Product Description |
|---|---|
| 093 | MARGIN A/C GLOBAL DERIVATIVE |
| 094 | MARGIN A/C ELECTR.BANK |
| 097 | MARGIN A/C ET. EK |
| 241 | MARGIN A/CS |
| 242 | MARGIN A/C T+3 |
| 243 | MARGIN A/CS Foreign Markets |

**B. Excluded Deposits as derived from Deloitte Adjustment Report**

The following are the details of deposits (including the above) which are exempted from the Transfer Assets as defined for the purposes of this Agreement.

(Note: Balances as at 15 March 2013).

| GNL. LEDGER | CUR | € Balance | Reason Going/Remain. |
|---|---|---|---|
| /20/, /24/, /27/ | | 192.481,40 | Credit balance of loans |
| | | 192.481,40 | **Credit balance of loans Total** |
| 00 06Y9W9 0211 97 | EUR | 51.192,63 | Institutional Accounts Serving Brokerage Transactions |
| 00 06Y9S8 0211 01 | USD | 351.620,75 | Institutional Accounts Serving Brokerage Transactions |
| 00 06UZ44 0211 01 | USD | 153.124,26 | Institutional Accounts Serving Brokerage Transactions |
| 00 06UZ44 0211 97 | EUR | 231.081,46 | Institutional Accounts Serving Brokerage Transactions |
| 00 06Y9U3 0211 01 | USD | 245.256,04 | Institutional Accounts Serving Brokerage Transactions |
| 00 06Y9U3 0211 97 | EUR | 189.834,36 | Institutional Accounts Serving Brokerage Transactions |
| 00 07G890 0211 01 | USD | 70.805,38 | Institutional Accounts Serving Brokerage Transactions |
| 00 07G890 0211 97 | EUR | 111.489,31 | Institutional Accounts Serving Brokerage Transactions |
| 00 07G8C3 0211 97 | EUR | 96.117,03 | Institutional Accounts Serving Brokerage Transactions |
| 00 07G8A7 0211 03 | GBP | 36.255,79 | Institutional Accounts Serving Brokerage Transactions |
| 00 07G8A7 0211 97 | EUR | 106.631,39 | Institutional Accounts Serving Brokerage Transactions |
| | | 1.643.408,40 | **Institutional Accounts Serving Brokerage Transactions Total** |
| | | 3.658.727,01 | **Margin Account Total** |
| 00 059955 1211 01 | USD | 5.439.947,53 | Overnight Investment |
| 00 059955 1211 97 | EUR | 25.024.891,98 | Overnight Investment |
| | | 30.464.839,51 | **Overnight Investment Total** |
| 00 06TDP1 1521 01 | USD | 27.344,22 | Serving Asset Management Purposes |
| 00 06TDP1 1521 97 | EUR | 2.494,42 | Serving Asset Management Purposes |
| 00 06RDN1 1521 97 | EUR | 1.764,63 | Serving Asset Management Purposes |
| 00 425099 1521 97 | EUR | 4.098,32 | Serving Asset Management Purposes |

13

EXECUTION VERSION

| | | | |
|---|---|---|---|
| 00 06T1V0 1521 97 | EUR | 3.216,38 | Serving Asset Management Purposes |
| | | 38.917,97 | **Serving Asset Management Purposes Total** |
| | | 1.302.436,71 | **Serving in Standing Order for Brokerage Account Total** |
| | | 1.175.839,43 | **Staff Deposit Total** |
| 00 514207 0411 97 | EUR | 4,39 | Staff Deposit - Serving in Standing Order for Brokerage Account |
| 00 508290 0411 97 | EUR | 0,08 | Staff Deposit - Serving in Standing Order for Brokerage Account |
| 00 499821 0411 97 | EUR | 89.292,00 | Staff Deposit - Serving in Standing Order for Brokerage Account |
| 00 062306 0411 97 | EUR | 12,69 | Staff Deposit - Serving in Standing Order for Brokerage Account |
| 00 534874 0471 01 | USD | 5,82 | Staff Deposit - Serving in Standing Order for Brokerage Account |
| | | 89.314,98 | **Staff Deposit - Serving in Standing Order for Brokerage Account Total** |
| | | 883.070,79 | **Staff Product Total** |
| 00 063783 1211 97 | EUR | 1.064.000,00 | Subsidiary - Institutional Account Serving Brokerage Transactions |
| | | 1.064.000,00 | **Subsidiary - Institutional Account Serving Brokerage Transactions Total** |
| 58.65.81.01 | | 11.540,14 | Subsidiary Deposit ACCRUAL ΤΟΚΩΝ 1/3/2013-15/3/2013 |
| 00 052281 1211 97 | EUR | 175.000,00 | Subsidiary Deposit |
| | | 186.540,14 | **Subsidiary Deposit Total** |
| 00 586192 9520 97 | EUR | 46.224,78 | ΤΕΚΕ Deposit - ΔΕΔΟΥΛ.ΤΟΚΟΙ ΚΤΘ ΠΡΟΘΕΣ |
| 00 054709 1211 97 | EUR | 5.292.661,91 | ΤΕΚΕ Deposit |
| | | 5.338.886,69 | **ΤΕΚΕ Deposit Total** |
| | | 46.038.463,03 | **Grand Total** |
| | | -2.700,13 | Discrepancy vs submitted to Deloitte |
| | | ....... | |

**C. Credit balances of any additional accounts recorded as at the Valuation Time**

The following are the details of deposits (in addition to the above) which are exempted from the Transfer Assets as defined for the purposes of this Agreement.

(Note: Balances as at 15 March 2013).

| GNL. LEDGER | CUR | € Balance | Reason Going/Remain. |
|---|---|---|---|
| 00 07KBH0 1211 97 | EUR | 149.230,05 | Bond Loan |
| 00 07PK49 1211 97 | EUR | 36.741,55 | Bond Loan |
| 00 07O5X2 0211 97 | EUR | 3.024,91 | Bond Loan |
| 00 07O5X2 1211 97 | EUR | 302.000,00 | Bond Loan |
| | | 490.996,51 | **Bond Loan Total** |
| 00 07IP73 0411 97 | EUR | 168.307,85 | Collateral Deposit for Resolution Purposes of IBG AEPEY |
| | | 168.307,85 | **Collateral Deposit for Resolution Purposes of IBG AEPEY Total** |
| 00 053537 0381 97 | EUR | 15.885,51 | Collateral Deposit Pending Dispute with "AKTIB AEPEY" |
| | | 15.885,51 | **Collateral Deposit Pending Dispute with "AKTIB AEPEY" Total** |
| | | 295.802,13 | **Collateral Deposit Pending Legal Actions for "ELL. EPEND. OMILOS" Total** |
| 00 550276 0211 97 | EUR | 309,53 | L/G - Piladakis |
| 00 550276 0911 97 | EUR | 80.000,00 | L/G - Piladakis |

14

EXECUTION VERSION

| | | 80.309,53 | L/G - Piladakis Total |
|---|---|---|---|
| 00 526649 0411 97 | EUR | 1,39 | Serving in Standing Order for Brokerage Account |
| 00 609619 0912 97 | EUR | 70,93 | Serving in Standing Order for Brokerage Account |
| 00 609619 0913 97 | EUR | 1,12 | Serving in Standing Order for Brokerage Account |
| 00 454610 1211 97 | EUR | 115.000,00 | Serving in Standing Order for Brokerage Account |
| | | 115.073,44 | **Serving in Standing Order for Brokerage Account Total** |
| | | 3.056.028,02 | **SPV's for HF II & III Total** |
| 00 499821 1211 97 | EUR | 100.000,00 | Staff Deposit |
| | | 100.000,00 | **Staff Deposit Total** |
| 00 613249 0411 97 | EUR | 861,09 | Staff Deposit - Serving in Standing Order for Brokerage Account |
| | | 861,09 | **Staff Deposit - Serving in Standing Order for Brokerage Account Total** |
| 00 063783 0211 97 | EUR | 314,47 | Subsidiary - Institutional Account Serving Brokerage Transactions |
| | | | **Subsidiary - Institutional Account Serving Brokerage Transactions** |
| | | 314,47 | **Total** |
| 00 052281 0211 97 | EUR | 11.225,67 | Subsidiary Deposit |
| 00 529288 1211 97 | EUR | 43.311,24 | Subsidiary Deposit |
| 00 07INL3 1211 97 | EUR | 114.317,48 | Subsidiary Deposit |
| 00 054394 0211 97 | EUR | 0,20 | Subsidiary Deposit |
| 00 054394 0212 97 | EUR | 6.275,29 | Subsidiary Deposit |
| | | 175.129,88 | **Subsidiary Deposit Total** |
| | | **4.498.708,43** | **Grand Total** |
| | | -2.700,42 | Discrepancy vs submitted to Deloitte |

15

## Schedule 3

### [Amounts standing to the credit of Loans]

These credit balances of loan accounts stand in liability accounts of IBG, which are not customer deposits, but need to be transferred as if they were deposits. They form collections received for the benefit of the below customers which are also obligors to IBG. These are typically for municipalities' loans. These amounts are standing in temporary accounts and are categorised under the General Ledger account 59.98.00

As at 31 May the following is a list of these accounts and balances:

| Radical | TOA | Seq | Cur | Επωνυμία | Νομ. | Υπόλοιπο | Επεξήγηση |
|---------|-----|-----|-----|----------|------|----------|-----------|
| 020189 | 060 | 1 | 97 | ALTER CHANNEL ΕΛΕΥΘ. | EUR | 837,12 | πίστωση από τόκους 30/04/2012 |
| 06V6B5 | 060 | 1 | 97 | ΔΗΜΟΣ ΧΑΛΑΣΤΡΑΣ | EUR | 851,78 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 06VR08 | 060 | 1 | 97 | ΔΗΜΟΣ ΠΥΡΓΟΥ | EUR | 48.038,47 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 06WXX7 | 060 | 1 | 97 | ΔΗΜΟΣ ΧΑΛΚΗΔΟΝΑΣ NOM | EUR | 20,59 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 556323 | 060 | 1 | 97 | ΔΗΜΟΣ ΦΙΛΟΘΕΗΣ - ΨΥΧ | EUR | 332,99 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 572171 | 060 | 1 | 97 | TERRA STABILE A.E | EUR | 103,89 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 588169 | 060 | 2 | 97 | ΙΕΡΑ ΜΟΝΗ ΣΙΜΩΝΟΣ ΠΕ | EUR | 3,82 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 593862 | 060 | 1 | 97 | ΔΗΜΟΣ ΚΟΙΛΑΔΟΣ | EUR | 27,78 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 602408 | 060 | 1 | 97 | ΕΛΛ.ΘΕΑ-ΕΛΛΗΝΙΚΗ ΘΕΑ | EUR | 0,16 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 629435 | 060 | 1 | 97 | ΔΗΜΟΣ ΙΩΑΝΝΙΤΩΝ | EUR | 580.486,93 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 633452 | 060 | 1 | 97 | ΔΗΜΟΣ ΜΕΓΑΡΕΩΝ | EUR | 64.938,86 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| 631100 | 060 | 1 | 97 | ΔΗΜΟΣ ΜΗΧΑΝΙΩΝΑΣ | EUR | 294,09 | πιστωτικό υπόλοιπο από κατάθεση για πληρωμή τόκι |
| | | 59.98.00 | | ΣΥΝΟΛΑ ΛΟΓΑΡΙΑΣΜΩΝ | | 675.536,46 | |

16

EXECUTION VERSION

## Schedule 4A

**'IBG AEPEY'**

A subsidiary company, under liquidation, with a loan and a provision of equivalent amount included in the data submitted. Due to the fact that this is an intragroup company it will be excluded from the loans and provisions originally submitted to be transferred to PB.

As at 15 March the following is a list of the relevant accounts and balances:

| | | |
|---|---|---|
| 00 054394 4971 97 | Loan | 787.906,80 |
| | Provision | -787.906,80 |

Note:

These accounts must remain at IBG in order to facilitate the continuation of the process by the liquidators of Active AEPEY and in relation to the deposit accounts collateralised by the liquidators of EllinikosEpendytikosOmilos in order to satisfy pending legal actions against IBG AEPEY.

17

EXECUTION VERSION

## Schedule 4B

**'ACTIVE AEPEY'**

This is a company, under liquidation, with a loan account and a collateralised liability account which is not a deposit.

In the data submitted for the STA the net balance of the two accounts has been communicated as eligible Gross Loan balance to be transferred to PB of €467.842,73.

As at 15 March the following is a list of the relevant accounts and balances:

| Account Number | | Balance at 15/3/2013 |
|---|---|---|
| 00 054238 4961 97 | Loan account | 2.793.993,72 |
| 00 054238 0601 97 | Collateralised liability account | -2.326.150,99 |
| | Net | 467.842,73 |

18

EXECUTION VERSION

## Schedule 4C

### [Receivables for client expenses incurred]

Expenses that have been incurred by IBG during the servicing of the Greek Loans are not debited to the loans' balances. These amounts are standing as receivable by the accountholders and payment of such amounts to IBG shall be subject to the 15% cap referred to under Definition "Greek Loans" of Art. 1 herein:

| Branch | Radical | TOA | Seq | Cur | Name | Bal in currency | SWT | Bal in EURO | Reason |
|--------|---------|-----|-----|-----|------|-----------------|-----|-------------|--------|
| | | | | | ALTER CHANNEL ΕΛΕΥΘ. | | | | |
| 00 | 020189 | 057 | 1 | 97 | ΕΛΕΥΘ. | -946,24 | EUR | -946,24 | Legal Expenses |
| 00 | 629062 | 057 | 1 | 97 | BESTEND A.E. ΕΚΔΟΣΕΩ | -8.545,14 | EUR | -8.545,14 | Legal Expenses |
| 00 | 613926 | 057 | 1 | 97 | KAROUZOS REAL ESTATE | -17.773,37 | EUR | -17.773,37 | Legal Expenses |
| 00 | 613926 | 057 | 2 | 97 | KAROUZOS REAL ESTATE | -1.144,57 | EUR | -1.144,57 | Legal Expenses |
| 00 | 613926 | 057 | 3 | 97 | KAROUZOS REAL ESTATE | -25,12 | EUR | -25,12 | Legal Expenses |
| 00 | 488972 | 057 | 1 | 97 | MODERN TIMES A.E.E. | -195.554,85 | EUR | -195.554,85 | Legal Expenses |
| 00 | 576081 | 057 | 1 | 97 | RITSI ΑΝΩΝΥΜΗ ΕΤΑΙΡΕ | -25,00 | EUR | -25,00 | Legal Expenses |
| 00 | 608074 | 057 | 1 | 97 | ΔΕΥΑ ΤΑΜΙΝΕΩΝ | -547,35 | EUR | -547,35 | Legal Expenses |
| 00 | 602408 | 057 | 1 | 97 | ΕΛΛ.ΘΕΑ-ΕΛΛΗΝΙΚΗ ΘΕΑ | -56,58 | EUR | -56,58 | Legal Expenses |
| 00 | 509504 | 057 | 1 | 97 | ΘΡΑΚΗ ΑΝ.ΕΤ.ΠΑΡΑΓ.& ΙΕΡΑ ΜΟΝΗ ΣΙΜΩΝΟΣ | -74,00 | EUR | -74,00 | Legal Expenses |
| 00 | 588169 | 057 | 1 | 97 | ΠΕ | -58.023,13 | EUR | -58.023,13 | Legal Expenses |
| 00 | 06V1Q7 | 057 | 1 | 97 | ΣΑΡΡΟΣ ΝΙΚΟΛΑΟΣ | -1.384,00 | EUR | -1.384,00 | Legal Expenses |
| | | | | | | | | -284.099,35 | |

As at 31 May. 2013 the following is a list of these accounts and their balances:

19

EXECUTION VERSION

## Schedule 4D

### [Actuarial Redundancy Liability for IBG Employees]

Actuarial liability as of 31/12/2012 to be transferred to PB for the IBG Employees referred to in Schedule 6.

| Personnel Record No | Actuarial Liability |
|---|---|
| 10276 | 22.921,39 |
| 11370 | 1.411,73 |
| 12508 | 865,24 |
| 12862 | 934,39 |
| 16107 | 385,37 |
| Total | 26.518,12 |

20

EXECUTION VERSION

## Schedule 5

### [Settlement Amount Calculation]

**Settlement Amount Calculation**
Checked and verified by Independent Expert

**Deposits**

| # | Description | Reference Date | Balance |
|---|---|---|---|
| 1 | March 2013 STA | 15/3/2013 | 68.000.000,00 |
| 2 | Deloitte Adjustment Report | To be Determined | 33.546.194,92 |
| 3 | Adjustment Amount Deposits IBG | | 34.453.805,08 |
| 4 | Transferred Deposits | 31/5/2013 | 12.108.376,12 |
| 5 | **Settlement Deposits IBG** | **31/5/2013** | **21.437.818,80** |

**Loans**

| # | Description | Reference Date | Balance |
|---|---|---|---|
| 6 | March 2013 STA | 15/3/2013 | 366.471.221,00 |
| 7 | Deloitte Adjustment Report | To be Determined | 366.471.221,00 |
| 8 | Adjustment Amount Loans IBG | | 0,00 |
| 9 | Transferred Loans | 31/5/2013 | 366.003.378,27 |
| 10 | **Settlement Loans IBG** | **31/5/2013** | **-467.842,73** |
| 11 | Aggregate Difference Deposits Loans | **31/5/2013** | **20.969.976,07** |
| 12 | Amounts standing to the credit of Loans | 31/5/2013 | -675.536,46 |
| 13 | Receivables for client expenses incurred at 15% | 31/5/2013 | 42.614,90 |
| 14 | Actuarial Redundancy Liability | 31/12/2012 | -26.518,12 |
| 15 | **Settlement Amount** | To be Determined | **20.310.536,39** |

**Notes:**
Items numbered: 4, 9, 12, 13 (and relevant aggregates) will be determined upon the Transfer Time.

21

EXECUTION VERSION

**Schedule 6**

**[IBG's Employees]**

A. Loans Administration & Credit Support

- Agapi Margetidi, Manager

- Charis Kalliani, Officer

B. The following two Credit/Loan officers now in ex-CPBs Special Loans division who are on IBG's payroll and who were on loan to ex-CPB Greece - .

- Timos Platis

- Petros Kozobolakos

C. Legal :

Georgia Plagou

22

EXECUTION VERSION

IN WITNESS TO THE ABOVE, this Agreement and any Schedule hereto was executed on the date mentioned above in four (4) counterparts and each party received one (1) copy of the Agreement

SIGNATORIES

SIGNED by
for **Investment Bank of Greece S.A.**

)
)
)
)

SIGNED by
for **Piraeus Bank, S.A.**

)
)
)
)

SIGNED by
for **Cyprus Popular Bank Public Co LTD**

)
)
)

ANDRI ANTONIADES
SPECIAL ADMINISTRATOR
CYPRUS POPULAR BANK PUBLIC CO LT

SIGNED by
for **BANK OF CYPRUS PUBLIC COMPANY LIMITED**

)
)

E. Livadiotou
CH. SOROTOS

23