# EXHIBIT 16

**IN THE HIGH COURT OF JUSTICE**　　　　　　　　**CL-2019-000129**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

**B E T W E E N**

**PIRAEUS BANK S.A.**
(a company incorporated under the laws of Greece)

**Claimant**

**-and-**

**(1) GRAND ANEMI LIMITED**
(a company incorporated under the laws of Malta)

**First Defendant**

**(2) GRANDUNION INC.**
(a company incorporated under the laws of the Marshall Islands)

**Second Defendant**

**(3) MICHAIL (MICHAEL) ZOLOTAS**

**Third Defendant**

---

**PARTICULARS OF CLAIM**

---

*The Parties*

1.　The Claimant is, and was at all material times, a banking institution duly incorporated and existing under the laws of Greece, whose registered office is at 4 Amerikis Street, 10564, Athens, Greece (**the Bank**).

2.　The First Defendant is, and was at all material times, a company duly organised and existing under the laws of the Republic of Malta (**Grand Anemi**), whose last known registered office is at 198 Old Bakery Street, Valletta, VLT 1455, Malta. Grand Anemi's business is that of ship owning and ship management. Grand Anemi is a subsidiary of the Second Defendant.

2.1     By letter dated 18 June 2017, Grand Anemi's corporate shipping agent, Fenech & Fenech Marine, informed the Malta Financial Services Authority that (i) it wished to be disassociated with Grand Anemi because, despite numerous attempts to reach Grand Anemi "in all possible ways", it had lost contact with the company; and (ii) Grand Anemi's registered office was "no longer actively located at 198 Old Bakery Street, Valleta VLT 1455, Malta".

2.2     In the premises and to the best of the Bank's knowledge Grand Anemi has ceased its business and, it should be inferred, is insolvent and/or has been dissolved.

3.      The Second Defendant was at all material times a company duly organised and existing under the laws of the Republic of the Marshall Islands (**Grandunion**), whose last known registered office is at Trust Company Complex, Ajeltake Islands, Ajeltake Road, Majuro MH96960, the Republic of the Marshall Islands. Grandunion was formed in 2007 by the Third Defendant and carried on business as a ship owner and in ship management.

3.1     On 11 August 2016, the Second Defendant was dissolved. The Bank believes this occurred further to acts or omissions by or on behalf of the Third Defendant, who was at all times the ultimate beneficial owner of Grandunion.

3.2     The effect of such dissolution is that Grandunion no longer carries on any business. However, by the operation of section 105(1) of the Marshall Island's Business Corporations Act, Grandunion continues to exist for, among other things, the purpose of defending any action, suit or proceeding brought against it within three years of the dissolution.

3.3     The present claim is an action (alternatively a suit or proceeding) that falls within the scope of the aforementioned section.

4.      The Third Defendant (**Mr Zolotas**) is a Greek national who carries on business as, among other things, the operator and manager of a fleet of shipping vessels. To the best of the Bank's knowledge, his last known address was at Chateau Perigord, 6 B (Flat 128) Lacets Saint Leon 9800 Monaco. The Bank does not presently know Mr Zolotas' domicile. As at 2006, Mr Zolotas operated a fleet of shipping vessels through

2

an entity that he controlled named Stamford Navigation Inc., a company incorporated in Liberia but operating from Greece. Thereafter his business was transferred and run through a vertically integrated shipping enterprise named Newlead Holdings Limited, which was incorporated in Bermuda and listed on the NASDAQ stock exchange between December 2009 and July 2014 (**Newlead**). Mr Zolotas is currently standing trial with others before the Nicosia Criminal Court in Cyprus in respect of an alleged €1million bribe paid to the former Governor of the Central Bank of Cyprus through a company connected to him named Focus Maritime Corporation. To the best of the Bank's knowledge, Mr Zolotas paid a significant bail security and is therefore able to enter and leave Cyprus as he pleases, required only to attend the trial when sitting. The trial is expected to continue for a number of months (possibly years).

5.   By this action, the Bank demands and claims at a minimum USD 85,557,894.70 as of 3 June 2019 plus interest due from Grand Anemi under a Loan Agreement and from each of Grandunion and Mr Zolotas as primary debtors (alternatively as guarantors) further to written contracts of surety that they provided in respect of the same lending (the **Grandunion Indemnity** and the **Zolotas Indemnity** respectively). Such monies were first demanded on 1 March 2013 and, insofar as necessary, such demand is repeated by the claim form and/or this statement of claim.

6.   The contractual counterparty for the relevant Defendant under each of the Loan Agreement, the Grandunion Indemnity and the Zolotas Indemnity was Marfin Egnatia Bank Societe Anonyme (**Marfin Egnatia Bank**). Cypriot Marfin Popular Bank Public Co. Ltd (**Marfin Popular Bank**) acquired Marfin Egnatia Bank in March 2011. Marfin Popular Bank then changed its name to Cyprus Popular Bank Public Co Ltd (**Cyprus Popular Bank**) on 5 April 2012.  Cyprus Popular Bank was restructured during the Cypriot financial crisis in early 2013: a process which was overseen by the governments of Greece and Cyprus. Under resolution, Cyprus Popular Bank sold specific assets relating to its Greek business to the Bank, including the rights under the three contracts that give rise to the present claim. That took effect by the following instruments governed by Greek law: (i) a Sale and Transfer Agreement dated 26 March 2013 between Cyprus Popular Bank Public Co. Ltd and the Bank; (ii) Decree No. 97/26-3-2013 by the Central Bank of Cyprus (**the Decree**); and (iii) Decision No. 66/26-3-2013 by the Bank of Greece (**the Decision**). The sale attracted considerable

3

media coverage and the Decree and the Decision regarding the sale were published in the Cypriot Gazette by way of public notice.

7.      The foregoing transfers of rights were valid as a matter of Greek law and take effect under English law as a statutory alternatively an equitable assignment to the Bank of all rights under each of the Loan Agreement, the Grandunion Indemnity and the Zolotas Indemnity, thereby entitling the Bank to pursue its present claims against the Defendants and each of them in this action. Accordingly and for the avoidance of doubt, the Bank holds and claims further to the rights of the "Lender" set out in the detailed description of contractual rights below.

*The Loan Agreement and the Indemnities*

8.      By a written contract dated 28 August 2009 Marfin Egnatia Bank (**the Lender**) agreed to make available a revolving credit facility of up to USD 112 million to Grand Anemi and another company named Grand Rodosi Inc (**the Original Borrowers**) (**the Loan Agreement**). The Bank will rely upon the full terms and effect of the Loan Agreement at trial and a copy thereof will be served with this statement of claim. The Loan Agreement contained the following relevant terms (including capitalised defined words and phrases) which are summarised below as appropriate and set out in full at Annex 1 hereto.

8.1     Clause 1A set out that the purpose of the Loan Agreement was for the Lender to make available to the Borrowers a USD 112 million revolving credit facility for specified purposes (defined as the Facility), being: (i) up to USD 89.5 million for refinancing certain outstanding debt under existing financial agreements with the lender; and (ii) the provision of working and investment capital.

8.2     The Loan Agreement and the two contracts of surety entered into by Grandunion and Mr Zolotas came within the definition of Finance Documents at Clause 2. The Finance Documents comprised a suite of documents relating to the lending and security arrangements put in place by the parties.

8.3     Clause 3.1 provided that the Lender was to make available the Facility in an aggregate amount not exceeding USD 112 million. The Borrowers undertook to use the proceeds of any monies advanced for the purposes referred to in Clause

4

1A. The Borrowers' liability was joint and several. By Clause 3.4 each Borrower declared that it was and would remain a principal debtor throughout the Security Period (defined as the period during which the Finance Documents remained in effect and ending when the indebtedness was paid in full).

8.4    Clause 5 set out the basis upon which each advance would be made available to the Borrowers, subject to a notice of drawdown and, among other things, the preservation of an agreed Security Margin (calculated further to Clause 23).

8.5    Clause 6 set out how the Interest Periods applicable to each advance were to be set. Relatedly, Clause 7 set out the basis for the calculation of Interest at the defined Interest Rate. Clause 8 set out the terms and rates on which Default Interest was to be applied and calculated in the event the Borrowers failed to pay an amount due on the date it was due and payable.

8.6    Clause 11 provided that, absent an agreed extension, the Borrowers were to repay all outstanding amounts under the loan Facility upon the earlier of (i) one year from the date on which Claimant's first advance to the First Defendant was made available (the Original Expiration Date); and (ii) the date on which the Lender first made a Demand for repayment.

8.7    Clause 13.1 provided that the Lender would maintain one or more Loan Accounts evidencing the level of indebtedness under the Loan Agreement. Clause 13.2 set out that, save in the case of manifest error, the entries in such Loan Account(s) would be conclusive evidence of the existence and amounts of the Borrowers' liabilities in the event of any legal action or proceedings arising out of or connection with the Loan Agreement or other Finance Documents.

8.8    Clause 14 provided that all amounts payable under the Loan Agreement and/or the other Finance Documents "*shall be paid in full to the Lender without set-off or counterclaim or retention and free and clear of and without any deduction or withholding for or on account of any Taxes.*"

8.9    Clause 18 set out a number of conditions precedent to the Lender's agreement to permit any advance to be drawn down. They included conditions precedent at Clause 18.1.8 requiring "*the Grandunion Guarantee duly executed by the*

*Grandunion Guarantor*" (i.e. by Grandunion) and at Clause 18.1.9 requiring "*the Personal Guarantee duly executed by the Personal Guarantor*" (to be an individual acceptable to the Lender).

8.10   Clause 19 set out Financial and General Undertakings given by the Borrowers. These undertakings applied throughout the Security Period and included:

8.10.1   at Clause 19.1 and 19.2 that the Borrowers would supply to the Lender annual Financial Statements for the Borrowers' Group of companies (including Grandunion) prepared in accordance with Applicable Accounting Principles;

8.10.2   at Clause 19.13 that the Borrowers would notify the Lender of any Event of Default or matter that might lead thereto;

8.10.3   at Clause 19.15 that the Borrowers would ensure and procure that each Security Party (which included Grandunion and Mr Zolotas) "*shall maintain its corporate existence under the laws of the country of its incorporation and shall comply with all relevant legislation and laws and regulations applicable to it*";

8.10.4   at Clause 19.17 that the Borrowers would not, and would ensure that Grandunion and Mr Zolotas would not, without the Lender's prior written consent, dispose of or otherwise deal with the Ships (being two bulk carrier vessels owned by each Borrower) or other property, assets or rights owned by the Borrowers, Grandunion or Mr Zolotas;

8.10.5   at Clause 19.23 that the Borrowers would use the proceeds of the Facility for the Borrowers' benefit and exclusively for the purposes specified in the Loan Agreement.

8.11   Clause 24 set out Events of Default which included:

8.11.1   at Clause 24.1.1 if "*the Borrowers of either of them or any other Security Party fail to pay on the due date for payment any amount which shall have become due hereunder or under the other Finance Documents.*" If an Event of Default occurred, the Lender was entitled to "*by written*

6

*notice to the Borrowers declare that the Facility of the Lender shall be cancelled, whereupon the same shall be cancelled and declare the Indebtedness immediately due and payable whereupon the same shall become so payable to the Lender.*" The definition of Indebtedness included all moneys, liabilities and obligations (actual or contingent) that were now payable or incurred or expressed to be due under the Loan Agreement and other Finance Documents (hence, including the indemnity contracts entered into by Grandunion and Mr Zolotas);

8.11.2 at Clause 24.1.6 if the Borrower or any Security Party entered into voluntary or involuntary liquidation or dissolution or became insolvent;

8.11.3 at Clause 24.1.7, if the Borrower or any Security Party ceased or threatened to cease carrying on the whole or substantial part of their/its business;

8.11.4 at Clause 24.1.8, if the Borrower or any Security Party transferred or disposed of all or a substantial part of their/its assets whether by one or a series of transactions, related or not;

8.11.5 at Clause 24.1.18, a material adverse change occurred in the financial condition or operation of any one or more of the Security Parties.

8.12 Clause 26 set out Fees that were payable by the Borrowers to the Lender, including at Clause 26.1 that the Borrowers would pay a Renewal Fee of USD 30,000 on each date the Lender agreed an extension of the Expiration Date further to Clause 11.

8.13 Clause 28 provided that the Borrowers would indemnify the Lender, upon its first demand, from and against any losses, costs or expenses (including legal expenses) incurred as a consequence of any Event of Default.

8.14 Clause 34 set out that the Agreement would bind the parties and their respective successors and permitted assigns. By Clause 34.3, the Lender was entitled to at any time assign or transfer all or part of the Facility and its rights and powers under the Agreement to any other bank or financial institution, without prior

notice to or consent from the Borrowers or any Security Party (which included Grandunion and Mr Zolotas). The Lender was to notify the Borrowers of such assignment or transfer as soon as practicable.

8.15   Clause 38 dealt with governing law and jurisdiction. Clause 38.1 provided that the Loan Agreement was governed by and to be construed in accordance with English law. By Clause 38.2, the English Courts were granted exclusive jurisdiction over any dispute arising out of or in connection with the Loan Agreement. That allocation of jurisdiction was expressly "*[s]ubject to Clause 38.3*". Clause 38.3 was for the exclusive benefit of the Lender and entitled it to commence relevant proceedings in Greece or in the Courts of any country which had or claimed jurisdiction over the matter, without the need for concurrent or additional proceedings in England or Greece. By Clause 38.4 the Borrowers irrevocably appointed a London-based service agent "*to receive and accept on their/its behalf any process or other document relating to any proceedings in the English courts which are connected with this Agreement.*"

9.   By a written contract dated 28 August 2009, Grandunion provided what was described in the title as a "*Guarantee and Indemnity*" relating to Loan Agreement. This was the Corporate Guarantee required by Clause 18.1.8 of the Loan Agreement and is the document referred to in this statement of claim as the **Grandunion Indemnity**. The Grandunion Indemnity contained the following relevant terms (including capitalised defined words and phrases) which are summarised below as appropriate and set out in full at Annex 2 hereto.

9.1   Clause 4.1 provided that Grandunion irrevocably and unconditionally guaranteed (i) the due and punctual performance by the Borrowers of their obligations under the Loan Agreement (also described as "*the Financial Agreement*") and the Finance Documents in general; and (ii) to discharge the Indebtedness from time to time on the Lender's first demand together with interest, costs, fees and other expenses. The liability was described as being "to pay to the Lender on the Lender's first demand, the full amount from time to time owing to the Lender by the Borrowers" under the Loan Agreement and Finance Documents.

9.2     Clause 4.2 provided "*as a separate, additional and continuing obligation*" that if Clause 4.1 was void or unenforceable for any reason, then Grandunion "*will be liable to the Lender as a sole and principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that indebtedness been recoverable and agrees to discharge its liability under this Clause 4.2 from time to time on demand by the Lender together with interest, costs, fees and other expenses on the amount demanded in accordance with Clause 5.*"

9.3     For the avoidance of doubt, on its true construction, Clause 4.2 is an expressly separate and free-standing indemnity obligation that bound (and binds) Grandunion as principal debtor to make payment of whatever Indebtedness was owed to the Lender. The sums so payable were calculated by reference to Clause 4.1 but were otherwise due irrespective of the guarantee obligation therein.

9.4     Clause 5 set out Grandunion's liability in respect of interest and all legal costs and other expenses.

9.5     Clause 6 set out the payment terms.

9.6     Clause 7.1 set out the scope of Grandunion's liability as follows: "*This Guarantee and Indemnity constitutes the primary obligation of the Guarantor to the Lender and the Guarantor shall be liable, jointly and severally with the Borrowers and with each other guarantor of the Borrowers' obligations to the Lender...for the amounts secured by this Guarantee and Indemnity not only as surety but also as if it were the principal debtor under the Financial Agreement...and the other Finance Documents.*" On its true construction and in the premises of Clause 4.2, this confirmed Grandunion's liability to the Lender was by way of indemnity and not merely guarantee.

9.7     By Clause 7.3, Grandunion waived any potential right to require the Lender first to proceed against or enforce any guarantee or security of, or claim payment from the Borrowers or any other Guarantor before claiming from Grandunion. Grandunion also waived any "*rights, remedies, defences or exceptions*" that might be available to a guarantor under any applicable law, including certain specific provisions of the Greek Civil Code.

9

9.8    By Clause 8.1.3 of the Corporate Guarantee, Grandunion undertook "*to comply and to ensure and procure that each of the Borrowers and any Other Guarantor shall comply with all covenants and undertakings set out in the [Loan Agreement] and the other Finance Documents.*" It further agreed by Clause 8.2.1 "*to maintain the corporate existence of [Grandunion] under the laws of the Marshall Islands and comply with all relevant legislation and laws and regulations applicable to it.*"

9.9    By Clause 8.2.14 Grandunion was required to supply the Lender with copies of the annual Financial Statements of the Group audited by the Auditors as soon as available, the quarterly unaudited Financial Statements of the Group as soon as available and such other information with regard to the business, properties or condition, financial or otherwise, of each member of the Group as the Lender may from time to time reasonably request.

9.10   Clause 9 set out the Lender's power to vary the amounts payable under the Loan Agreement or otherwise to grant any waiver or extension and deal with any other security without prejudice to its rights under the Grandunion Indemnity, such that Grandunion would not be exonerated or discharged from liability (or that the same be in any way limited).

9.11   Clause 13.1 provided that in the event the rights of the Lender under the Loan Agreement and/or the Financial Documents were assigned or transferred to a third party pursuant to Clause 34.3 of the Loan Agreement, the Lender was entitled to assign or transfer its rights, powers and the benefits of the Grandunion Guarantee to that third party.

9.12   Clause 19 dealt with governing law and jurisdiction. Clause 19.1 provided that the Grandunion Indemnity was governed by and to be construed in accordance with English law. By Clause 19.2, the English Courts were granted exclusive jurisdiction over any dispute arising out of or in connection with the Indemnity. That allocation of jurisdiction was expressly "*[s]ubject to Clause 19.3*". Clause 19.3 was for the exclusive benefit of the Lender and entitled it to commence relevant proceedings in Greece or in the Courts of any country which had or claimed jurisdiction over the matter, without the need for concurrent or additional

proceedings in England or Greece. By Clause 19.4 the Borrowers irrevocably appointed a London-based service agent "*to receive and accept on their/its behalf any process or other document relating to any proceedings in the English courts which are connected with this Agreement.*"

10.   The lending under the Loan Agreement was further secured by, *inter alia*, a number of share charges executed by Grandunion in favour of the Lender.

11.   By a written contract dated 28 August 2009, Mr Zolotas provided what was described in the title as a "*Personal Guarantee*" relating to Loan Agreement. This was the Personal Guarantee required by Clause 18.1.9 of the Loan Agreement and is the document referred to in this statement of claim as the **Zolotas Indemnity**. The Zolotas Indemnity contained the following relevant terms (including capitalised defined words and phrases) which are summarised below as appropriate and set out in full at Annex 3 hereto.

11.1   Clause 4 set out the terms of the indemnity. It described Mr Zolotas as "a major beneficial owner of the shares in the Borrowers" and provided that Mr Zolotas was entering the contract in consideration of the Lender's entry the Loan Agreement and other sufficient valuable consideration. Further to which "and in order to promote his own commercial activities, [Mr Zolotas] as primary obligor and debtor and not merely as surety hereby irrevocably and unconditionally guarantees the full prompt and punctual payment by the Borrowers to the Lender of all amounts from time to time or at any time outstanding, due, owing or payable to the Lender by the Borrowers" under the Loan Agreement or other Finance Documents, to be paid unconditionally on the Lender's first demand.

11.2   For the avoidance of doubt, on its true construction, Clause 4 was an express and free-standing indemnity obligation that bound (and binds) Mr Zolotas as principal debtor to make payment to the Lender.

11.3   Clause 5 set out Mr Zolotas' liability in respect of interest and all legal costs and other expenses.

11.4   Clause 6 set out the payment terms.

11.5    Clause 7.1 provided that the instrument "*constitutes the primary obligation of [Mr Zolotas] and [Mr Zolotas] shall be liable, jointly and severally with the Borrowers and with each other guarantor of the Borrowers' obligations to [the Claimant] for the amounts secured by [the Zolotas Indemnity] not only as surety but also as if he were the principal debtor under the [Loan Agreement].*" On its true construction and in the premises of Clause 4, this confirmed Mr Zolotas' liability to the Lender was by way of indemnity and not merely guarantee.

11.6    By Clause 7.3, Mr Zolotas waived any potential right to require the Lender first to proceed against or enforce any guarantee or security of, or claim payment from the Borrowers or any other Guarantor before claiming from him. Mr Zolotas also waived any "*rights, remedies, defences or exceptions*" that might be available to a guarantor under any applicable law, including certain specific provisions of the Greek Civil Code.

11.7    Clause 7.4 provided that *"[i]n any legal action or proceedings arising out of or in connection with [the Zolotas Indemnity], the entries made in the Loan Accounts maintained by [Claimant] pursuant to Clause 13.1 of the [Loan Agreement] shall be conclusive evidence . . . of the existence and the amount of the liabilities of the Borrowers . . . and of the Guarantor.*"

11.8    Clause 8 set out Mr Zolotas' undertakings. Clause 8.2 required Mr Zolotas to ensure that at all times the claims of the Lender against him under the Zolotas Guarantee ranked at least *pari passu* with the claims of all his other unsecured creditors save in the event of claims preferred in an insolvency or similar legal process. Clause 8.3 set out Mr Zolotas' obligation to "*comply and to ensure and procure that the Borrowers and any other Guarantor shall comply with all covenants and undertakings set out in the [Loan Agreement] . . . and the other Finance Documents.*"

11.9    Clause 9 set out the Lender's power to vary the amounts payable under the Loan Agreement or otherwise to grant any waiver or extension and deal with any other security without prejudice to its rights under the Zolotas Indemnity, such that Mr Zolotas would not be exonerated or discharged from liability (or that the same be in any way limited).

11.10   Clause 10.4 provided that the Lender had the right and power to claim all amounts due and payable hereunder against the Borrowers and/or Grandunion and/or Mr Zolotas in such order and at such time as the Lender, in its absolute discretion, considered to its advantage.

11.11   Clause 13.1 provided that in the event the rights of the Lender under the Loan Agreement and/or the Financial Documents were assigned or transferred to a third party pursuant to Clause 34.3 of the Loan Agreement, the Lender was entitled to assign or transfer its rights, powers and the benefits of the Zolotas Guarantee to that third party.

11.12   Clause 19 dealt with governing law and jurisdiction. Clause 19.1 provided that the Zolotas Indemnity was governed by and to be construed in accordance with Greek law. By Clause 19.2, the Courts of Piraeus in Greece were granted exclusive jurisdiction over any dispute arising out of or in connection with the Indemnity. That allocation of jurisdiction was expressly *"[s]ubject to Clause 19.3"*. Clause 19.3 was for the exclusive benefit of the Lender and entitled it to commence relevant proceedings in Greece or in the Courts of any country which had or claimed jurisdiction over the matter, without the need for concurrent or additional proceedings in Greece. By Clause 19.4 Mr Zolotas irrevocably appointed an agent to receive service of process in Greece. Clause 19.5 provided that nothing in Clause 19 excluded or limited any right the Lender may have to bring proceedings, serve process or recognise or enforce judgment in any jurisdiction. Clause 19.7 stated that the foregoing provisions did not limit the Lender's right to serve process on Mr Zolotas in any other manner permitted by law or to commence proceedings against him in any other court or place.

*Drawdown*

12.      The Lender performed its obligations under the Loan Agreement by making available the Facility for draw downs. Monies were drawn down by Grand Anemi as follows:

12.1    EUR 109,195,785.14 on 28 August 2009.

12.2    EUR 11,229,107.56 on 26 August 2009.

13. In a first side letter dated 31 March 2010 made between, *inter alios*, the Lender and the Original Borrowers (**the First Side Letter**) the Lender agreed to release Grand Rodosi Inc. from its obligations under the Loan Agreement and other finance documents to which it was a party.

14. Between 2 September 2009 and 30 July 2012, Grand Anemi made repayments further to the Loan Agreement, including in respect of capital, fees, expenses and interest (often at a penalty rate). Part of the capital was repaid prior to the second draw down. Those payments are set out at Annex 4 hereto.

*Breach and loss*

15. The following particulars are premised on the Bank's knowledge at the date of this claim. The Bank reserves the right to amend and/or amplify its case upon disclosure in this action and/or in any event upon the discovery of any new material relating to breach of the Loan Agreement, the Grandunion Indemnity and the Zolotas Indemnity.

16. Grand Anemi failed to make payments of all overdue interest outstanding after 30 July 2012. It also failed to pay a renewal fee due under Clause 26.1.

17. Those failures constituted a breach of the obligations to (i) pay interest under Clause 7.1 of the Loan Agreement; (ii) pay the renewal fee due under Clause 26.1 of the Loan Agreement; and, as a consequence (iii) pay the Lender in full under Clause 14.1 of the Loan Agreement. Those breaches also meant that an Event of Default under Clause 24.1.1 had occurred, because of Grand Anemi's failure to pay on the due date, the foregoing amounts due under the Loan Agreement.

18. By email dated 26 February 2013 Marfin demanded payment of overdue interest between 30 April 2012 and 28 February 2013 and a renewal fee in the sum of USD 30,000.00 due on 31 August 2011 by close of business Athens time on 28 February 2013. No payment was made.

19. By letter dated 1 March 2013 (sent by hand and by fax) Marfin notified Grand Anemi and Grandunion of the breaches of the Loan Agreement by reason of the failure to pay interest between 30 April 2012 and 28 February 2013 and the renewal fee in the sum of USD 30,000.00 due on 31 August 2011. It notified both parties as to the operation of the Clause 24.1.1 Event of Default provisions and that, in consequence of the

foregoing, the Facility was cancelled, had expired and that the "*Indebtedness was immediately due and payable*" to the Lender.

20.     As a consequence, the Defendants and each of them were subject to a liability to make repayment to the Lender of all outstanding sums that the Borrowers had received under the Loan Agreement, which sums were, further to Clause 13 of the Loan Agreement conclusively calculated by reference to the relevant Loan Account held by the Lender at the material time. The current outstanding sum is USD 85,557,894.70 as of 03 June 2019 (see attached loan statements at Annex 5).

Breach by Grand Anemi

21.     In breach of Clauses 7.1 and/or 14.1 and/or Clause 26.1 and in the premises of an Event of Default notified to it further to Clause 24.1 of the Loan Agreement, Grand Anemi has failed to make payment.

22.     Further or alternatively, without prejudice to the foregoing:

22.1    An Event of Default occurred further to Clauses 24.1.6 and/or 24.1.7 and/or 24.1.18 of the Loan Agreement, giving rise to the liability claimed herein because it is to be inferred that Grand Anemi has ceased its business and/or is insolvent and/or has been dissolved as set out at paragraph 2 above.

22.2    An Event of Default occurred further to Clauses 24.1.6 and/or 24.1.7 and/or 24.1.8 and/or 24.1.18 of the Loan Agreement, giving rise to the liability claimed herein because of Grandunion's failure to maintain corporate existence, its business and so its capacity to make payment as set out at paragraph 3 above.

22.3    In breach of Clause 19.17 of the Loan Agreement, Grand Anemi did not obtain the Lender's prior written consent to Mr Zolotas' transfer on 28 May 2010 of his ownership in 500 shares in Aurora Properties Inc. (a company incorporated in the Marshall Islands) to one Chrysanthi Giara.

22.4    In breach of Clause 19.13, Grand Anemi did not notify the Bank of the foregoing (or any) Events of Default and/or of any steps being taken to nullify or mitigate the effect thereof.

15

Breach by Grandunion

23.   In breach of Clauses 4.1(a) and/or 4.1(b) and/or 4.2 and/or 5 and/or 6.1 and/or 7.1 of
       the Grandunion Indemnity, Grandunion has failed to make payment. Those failures
       are each and cumulatively a breach of Grandunion's obligation to indemnify the Bank
       against loss, which obligation operates either as an indemnity or alternatively a
       guarantee liability.

24.   Further or alternatively, without prejudice to the foregoing, in breach of its
       undertaking at Clause 8.2.1 of the Grandunion Indemnity, Grandunion failed to
       maintain corporate existence as set out at paragraph 3 above, giving rise to the liability
       claimed herein.

Breach by Mr Zolotas

25.   In breach of Clauses 4 and/or 5 and/or 6 and/or 7.1 or the Zolotas Indemnity, Mr
       Zolotas has failed to make payment. Those failures are each and cumulatively a breach
       of Mr Zolotas' obligation to indemnify the Bank against loss, which obligation
       operates either as an indemnity or alternatively a guarantee liability.

26.   Further or alternatively, without prejudice to the foregoing, in breach of Clause 8.3 of
       the Zolotas Indemnity, Mr. Zolotas did not (i) obtain the Lender's prior written
       consent for the transfer on 28 May 2010 of his ownership in 500 shares in Aurora
       Properties Inc. (a company incorporated in the Marshall Islands) to one Chrysanthi
       Giara, as required under Clause 19.17 of the Loan Agreement; and/or (ii) ensure or
       procure Grand Anemi's compliance with the undertakings set forth in Clauses 19.13
       and 19.15 of the Loan Agreement; and/or (iii) ensure or procure Grandunion's
       compliance with Clause 8.2.1 of the Grandunion Indemnity.

Loss

27.   Each of the foregoing breaches has individually and/or cumulatively caused the Bank
       to suffer loss and damage as follows:

       27.1  Principal USD 53,718,984.79;

27.2     Aggregate default interest accrued thereon in the amount of USD 31,838,909.91 from 1 March 2013 to 3 June 2019.

**In total: USD 85,557,894.70**

Interest

28.     The Claimant further claims interest accruing on the unpaid sums claimed and/or on such damages as may be awarded at the contractual rates pursuant to Clause 8.1 of the Loan Agreement, Clause 5.1 of the Grandunion Indemnity and Clause 5.1 of the Zolotas Indemnity or alternatively under s.35A of the Supreme Courts Act 1981 and/or under the inherent jurisdiction of the Court at such a rate and for such period as the Court thinks just.

29.     The claim is for payment in US dollars because the contracts relied upon herein so provide.

*Admission of liability and notice of Bank's rights*

30.     In 2014 Mr Zolotas met with representatives of the Bank in open discussions over the restructuring of the liabilities owed to the Bank by Mr Zolotas and related entities. Those liabilities included the subject matter of this claim. Mr Zolotas provided a number of further securities thereafter. In January 2016, Mr Zolotas submitted a further proposal for restructuring. No resolution was ultimately reached and the liabilities that are the subject of this claim remain outstanding. It is to be inferred from the foregoing that the Defendants and each of them (through Mr Zolotas) (i) had due notice as to the relevant assignments made in the premises of paragraphs 6 and 7 above; (ii) are or are to be taken to be aware of demands for payment by the Bank as assignee in respect of each of the Loan Agreement, the Grandunion Indemnity and the Zolotas Indemnity; and (iii) have admitted or are to be taken to have admitted liability in respect of the same.

**AND THE CLAIMANT CLAIMS:**

(1)     The sum of USD 85,557,894.70 alternatively damages;

(2)     Interest as set out in paragraph 28 above; and

(3)     Such further or other relief as the Court may order.

RAJESH PILLAI

**Statement of Truth**

| |
|---|
| *I believe (The Claimant believes) that the facts stated in these particulars of claim are true. *I am duly authorised by the claimant to sign this statement <br><br> Full Name: CHARLES HEWETSON <br><br> Name of claimant solicitor's firm: Reed Smith LLP <br><br> Signed: _____ <br><br> Position or office held: Partner <br><br> *(Claimant)(Litigation friend)(Claimant's Solicitor)(if signing on behalf of firm or company) <br><br> *delete as appropriate |

SERVED this the 6th day of June 2019 by Reed Smith LLP, The Broadgate Tower, 20 Primrose Street, London, EC2A 2RS, Solicitors for the Claimant.

CL-2019-000129

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN:**

**PIRAEUS BANK S.A.**

**Claimant**

-and-

**(1) GRAND ANEMI LIMITED**

**First Defendant**

**(2) GRANDUNION INC.**

**Second Defendant**

**(3) MICHAIL (MICHAEL)**
**ZOLOTAS**

**Third Defendant**

---

**PARTICULARS OF CLAIM**

---

Reed Smith LLP
The Broadgate Tower
20 Primrose Street
London
EC2A 2RS

Tel: 020 3116 3000
Fax: 020 3116 3999
DX: 1066 City/DX18 London

**Solicitors for the Claimant**

19

# ANNEX 1

## 1.    PURPOSE

A    This Agreement sets out the terms and conditions on which the Lender has agreed to make available to the Borrowers as joint and several borrowers a revolving credit facility, not exceeding at any relevant time the aggregate amount of One hundred Twelve million Dollars ($112,000,000) in multiple Advances in the following amounts and for the following purposes:

  (i)    an Advance of up to Eighty Nine million Five hundred thousand Dollars ($89,500,000) for the purpose of refinancing in full certain outstanding indebtedness in relation to, *inter alia*, the Ships pursuant to the Existing Financial Agreements; and

  (ii)    Advances in amounts approved by the Lender for the purpose of providing the Borrowers with working and investment capital.

## 2.    DEFINITIONS

"Finance Documents" means

(a)    this Agreement;

(b)    the Master Agreement;

(c)    the Security Documents; and

(d)    any other document (whether creating an Encumbrance or not) which is executed at any time by any Security Party or any other person as security for, or to establish any form of subordination or priorities' arrangement in relation to any amount payable to the Lender under this Agreement and/or the Master Agreement or any of the documents referred to in this definition or in any other Clause of this Agreement;

## 3.    THE FACILITY – THE BORROWERS JOINT AND SEVERAL LIABILITY

3.1    The Lender hereby agrees to make available to the Borrowers subject to the terms and the conditions hereof the Facility for the purposes stated  in Clause 1 (A) in an aggregate amount not exceeding at any relevant time One hundred Twelve million Dollars ($112,000,000) provided however that no Working and Investment Capital Advance shall be drawdown unless specifically approved by the Lender.

3.4    Each of the Borrowers declares that it is and will, throughout the Security Period, remain a principal debtor for all amounts owing under this Agreement and neither of the Borrowers shall in any circumstances be construed to be a surety for the obligations of the other Borrower hereunder.

## 5.    NOTICE OF DRAWDOWN

5.1    Subject to:

5.1.1        the receipt by the Lender of the documents specified in Clause 18  in form and substance satisfactory to the Lender and Its legal advisers before the relevant Drawdown Date; and

5.1.2        no Event of Default or an event which with the giving of notice or passage of time or satisfaction of any other condition or any combination of the foregoing, may become an Event of Default having occurred; and

5 1.3        the representations and warranties set out in Clause 16 (updated *mutatis mutandis* to the relevant Drawdown Date) being true and correct; and

5 1.4        the receipt by the Lender of a Notice of Drawdown in the form set out in Schedule 1 hereto not later than 11.00 a.m. (London time) two (2) Banking Days prior to the relevant Drawdown Date setting out the date of the proposed Advance,

each Advance shall be made available to the Borrowers in accordance with and on the terms and conditions of this Agreement

5.2    Without prejudice to the generality of the foregoing provisions of this Clause 5 the Lender shall not be obliged to make available any Advance if, following its drawing, the covenant contained in Clause 23 (Security Margin) would cease to be complied with

5.3    Unless otherwise expressly agreed between the Borrowers and the Lender no Advance shall be made:

5.3.1        If by being drawn down it would increase the Facility to a sum in excess of the Applicable Limit; and/or

5.3.2        in an amount of less than Five million Dollars ($5,000,000) or multiples thereof

5.4    Each Notice of Drawdown shall be irrevocable and the Borrowers shall be bound to borrow in accordance with such notice

5.5    On payment of the amount drawn down in respect of each Advance the Borrowers shall sign an Acknowledgement in the form set out in Schedule 2 hereto.

5.6    If the Borrowers give a Notice of Drawdown pursuant to Clause 5.1.4 and the Lender makes arrangements on the basis of such notice to acquire Dollars in the London Interbank Market to fund an Advance or any part thereof and the Borrowers are not permitted or otherwise fail to borrow in accordance with such Notice of Drawdown (either on account of any condition precedent not being fulfilled or otherwise) the Borrowers shall indemnify the Lender against any damages, losses or expenses which the Lender may incur (either directly or indirectly) as a consequence of the failure by the Borrowers to borrow in accordance with such Notice of Drawdown.

5.7     The Borrowers may, at any time during the Availability Period, cancel the Facility or, as the case may be, any part thereof which remains undrawn in whole or in part (but if in part in a minimum of Five hundred thousand Dollars ($500,000) or a multiple thereof upon giving the Lender three (3) Banking Days' notice in writing to that effect. Such notice once given shall be irrevocable and upon such cancellation taking effect the Facility shall be reduced accordingly. Notwithstanding any such cancellation pursuant to this Clause 5.7 the Borrowers shall continue to be liable for any and all amounts due to the Lender under this Agreement including without limitation any amounts due to the Lender under Clauses 7, 9, 15 and 28.

## 6.     INTEREST PERIODS

6.1     Subject to Clause 6.2, the Interest Periods applicable to each Advance shall (subject to market availability), be periods of a duration of three (3) or six (6) months (or such other periods as the Lender and the Borrowers may agree) as selected by the Borrowers by written notice to be received by the Lender not later than 11.00 a.m. (London time) on the relevant Nomination Date;

6.2     Notwithstanding the provisions of Clause 6.1;

6.2.1     the initial Interest Period in respect of each Advance shall commence on the Drawdown Date thereof and shall end on the expiry date thereof and each subsequent Interest Period for that Advance shall commence on the expiry of the preceding Interest Period in respect thereof;

6.2.2     if any Interest Period would otherwise end on a day which is not a Banking Day, that Interest Period shall be extended to the next succeeding day which is a Banking Day unless such next succeeding Banking Day falls in another calendar month in which event that Interest Period shall end upon the Immediately preceding Banking Day;

6.2.3     if any Interest Period commences on the last Banking Day in a calendar month or if there is no numerically corresponding day in the month in which that Interest Period ends, that Interest Period shall end on the last Banking Day in that later month,

6.2.4     no Interest Period shall extend beyond the Repayment Date;

6.2.5     save as provided in Clause 6.2.1, if the Borrowers fail to select an Interest Period in accordance with the above, such Interest Period shall be of three (3) months duration or of such other duration as the Lender in its sole discretion may select; and

6.2.6     save as provided in Clause 6.2.1 the Borrowers shall not select more than one (1) Interest Period at any one time.

## 7.      INTEREST

7.1    Subject to the terms of this Agreement the Borrowers shall pay to the Lender interest in respect of each Advance (or the relevant part thereof) accruing at the Interest Rate for each Interest Period relating thereto in arrears on the last day of each Interest Period, provided that where such Interest Period is of a duration longer than three (3) months, accrued interest in respect of such Advance (or such part thereof) shall be paid every three (3) months during such Interest Period and on the last day of such Interest Period.

7.2    Interest shall be calculated on the basis of the actual number of days elapsed and a three hundred and sixty (360) day year.

7.3    The Interest Rate applicable for each Interest Period shall be calculated and determined by  the Lender on each Interest Determination Date and each such determination of an interest Rate hereunder shall be promptly notified by the Lender to the Borrowers at the beginning of each Interest Period in respect thereof

7.4    The Lender's certificate as to the Interest Rate applicable shall be final and (except in the   case of manifest error) binding on the Borrowers and the other Security Parties.


## 8.      DEFAULT INTEREST

8.1    In the event of a failure by the Borrowers to pay any amount on the date on which such amount is due and payable pursuant to this Agreement and/or the Master Agreement and/or the other Finance Documents and irrespective of any notice by the Lender or any other person to the Borrowers in respect of such failure, the Borrowers shall pay Interest on such amount on demand from the date of such default up to the date of actual payment (as well after as before judgment) at the per annum rate which is the aggregate of (a) two point five per cent (2.5%) and (b) the Applicable Margin and (c) the rate at which the Lender in accordance With its normal practice Is offered deposits in Dollars in the London Interbank Market for such period as the Lender may select at or about 11.00 a.m. (London time) on the Banking Day immediately following that on which the Lender becomes aware of the default and, so long as the default continues, such rate shall be recalculated on the same basis thereafter.

8.2    Any interest which shall have accrued under Clause 8.1 in respect of an unpaid amount shall be due and payable at the end of the period by reference to which it is calculated or such other date or dates as the Lender may specify by written notice to the Borrowers

8.3    Clause 7.2 shall apply to the calculation of interest on amounts in default.


## 11.     REPAYMENT

11.1   Subject as hereinafter provided, the aggregate of all outstanding amounts of the Facility shall be repaid by the Borrowers upon the earlier of:

    i)              the Original Expiration Date or, subject to Clause 11.2 in the case of any extension or renewal of the Facility pursuant to Clause 11.3, the last

> Banking Day of the period specified in the Lender's notice referred to in Clause 11.3; and

ii)        the Demand Date, provided however that unless an Event of Default has occurred the Lender shall give a ninety (90) days prior written notice to the Borrowers of its intention to make a demand for repayment hereunder

whereupon in either such case, the Facility shall be cancelled and no further Advances shall be drawn down.

11.2    The Borrowers may request in writing an extension of the Facility for further periods of up to twelve (12) months, PROVIDED THAT such request must be addressed to the Lender at least twenty (20) Business Days prior to the Original Expiration Date or (in case the Facility has already been extended pursuant to the terms of this Clause) twenty (20) Banking Days prior to the relevant Expiration Date specified in the Lender's notice referred to in Clause 11.3.

11.3    The Lender may (in its sole and absolute discretion) by a notice in writing to the Borrowers, consent to the request of the Borrowers referred to in Clause 11.2 above and agree to the extension of the Facility for one or more periods of up to twelve (12) months. PROVIDED HOWEVER THAT the Lender may at its discretion, upon giving its consent to such extension adjust the Applicable Limit as it may deem appropriate. If the Lender does not give such consent as aforesaid, all outstanding amounts of the Facility shall be repayable in accordance with Clause 11.1. Any such notice shall be without prejudice to the Lender's right to make demand upon the Borrowers at any time pursuant to Clause 11.1 (ii).

11.4    Each amount payable in respect of the Facility shall be paid in Dollars.


## 13.    EVIDENCE OF DEBT

13.1    The Lender shall maintain in accordance with its usual practice one or more Loan Accounts in the name of the Borrowers evidencing the Indebtedness which shall be in the "account current" referred to in the Mortgage over the Anemi Ship.

13.2    In any legal action or proceedings arising out of or in connection with this Agreement and/or the other Finance Documents the entries made in the loan Account(s) maintained pursuant to Clause 13.1  shall be conclusive evidence (save in  the case of  manifest error) of the existence and amounts of the liabilities of the Borrowers therein recorded.


## 14.    PAYMENTS

14.1    All amounts payable under this Agreement and/or the other Finance Documents by the Borrowers, including amounts payable under this Clause 14, shall be paid in full to the Lender without set-off or counterclaim or retention and free and clear of and without any deduction or withholding for or on account of any Taxes.

14.2   In the event the Borrowers are required by law to make any such deduction or withholding from any payment hereunder then the Borrowers shall forthwith pay to the Lender such additional amount as will result in the immediate receipt by the Lender (as the case may be) of the full amount which would have been received hereunder had no such deduction or withholding been made, but if the Lender shall be or become entitled to any Tax credit or relief in respect of any Tax which is deducted from any payment by the Borrowers and if the Lender in its sole determination actually receives a benefit from such Tax credit or relief in its country of domicile, incorporation or residence, the Lender shall, subject to any laws or regulations applicable thereto, pay to the Borrowers after such benefit is effectively received by the Lender such amounts (which shall be conclusively certified by the Lender) as shall ensure that the net amount actually retained by the Lender is equal to the amount which would have been retained if there had been no such deduction; the Borrowers shall immediately forward to the Lender official receipt of the relevant taxation or other authority or other evidence acceptable to the Lender of the amount deducted or withheld as aforesaid, provided that in the event that it shall be illegal for the Borrowers to pay such additional amount as is referred to in this Clause 14.2 then the Indebtedness shall be repayable by the Borrowers to the Lender on demand.

14.3   All payments to be made by the Borrowers under this Agreement and/or the other Finance Documents shall be made in Dollars in immediately available and freely transferable and convertible funds not later than 11.00 a.m. London time on the date upon which the relevant payment is due to the Lender at such account as the Lender may from time to time nominate by written notice to the Borrowers.

14.4   The Borrowers undertake to indemnify the Lender against any loss incurred by the Lender as a result of any judgment or order being given or made for the payment of any amount due under this Agreement, the Master Agreement and/or the other Finance Documents and such judgment or order being expressed in a currency other than the currency in which the payment was due under this Agreement, the Master Agreement and/or the other Finance Documents and as a result of any variation having occurred in rates of exchange between the date on which the currency is converted for the purpose of such judgment or order and the date of actual payment thereof. This indemnity shall constitute a separate and independent liability of the Borrowers and shall continue in force and effect notwithstanding any such judgment or order as aforesaid.


**18.    CONDITIONS PRECEDENT AND CONDITIONS SUBSEQUENT**

18.1   Notwithstanding the provisions of Clause 5, the agreement of the Lender to permit the Drawdown of any Advance hereunder is subject to the condition that the Lender shall have received not later than the Drawdown Date in respect of such Advance the following documents or evidence in form and substance satisfactory to the Lender and its legal advisers:

18.1.1          a certificate as to the shareholding of each Security Party, signed by the secretary or a director of that Security Party, stating the full names of the persons or persons legally and beneficially entitled as shareholders/stockholders of the

entire issued and outstanding shares/stock of that Security Party and a copy, certified as a true copy by the secretary of each Security Party of the resolutions of the board of directors and of the shareholders of each Security Party authorising the transaction contemplated hereby and authorising a person or persons to sign or execute on behalf of each Security Party this Agreement, each Notice of Drawdown (as in the form of Schedule t thereof), each Acknowledgement (as in the form of Schedule 2 hereof) and the other Finance Documents as is a party thereto;

18.1.2    the originals of any power or powers of attorney granted pursuant to Clause 18.1.1;

18.1.3    specimen signatures, duly authenticated of the person or persons referred to in Clause 18.1.1;

18.1.4    certificates or other evidence satisfactory to the Lender in its sole discretion of the existence  and good standing of each Security Party, dated not more than fifteen (15) days before the date of this Agreement;

18.1.5    copies, duly certified as a true copy by the respective secretaries of each Security Party of the certificate of incorporation and the other constitutional documents of each Security Party;

18.1.6    evidence that each Earnings Account has been duly opened by the  relevant Borrower(s) as appropriate and all mandate forms, signature cards and authorities have been duly delivered and that each of such accounts is free of all liens or charges other than the liens and charges in favour of the Lender referred to herein;

18.1.7    certified copies of all documents (with a certified translation if an original is not in English) evidencing any other necessary action (including but without limitation governmental approval, consents, licences, authorisations, validations or exemptions which the Lender or its legal advisers may require) by or of parties with respect to this Agreement and the other Finance Documents;

18.1.8    the Grandunion Guarantee duly executed by the Grandunion Guarantor;

18.1.9    the Personal Guarantee duly executed by the Personal Guarantor;

18.1.10    the Earnings Account Charges duly executed by each of the Borrowers, as appropriate;

18.1.11    the Shares' Pledges (other than the Aries Maritime Shares' Pledge) duly executed by the Grandunion Guarantor together with the original of the relevant share certificates in respect of all relevant shares;

18.1.12    evidence that the fees payable to the Lender in accordance with Clause 26 have been duly paid;

18.1.13    the Master Agreement duly executed between the Borrowers and the Lender;

18.1.14      the Master Agreement Assignment duly executed by the Borrowers;

18.1.15      evidence that an amount of Twenty thousand Euros (€20,000) has been paid to the Lender's Greek and English law legal advisors in respect of their fees in connection with this Agreement and the other Finance Documents;

18.1.16      evidence that an amount of One thousand Euros (€1,000) has been paid to the Lender's Liberian and Marshall Islands law legal advisors in respect of their fees in connection with this Agreement and the other Finance Documents;

18.1.17      evidence that payment has been made to the Lender's U.S. law legal counsels in of  their fees in connection with this Agreement and the other Finance Documents;

18.1.18      evidence that an amount of Two thousand Euros (€2,000) has been paid to the Lender's Maltese legal counsels in respect of their fees in connection with this Agreement and the other Finance Documents;

18.1.19      letter from HFW Nominees Limited to the Lender confirming acceptance of their appointment as agents for service of process in England under Clause 38.4;

18.1.20      a letter from Mr. George Livanos to the Lender confirming acceptance of his appointment as agent for service of process in Greece under Clause 38.5

18.1.21      the opinion letters from Marshall Islands, Liberia, Malta and such other legal counsels as the Lender may require, all acceptable to the Lender, in relation to this Agreement and the other Finance Documents referred to in this Clause 18.1, and in form and substance satisfactory  to the Lender;

18.1.22      copies of the Management Agreements and of the Charters certified as true and complete copies thereof by the Borrowers' legal counsel;

18.1.23      the letter of Undertaking duly executed by the relevant Subsidiaries of the Grandunion Guarantor;

18.1.24      the Mortgages over each Ship duly executed by the Owner thereof and notarised or legalised as appropriate and duly recorded at the appropriate registry of ships;

18.1.25      the General Assignment and the Charter Assignment in respect of each Ship duly executed by the parties thereto;

18.1.26      the notices of assignment of the Insurances and of the Earnings in respect of each Ship duly signed by the relevant Owner thereof;

18.1.27      the notices of assignment of the Earnings and of the Charter in respect of each Ship duly signed by the Owner thereof and acknowledged by the relevant Charterer as appropriate;

18.1.28      if required by the Lender, a survey report for each Ship issued by a  surveyor appointed by and/or acceptable to the Lender at the expense of the relevant Owner certifying the condition of such Ship;

18.1.29    evidence that save for the Encumbrances created by the relevant Finance Documents there is no Encumbrance whatsoever on each Ship except in favour of the Lender;

18.1.30    evidence that each Ship is insured in accordance with the provisions of this Agreement;

18.1.31    evidence that each Ship is classed at the highest classification status with the Classification Society, free of overdue recommendations or other conditions or notations affecting her class;

18.1.32    market valuations on the basis specified in Clause 21 27 issued by reputable sale and purchase brokers appointed by or acceptable to the Lender, at the expense of the Borrowers, certifying the Market Value of each Ship;

18.1.33    certified copies of the classification and international safety and trading certificates of the relevant Ship issued by the Classification Society of each Ship free of recommendations or other conditions or notations affecting her class;

18.1.34    evidence that the each Ship will be registered in the ownership of the relevant Owner under the laws of the relevant Flag State, free from registered Encumbrances other than the Mortgage registered thereon;

18.1.35    copies of the ISM Code Documentation and the ISPS Code Documentation in relation to each Ship, the Owner thereof and the Manager;

18.1.36    the Manager's Undertaking in respect of each Ship duly executed by the Manager; and

18.1.37    evidence that all indebtedness in relation to (a) the Existing Financial Agreements, (b) the facility letter dated 17 January 2007 as amended by an addendum No. 1 dated 6 May 2008, both made by and among (i) the Lender as lender and (ii) YIOSONAS MARITIME S.A. of the Marshall Islands, ANTARIOS MARITIME S.A. of the Marshall Islands and NEW WAVE SHIPPING LIMITED of Malta as joint and several borrowers and (c) the overdraft facility agreement dated 21 June 2007 (the **"GU Overdraft"**) made between the Lender as lender and the Grandunion Guarantor as borrower, has been repaid in full; and

18.1.38    confirmation from (i) the Existing Borrowers that the revolving facility and overdraft facility available pursuant to the Existing Financial Agreements and (ii) the  Grandunion Guarantor that the overdraft facility available pursuant to the GU Overdraft are now cancelled and no further drawdowns will be made thereunder;

18.1.39    such further documents and evidence as the Lender may hereafter request

18.2    If the Lender, at its discretion, permits an Advance or any part thereof to be borrowed before certain of the conditions referred to in Clause 18.1 are satisfied, the Borrowers shall ensure that those conditions are satisfied within five (5) Banking Days after the relevant Drawdown Date (or such longer period as the Lender specifies).

18.3        The Borrowers shall ensure and procure that the Lender shall receive on or prior to the Acquisition Date the following documents or evidence in form and substance satisfactory to the Lender and its legal advisors:

18.3.1      each of the matters specified in any Acquisition Document as conditions precedent to the Acquisition shall have been satisfied (or waived by the Grandunion Guarantor with the Lender's prior written consent);

18.3.2      copies of any and all Acquisition Documents;

18.3.3      the Aries Maritime Shares' Pledge duly executed by the Grandunion Guarantor;

18 3.4      evidence that payment has been made to the Lender's Bermuda legal counsel in respect of their fees in connection with this Agreement and the other Finance Documents; and

18.3.5      the opinion letters from Bermuda, United States and such other legal counsels as the Lender may require, all acceptable to the Lender in relation to the Aries Maritime Shares' Pledge the Acquisition Documents and such other matters as the Lender may require in its absolute discretion.


**19.        FINANCIAL AND GENERAL UNDERTAKINGS**

The Borrowers hereby jointly and severally undertake with the Lender that throughout the Security Period the Borrowers shall (and shall procure that each other relevant  Security Party shall) comply with the following provisions of this Clause  19, except  as the Lender may otherwise permit:

19.1        to supply the Lender with two (2) copies of (i) the annual Financial Statements of the Group audited by the Auditors as soon as available but in any event not later than one hundred and eighty (180) days after the end of the relevant period to which they relate starting with the 2008 Financial Statements and (ii) the quarterly unaudited Financial Statements of the Group as soon as available but in any event not later than ninety (90) days after the end of the relevant quarterly period starting with the accounts for the quarterly period ending 31 December 2009 and (iii) such other information with regard to the business, properties or condition, financial or  otherwise, of each  member  of the Group as the Lender may from time to time reasonably request;

19.2        to procure that the Financial statements to be delivered from time to time in accordance  with Clause  19.1  shall  be prepared  in accordance  with the Applicable  Accounting Principles;

19.3        to obtain promptly at any time and from time to time such registrations, licenses, consents and approvals as may  be  required  in respect of this Agreement  and the  other  Subject Documents under any applicable law or regulation to enable them  to  perform  and  discharge  their  duties  and  liabilities  hereunder  and thereunder and promptly supply the Lender with copies thereof;

19.4      to ensure that at all times the claims of the Lender against each Security Party under this Agreement and the other Finance Documents rank at least pari passu with the claims of all its other unsecured creditors save those whose claims are preferred by any bankruptcy, insolvency or other similar laws of general application;

19 5      to deliver to the lender translations into English (certified by an authorised translator) of any documents which have to be delivered to the Lender under the terms of this Agreement or the other Finance Documents, the originals of which are not in the English language;

19.6      not to make any loans or advances to, or any investments in, any person, firm, corporation or joint venture (or to any officer, director, stockholder, employee or customer of any such person),

19.7      not to borrow any money or permit any such borrowing to continue or incur any indebtedness whatsoever other than the Facility, the Swap Exposure or other than by way of subordinated shareholders' loans or enter into any agreement for payment on deferred terms (otherwise than on customary suppliers' credit terms) or any equipment lease or contract hire agreement other than in the ordinary course of business;

19.8      not to assume, guarantee or otherwise undertake the liability of any person, firm or company (otherwise than pursuant to the terms hereof and in the ordinary course of operation or trading of the Ships);

19.9      not to authorise or accept any capital commitments (save and except in connection with the ordinary course of operation or trading of the Ships where appropriate);

19.10      not to declare or pay any dividends or repay any shareholders' loans or make any distributions to their shareholders in any form whatsoever;

19.11      not to and procure that the Manager and each Security Party shall not change the nature of their/its business or commence any business other than the ownership and operation of ships;

19.12      not to (save and except as provided in this Agreement or otherwise in favour of the Lender), create or permit to exist any Encumbrance whatsoever on the Ships or either of them or on any of the other property or assets, real or personal of the Borrowers or either of them whether now owned or hereafter acquired, other than a Permitted Lien without the prior written consent of the Lender,

19.13      without prejudice to the obligations of the Borrowers under Clause 19.14, promptly after the happening of an Event of Default or an event which with the giving of notice or passage of time or satisfaction of any other condition or any combination of the foregoing, may become an Event of Default having occurred, to notify the Lender of such event and of the steps (if any) which are being taken to nullify or mitigate its effect;

19.14      from time to time (but not more than once every six (6) months) on request by the   Lender, to deliver to it a certificate signed by a director or officer of the Borrowers confirming that, save as may be notified in detail in such certificate, no Event of Default or an event which with the giving of notice or passage of time or satisfaction  of any other condition or any combination of the foregoing, may become an Event of Default having occurred and is then subsisting to be accompanied by such evidence as to the information and matters contained in such certificate as the Lender may from time to time reasonably require;

19 15      to ensure and procure that each Security Party shall maintain its corporate existence under the laws of the country of its incorporation and shall comply with all relevant legislation and laws and regulations applicable to it;

19.16      to pay and to ensure and procure that the other Security Parties shall pay all Taxes, assessments and other governmental charges when the same fall due, except to the extent that the same are being contested in good faith by appropriate proceedings and adequate reserves have been set aside for their payment if such proceedings fail and ensure and procure that all relevant tax returns of the Borrowers and the other Security Parties shall be properly and timely filed;

19.17      not to and ensure that the Grandunion Guarantor and the Personal Guarantor' shall not convey, assign, transfer, sell or otherwise or dispose of the Ships or either of them or any of the other property, assets or rights owned by the Borrowers or by  the  Grandunion Guarantor or by the Personal Guarantor whether present or future, without the prior written consent of the Lender;

19.18      to send (or procure that it is sent) to the Lender as soon as the same is instituted (or, to  the knowledge of the Borrowers or any of them threatened), details of any litigation, arbitration or administrative proceedings against or involving the Borrowers (or either of them) and/or the other Security Parties (or any of them) or the Ships (or either of them) or the Shares (or any of  them), which is likely to have a material adverse effect on the Borrowers (or either of them), the other Security Parties (or any of them) or the operation of the Ships (or either of them);

19.19      to comply (and ensure that each other Security Party will comply) with all laws regulations treaties and conventions applicable to the Borrowers, the other Security Parties and the Ships and to carry on the Ships all certificates and other documents which may from time to time be required to evidence such compliance;

19.20      not to and ensure and procure that each Security Party shall not dissolve, merge into or consolidate with any other company or  person and  procure that no change in   the management Or the legal or beneficial  ownership of the Borrowers,  the other Security Parties and the Ships shall be effected;

19.21      to ensure and procure that no change of Control in the Grandunion Guarantor shall occur without the Lender's prior written consent;

19.22      to execute and procure the execution by each other Security Party of any further document or documents required by the Lender in order to perfect or complete the security created by the Finance Documents;

19.23      to use the proceeds of the Facility for the Borrowers' benefit and under their full responsibility and exclusively for the purposes specified in this Agreement;

19.24      to ensure and procure that at all times throughout the Security Period the Borrowers and/or the Guarantors shall maintain with the Lender to the credit of any account held with the Lender (including the Earnings Accounts) free cash deposits having minimum average quarterly balances of an aggregate amount equal to the interest payable under this Agreement for the next three (3) months;

19.25      to ensure and procure that on the Acquisition Date the Aries Maritime Shares' Charge shall be executed by the Grandunion Guarantor;

19.26      to ensure and procure that the Swap Exposure shall not exceed the Maximum Permitted Swap Exposure,

19.27      to supply the Lender with quarterly Budgets showing all forecasted operating expenses and disbursements of whatsoever nature in relation to the Ships (on a per-Ship basis) in such detail and such form as the lender shall require. The said Budgets shall be delivered to the Lender as soon as possible prior to, and in any event not more later than seven (7) days before the expiry of the quarterly period to which the previous Budget relates with the first such period expiring on 31 December 2009; and

19.28      to deliver to the Lender such documents and evidence as the Lender shall from time to time require relating to the verification of identity and knowledge of the Lender's customers and the compliance by the Lender with all necessary "know your customer" or similar checks, always on the basis of applicable laws and regulations or the Lender's own internal guidelines, in each case as such laws, regulations or internal guidelines apply from time to time.


**24.      EVENTS OF DEFAULT**

24.1      If:

24.1.1      the Borrowers or either of them or any other Security Party fail to pay on the due  date for payment any amount which shall have become due hereunder or under the other Finance Documents;

24.1.2      any representation, warranty or statement made by the Borrowers or either of them or any other Security Party in this Agreement or in any of the other Finance Document or any certificate, statement or opinion delivered or made hereunder or under the Subject Documents or in connection herewith or with the Subject Documents shall be incorrect or inaccurate when made in any material respect;

24.1.3      an Event of Default under any of  the Subject Documents (as defined therein) shall occur;

24.1.4      the Borrowers or either of them or any other Security Party fail(s) duly and punctually to perform or observe any other term of this Agreement and/or the Master Agreement and in any such case such failure, if capable of remedy, shall continue for fourteen (14) days after the Lender shall have given to the Borrowers notice in writing of such failure;

24.1.5      except when contested in good faith and by the appropriate proceedings, any other indebtedness of the Borrowers, the other Security Parties or any of them exceeding in aggregate Five hundred thousand Dollars ($500,000}, shall become due and payable or, with the giving of notice or lapse of time or both, capable of being declared due and payable prior to its stated maturity by reason of any circumstance entitling the creditor(s) thereof to declare such indebtedness due and payable and such indebtedness is not paid within fourteen (14) days thereof;

24.1.6      the Borrowers or either of them or any other Security Party or any other member of the Group shall enter into voluntary or involuntary bankruptcy, liquidation or dissolution, or shall become insolvent, or an administrator, administrative receiver, receiver or liquidator shall be appointed of all or a material part of its undertaking or assets or proceedings are commenced by or against them/it under any reorganisation, arrangement, readjustment of debts, dissolution or liquidation law or regulation, or if any event shall occur which, under the relevant system of law, shall have an equivalent effect;

24.1.7      the Borrowers or either of them or any other Security Party or any other member of the Group shall cease or threaten to cease to carry on the whole or a substantial part of their/its business;

24.1.8      the Borrowers or either of them or any other Security Party or any other member of the Group shall transfer or dispose of all or a substantial part of their/its assets whether by one or a series of transactions, related or not;

24.1.9      the Subject Documents or any of them shall cease, in whole or in part, to be valid, binding and enforceable;

24.1.10     the Borrowers or either of them shall sell, transfer, dispose of or encumber their/its Ship or any interest or share therein, or agree so to do (other than Permitted Liens) without the prior written consent of the Lender;

24.1.11     either Ship shall become a Total loss and the Borrowers shall fail to make the mandatory prepayment required to be made under Clause 10.1 in respect of such Total Loss within the time therein set forth;

24.1.12     any governmental or other consent, licence or authority required to make this Agreement and/or any of the other Finance Documents legal, valid, binding, enforceable and admissible in evidence or required to enable the Borrowers or either of them or any other Security Party to perform their/its respective duties and discharge their/its liabilities hereunder or under the other Finance Documents   is withdrawn or ceases to be in full force and effect unless the Borrowers or such other Security Party procures that such consent, licence or

14

authority is reinstated or re-issued to the satisfaction of the Lender within fifteen (15) calendar days of the said withdrawal or cessation;

24.1.13    any distress or execution is levied or enforced against a material (In the opinion of the Lender) part of the property and assets of the Borrowers or either of them or any other Security Party and such distress or execution is not withdrawn or discharged within ten (10) Banking Days; or

24.1.14    the Borrowers or either of them or any other Security Party or any other member of the Group shall stop payment of, or shall be unable to, or shall admit inability to pay their/its debts as they fall due, or shall enter into any composition or other arrangement with their/its creditors generally or shall declare a general moratorium on the payment of indebtedness;

24.1.15    the fulfilment of any one or more of the obligations covenants and undertakings. contained in any one or more of this Agreement, the other Finance Documents and any other documents executed pursuant hereto or thereto or the exercise of any of the rights vested in the Lender hereunder or thereunder becoming either unlawful under any applicable law or unauthorised by any authority having jurisdiction or otherwise impossible;

24.1.16    if the Personal Guarantor dies or otherwise ceases to be actively involved in the business of the Borrowers and the Borrowers failing upon lender's request to provide the lender with a guarantee from an alternative Personal Guarantor acceptable to the Lender in its sole discretion within sixty (60) days from such request;

24.1.17    if (a) an Event of Default or Potential Event of Default (in each case as defined In the Master Agreement) has occurred and is continuing under the Master Agreement or (b) an Early Termination Date (as defined in the Master Agreement) has occurred or been or become capable of being effectively designated under the Master Agreement or (c) a person entitled to do so gives notice of an Early Termination Date under Section 6(b)(iv) of the Master Agreement or (d) the Master Agreement is terminated, cancelled, suspended, rescinded or revoked or otherwise ceases to remain in full force and effect for any reason;

24.1.18    a material adverse change occurs in the financial condition or operation of any one or more of the Security Parties or any other member of the Group;

24.1.19    if any Security Party or any Charterer repudiates or evidences an intention to repudiate any one or more of the Subject Documents or if any Subject Document is rescinded or cancelled or terminated or amended or varied, without the Lender's prior written consent; or

24.1.20    if either Ship is arrested or detained and such arrest or detention is not released within fourteen (14) days, or an order for the sale of either Ship is made by a court of competent jurisdiction or the Borrowers cease to retain possession and/or control of either Ship for a period in excess of fourteen (14) days

then, and in any such event and at any time thereafter, the Lender may by written notice to the Borrowers declare that the Facility of the lender shall be cancelled. whereupon the same shall be cancelled and declare the Indebtedness immediately due and payable whereupon the same shall become so payable to the Lender

24.2 All amounts received by the lender under or pursuant to any of the Finance Documents after the happening of any Event of Default shall be applied by the Lender in payment of the Indebtedness in accordance with the terms of Clause 12.

24.3 On the occurrence of an Event of Default the Lender shall have the right and power to order the Ships or either of them to proceed forthwith at the Borrowers' risk and expense to a port or place nominated by the Lender The Borrowers undertake to give the necessary instructions to the Master of each Ship to comply with any such order of the lender and if the Borrowers fail to give such instructions for any reason whatsoever the lender shall have the right and power to give such instructions direct to the Master(s).

24.4 On the occurrence of any Event of Default the Lender shall be entitled but not obliged to, exercise all its rights under the Master Agreement and to, *inter alia*, cancel, net out, unwind, terminate or liquidate all or any part of the rights, benefits and obligations created by any Designated Transaction and/or the Master Agreement. Without prejudice to or limitation of the obligations of the Borrowers hereunder and under the Master Agreement, in the event that the lender exercises any of its rights under the Master Agreement and such exercise results in all or part of a Designated Transaction being terminated, such termination shall constitute a Terminated Transaction (as defined in section 14 of the Master Agreement) effected by the Lender after an Event of Default (as so defined in that section 14) by the Borrower and, accordingly, the lender shall be entitled to recover from the Borrowers a payment for early termination calculated in accordance with the provisions of section 6(e)(i) of the Master Agreement.

## 26. FEES

26.1 The Borrowers shall pay to the lender a renewal fee (the Renewal Fee ) of Thirty thousand Dollars ($30,000) on each date on which the Lender may agree to an extension of the Expiration Date in accordance with Clauses 11.2 and 11 3.

26.2 The Borrowers shall also pay to the Lender a commitment fee (the commitment Fee") of zero point five per cent (0.5%) per annum on the amount of the Facility which is from time to time available and has not been drawn down from the date of acceptance of the Commitment Letter until the expiry of the Availability Period, such Commitment Fee to be payable on each relevant Termination Date, such Commitment Fee shall be calculated upon the exact number of days which have elapsed on the basis of a year consisting of three hundred and sixty (360)

days and shall be payable quarterly in arrears and on each relevant Termination Date.

**28.       INDEMNITY**

The Borrowers hereunder jointly and severally undertake and agree to indemnify the Lender, upon the Lender's first demand, from and against any losses, costs or expenses (including legal expenses) which they incur in consequence of any Event of Default including (but without limitation) all losses (including loss of profit for the current Interest Period), premiums and penalties incurred or to be incurred in liquidating or redeploying deposits made by third parties or funds acquired or arranged to advance or maintain the Facility or any part thereof and any liability Items which arise, or are asserted, under or in connection with any law relating to safety at sea.

**34.       TRANSFER.   ASSIGNMENT,   PARTICIPATION,   CHANGE   OF LENDING BRANCH**

34.1      This Agreement shall bind and be to the benefit of the Borrowers and the Lender and their respective successors and permitted assigns.

34.2      Neither of the Borrowers may assign any of its rights, powers, duties or liabilities hereunder without the prior written consent of the Lender which it shall have full power to withhold

34.3      The Lender may, without prior notice or the consent of the Borrowers or any other Security Party, at any time assign, transfer all or part of the Facility and its rights and powers under this Agreement to any other bank or other financial institution (the **"Transferee Lender"**). The Lender shall notify the Borrowers of any such assignment or transfer as soon as practicable.

34.4      The lender may at any time and from time to time change its lending office in respect of the whole or any part of its participation in the Facility. The Lender shall notify the Borrowers of any such change in the lending office as soon as is practicable

34.5      If the Lender transfers or assigns, transfers or in any other manner grants participation in respect of all or any part of its rights, powers duties and liabilities hereunder pursuant to Clause 34 3 the Borrowers undertake immediately on being requested to do so by the Lender and at the cost of the Lender to enter into and procure that the other parties to the Finance Documents shall enter into, such documents as may be necessary or desirable to transfer to the relevant assignee, transferee or participant all or the relevant part of the Lender's interest in the Finance Documents and all relevant references in this Agreement and the Finance Documents to the Lender shall thereafter be construed as a reference to the Lender and/or such assignee, transferee or participant (as the case may be) to the extent of their respective interests

34.6        The Lender may disclose to a potential assignee, transferee of participant or to any other person who may propose entering into contractual relations with the Lender in relation to this Agreement such information about the Borrowers and the other Security Parties as the Lender shall consider appropriate.


**38.        LAW AND JURISDICTION**

38.1        This Agreement shall be governed by, and construed in accordance with, English law

38.2        Subject to Clause 38.3, the courts of England shall have exclusive jurisdiction to settle any disputes, which may arise out of or in connection with this Agreement

38.3        Clause 38.2 is for the exclusive benefit of the Lender, which reserves the right

(a)         to commence proceedings in relation to any matter which arises out of or in connection with this Agreement in the courts of the Republic of Greece and/or any country other than England or Greece and which have or claim jurisdiction to that matter; and

(b)         to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in England or Greece or without commencing proceedings in England or Greece.

            The Borrowers shall not commence any proceedings in any country other than England in relation to a matter, which arises out of or in connection with this Agreement

38.4        The Borrowers irrevocably appoint HFW Nominees Limited, presently at Friary Court, 65 Crutched Friars, London EC3N 2AE, England, to act as its/their agent to receive and accept on their/its behalf any process or other document relating to any proceedings in the English courts which are connected with this Agreement.

38.5        The Borrowers irrevocably designate and appoint Mr. George Livanos, an Attorney-at-law with offices at 2 Thesmoforiou Street, Piraeus 18454, Greece, as agent for the service of process in Greece ("antiklitos") and agree to consider any legal process or any demand or notice made served by or on behalf of the Lender on the said agent as being made to the Borrowers. The designation of such an authorized agent ("antiklitos") shall remain irrevocable until all Indebtedness shall have been paid in full in accordance with the terms of this Agreement and the other Finance Documents

38.6        Nothing in this Clause 38 shall exclude or limit any right which the Lender may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgement or any similar or related matter in any jurisdiction

18

38.7        In this Clause 38, "proceedings" means proceedings of any kind, including an application for a provisional or protective measure or enforcement court order (diatagi pliromis).

**ANNEX 2**

**4.      GUARANTEE AND INDEMNITY**

4.1      irrevocably and unconditionally guarantees to the Lender

(a)      the due and punctual performance by the Borrowers of all their obligations of whatever nature (which for the avoidance of doubt, include the Borrowers' liability to pay damages agreed or otherwise) under or in connection with the Financial Agreement, the Master Agreement and the other Finance Documents; and

(b)      to discharge the Indebtedness from time to time on the Lender's first demand together with interest costs, fees and other expenses on the amount demanded in accordance with Clause 5. The liability of the Guarantor shall be to pay to the Lender, on the Lender's first demand, the full amount from time to time owing to the Lender by the Borrowers under the Financial Agreement, the Master Agreement and/or the other Finance Documents; and

4.2      as a separate, additional and continuing obligation, unconditionally and irrevocably undertakes with the Lender that should Clause 4.1 be void or unenforceable against the Guarantor for any reason whatsoever (including, but without prejudice to the generality of the foregoing, by reason of any provision of the Financial Agreement the Master Agreement and/or the other Finance Documents being or becoming void, unenforceable or otherwise invalid under any applicable law) then the Guarantor will be liable to the Lender as a sole and principal debtor by way of indemnity for the same amount as that for which the Guarantor would have been liable had that Indebtedness been recoverable and agrees to discharge its liability under this Clause 4.2 from time to time on demand by the Lender together with interest, costs, fees and other expenses on the amount demanded in accordance with Clause 5.

**5.      INTEREST**

In addition to the amounts referred to in Clause 4.1 the Guarantor undertakes to pay to the Lender on first demand:

5.1      interest on all amounts due and payable under this Guarantee and Indemnity from the date of demand under Clause 4 above to the date of payment in full (whether before or after judgment) at the rate specified in Clause 8.1 of the Financial Agreement; and

5.2      all legal costs and other expenses on an indemnity basis incurred by the Lender in enforcing the payment of any amounts due under this Guarantee and Indemnity.

**6.     PAYMENT**

6.1     The Guarantor shall make all payments due to the Lender in Dollars in full in immediately available funds, without set-off or counterclaim or retention and free and clear of and without any deduction or withholding for or on account of any Taxes.

6.2     In the event the Guarantor is required by law to make any such deduction or withholding from any payment hereunder then the Guarantor shall forthwith pay to the Lender for account of the Lender such additional amount as will result in the immediate receipt by the Lender of the full amount which would have been received hereunder had no such deduction or withholding been made.

6.3     The Guarantor shall immediately forward to the Lender official receipts of the relevant taxation or other authority or other evidence acceptable to the Lender of the amount deducted or withheld as aforesaid.


**7.     LIABILITY**

7.1     This Guarantee and Indemnity constitutes the primary obligation of the Guarantor to the Lender and the Guarantor shall be liable, jointly and severally with the Borrowers and with each other guarantor of the Borrowers' obligations to the Lender (each the "Other Guarantor") for the amounts secured by this Guarantee and Indemnity not only as surety but also as if it were the principal debtor under the Financial Agreement, the Master Agreement and the other Finance Documents.

7.3     Without prejudice to the generality of Clause 10, the Guarantor hereby waives any rights which the Guarantor may have to require the Lender first to proceed against or enforce any guarantee or security of, or claim payment from the Borrowers or either of them or any Other Guarantor of the Borrowers' obligations to the Lender before claiming from the Guarantor under this Guarantee and Indemnity as well as all other rights, remedies, defences or exceptions (if any) which are or may be given to a guarantor by any applicable law including without limitation (and notwithstanding the provisions of Clause 19) Articles 853, 855, 856, 858, 859, 860, 861, 862, 863, 864, 866, 867 and 868 of the Greek Civil Code (or any statutory re enactment or modification thereof).


**8.     UNDERTAKINGS**

8.1     The Guarantor hereby undertakes to the Lender:

8.1.3   to comply and to ensure and procure that each of the Borrowers and any Other Guarantor shall comply with all covenants and undertakings set out in the Financial Agreement and the other Finance Documents.

8.2.1   to maintain the corporate existence of the Guarantor under the laws of the Marshall Islands and comply with all relevant legislation and laws and regulations applicable to it;

8.2.14   To supply the Lender with two (2) copies of (i) the annual Financial Statements of the Group audited by the Auditors as soon as available but in any event not later than one hundred and eighty (180) days after the end of the relevant period to which they relate starting with the 2009 Financial Statements and (ii} the quarterly unaudited Financial Statements of the Group as soon as available but in any event not later than ninety (90) days after the end of the relevant quarterly period starting with accounts for the quarterly period ending 31 December 2009 and (iii} such other information with regard to the business, properties or condition, financial or otherwise, of each member of the Group as the lender may from time to time reasonably request;

## 9.    VARIATIONS

The Lender shall have the right and power at all times whether before or after any demand hereunder for payment and without prejudice to the terms of this Guarantee and Indemnity so that the Guarantor shall not be exonerated or discharged hereunder or its liability in any way be limited, to:

9.1     vary the amounts of principal payable in respect of the Facility, the date{s) for payment thereof or vary or increase the rate of interest, the fees and other amounts payable under the Financial Agreement and/or the Master Agreement and/or the other Finance Documents or vary or waive any of the other terms and conditions of the Financial Agreement and/or the Master Agreement and/or the other Finance Documents;

9.2     grant to the Borrowers or either of them or to any other person any waiver or extension of time; and

9.3     release, vary or waive any securities, guarantees or rights which the Lender may now or hereafter have from or against the Borrowers or either of them or any other person.

## 13.    TRANSFER

13.1    In the event that the rights of the Lender under the Financial Agreement and/or the Finance Documents are assigned or transferred in whole or in part by the lender pursuant to Clause 34.3 of the Financial Agreement then the lender may assign or transfer all or part (as the case may be) of its rights, powers and the benefit of this Guarantee and Indemnity to the assignee or transferee of the assigned or transferred part of the Facility.

## 19.    PROPER LAW AND JURISDICTION

19.1    This Guarantee and Indemnity shall be governed by and construed in accordance with English Law.

19.2    Subject to Clause 19.3, the courts of England shall have exclusive jurisdiction to settle any disputes, which may arise out of or in connection with this Guarantee and Indemnity.

19.3    Clause 19.3 is for the exclusive benefit of the Lender, which hereby reserves the right:

19.3.1        to commence proceedings in relation to any matter which arises out of or in connection with this Guarantee and Indemnity in the courts of the Republic of Greece and/or any country other than England or Greece and which have or claim jurisdiction to that matter; and

19.3.2        to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in England or Greece or without commencing proceedings in England or Greece.

The Guarantor shall not commence any proceedings in any country other than England in relation to a matter, which arises out of or in connection with this Agreement.

19.4    The Guarantor irrevocably appoints HFW Nominees Limited, presently at Friary Court, 65 Crutched Friars, London EC3N 2AE, England to act as its agent to receive and accept on its behalf any process or other document relating to any proceedings in the English courts which are connected with this Agreement.

19.5    The Guarantor irrevocably designates and appoints Mr. George Uvanos, an attorney-at-law with offices at 2 Thesmoforiou Street, Piraeus 18454, Greece, as agent for the service of process in Greece *("antiklitos")* and agrees to consider any legal process or any demand or notice made served on behalf of the Lender on the said agent as being made to the Guarantor. The designation of such an authorized agent ("*antiklitos*") shall remain irrevocable until all Indebtedness shall have been paid in full in accordance with the terms of this Guarantee and Indemnity and the other Finance Documents.

19.6    The Guarantor irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Clause, and any claim that those proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

19.7    Nothing in this Clause 19 shall exclude or limit any right which the lender may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

19.8    In this Clause 19, "proceedings means proceedings of any kind, including an application for a provisional or protective measure or enforcement court order (*diatagi pliromis*).

**ANNEX 3**

4.     **GUARANTEE**

In consideration of the Lender (i) entering into the Financial Agreement and the Master Agreement with the Borrowers (at the request of, *inter alios*, the Guarantor (who is the Personal Guarantor as defined in the Financial Agreement and a major beneficial owner of the shares of the Borrowers), (ii) advancing or agreeing to advance the Facility or any part thereof to the Borrowers, (iii) agreeing to enter from time to time into Designated Transactions (as such term is defined in the Financial Agreement) with the Borrowers pursuant to separate Confirmations (as such term is defined in the Master Agreement) and other good and valuable consideration (receipt and sufficiency of which is hereby acknowledged by the Guarantor) and in order to promote his own commercial activities, the Guarantor as primary obligor and debtor and not merely as surety hereby irrevocably and unconditionally guarantees the full prompt and punctual payment by the Borrowers to the Lender of all amounts from time to time or at any time outstanding, due, owing or payable to the Lender by the Borrowers (whether as principal or surety) by way of principal, interest, fees or otherwise actually or contingently under the terms of the Financial Agreement, the Master Agreement or the other Finance Documents or in connection therewith and unconditionally undertakes to pay to the Lender the said amounts on the Lender's first demand. The liability of the Guarantor shall be to pay to the Lender the full amount from time to time owing to the Lender by the Borrowers or either of them under the Financial Agreement and/or the other Finance Documents.

5.     **INTEREST**

5.1    In addition to the amounts referred to in Clause 4 the Guarantor undertakes to pay to the Lender on first demand:

5.1.1         interest on all amounts due and payable under this Guarantee from the date of demand under Clause 4 above to the date of payment in full (whether before or after judgement) at the rate specified in Clause 8.1 of the Financial Agreement or Section h (i) (1) of the Master Agreement (as the case may be); and

5.1.2         all legal costs and other expenses on an indemnity basis incurred by the Lender in enforcing the payment of any amounts due under this Guarantee.

6.     **PAYMENT**

6.1    The Guarantor shall make all payments due to the Lender in Dollars in full in immediately available funds, without set off for counterclaim or retention and free and clear of and without any deduction or withholding  for or on account of any Taxes.

6.2    In the event the Guarantor is required by law to make any such deduction or withholding from any payment hereunder then the Guarantor shall forthwith pay to the Lender such

additional amount as will result in the immediate receipt by the Lender of the full amount which would have been received hereunder had no such deduction or withholding been made.

6.3    The Guarantor shall immediately forward to the Lender official receipts of the relevant taxation or other authority or other evidence acceptable to the Lender of the amount deducted or withheld as aforesaid.


## 7.    LIABILITY

7.1    This Guarantee constitutes the primary obligation of the Guarantor and the Guarantor shall be liable, jointly and severally with the Borrowers and with each other guarantor of the Borrowers' obligations to the Lender (each the "Other Guarantor") for the amounts secured by this Guarantee not only as surety but also as if he was the principal debtor under the Financial Agreement, the Master Agreement and the other Finance Documents.

7.3    Without prejudice to the generality of Clause 10, the Guarantor hereby waives any rights which the Guarantor may have to require the Lender first to proceed against or enforce any guarantee or security of, or claim payment from the Borrowers or either of them and/or any Other Guarantor before claiming from the Guarantor under this Guarantee as well as all other rights, remedies, defences or exceptions (if any) which are or may be given to a guarantor by any applicable law including without limitation and notwithstanding the provisions of Clause 19.1, Articles 853, 855, 856, 859, 860,861, 862, 863, 864, 866, 867 and 868 of the Greek Civil Code (or any statutory re-enactment or modification thereof).

7.4    In any legal action or proceedings arising out of or in connection with this Guarantee, the entries made in the Loan Accounts maintained by the Lender pursuant to Clause 13.1 of the Financial Agreement shall be conclusive evidence (save in case of manifest error) of the existence and the amount of the liabilities of the Borrowers or either of them therein recorded and of the Guarantor under this Guarantee.


## 8.    UNDERTAKINGS

The Guarantor hereby undertakes to the Lender throughout the Security Period:

8.1    to obtain promptly at any time and from time to time such registrations, licenses, consents and approvals as may be required in respect of this Guarantee under any applicable law or regulation to enable him to perform and discharge his duties and liabilities hereunder and thereunder and promptly supply the Lender with copies thereof;

8.2    to ensure that at all times the claims of the lender against him under this Guarantee rank at least *pari passu* with the claims of all his other unsecured creditors save those whose claims are preferred by any bankruptcy, insolvency or other similar laws of general application;  and

2

8.3 to comply and to ensure and procure that the Borrowers and any Other Guarantor shall comply with all covenants and undertakings set out in the Financial Agreement, the Master Agreement and the other Finance Documents.

## 9. VARIATIONS

9.1 The Lender shall have the right and power at all times whether before or after any demand hereunder for payment and without prejudice to the terms of this Guarantee so that the Guarantor shall not be exonerated or discharged hereunder or his liability in any way limited to:

9.1.1 vary the amounts of principal required to be repaid in respect of the Facility under the Financial Agreement or vary or increase the rate of interest, the fees and other amounts payable under the Financial Agreement and/or the Master Agreement and/or the other Finance Documents or vary or waive any of the other terms and conditions of the Financial Agreement and/or the Master Agreement and/or the other Finance Documents; and

9.1.2 grant to the Borrowers or either of them or to any Other Guarantor or to any other person any waiver or extension of time; and

9.1.3 release, vary or waive any securities, guarantees or rights which the Lender may now or hereafter have from or against the Borrowers or either of them or any Other Guarantor or any other person.

## 10. WAIVER

10.4 The Lender has the right and power to claim all amounts due and payable hereunder against the Borrowers or either of them and/or against the Guarantor and/or against any Other Guarantor and/or against any third party in such order and at such time as the Lender in its absolute discretion consider to its advantage.

## 13. ASSIGNMENT AND TRANSFER

13.1 In the event that the rights of the Lender under the Financial Agreement and/or the other Finance Documents are assigned or transferred in whole or in part by the Lender pursuant to Clause 34.3 of the Financial Agreement then the Lender's rights, powers and benefit under this Guarantee shall be assigned or transferred (pro rata) to the assignee or transferee of the assigned or transferred part of the Lender's participation in the Facility.

*Clause 34.3 of the Loan of Agreement*

*34.3 The Lender may, without prior notice or the consent of the Borrowers or any other Security Party, at any time assign, transfer all or part of the Facility and its rights and powers under this Agreement to any other bank or other financial institution (the*

3

*"Transferee Lender"). The Lender shall notify the Borrowers of any such assignment or transfer as soon as practicable.*

## 19.    PROPER LAW AND JURISDICTION

19.1    This Guarantee shall be governed by, and construed in accordance with, the laws of the Republic of Greece.

19.2    Subject to Clause 19.3, the courts of Piraeus shall have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Guarantee.

19.3    Clause 19.2 is for the exclusive benefit of the Lender, which reserves the right:

(i)    to commence proceedings in relation to any matter which arises out of or in connection with this Guarantee in the courts of the Republic of Greece and/or any country other than the Republic of Greece and which have or claim jurisdiction to that matter; and

(ii)    to commence such proceedings in the courts of any such country or countries concurrently with or in addition to proceedings in the Hellenic Republic or without commencing proceedings in the Hellenic Republic.

19.4    The Guarantor irrevocably designates and appoints George Livanos, an attorney-at-law with offices at 2 Thesmoforiou Street, Piraeus 18454, Greece as his agent for the service of process in Greece ("*antiklitos*") and agrees to consider any legal process or any demand or notice made served on behalf of the Lender on the said agent as being made to the Guarantor. The designation of such an authorized agent (*antiklitos*) shall remain irrevocable until all Indebtedness shall have been paid in full in accordance with the terms of the Financial Agreement and the other Finance Documents.

19.5    Nothing in this Clause 19 shall exclude or limit any right which the Lender may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

19.6    In this Clause 19, "proceedings" means proceedings of any kind, including an application for a provisional or protective measure or enforcement court order (*diatagi pliromis*).

19.7    The foregoing shall not limit the right of the Lender to serve process in any other manner permitted by law or to commence proceedings against the Guarantor in any other court or place.

19.8    To the extent that the Guarantor may in any jurisdiction claim for himself or his assets or be accorded immunity from suit, execution, attachment or other legal process the Guarantor hereby irrevocably agrees not to claim and irrevocably waive such immunity to the full extent permitted by the laws of such jurisdiction.

# ANNEX 4

## Capital and interest payments of the Grand Anemi loan

| | Date | Description | Amount |
|---|---|---|---|
| 1 | 02/09/2009 | EARLY PARTIAL CAPITAL REPAYMENT | 8.450.000,00 € |
| 2 | 02/09/2009 | FEES / EXPENSES REPAYMENT | 4.178,00 € |
| 3 | 02/12/2009 | OVERDUE INTEREST REPAYMENT | 1.089.132,80 € |
| 4 | 10/03/2010 | PENALTY INTEREST RATE REPAYMENT | 2.137,29 € |
| 5 | 10/03/2010 | OVERDUE INTEREST REPAYMENT | 986.148,55 € |
| 6 | 31/03/2010 | EARLY PARTIAL CAPITAL REPAYMENT | 31.000.000,00 € |
| 7 | 31/03/2010 | FEES / EXPENSES REPAYMENT | 24.111,11 € |
| 8 | 21/05/2010 | FEES / EXPENSES REPAYMENT | 173.005,40 € |
| 9 | 02/06/2010 | PENALTY INTEREST RATE REPAYMENT | 1.056,29 € |
| 10 | 02/06/2010 | OVERDUE INTEREST REPAYMENT | 382.466,69 € |
| 11 | 15/06/2010 | PENALTY INTEREST RATE REPAYMENT | 1.028,08 € |
| 12 | 15/06/2010 | ΠΛΗΡΩΜΗ ΛΗΞΙΠΡΟΘΕΣΜΩΝ ΤΟΚΩΝ | 331.839,16 € |
| 13 | 24/06/2010 | OVERDUE INTEREST REPAYMENT | 55.047,35 € |
| 14 | 24/06/2010 | PENALTY INTEREST RATE REPAYMENT | 150,97 € |
| 15 | 24/06/2010 | OVERDUE INTEREST REPAYMENT | 89.333,93 € |
| 16 | 21/07/2010 | EARLY PARTIAL CAPITAL REPAYMENT | 23.000.000,00 € |
| 17 | 21/07/2010 | FEES / EXPENSES REPAYMENT | 4.600,00 € |
| 18 | 26/08/2010 | PARTIAL INTEREST PAYMENT | 98.821,59 € |
| 19 | 24/09/2010 | PENALTY INTEREST RATE REPAYMENT | 2.733,36 € |
| 20 | 24/09/2010 | OVERDUE INTEREST REPAYMENT | 378.892,11 € |
| 21 | 30/09/2010 | PENALTY INTEREST RATE REPAYMENT | 183,00 € |
| 22 | 30/09/2010 | OVERDUE INTEREST REPAYMENT | 181.263,63 € |
| 23 | 29/11/2010 | PENALTY INTEREST RATE REPAYMENT | 326,06 € |
| 24 | 29/11/2010 | OVERDUE INTEREST REPAYMENT | 179.673,94 € |

| 25 | 15/12/2010 | PENALTY INTEREST RATE REPAYMENT | 1.217,18 € |
| 26 | 15/12/2010 | OVERDUE INTEREST REPAYMENT | 179.282,82 € |
| 27 | 29/12/2010 | PENALTY INTEREST RATE REPAYMENT | 609,44 € |
| 28 | 29/12/2010 | OVERDUE INTEREST REPAYMENT | 189.390,56 € |
| 29 | 03/01/2011 | PENALTY INTEREST RATE REPAYMENT | 0,02 € |
| 30 | 13/01/2011 | PENALTY INTEREST RATE REPAYMENT | 137,31 € |
| 31 | 13/01/2011 | OVERDUE INTEREST REPAYMENT | 50.439,29 € |
| 32 | 14/03/2011 | PENALTY INTEREST RATE REPAYMENT | 1.545,86 € |
| 33 | 14/03/2011 | OVERDUE INTEREST REPAYMENT | 148.454,14 € |
| 34 | 30/03/2011 | PENALTY INTEREST RATE REPAYMENT | 1.335,55 € |
| 35 | 30/03/2011 | OVERDUE INTEREST REPAYMENT | 148.664,45 € |
| 36 | 10/05/2011 | PENALTY INTEREST RATE REPAYMENT | 3.082,22 € |
| 37 | 10/05/2011 | OVERDUE INTEREST REPAYMENT | 311.917,78 € |
| 38 | 19/05/2011 | PENALTY INTEREST RATE REPAYMENT | 629,07 € |
| 39 | 19/05/2011 | OVERDUE INTEREST REPAYMENT | 91.590,01 € |
| 40 | 03/06/2011 | PENALTY INTEREST RATE REPAYMENT | 800,69 € |
| 41 | 03/06/2011 | OVERDUE INTEREST REPAYMENT | 86.391,57 € |
| 42 | 14/06/2011 | PENALTY INTEREST RATE REPAYMENT | 415,79 € |
| 43 | 14/06/2011 | OVERDUE INTEREST REPAYMENT | 159.584,21 € |
| 44 | 20/06/2011 | PENALTY INTEREST RATE REPAYMENT | 54,12 € |
| 45 | 20/06/2011 | OVERDUE INTEREST REPAYMENT | 50.014,82 € |
| 46 | 14/07/2011 | PENALTY INTEREST RATE REPAYMENT | 1.047,48 € |
| 47 | 14/07/2011 | OVERDUE INTEREST REPAYMENT | 61.202,52 € |
| 48 | 20/09/2011 | PENALTY INTEREST RATE REPAYMENT | 6.585,13 € |
| 49 | 20/09/2011 | OVERDUE INTEREST REPAYMENT | 88.914,87 € |
| 50 | 26/09/2011 | PENALTY INTEREST RATE REPAYMENT | 674,79 € |

| 51 | 26/09/2011 | OVERDUE INTEREST REPAYMENT | 94.825,21 € |
| 52 | 03/10/2011 | PENALTY INTEREST RATE REPAYMENT | 811,35 € |
| 53 | 03/10/2011 | OVERDUE INTEREST REPAYMENT | 728.323,01 € |
| 54 | 31/10/2011 | OVERDUE INTEREST REPAYMENT | 193.500,00 € |
| 55 | 10/11/2011 | PENALTY INTEREST RATE REPAYMENT | 20,29 € |
| 56 | 10/11/2011 | OVERDUE INTEREST REPAYMENT | 11.246,17 € |
| 57 | 29/11/2011 | OVERDUE INTEREST REPAYMENT | 92.939,58 € |
| 58 | 02/01/2012 | PENALTY INTEREST RATE REPAYMENT | 5,30 € |
| 59 | 13/03/2012 | PENALTY INTEREST RATE REPAYMENT | 100.000,00 € |
| 60 | 11/04/2012 | PENALTY INTEREST RATE REPAYMENT | 2.190,14 € |
| 61 | 11/04/2012 | PENALTY INTEREST RATE REPAYMENT | 358.401,74 € |
| 62 | 11/04/2012 | PENALTY INTEREST RATE REPAYMENT | 6.176,90 € |
| 63 | 11/04/2012 | OVERDUE INTEREST REPAYMENT | 280.000,00 € |
| 64 | 11/04/2012 | OVERDUE INTEREST REPAYMENT | 119.638,30 € |
| 65 | 11/04/2012 | OVERDUE INTEREST REPAYMENT | 493.461,40 € |
| 66 | 11/04/2012 | OVERDUE INTEREST REPAYMENT | 93.823,10 € |
| 67 | 30/04/2012 | OVERDUE INTEREST REPAYMENT | 426.346,56 € |
| 68 | 03/05/2012 | PENALTY INTEREST RATE REPAYMENT | 75,28 € |
| 69 | 03/05/2012 | PENALTY INTEREST RATE REPAYMENT | 37,64 € |
| 70 | 03/05/2012 | OVERDUE INTEREST REPAYMENT | 201.782,02 € |
| 71 | 03/05/2012 | OVERDUE INTEREST REPAYMENT | 201.782,02 € |
| 72 | 30/07/2012 | OVERDUE INTEREST REPAYMENT | 15,52 € |